# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW MEXICO

In re:  OTERO COUNTY HOSPITAL                     Case No. 11-11-13686 JL
ASSOCIATION, INC.,

          Debtor.

UNITED TORT CLAIMANTS, as
Individuals,[1]

          Plaintiffs,

                                        Consolidated Misc. Adv. No. 13-00007
                                        Adversary Nos:

          v.                            12-1204j through 12-1216j,
                                        12-1208j through 12-1223j,
                                        12-1235j, 12-1238j through
                                        12-1249j, 12-1251j through
                                        12-1261j, 12-1271j, 12-1276j and
                                        12-1278j.

QUORUM HEALTH RESOURCES, LLC,

          Defendant.

## <u>MEMORANDUM OPINION</u>

THIS MATTER is before the Court on the cross motions for summary judgment filed by

Plaintiffs United Tort Claimants (together "UTC") and Defendant Quorum Health Resources,

LLC ("QHR").  *See* Docket Nos. 161, 162, 168, 186, 176, 177, 189, and 194.  UTC seeks a

determination that QHR owed a duty to the UTC claimants and breached that duty by allowing

Dr. Christian Schlicht to perform experimental back surgeries at a hospital in Alamogordo, New

Mexico.  QHR seeks to establish that it did not owe a duty to the claimants and is therefore not

liable in this case.  A trial on the issue of liability is set to commence on September 2, 2014.

---

[1] The "United Tort Claimants" consist of all of the plaintiffs in the adversary proceedings listed in the
Order Establishing Master Docket for Consolidated Matters, entered August 15, 2013 in Consolidated
Misc. Adv. No. 13-00007.  The Court consolidated such adversary proceedings for purposes of
conducting a single trial on liability.

After considering the cross motions, the responses, and replies, and the supporting papers, and being otherwise sufficiently informed, the Court finds that fact issues exist as to whether QHR owed a duty to UTC. Both motions for summary judgment are therefore DENIED.

## SUMMARY JUDGMENT STANDARDS

Summary judgment, governed by Fed.R.Civ.P. 56, will be granted when the movant demonstrates that there is no genuine dispute as to a material fact and that the movant is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(a), made applicable to adversary proceedings by Fed.R.Bankr.P. 7056. "[A] party seeking summary judgment always bears the initial responsibility of informing the ... court of the basis for its motion, and ... [must] demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). In considering a motion for summary judgment, the Court must "examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment." *Wolf v. Prudential Ins. Co. of America,* 50 F.3d 793, 796 (10th Cir. 1995) (quoting *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.,* 912 F2d 1238, 1241 (10th Cir. 1990)).

"[A] party opposing a properly supported motion for summary judgment may not rest on mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial" through affidavits or other supporting evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Furthermore, New Mexico Local Bankruptcy Rule 7056–1(c) provides that the party opposing summary judgment must: 1) list the material facts as to which the party contends a genuine fact exists; 2) "refer with particularity to those portions of the record upon which the opposing party relies;" and 3) "state the number of the movant's fact that is disputed." NM LBR 7056-1(c). Properly supported material facts set forth in the movant's

2

motion are "deemed admitted unless specifically controverted" by the party opposing summary judgment.  NM LBR 7056-1(c).

## APPLICATION OF SUMMARY JUDGMENT
## STANDARDS TO THE PENDING MOTIONS

Consistent with the 2010 amendments to Fed.R.Civ.P. 56, the Court used a flexible approach in examining the summary judgment papers, which included voluminous briefs and exhibits.  *See Martin v. Performance Boat Brokerage.com, LLC,* 973 F.Supp.2d 820, 824 (W.D.Tenn. 2013) (noting that "the 2010 amendment to Rule 56 introduce[d] flexibility in place of the bright-line rules") (internal quotations omitted); Charles Alan Wright, et al, 10A Fed. Prac. & Proc. Civ. § 2721 (3d ed.2009) ("The court and the parties have great flexibility with regard to the evidence that may be used on a Rule 56 proceeding.").

To determine which facts are not in genuine dispute, the Court disregarded legal conclusions which appeared in either party's statement of material facts.  In addition, when a party introduced a new fact in its response to the opponent's statement of material facts without including such fact in the party's own statement of material facts, the Court generally disregarded it.  Exceptions were made, however, when the new fact introduced in the response was necessary to give context to the original fact.  The Court considered documents which may or may not be admissible at trial when both parties referenced the documents in their papers in a manner that presumes the Court would consider the evidence, such as arguing about a document's meaning or import.  Finally, the Court finds the facts identified in this opinion for purposes of its ruling on the instant cross motions only.  Such facts will not be treated as established in the case.

3

FACTS NOT SUBJECT TO MATERIAL DISPUTE

1.     Debtor Otero County Hospital Association, Inc. owns a hospital located in southern New Mexico known as Gerald Champion Regional Medical Center (the "Hospital"). *See generally* QHR's Memorandum in Support of Motion for Summary Judgment Based on Scope of Duty Defined by the Agreement (Docket No. 162) ("QHR's Motion"), ¶ 6; UTC's Opposition to Motion for Summary Judgment Based on Scope of Duty Defined by the Agreement (Docket No. 168) ("UTC's Response"), p. 2.

2.     At all times material to this litigation, the Hospital had a Board of Directors (the "Board"). *See* QHR's Motion, ¶ 7; UTC's Response, p. 7. The Board adopted corporate bylaws (the "Hospital Bylaws"). *See generally* QHR's Motion, ¶ 9; Corporate Bylaws of Otero County Hospital Association d/b/a Gerald Champion Regional Medical Center attached as Exhibit 5 to QHR's Motion (Docket No. 162-5).

3.     On November 30, 2005, QHR - a hospital management company - and the Hospital entered into an Agreement for Hospital Administrative Services (the "Agreement"). *See* QHR's Motion, ¶ 1; UTC's Response, p. 2; Agreement for Hospital Administrative Services attached as Exhibit 1 to QHR's Motion (Docket No. 162-1).

4.     One of QHR's strengths, according to its internal operating manual, "is its expertise in virtually all areas of hospital operations and management." *See* Memorandum in Support of United Tort Claimants' Motion for Partial Summary Judgment (Docket No. 177) ("UTC's Motion), ¶ 1; Excerpt from manual titled "Operating Practices: QHR Management Division" filed under seal as Exhibit 3 in connection with UTC's Motion (Docket No. 180) (the "Operating Practices Manual"), p. 4 of 12. Such statement appears in a section of the Operating Practices Manual setting forth the procedure to be used in providing "Consulting Services." *Id.*

5.      The Agreement was to expire on December 15, 2011, unless otherwise provided

therein.  *See* QHR's Motion, ¶ 2; UTC's Response, p. 2.  The Agreement was in effect at all

times material to the claims asserted by each UTC claimant.  *See* QHR's Motion, ¶ 3; UTC's

Response, p. 2.

6.      The relevant terms of the Agreement, as identified by QHR and UTC, are as

follows:[2]

> (a) QHR was required to provide key executives to the Hospital, including the Chief Executive Officer ("CEO") and the Chief Financial Officer ("CFO").[3]
>
> (b)  QHR was required to "abide by all policies and procedures reasonably established by the Hospital."[4]
>
> (c)  QHR agreed "to comply with the requirements of the Hospital's compliance program in carrying out its duties under th[e] Agreement, to bring items of potential noncompliance to the Board when actually discovered by QHR (and of which QHR had actual notice) and … to take corrective action prescribed by the Board."[5]
>
> (b)  The Hospital, through its Board, was required to exercise ultimate control over its policies and operation and retained ultimate responsibility for all duties vested in the Hospital by applicable law.[6]
>
> (c)  QHR had no right to direct the Hospital or its employees in the performance of their medical judgments or duties.[7]
>
> (d)  QHR was to be the agent of the Hospital solely to perform the non-medical administrative services identified in the Agreement.[8]
>
> (e)  The Hospital retained responsibility for all matters requiring professional medical judgment.  QHR retained no responsibility for such judgments and was not in any way responsible for the credentialing of any doctors.[9]

---

[2] Each party claims, at one point or another, that the excerpts from the Agreement appearing in the opposing party's summary judgment papers are taken out of context.  Though this opinion only summarizes those contract terms identified by the parties, the Court read and considered the entire Agreement and is familiar with New Mexico law regarding contract construction.

[3] *See* UTC's Motion, ¶ 1; Agreement, Section 2.1.1.

[4] *See* UTC's Motion, ¶ 3; Agreement, Section 3.1.

[5] *See* UTC's Motion, ¶ 16; Agreement, Section 3.5.

[6] *See* QHR's Motion, ¶ 5; Agreement, Section 1.1.

[7] *See* QHR's Motion, ¶ 5; Agreement, Section 1.2.

[8] *Id.*

5

7.      Under the Hospital Bylaws, the Board was to "delegate to the medical staff the responsibility and authority to investigate and evaluate all matters relating to medical staff membership status, clinical privileges, and corrective action…." *See* QHR's Motion, ¶ 8; Hospital Bylaws, Section 7.3-1.

8.      The Hospital Bylaws also state that the medical staff and other professionals providing patient care were required to "conduct and be accountable to the [B]oard for conducting activities that contribute to the preservation and improvement of the quality and efficiency of patient care provided in the [H]ospital." *See* QHR's Motion, ¶ 9; Hospital Bylaws, Section 8.2.   Under the Hospital Bylaws, such activities included:

> (a)  Review and evaluation of the quality of patient care (generally on a retrospective basis) through a valid and reliable patient care audit procedure.
>
> (b) On-going monitoring of patient care practices through the defined functions of the medical staff, the other professional services[,] and the [H]ospital administration.
>
> (c)  Delineation of clinical privileges for members of the medical staff commensurate with individual credentials and demonstrated ability and judgment and assignment of patient care responsibilities to other health care professionals consistent with individual qualification and demonstrated ability.
>
> (d)  Provision of continuing professional education, shaped primarily by the needs identified through the review and evaluation activities.
>
> (e)  Review of authorization of the [H]ospital's resources to provide for their allocation to patients in need of them.
>
> (f)  Such other measures as the [B]oard may, after considering the advice of the medical staff, the other professional services and the hospital administration, deem necessary for the preservation and improvement of the quality and efficiency of patient care.

*Id.*

---

[9] *See* QHR's Motion, ¶ 5; Agreement, Section 4.2.

6

9.      The Hospital's medical staff issued their own bylaws acknowledging and implementing their responsibility for patient care.  *See* QHR's Motion, ¶ 10; UTC's Response, p. 3; 2006 Medical Staff Bylaws attached as Exhibit 6 to QHR's Motion (Docket No. 162-6); 2007 Medical Staff Bylaws attached as Exhibit 7 to QHR's Motion (Docket No. 162-7).

10.      QHR employed the Hospital's CEO and CFO.  *See* UTC's Motion, ¶ 1; Agreement, Section 2.1.1.

11.      The CEO was responsible for the day-to-day operations of the Hospital.  *See* UTC's Motion, ¶ 5; Deposition of QHR CEO Robert James Heckert attached as Exhibit 7 to UTC's Motion (Docket No. 177-2) (the "Heckert Deposition") at 26:20 - 26:23.

12.      It is the understanding of James Heckert, a CEO of the Hospital, that as a hospital administrator or CEO of the Hospital, he has a duty to avoid or prevent risk of injury to the patients.  *See* UTC's Motion, ¶ 6; Heckert Deposition at 22:14 - 22:18.

13.      The Hospital's Board generally relied on and followed the recommendations from the CEO or other consultants obtained by QHR.  *See* UTC's Motion, ¶ 2; Deposition of Harry Jarvis attached as Exhibit 1 to UTC's Motion (Docket No. 177-1) (the "Jarvis Deposition") at 36:2 - 36:24.

14.      The Hospital's Organizational Chart[10] reflects that nearly all Hospital employees, including the Senior Vice President of Medical Staff Affairs, were listed below the CEO.  *See* UTC's Motion, ¶ 5; QHR's Opposition to UTC's Motion for Partial Summary Judgment (Docket No. 189) ("QHR's Response"), ¶ 5; GCRMC Organizational Chart attached as Exhibit F to QHR's Response (Docket No. 189-6), p. 2-13 of 45; GCRMC Organizational Chart attached as Exhibit 5 to UTC's Motion (Docket No. 177-2).  The Organizational Chart proffered by QHR

---

[10] QHR and UTC proffered different versions of the Organizational Chart.  The Court considered only those portions of the separate Organizational Charts which were the same.

reflects that the Board is listed above the CEO. *See* QHR's Response, ¶ 5; GCRMC

Organizational Chart attached as Exhibit F to QHR's Response (Docket No. 189-6).

15.    The Hospital had a policy regarding the issuance of temporary privileges to

practice medicine at the Hospital (Policy # MS-C-9140). Pursuant to that policy, a doctor may

only be granted temporary privileges at the Hospital after he or she has submitted a complete

application package, including the following documents:

> (a)  Completed application and curriculum vitae (CV).
> (b)  Written request for temporary privileges, including reason for request.
> (c)  Response from the national practitioner data bank.
> (d)  Completed request for clinical privilege form.
> (e)  Malpractice liability insurance face sheet and claims verification from the insurance company.
> (f)  A copy of New Mexico driver's license.
> (g)  Copy of DEA [certificate].
> (h)  Copy of New Mexico board of pharmacy [certificate].
> (i)  AMA profile.
> (j)  Response from three professional references.
> (k)  Medical degree.
> (l)  Copy of other certifications (*i.e.* PALS, NRP).

*See* UTC's Motion, ¶ 7; QHR's Response, ¶ 7; Hospital's Policy # MS-C-9140 attached as

Exhibit 9 to UTC's Motion (Docket No. 177-2), p. 31-32 of 45.

16.    QHR has internal educational materials regarding the temporary privileging of

doctors at a client hospital, though it is unclear from the evidence before the Court when the

materials were disseminated or whether they were used in connection with the Hospital. *See*

UTC's Motion, ¶ 10; QHR's Response, ¶ 9; Excerpts from QHR's PowerPoint presentation titled

"Avoiding Liability Issues in Credentialing" attached as Exhibit P to QHR's Response (Docket

Nos. 189-16 – 189-18) (the "Educational Materials").

17.    QHR's Educational Materials set forth a client hospital's duty with respect to

privileging, stating that the "[client hospital] … (through its credentialing bodies, and ultimately

8

its Board) owes a duty to its patients to use reasonable care to insure that practioners granted hospital privileges are competent, and to supervise the medical treatment provided by members of its medical staff." *Id.*

18. The Educational Materials contain bullet points stating that temporary privileges should be "avoid[ed] where possible" because there is "[n]ot enough information to act on," and that "[o]nce they're 'in,' [it is] hard to get them 'out.'" *Id.* The Educational Materials also warn that temporary privileges "[s]hould not be used for convenience while an application is being processed." *Id.*

19. The Hospital also had a policy (Policy # MS-C-9000) stating that any new procedures performed at the Hospital must be separately credentialed. *See* UTC's Response, p. 4 of 12; Hospital's Policy # MS-C-9000 attached as Exhibit 8 to UTC's Response (Docket No. 168-2), p. 22 of 47. The policy stated:

> Procedures[] which have not been performed at Gerald Champion Regional Medical Center[] previously must be credentialed separately. The credentialing process for new procedures will include a review by the Medical Executive Committee and the Chief Nursing Officer.

*Id.*

20. On or about July 24, 2006, the Hospital entered into an employment agreement with Christian Schlicht, M.D. ("Dr. Schlicht") to provide medical services in the specialty of anesthesia and pain management. *See* UTC's Response, p. 4 of 12; Physician Employment Agreement attached to UTC's Response as Exhibit 13 (Docket No. 168-2), p. 35-38 of 47. CEO Sue Johnson-Phillippe, then an employee of QHR, signed the employment agreement on behalf of the Hospital. *Id.*

21. In August, 2006, Dr. Schlicht was granted temporary privileges to practice at the Hospital. *See* UTC's Motion, ¶ 8; QHR's Response, ¶ 8; Letter granting Dr. Schlicht temporary

privileges attached as Exhibit 10 to UTC's Motion (Docket No. 177-2) (the "Letter Granting Temporary Privileges"), p. 34 of 45.

22.     The Letter Granting Temporary Privileges - which specifically referenced Policy # MS-C-9140 - is dated August 9, 2006 and was signed by the Hospital's Chief of Staff, Frank Bryant, M.D. ("Dr. Bryant") and QHR's employed CEO, Sue Johnson-Phillippe. *Id.* According to QHR, the date on the Letter Granting Temporary Privileges is a typographical error; QHR contends the letter was more likely signed on August 29, 2006. *See* QHR's Response, ¶ 8(b); Physician's Employment Agreement attached as Exhibit L to QHR's Response (Docket No. 189-12) (noting that Dr. Schlicht's employment was to commence on August 21, 2006).

23.     As of August 9, 2006, the Hospital had not received copies of Dr. Schlicht's photo ID or medical degree, nor had it received responses from Dr. Schlicht's professional references. *See* UTC's Motion, ¶ 8; QHR's Response, ¶ 8 (failing to deny that those items were missing and admitting that the Hospital received all of the items required by Policy # MS-C-9140 by August 28, 2006); Gerald Champion Regional Medical Center Appointment Summary Sheet attached as Exhibit 12 to UTC's Motion (Docket No. 177-3), p. 2 of 43.

24.     Two of the physicians who were asked to provide references for Dr. Schlicht indicated that they did not have enough information to recommend that he receive privileges to perform minimally invasive spine surgical procedures. *See* UTC's Motion, ¶ 12; Responses from Dr. Schlicht's references attached as Exhibit 15 to UTC's Motion (Docket No. 177-3), p. 14-25 of 43.

25.     QHR's Operating Practices Manual required the CEO to review any physician employment agreement - including Dr. Schlicht's contract - with QHR's regional office prior to

presenting it to the Board. *See* UTC's Motion, ¶ 14; Operating Practices Manual filed under seal as Exhibit 17 in connection with UTC's Motion (Docket No. 180), p. 8 of 12.

26. For the first year of Dr. Schlicht's tenure at the Hospital, David Masel, M.D., a board-certified spine surgeon, was appointed as Dr. Schlicht's proctor. *See* UTC's Motion, ¶ 15; QHR's Response, ¶ 14.

27. On July 10, 2007, Dr. Masel submitted the results of his one-year evaluation of Dr. Schlicht.[11] *See* UTC's Motion, ¶ 15; UTC's Response, ¶ 14. In response, Dr. Schlicht sent a letter dated July 21, 2007 to the "Administration" of the Hospital to "directly and unequivocally refute [Dr. Masel's] statements" that Dr. Schlicht was "perform[ing] experimental surgery." *See* UTC's Motion, ¶ 15; Letter dated July 21, 2007 from Dr. Schlicht attached as Exhibit 18 to UTC's Motion (Docket No. 177-3), p. 40-41 of 43.

28. On September 14, 2007, insurer Molina Healthcare of New Mexico ("Molina") sent a letter to Mary Harding, the Hospital's RN Risk Manager. *See* UTC's Motion, ¶ 17; Letter from Molina dated September 14, 2007 attached as Exhibit 19 to UTC's Motion (Docket No. 177-3), p. 43 of 45. The letter resulted from Molina's Internal Quality of Care review process in the case of a certain back surgery procedure performed by Dr. Schlicht. *Id.* Molina assigned the case a severity Level of IV, which indicates a "[g]ross and flagrant violation of acceptable medical practice, or service standard." *Id.* The letter states that the "provider does not appear to have been credentialed to perform this second surgery," and that "[p]erforming … [the] surgery appears to be outside the practitioner's scope of practice." *Id.*

29. By September 21, 2007, QHR's regional office in Texas was aware of Molina's September 14, 2007 letter addressing its concerns over a surgery performed by Dr. Schlicht. *See*

---

[11] QHR claimed the evaluation was privileged and declined to produce it during discovery. It was not submitted to the Court in connection with the summary judgment papers.

11

UTC's Motion, ¶ 18; QHR's Response, ¶ 17; Summary of QHR's Monthly Operation Review filed under seal as Exhibit 20 in connection with UTC's Motion (Docket No. 180), p. 11-12 of 12. The "Dr. Schlicht/Molina issue" was identified as one of five "major issues" to be discussed at a Monthly Operating Meeting in September, 2007. *Id.*

30.     QHR's on-site team at the Hospital was also aware of the Dr. Schlicht/Molina issue. *See* UTC's Motion, ¶ 21; QHR's Response, ¶ 19. James Richardson, the Hospital's CEO and a QHR employee, became aware of the September 14, 2007 letter from Molina shortly after it was sent. *Id.* Mr. Richardson became concerned about Dr. Schlicht when Molina suspended his insurance-related privileges (as distinguished from his Hospital privileges). *Id.*

31.     The Dr. Schlicht/Molina issue was not referenced in the minutes of the Board meeting held on September 26, 2007.[12] *See* UTC's Motion; ¶¶ 19-20; Board of Directors minutes dated September 26, 2007 attached as Exhibit 22 to UTC's Motion (Docket No. 177-4) p. 8-12 of 46. At the meeting, the Board approved the purchase of an "additional spine instrument" for the surgical department, which cost $54,000. *Id.*

32.     Dr. Schlicht was allowed to continue to perform spinal surgery at the Hospital on patients who were not insured by Molina after Molina raised its concerns in the September 14, 2007 letter. *See* UTC's Motion, ¶ 22; QHR's Response, ¶ 20.

33.     In October, 2007, CEO James Richardson exchanged a series of letters with Molina in which he took issue with Molina's assessment in the September 14, 2007 letter. *See* UTC's Motion, ¶ 24; QHR's Response, ¶ 22; Fax Cover Sheet attached as Exhibit 25 to UTC's Motion (Docket No. 177-4), p. 32 of 48; Letters from Mr. Richardson to Molina attached as

---

[12] QHR contends that the Board was aware of the letter from Molina and that the issue was discussed at the Board meeting, notwithstanding the fact that the minutes do not reference such a discussion. Because QHR offered evidence to support this assertion, fact issues remain as to whether QHR made the Board aware of the letter from Molina.

Exhibit HH to QHR's Response (Docket No. 189-38). A letter Mr. Richardson signed demanded that Molina remove the suspension of Dr. Schlicht's insurance-related privileges until Molina completed a full inquiry into the matter and promised that Dr. Schlicht would refrain from performing surgeries on Molina insureds in the meantime. *Id.* When Molina failed to timely remove the suspension, Mr. Richardson sent a letter demanding that Molina take immediate action "to prevent aggressive legal and regulatory action against Molina." *Id.*

34. In a follow-up letter dated December 21, 2007, Molina informed Mr. Richardson that, after reviewing the case further, it considered the matter closed. *See* QHR's Response, ¶ 16; Letter from Molina dated December 21, 2007 attached as Exhibit DD to QHR's Response (Docket No. 189-34). The letter also stated that Molina made an administrative decision not to cover minimally invasive spinal surgery unless it was performed by a doctor who completed a residency in either neurosurgery or orthopedics. *Id.* There is no evidence before the Court that Dr. Schlicht completed either residency.

DISCUSSION

In each complaint, UTC claims, among other things, that QHR was negligent in the hiring, privileging, and supervision of Dr. Schlicht. By its motion for summary judgment, QHR seeks to establish that it had no right or responsibility to engage in such activities under the Agreement and therefore owes no duty to UTC. UTC disagrees, arguing that because QHR actually did privilege, hire, and supervise Dr. Schlicht, QHR owes a duty to the claimants under ordinary tort principles and under the more stringent doctrine of "corporate negligence," which applies primarily to hospitals. The Court will address each argument below.

## I. New Mexico law regarding negligence and duty

Under New Mexico law,[13] a civil negligence claim generally "requires the existence of a duty from a defendant to a plaintiff, breach of that duty, which is typically based upon a standard of reasonable care, and the breach being a proximate cause and cause in fact of the plaintiff's damages." *Herrera v. Quality Pontiac,* 134 N.M. 43, 47-48, 73 P.3d 181, 185-86 (2003). *See also Ross v. City of Las Cruces,* 148 N.M. 81, 84, 229 P.3d 1253, 1256 (Ct. App. 2009) ("The elements of a negligence claim are (1) the existence of a duty running from the defendant to the plaintiff; (2) a breach of that duty based on a reasonable care standard; and (3) the breach of duty is both the proximate and in-fact cause of the plaintiff's damages."). "Negligence is generally a question of fact…. A finding of negligence, however, is dependent upon the existence of a duty on the part of the defendant." *Herrera*, 134 N.M. at 48, 73 P.3d at 186. Whether a duty exists is a question of law to be decided by the courts based on established legal policy. *Rodriguez v. Del Sol Shopping Center Associates, L.P.,* 326 P.3d 465, 476 (N.M. 2014). *See also Solon v. WEK Drilling Co., Inc.,* 113 N.M. 566, 571, 829 P.2d 645, 650 (1992) ("It is thoroughly settled in New Mexico … that whether the defendant owes a duty to the plaintiff is a question of law.").

"An actor ordinarily has a duty to exercise reasonable care when the actor's conduct creates a risk of physical harm." Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 7 (2010).[14] The mere existence of an injury does not automatically give rise

---

[13] Because the injuries and acts of which UTC complains occurred primarily in New Mexico, it is appropriate for the Court to apply New Mexico tort law. *See Torres v. State,* 119 N.M 609, 613, 894 P.2d 386, 390 (1995) (The New Mexico Supreme Court "generally . . . applies the law of the state in which the wrongful conduct occurred.") (internal citations omitted); *Terrazas v. Garland & Loman, Inc.,* 140 N.M. 293, 296, 142 P.2d 374, 377 (Ct. App. 2006) ("In determining which jurisdiction's law should apply to a tort action, New Mexico courts follow the doctrine of *lex loci delicti commissi* - that is, the substantive rights of the parties are governed by the law of the place where the wrong occurred.") (internal citations omitted).

[14] The New Mexico Supreme Court adopted Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 7, along with comment j of that section, in *Rodriguez v. Del Sol Shopping Center*

to a duty, however. "A relationship must exist that legally obligates the defendant to protect the plaintiff's interest." *Johnstone v. City of Albuquerque,* 140 N.M. 596, 600, 145 P.3d 76, 80 (Ct. App. 2006).

Traditionally, the duty component in New Mexico negligence cases involved two concepts: foreseeability and policy. *See Herrera,* 134 N.M. at 52, 73 P.3d at 190 (observing that "New Mexico has adopted and applied for decades the majority view of *Palsgraf,* that a negligent actor only owes a duty to those whose injuries are a foreseeable result of the negligence[,]" and stating further that "[t]his court has consistently relied on the principle of foreseeability, along with policy concerns, to determine whether a defendant owed a duty to a particular plaintiff or class of plaintiffs").[15] The New Mexico Supreme Court recently reevaluated the duty analysis in *Rodriguez v. Del Sol Shopping Center Associates, L.P.,* 326 P.3d 465 (N.M. 2014). *Del Sol* overruled several prior cases holding that foreseeability considerations can support a court's determination that no duty exists or that an existing duty should be limited. Instead, the determination of whether a duty exists must be based on policy considerations. *Del Sol,* 326 P.3d at 474 (concluding that "courts must articulate specific policy reasons, unrelated to foreseeability considerations, when deciding whether a defendant does or does not have a duty or that an existing duty should be limited"). "[F]oreseeability is not a factor" in determining whether a duty exists. *Id.* at 474.

---

*Associates, L.P.*, 326 P.3d 465 (N.M. 2014), which is discussed in more detail below. That entire section provides:

> (a) An actor ordinarily has a duty to exercise reasonable care when the actor's conduct creates a risk of physical harm.
> (b) In exceptional cases, when an articulated countervailing principle or policy warrants denying or limiting liability in a particular class of cases, a court may decide that the defendant has no duty or that the ordinary duty of reasonable care requires modification.

*Id.*

[15]*See also Chavez v. Desert Eagle Distributing Co.,* 141 N.M. 116, 120, 151 P.3d 77, 81 (Ct. App. 2006) ("In New Mexico, the question of whether a common law duty exists requires consideration of both foreseeability and policy.").

Although the ultimate determination of whether a defendant owes a duty to a plaintiff is a question of law, fact questions relating to the Court's consideration of duty, such as "the relationship of the parties, the nature of the plaintiff's interest[,] and the defendant's conduct," may affect that determination. *Johnstone,* 140 N.M. at 600, 145 P.3d at 80. *See also R.A. Peck, Inc. v. Liberty Fed. Sav. Bank,* 108 N.M. 84, 89, 766 P.2d 928, 933 (Ct. App. 1988) (observing that "where the facts and circumstances of the relationship between the parties are at issue . . . existence of a duty may become a mixed question of law and fact . . .") (internal citation omitted). For example, whether a hospital owes a duty to its patients is a question of law, but whether a particular plaintiff was a patient of the hospital is a question of fact. *See Eckhardt v. Charter Hosp. of Albuquerque, Inc.,* 124 N.M. 549, 558, 953 P.2d 722, 731 (Ct. App. 1997) (stating that "Plaintiff's case presents circumstances in which the question of whether Charter owed her a duty depends on the existence of particular facts[,]" so that "the existence of a duty owed by Charter to Plaintiff depended on whether Plaintiff was a Charter patient . . .").

## II. Whether QHR's duties are limited by the terms of the Agreement

QHR contends any duty it owed in connection with this case is expressly defined and limited by the terms of the Agreement. Since, according to QHR, it was not required or allowed to privilege or supervise doctors under the Agreement, QHR argues that it owes no duty with respect to those activities. Under the facts of this case, the Court disagrees that the Agreement is dispositive of whether QHR owes a duty to UTC.

In *Klopp v. Wackenhut Corp.,* 113 N.M. 153, 160, 824 P.2d 293, 300 (1992), the New Mexico Supreme Court made clear that "[t]he tort liability of an employee or an agent for an omission is determined by the law of negligence and is not limited to the affirmative obligations of the contract of service." There the plaintiff sued Wackenhut Corporation ("Wackenhut"), the

16

company hired by an airline to provide security personnel to operate its airport security station (which included a metal detector), for personal injuries after she tripped over the base of the metal detector.  Wackenhut did not own or design the security station.  Under its contract with the airline, Wackenhut was not permitted to change the configuration of the security station, nor did it in fact change the configuration.  The plaintiff was not a party to that contract.  The New Mexico Supreme Court acknowledged that Wackenhut "certainly had a greater duty to passengers than merely to search for weapons" but found that its duty was "limited by the extent of its control over the chattels in its custody or over the area that it occupied."  *Klopp*, 113 N.M. at 161, 824 P.2d at 301.  The court ultimately found that Wackenhut had no liability to the plaintiff because, under the contract, it lacked any control over the configuration of the security station.  *Id.*

Because *Klopp* limited Wackenhut's duty based on the extent of its control, and because it was prohibited from exercising control by the contract, QHR reasons that the Court should look solely to the Agreement between the Hospital and QHR to determine whether QHR owes a duty to the Hospital's patients.  This argument fails for two reasons.  First, the duties imposed by tort law are not limited to those imposed by contract.  *See Klopp,* 113 N.M. at 160, 824 P.2d at 300 (observing that the trial court's rationale for determining that Wackenhut's only duty was "to prevent deadly or dangerous weapons from being carried aboard an airliner" "confuse[s] duties imposed on an employee or agent by contract (*e.g.,* to provide airport security) and duties imposed by the law of negligence.").

Second, although both Wackenhut and QHR lacked the authority under their respective contracts to control the alleged tortious conduct, QHR misses a key distinction between these cases.  Unlike in *Klopp,* where it was undisputed that Wackenhut did not modify the security

17

station or its configuration, here UTC alleges that QHR actually controlled and actively participated in the privileging and supervision of Dr. Schlicht. QHR in effect argues that if the Agreement prevented it from privileging and supervising doctors - but QHR in fact undertook such actions - the Agreement nevertheless relieves QHR from liability. Such a result is not consistent with the holding of *Klopp.* If Wackenhut had in fact modified the base of the metal detector contrary to the terms of its contract and thereby created a risk of physical harm, the case would have produced a different result. QHR's tort duty to the Hospital's patients is therefore not solely defined by its contractual obligations to Hospital.[16]

Because the question of duty is policy driven, QHR also argues that the public policy favoring freedom of contract weighs in favor of concluding that QHR did not owe a duty to the Hospital's patients. This argument would be more persuasive if, like many cases cited in QHR's brief, the Hospital was seeking to assert a tort claim predicated upon the contract or a third party was essentially seeking to assert a contract claim dressed in tort clothing. Here, however, the UTC claimants were not parties to QHR's Agreement with the Hospital, nor are they seeking to sue for breach of contract. The public policy favoring freedom of contract therefore does not apply here; as strangers to the Agreement, the UTC claimants did not exercise any freedom in negotiating its terms.

The Court concludes that, to the extent QHR owes a duty to UTC, such duty is not limited or defined by QHR's Agreement with the Hospital. Under the facts of this case, QHR's duty to UTC should be defined by the tort law of negligence.

---

[16]If QHR owes a duty to UTC, whether QHR complied with the Agreement may have some probative value in determining whether QHR breached that duty; however, the Agreement itself would not define the standard of care owed under the duty. *See Grassie v. Roswell Hosp. Corp.,* 150 N.M. 283, 258 P.3d 1075, 1093 (Ct. App. 2011) (expressing "doubt that the Agreement by itself can or should be used to set the definitive standard of conduct against which the Hospital's action must be measured….The Agreement is evidence of a standard the Hospital set for itself. But a failure to follow it may or may not be negligent….").

Case 13-00007-j    Doc 215    Filed 07/25/14    Entered 07/25/14 14:20:55 Page 18 of 24

II.  <u>Whether QHR owed a duty under ordinary negligence principles</u>

UTC appears to argue that QHR owes a duty to the claimants under two theories: 1) ordinary negligence by a corporation; and 2) corporate negligence, which the Court discusses in more detail below.[17]  For ordinary negligence claims, "[a]ssuming other policy considerations are satisfied, a duty to exercise ordinary care, where one otherwise would not exist, may arise when a person voluntarily undertakes a course of conduct."  *Davis v. Board of County Com'rs of Dona Ana County,* 127 N.M. 785, 792, 987 P.2d 1172, 1178.[18]  The Restatement (Third) of Torts likewise provides that a person who undertakes to act may be liable to third parties for negligence in the performance of that act.[19]  Because QHR is a corporation, QHR's duty would ordinarily arise through the conduct of its employees and agents.  *See Baker v. Hedstrom,* 309 P.3d 1047, 1056 (N.M. 2013) (stating that "[b]ecause corporations act through their employees, corporations may be held vicariously liable for the negligence of their employees who injure

---

[17] Though UTC does not present these as separate theories in its summary judgment papers, it cites cases relating to both corporate and ordinary negligence claims.  Based on its review of the case law, the Court is convinced that they provide separate bases for liability.

[18] *See also Calkins v. Cox Estates*, 110 N.M. 59, 63-64, 792 P.2d 36, 40-41(1990) (noting that "when a landowner undertakes to provide a common area for the use of his tenants, he [or she] undertakes to maintain it in a reasonably safe condition"); *Cobos v. Dona Ana County Housing Authority*, 126 N.M. 418, 425-426, 970 P.2d 1143, 1149-1150 (holding that once a county voluntarily undertakes a subsidized private housing program, it assumes a duty of care to perform safety inspections in connection with the housing).

[19]The Restatement (Third) of Torts, § 43 Duty to Third Parties Based on Undertaking to Another, provides:

> An actor who undertakes to render services to another and who knows or should know that the services will reduce the risk of physical harm to which a third person is exposed has a duty of reasonable care to the third person in conducting the undertaking if:
> > (a) the failure to exercise reasonable care increases the risk of harm beyond that which existed without the undertaking,
> > (b) the actor has undertaken to perform a duty owed by the other to the third person, or
> > (c) the person to whom the services are rendered, the third party, or another relies on the actor's exercising reasonable care in the undertaking.

New Mexico courts have not expressly adopted this section of the Restatement.  The New Mexico Supreme Court recognizes that the Restatement of Torts, though not binding, is "merely persuasive authority entitled to great weight."  *Gabaldon v.Erisa Mortgage Co.,* 128 N.M. 84, 90, 990 P.2d 197, 203 (1999) (internal citations omitted).

someone while in the course and scope of their employment") (citing Restatement (Third) of Agency § 2.04).

Here, UTC claims that QHR owes the patients a duty because QHR undertook to exercise the Hospital's duties in running the hospital, including the privileging and supervision of Dr. Schlicht. These issues, as well as various others which define the contours of the parties' relationship, are in material dispute. Fact issues remain, for example, as to whether QHR pushed the Hospital to hire Dr. Schlicht and whether, and to what extent, QHR exercised control over or otherwise participated in the priviledging of Dr. Schlicht. It is unclear from the evidence before the Court whether QHR's employed CEO - who signed the letter granting temporary privileges to Dr. Schlicht - was just a scrivener, or whether she was responsible for or participated in the decisions to recruit or privilege Dr. Schlicht. There is conflicting evidence as to when the letter was sent. QHR contends it was sent after the Hospital received Dr. Schlicht's full application; UTC contends the temporary privileges were granted before he submitted about half of the required paperwork.

Fact issues also exist regarding QHR's role in the Dr. Schlicht/Molina issue. The facts not subject to genuine dispute show that the CEO communicated with Molina regarding Dr. Schlicht's insurance-related privileges and that QHR's regional team was informed about the issue. The Court needs more evidence regarding the facts and circumstances surrounding these events. It is unclear, for example: (1) whether the CEO himself advocated on behalf of Dr. Schlicht or whether the Hospital's Board or medical staff fully controlled the demands on and negotiations with Molina; (2) whether the CEO informed the Board about the Dr. Schlicht/Molina issue; (3) whether QHR's regional team acted on its awareness of the Dr. Schlicht/Molina issue; and (4) whether, and to what extent, QHR was involved in the decision to

20

allow Dr. Schlicht to continue to perform surgeries after Molina revoked his insurance-related priviledges. Facts relating to the Hospital's organizational structure are also in material dispute, including whether the Hospital's medical staff acted independently of the CEO in making decisions concerning the quality of patient care.

Clarification of fact issues is necessary to determine whether to impose a duty on QHR as a matter of law based on the nature of the activities QHR undertook to perform and its relationship with the Hospital. *See Provencio v. Wenrich,* 2150 N.M. 457, 261 P.3d 1089, 1094 (2011) (noting that whether a defendant owes a duty "depends on the nature of the activity in question, the parties' general relationship to the activity, and public policy considerations[;]" and that policy considerations, in turn, are "answered by reference to legal precedent, statutes, and other principles of law.") (internal quotations omitted); *Eckhardt v. Charter Hosp. of Albuquerque, Inc*., 124 N.M. 549, 559, 953 P.2d 722, 732 (finding that whether the defendant owed a duty was dependent upon the existence of particular facts). The Court will therefore not make a determination on summary judgment as to whether QHR owed a duty under ordinary negligence principles.

### III. Whether QHR owed a duty under corporate negligence principles

The second theory under which UTC intends to proceed is corporate negligence, which imposes a specialized and more stringent duty on hospitals in situations where they may not face liability under ordinary negligence principles. Under the doctrine of corporate negligence, also known as "hospital corporate negligence" or "corporate liability," hospitals owe a direct, independent duty of care "to the patient to review and supervise the medical care administered to the patient." *Malanowski v. Jabamoni*, 293 Ill.App.3d 720, 728, 688 N.E.2d 732, 738 (Ct. App. 1997). The theory "is predicated on the hospital's own negligence, not the negligence of the

21

physician." *Id.* New Mexico law recognizes the doctrine of corporate negligence. *See Diaz v. Feil,* 118 N.M. 385, 389, 881 P.2d 745, 749 (Ct. App. 1994) ("[I]t is beyond question in New Mexico that a hospital owes an independent duty of care to patients at the hospital.") (internal citations omitted); *Eckhardt,* 124 N.M. at 559, 953 P.2d at 732 (noting that "the doctrine of corporate negligence may impose liability on a hospital for the negligent granting of staff privileges or the negligent supervision of treatment") (internal citation omitted).[20]

Several policies reasons exist for imposing a direct duty on hospitals to patients to exercise ordinary care in granting staff privileges to doctors. First, patients tend to look to the hospital itself - rather than the individual doctors practicing within the hospital - as their health care provider while receiving treatment at the hospital. *See Malanowski,* 293 Ill.App.3d at 728, 688 N.E.2d at 738 (explaining that "hospitals today assume a much greater role in coordinating the total health care of patients, leading the public to rely on the hospital, itself, as the heath care provider").[21] Next, the doctrine allows a patient to hold a hospital liable "when the physicians who allegedly caused the injuries were independent contractors rather than employees, rendering the theory of respondeat superior inapplicable." *Harris v. Extendicare Homes, Inc.*, 829 F.Supp.2d 1023, 1029 (W.D. Wash. 2011). Finally, "the hospital is in a superior position to supervise and monitor physician performance and is, consequently, the only entity that can

---

[20]*See also Archuleta v. Taos Living Center, LLC,* 971 F.Supp.2d 1066, 1079 (D.N.M. 2011) (acknowledging that "New Mexico courts have found that a hospital owes a duty to act with reasonable care in furnishing services to patients.") (internal citations omitted); UJI 13-1119(B) (committee comment) (recognizing the "theory of hospital liability generally known as corporate negligence, which arises when the hospital has failed to take reasonable steps to determine the qualifications or competency of a practitioner to whom it has granted clinical privileges")

[21]*See also,* Martin C. McWilliams, Jr. & Hamilton E. Russell, III, *Hospital Liability for Torts of Independent Contractor Physicians,* 47 S.C.L.Rev. 431, 473 (1996) (explaining that "the hospital itself has come to be perceived as the provider of medical services. According to this view, patients come to the hospital to be cured, and the doctors who practice there are the hospital's instrumentalities, regardless of the nature of the private arrangements between the hospital and the physician. Whether or not this perception is accurate seemingly matters little when weighed against the momentum of changing public perception and attendant public policy.").

22

realistically provide quality control … and protect their patients." *Insinga v. LaBella*, 543 So.2d 209, 212-213 (Fla. 1989).

Based on the Court's review of the case law, it is not clear whether the doctrine of corporate liability should be extended to a hospital management company such as QHR. If QHR performed those duties that would subject the Hospital to corporate liability, and if the same policy reasons that establish a duty under the doctrine of corporate negligence apply to QHR, then it may be appropriate to extend the doctrine to QHR. As discussed above, however, the evidence before the Court does not clearly define the nature of the parties' relationship or the nature of the actions QHR undertook in its administrative or management role. The Court therefore declines to determine whether QHR owes a duty under the theory of corporate negligence on summary judgment.

IV. Whether QHR owed a duty under state and federal regulations

UTC also references 42 C.F.R. § 482 and Section 7.7.2 of the New Mexico Administrative Code in its motion, presumably to demonstrate that QHR owes a tort duty to patients based on the regulations governing hospitals and their CEOs. The language of the regulations appears in UTC's statement of material facts and then briefly in its reply in support of its motion for summary judgment. In general, the Court disregards legal conclusions that appear in a party's statement of material facts as well as legal arguments that appear for the first time in a reply. Because neither party really briefed the issue of whether the regulations give rise to a tort duty on the part of QHR to UTC, the Court declines to reach it at this stage in the proceeding.

CONCLUSION

Based on the foregoing, the cross motions for summary judgment will be denied.   The

Court will enter a separate order consistent with this memorandum opinion.

_____
ROBERT H. JACOBVITZ
United States Bankruptcy Judge

Date entered on docket:  July 25, 2014

COPY TO all attorneys of record associated with Consolidated Misc. Adv. No. 13-00007,
including:

> Tamara Safarik & Joe L. McClaugherty
> P.O. Box 8680
> Santa Fe, NM 87504-8680

> John A. Klecan
> One North Central, Suite 900
> Phoenix, AZ 85004

> Lisa Curtis
> 301 Gold Avenue SW #201
> Albuquerque, NM  87102

> Bernard R Given, II
> 10100 Santa Monica Blvd., Suite 2200
> Los Angeles, CA 90067-4120

> Paul M Fish
> P.O. Box 2168
> Albuquerque, NM 87103-2168