## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW MEXICO

In re: OTERO COUNTY HOSPITAL         Case No. 11-11-13686 JL
ASSOCIATION, INC.,

     Debtor.

UNITED TORT CLAIMANTS, as
individuals,

       Plaintiffs,

                                 Consolidated Misc. Adv. No. 13-00007
                                 Adversary Nos:

      v.                            12-1204j through 12-1216j,
                                 12-1208j through 12-1223j,
                                 12-1235j, 12-1238j through
                                 12-1249j, 12-1251j through
                                 12-1261j, 12-1271j, 12-1276j and
                                 12-1278j.

QUORUM HEALTH RESOURCES, LLC,

     Defendant.

### AMENDED MEMORANDUM OPINION

THIS MATTER is before the Court following an eleven-day trial on the merits of the corporate liability phase of this litigation. The United Tort Claimants (the "UTC")[1] and Quorum Health Resources, LLC ("QHR") were represented by counsel as noted on the record.

This case stems from the suffering of dozens of patients who unwittingly were subjected to experimental procedures on their lower backs by a doctor tasked with alleviating pain. The hospital, doctors, and others involved have reached settlements with the patients. The sole remaining defendant is the hospital management company that provided non-medical

---

[1] The "United Tort Claimants" consist of all of the plaintiffs in the adversary proceedings listed in the Order Establishing Master Docket for Consolidated Matters, entered August 15, 2013 in this Consolidated Misc. Adv. No. 13-00007. *See* Docket No. 1. The Court consolidated those adversary proceedings for purposes of conducting a single trial on liability.

administrative services to the hospital. Although the hospital and its medical staff are in a position to supervise, monitor, and evaluate physician performance, hospital management companies have a more limited role. They do not exercise professional medical judgments. While there is little doubt negligence occurred, the Court necessarily must focus on the role and responsibility of a hospital management company in deciding whether and to what extent QHR should be held accountable for what happened.

The UTC claims QHR was negligent in the way in which it managed the hospital, particularly with respect to the hiring, privileging, and retention of Dr. Schlicht. Dr. Schlicht performed various procedures on members of the UTC. To find QHR liable, the Court must find that QHR had a duty directly to patients of the hospital and by its negligence failed to fulfill the duty. The UTC asserts that QHR had broad duties to patients. QHR denies it owed any duty to patients. Taking into account the specialized role of a hospital management company, the Court finds that QHR owed a duty to the UTC, but one that is narrower than what the UTC urges.

QHR owed a direct duty to the UTC and breached its duty when the hospital's chief executive officer: 1) granted temporary privileges to Dr. Schlicht to perform procedures on patients of the hospital; and 2) failed to make a formal request that the hospital's medical executive committee initiate an investigation of Dr. Schlicht's performing a procedure on patients after learning that another physician asserted the procedure is experimental. In connection with the second breach, the Court further concludes that QHR failed to keep the hospital's board appropriately informed. In addition, the Court concludes that the doctrine of comparative fault applies to any assessment of damages against QHR. Under that doctrine, each negligent party causing the injury is responsible only for its own percentage of fault for the injury. The issues of causation and damages have been reserved for later proceedings.

- 2 -

I.      SCOPE OF MATTERS AT ISSUE IN THE CONSOLIDATED TRIAL ON
CORPORATE LIABILITY

The Court will first identify the issues appropriately before the Court following the

September 2014 trial.  In this ruling, the Court will decide: 1) whether and what duty or duties

QHR owed to the UTC;  2) whether QHR breached any duties to the UTC; and 3) whether the

doctrine of joint and several liability or comparative negligence applies.  The Court will not now

decide: 1) whether QHR caused the UTC any injury; or 2) damages, including allocation of fault

for purposes of calculating damages.  Although duty, breach, causation, and damages ordinarily

would be decided together, causation and damages issues are not presently before the Court.

In the summer of 2012, the UTC removed certain negligence actions pending in state

court to this Court in connection with Otero County Hospital Association, Inc.'s Chapter 11

bankruptcy case.  A year later, the Court consolidated certain portions of the UTC's claims

against QHR for purposes of conducting a separate consolidated trial "on the liability issues

relating to QHR," defined in the consolidation order as the "Corporate Liability Issues."  *See,*

*e.g.,* Order Resulting from Hearing on Motion to Establish Discovery and Case Management

Procedures ("Case Management Order"), Adversary Proceeding No. 12-1204 – Docket No. 44.[2]

The Case Management Order expressly clarified that Corporate Liability Issues "do not include

issues regarding whether any medical providers committed malpractice or any issues with

respect to damages."  *See* Case Management Order, n. 1.  An Amended Case Management Order

for Trial on the Bifurcated Issue of Corporate Liability ("Amended Case Management Order")

entered on July 18, 2014 echoed the Case Management Order's deferral of issues to the second

phase of the trial other than the Corporate Liability Issues.  *See* Docket No. 199.

---

[2] An identical Case Management Order was entered in each of the forty-seven adversary proceedings initiated upon removal of the individual state court lawsuits.

Of the four elements of the UTC's negligence claim (duty, breach of duty, causation, and damages), it is clear that duty and breach were at issue at the September 2014 trial. It is also clear that causation and damages were not at issue.[3]

At the request of the parties, the Court also agreed to decide whether the doctrine of joint several and liability or the doctrine of comparative negligence applies. For a couple of reasons, the Court rejects the UTC's contention that it should attribute all fault to QHR because QHR did not put on evidence that anyone other than QHR was negligent. First, there is evidence before the Court that the hospital and its medical staff were at fault. And more importantly, requiring QHR to present evidence that anyone other than QHR was negligent as a condition to the Court determining whether to apply comparative negligence or joint and several liability would be contrary to the Case Management Order and the Pretrial Order. Allocation of fault to others is part of the Court's damages analysis and, at least in part, would require a determination of whether the physicians committed malpractice. That was reserved for a later phase of the trial.

In addition, in closing argument and in a post-trial brief, QHR argued that the UTC cannot prove causation because they denied QHR's request for an admission that Dr. Schlicht and Dr. Bryant were "a cause" of their injuries. The Court rules on that issue below because it is potentially dispositive of all of the adversary proceedings even though causation was not at issue in the consolidated trial.

In sum, causation and damages are reserved for a later phase of the trial, except for the Court's decisions whether joint and several liability or comparative fault applies and whether the UTC's denial of a request for admission entirely defeats their claims.

---

[3] In the UTC's and QHR's "statement of legal issues presented" section of the Pretrial Order, the parties identified the issues as whether QHR owed a duty to the UTC, and whether, if a duty was owed, QHR breached a duty by failing to conform with the required standard of care. *See* Pretrial Order, ¶4, p. 27 – Docket No. 224. Neither party included causation or damages in their statement of legal issues presented.

- 4 -

## II.    FINDINGS OF FACT[4]

A.  Background

QHR is one of the country's largest hospital management companies.  QHR provided administrative services for Otero County Hospital Association, Inc. d/b/a Gerald Champion Regional Medical Center ("GCRMC" or the "Hospital") from December 15, 2005 until sometime in 2008.  In 2006, Dr. Christian Schlicht became an employed physician at the Hospital.  While employed at the Hospital, Dr. Schlicht performed various procedures on patients of the Hospital, including a procedure sometimes called percutaneous disc arthroplasty ("PDA").[5]  The PDA procedure, which Dr. Schlicht invented, involves the injection of polymethylmethacrylate ("PMMA") into the intervertebral disc space of the patient's lumbar spine.  Dr. Schlicht is a D.O. who was board certified as an anesthesiologist and trained in pain management.  He is not an M.D. and is not a board certified surgeon.

Many patients of the Hospital who underwent a PDA procedure, minimally invasive spine surgery, or other procedures on the spine while Dr. Schlicht was a Hospital employee, filed lawsuits asserting that they were harmed by the procedures.  Due to the large number of lawsuits, the Hospital filed a voluntary petition under Chapter 11 of the Bankruptcy Code on August 16, 2011.  The plaintiffs in most of those lawsuits removed their state court lawsuits to this Court, initiating forty-seven separate adversary proceedings.  Those plaintiffs collectively are referred to as the UTC, which stands for United Tort Claimants.  Other lawsuits remain pending in state court.  The UTC settled their claims against the Hospital and others as part of the Chapter 11

---

[4] Any findings of fact contained in the Discussion portion of this Memorandum Opinion not also set forth in the Findings of Fact section are incorporated by this reference into the Findings of Fact Section.
[5] Dr. Schlicht also referred to the PDA procedure as interpositional disc arthroplasty, disc arthroplasty, or disc height restoration arthroplasty.

bankruptcy case. QHR is the remaining defendant in the removed lawsuits disputing the UTC's claims.

B. The Respective Roles and Responsibilities of the Board, CEO, and Medical Staff

GCRMC is a rural hospital located in Alamogordo, New Mexico. It is a non-profit hospital that provides healthcare services to patients in the Alamogordo area. QHR is a national, for-profit hospital management company. QHR represents itself to potential hospital clients, particularly those in rural areas, as an expert in hospital administration. Its internal operating manual touts QHR's "expertise in virtually all areas of hospital operations and management." *See* Exhibit 7. QHR does in fact have a high level of expertise in hospital administration.

1. The Agreement for Hospital Administration Services

In 2005, GCRMC and QHR entered into an Agreement for Hospital Administrative Services (the "Services Agreement"), effective December 15, 2005. *See* Exhibit 6. The facts underlying the UTC's claims occurred while the Services Agreement was in effect.

Under the Services Agreement, QHR provided administrative services to the Hospital. Those administrative services included an account executive team comprised of members of one of QHR's regional offices, such as the Regional Vice President and Regional Assistant Vice President; onsite administrators, consisting of a CEO and chief financial officer ("CFO"); access to a group purchasing organization; and access by members of the Hospital's board and senior management to QHR's management training and development offerings provided by the QHR Learning Institute. *See* Services Agreement, Article II and Article III. The CEO and CFO of the Hospital were QHR employees at all times material to the UTC's claims.

The Services Agreement provided that the CEO or CFO were responsible, among other things, to "oversee the execution and performance of the administrative functions of the

- 6 -

Hospital;" to "routinely communicate with the Board or a Board representative regarding the business and operational activity of the Hospital;" to prepare an annual operating budget, annual cash flow projections, and unaudited financial statements; and to manage accounts receivable, accounts payable, and cash. *Id.* at Article II, Sections 2.2, 2.2.1, 2.2.2, 2.2.3, 2.2.4 and 2.2.5. The CEO was accountable to the Hospital's board of directors ("Board"). *Id.* at Article II, Section 2.2.

QHR was required, among other things, to

(a) "abide by all policies and procedures reasonably established by the Hospital[;]"

(b) "comply with the requirements of the Hospital's compliance program in carrying out its duties under th[e] [Services] Agreement[;]"

(c) "bring items of potential noncompliance to the Board when actually discovered by QHR (and of which QHR had actual notice)[;]" and

(d) "take corrective action prescribed by the Board once any item of noncompliance is identified[.]"

*Id.* at Article III, Sections 3.1 and 3.5.

The Services Agreement also required QHR to assist the Board with strategic planning; assist the Hospital in developing and preparing a business plan, subject to the Board's approval; and implement the Hospital's goals and objectives as established by the Board. *Id.* at Article III, Sections 3.1 and 3.3.

The Services Agreement created limitations on QHR's powers and responsibilities. Under the Services Agreement, QHR did not have the responsibility or authority to provide medical services to patients of the Hospital and was not directly involved in making clinical decisions at the Hospital. Article IV, Section 4.2 provides that the Board and the medical staff remained responsible for "[a]ll matters requiring professional medical judgments." *Id.* at Article

- 7 -

IV, Section 4.2.  According to the Services Agreement, QHR was not responsible "in any way . . . for the credentialing of any healthcare professionals on staff at the Hospital."  *Id.*

QHR had no right to direct the Hospital or its employees in the performance of their medical judgments or duties, and was to act as the Hospital's agent solely to perform the administrative services identified in the Services Agreement.  *Id.* at Article I, Section 1.2.  The CEO did not have the power to enter into or to terminate a physician's contract with the Hospital except as authorized by the Board, but could negotiate and administer physician contracts on behalf of the Hospital.  *Id.* at Article II, Section 2.3.1.

2. <u>QHR's Role in the Administrative Management of the Hospital and the Function of the CEO</u>

QHR provided the services required of it under the Services Agreement.  QHR had both an off-site team to assist the Hospital, including a Regional Vice President ("RVP"), Regional Assistant Vice President ("RAVP"), and regional financial analyst; and an on-site team at Hospital, consisting of the CEO and the CFO.  The RVP and RAVP provided guidance and assistance to the CEO, CFO, and the Board.  QHR assisted the Hospital in the preparation of a strategic plan and operating budgets.  QHR also provided support to the Hospital in the form of experts and consultants, and access to "strategic service partners" and its "group purchasing organization."  A strategic service partner provides goods or services at a reduced cost to the hospital, and pays an administrative fee to QHR in exchange for the hospital's purchase of goods or services.  The Hospital chose but was not required to use the strategic service partners.  Members of the Board and senior Hospital management attended QHR Learning Institute seminars and reviewed Learning Institute educational materials.

QHR created an Operating Practice Manual to help its regional and onsite teams meet QHR's goals of operational excellence.  *See* Exhibit 38.  The QHR Operating Practices Manual

- 8 -

requires the CEO and CFO to keep the regional office informed of all key events, such as any "incidents which could create serious problems for the hospital or QHR . . ." Exhibit 38, p.18.

QHR and its employed CEO of the Hospital were responsible for managing administrative matters at the Hospital that did not require professional medical judgments, subject to oversight by the Board. The medical staff had its own separate administrative team outside the responsibility of the CEO that reported to the medical staff, not the CEO. The CEO was responsible to make sure the Hospital had in place policies and procedures in its financial and business operations to ensure patient safety, and to see that the policies and procedures were followed. The CEO was a liaison among the governing body, medical staff, nursing services, and other services at the hospital. To better discharge this role, the CEO was an ex officio member of various committees, including the MEC. However, the CEO had no responsibility for making professional medical judgments.

A hospital CEO serves as the "gatekeeper" to ensure the safety and quality of care for the hospital's patients. The CEO protects the hospital by making sure that the hospital complies with all applicable laws and regulations. Although the CEO does not make professional medical decisions, the CEO makes sure that there are established procedures in place to ensure patient safety that comply with the requirements of the hospital's bylaws and satisfy applicable operating standards. The CEO is also responsible to make sure the procedures are followed. With respect to allegations by one physician against another relating to the care of patients, the CEO's role is not to make a medical judgment but to be sure that the right parties are at the table to discuss and evaluate what went on. If the CEO is made aware of a medical issue that could affect patient safety at the hospital, he or she should appropriately bring that matter to the attention of the medical staff leadership.

- 9 -

The role of the CEO in connection with the grant of privileges to a doctor to perform procedures on patients at the Hospital is an example of the role of the CEO in relation to patient safety.[6]  The CEO is responsible to make sure the medical staff develops a policy for the grant of privileges to physicians.  At the Hospital, the policy included an initial evaluation and recommendation by a Credentials Committee, the MEC reviewing the recommendation of the Credentials Committee, and the Board ultimately approving or disapproving the grant of privileges based upon the recommendation of the committees.  Policies were developed by the medical staff to guide the Credentials Committee's review.  The policies included verification of items on a doctor's curriculum vitae, such as college and medical degrees and licenses to practice medicine, and obtaining letters of recommendation from other doctors.  Verification of items on the doctor's curriculum vitae ("CV") and assessment of letters of recommendation was the responsibility of the medical staff and its administrative support team.  It was not the responsibility of the CEO.  The CEO's responsibility in relation to the grant of privileges was to make sure a committee structure and protocol were in place for the medical staff to review and recommend the grant of privileges, that the committees met and conducted a review and made recommendations, and that the Board ultimately approved the grant of privileges.[7]

The Corporate Bylaws of the Hospital (the "Corporate Bylaws") provided that the CEO was responsible for the "overall administrative management of GCRMC," served as an "ex officio member without a vote of all management committees," and acted as the "duly authorized representative of the board."  Exhibit P - Corporate Bylaws at Section 5.6.  Section 5.6 of the

---

[6] The Hospital has a modified policy for the grant of temporary privileges, which is outside the scope of what is described here.  The temporary privileging process, and the CEO's role in that process, is described below.

[7] The role of the CEO with respect to the suspension and revocation of privileges is discussed below under the subheading *Suspension and Revocation of Privileges*.

Corporate Bylaws provided that the CEO "shall be delegated the responsibility for overall administrative management of the hospital," including to:

> A. be responsible for implementing established policies in the operation of the hospital.
> B. provide liaison among the board, the medical staff, and the departments of the hospital.
> I. be responsible for . . . compliance with all laws, regulations and the standards of the Joint Commission on Accreditation of Hospitals.
>
> Corporate Bylaws, Section 5.6(A), (B), and (I) – Exhibit P.

In 2007, the Hospital paid QHR $1,436,664 in management fees.  *See* 2007 Tax Return – Exhibits 8 and 9.  This figure included the salaries and benefits QHR paid its employed Hospital CEO and CFO, which together totaled over $750,000.[8]

3. <u>The Role and Function of the Board</u>

The Hospital is governed by a board of trustees.  *See* Corporate Bylaws, ¶ 2.  As the governing body of the Hospital, the Board was ultimately responsible for the operation of the Hospital.  Its responsibilities included review and evaluation based on recommendations of the medical staff in order "to assess, preserve and improve the overall quality and efficiency of patient care in the hospital."  Corporate Bylaws, Section 8.1 – Exhibit P.  Through the CEO, the Board was required to "provide whatever administrative assistance [was] reasonably necessary to support and facilitate the implementation and the ongoing operation of these review and evaluation activities."  *Id.*  The Board selected and appointed the CEO of the Hospital and delegated to the CEO the responsibility for the "overall administrative management of the hospital."  Corporate Bylaws, Section 5.6.

The Board was comprised primarily of lay members of the community.  There were nine board members, including two physicians.  Over the years, there has been little turnover on the

---

[8] This figure may also include severance pay in the amount of $236,000 paid to Sue Johnson-Phillippe after her termination as CEO in 2007.

- 11 -

Board.  Norm Arnold served as chair of the Board for many years.  As chair, he took care to be informed about what was going on at the Hospital.  He is not a physician.  Dr. Art Austin served as member of the Board from 1987 through August of 2014.

The Board took its responsibilities seriously.  Based on his experience as a QHR RVP for many of QHR's managed hospitals, Bob Vento credibly testified that he considered the Board as the "gold standard" for effective and competent hospital boards.  Interim CEO James Richardson also believed that the Board was one of the more competent boards he had worked with.

The Board met monthly.  A QHR off-site representative, such as a RAVP, often attended Board meetings to serve as a sounding board for questions that might arise at a meeting or to bring educational materials to the Board.  QHR representatives did not run or control the Board meetings or the Board, and did not usurp the Board's ultimate authority.  On the other hand, the Board generally approved matters that QHR employees brought before the Board and relied on their expertise and advice.

4.  <u>The Medical Staff</u>

The medical staff of the Hospital was accountable to the Board "for conducting activities that contribute to the preservation and improvement of the quality and efficiency of patient care." Corporate Bylaws, Section 8.2 – Exhibit P.  The medical staff was responsible for, among other things, evaluating the quality of patient care, monitoring patient care practices, and delineating clinical privileges of medical staff members according to the medical staff member's "individual credentials and demonstrated ability."  Corporate Bylaws, Sections 8.2.A, B, and C.  Under the Corporate Bylaws, the Board delegated "to the medical staff the responsibility and authority to investigate and evaluate all matters relating to medical staff membership status, clinical privileges, and corrective action . . . ."  Corporate Bylaws, Section 7.3-1.  The Board had the

- 12 -

responsibility to take "[f]inal action on all matters relating to medical staff membership status, clinical privileges and corrective action" based on the recommendations of the medical staff, unless the medical staff failed to timely provide such recommendation to the Board, in which case, the Board could act on its own. Corporate Bylaws, Section 7.3-2. The medical staff was "comprised of all physicians . . . privileged to attend patients." Corporate Bylaws, Section 7.1.

The Chief of Staff was "accountable to the President and CEO, and the MEC as appropriate, for the discharge of duties in accordance with Section 9.1.B." of the Gerald Champion Regional Medical Center Medical Staff Bylaws in effect in 2007 ("Medical Staff Bylaws"). *See* Medical Staff Bylaws, Section 1.7 – Exhibit Q. Among other things, the Chief of Staff was required to work collaboratively with the Hospital's administration and the Board "in all matters of mutual concern within the hospital." *See* Medical Staff Bylaws, Sections 1.7 and 9.1.B.7 – Exhibit Q. The Chief of Staff's specific responsibilities included:

> Enforcing the Medical Staff Bylaws, Rules and Regulations, implementing sanctions when indicated, and ensuring compliance with procedural safeguards where corrective action has been warranted;
>
> Developing and implementing methods for Medical Staff Performance Improvement activities within Hospital, including quality assurance, credentialing and privileging, and utilization management; [and]
>
> Arranging for all meetings of the Medical Staff in conjunction with the President/CEO[.]
>
> Medical Staff Bylaws, Sections 9.1.B.2, 3, and 4.[9]

The Chief of Staff served as a liaison between the medical staff and the Board in representing the views of the medical staff to the Board. Dr. Frank Bryant served as Chief of Staff at the Hospital during the time period material to the UTC's claims.

The Medical Staff has its own administrative support separate from the administrative functions that are the responsibility of the CEO. The Medical Staff Coordinator is part of the

---

[9] The Medical Staff Bylaws in effect in 2006 contained similar provisions. *See* Exhibit TTT.

administrative staff that supports the medical staff. The Medical Staff Coordinator reported to the Senior Vice President of Medical Staff Affairs, not to the CEO. The welfare of the Hospital's patients is the collective responsibility of the Board, the medical staff, and the CEO. Dianna Melendrez served as Medical Staff Coordinator during the time period material to the UTC's claims.

C. The Process for Obtaining Medical Staff Appointment at the Hospital

To apply for privileges to attend patients at the Hospital and thereby be appointed to the Hospital's medical staff, a physician must submit a properly completed application to the Chief of Staff, including written recommendations, competency reports as required by the MEC, and all required supporting documentation. *See* Medical Staff Bylaws, Section 4.1 – Exhibit Q. *See also,* Medical Staff Bylaws in effect in 2006 ("2006 Medical Staff Bylaws"), Section 3.3 (requiring the applicant to submit the completed application to the medical staff office or medical staff coordinator) – Exhibit TTT. The Medical Staff Coordinator compiles the applicant's supporting documentation to be presented to the Credentials Committee, and independently verifies, among other things, an applicant's education and board certifications.

The Credentials Committee first reviews the application and makes a recommendation to the MEC as to whether the applicant should be appointed to the medical staff and what delineated privileges should be granted to the applicant. *See* Medical Staff Bylaws, Section 4.3.B.1 and 2; 2006 Medical Staff Bylaws, Section 3.4. The MEC then reviews the application, conducts whatever additional investigation the MEC thinks is appropriate, and provides a recommendation to the Board. The MEC's recommendation to the Board will specify whether the applicant should be appointed to the medical staff, and, if so, whether the applicant should be appointed with all, or only some, of the requested clinical privileges. *See* Medical Staff Bylaws,

- 14 -

Section 4.3.C; 2006 Medical Staff Bylaws, Section 3.5.  The CEO is a non-voting ex-officio member of the MEC.  *See* Medical Staff Bylaws, Section 11.3.  *See also,* 2006 Medical Staff Bylaws, Section 9.5 ("The Chief Executive Officer . . . may attend any committee, department, or section meetings of the Medical Staff as an ex-officio member.").  The CEO also may attend Credentials Committee meetings.  The Board ultimately approves the applicant's appointment to the medical staff based on the MEC's recommendations.

       D.  <u>Suspension and Revocation of Privileges</u>

The Medical Staff Bylaws empowered the Chief of Staff, the Vice Chief of Staff when acting for the Chief of Staff, the MEC, the Chief of the department of which the affected medical staff member is a member, or the CEO, to restrict or summarily suspend without a hearing or personal appearance any or all of the privileges of a physician with medical staff privileges at the Hospital "if there is cause to believe that the Medical Staff member's conduct requires that immediate action be taken to protect the life of any patient or to reduce the likelihood of imminent danger to the health or safety of any individual."  Medical Staff Bylaws, Section 6.6.A.  If a cause determination requires the exercise of professional medical judgment, the CEO could not make that determination and therefore could not summarily restrict or suspend privileges on that basis.

The Medical Staff Bylaws further provide for a "Focused Review of Medical Staff Member Conduct" process to be invoked if it appears that the conduct of a physician with medical staff privileges jeopardizes or may jeopardize patient safety, or there are competency issues. *See* Medical Staff Bylaws, Article VI.  The focused review process is initiated upon a written request submitted to the Chief of Staff, who then apprises the MEC of the request.  *Id.* at Section 6.2.  The Medical Staff Bylaws do not limit who may initiate a request for a focused

- 15 -

review. The CEO, therefore, can initiate the focused review process by submitting a written request to the Chief of Staff.[10] If a written request is made, the MEC determines whether to commence an investigation. *Id.* If the MEC fails to investigate or initiate corrective action, the Board may direct the MEC to do so if it determines that a failure to do so is against the weight of the evidence. *See* Medical Staff Bylaws, Section 6.4. The Medical Staff Bylaws also expressly impose upon the MEC the responsibility to "[r]equest evaluations of practitioners privileged through the medical staff credentialing process in instances where there is doubt about an applicant's ability to perform the privileges requested." *See* Medical Staff Bylaws, Section 11.1.A.8.

The medical staff was also responsible for peer review of physicians granted privileges at the Hospital. All physicians granted privileges were required to reapply for appointment to medical staff membership every two years. *See* Medical Staff Bylaws, Section 4.6.A. The Credentials Committee evaluated physician reapplications based on "clinical performance while a member of the medical staff including the results of quality assessment and peer review activities," and made recommendations to the MEC for review and recommendation to the Board. *Id.* at Section 4.6.C. Upon review of a physician's reapplication for medical staff membership, the Credentials Committee or the MEC could require additional proctoring if appropriate. *Id.* at Section 4.6.B. ("The Credentials Committee or MEC may require additional

---

[10] The 2006 Medical Staff Bylaws expressly provided that the CEO could request the medical staff to investigate a physician upon reliable information indicating that a physician may have exhibited conduct likely to be detrimental to patient safety or to the quality of patient care in the Hospital. *See* Exhibit TTT. Article XII, Section A provided:

> Any person with personal knowledge may provide information in writing to the medical staff about the conduct, performance, or competence of its members. When reliable information indicates a member may have exhibited acts, demeanor, or conduct reasonably likely to be (1) detrimental to patient safety or to the delivery of quality patient care within the hospital; (2) unethical; (3) contrary to the medical staff bylaws and policies and procedures; or (4) below applicable professional standards, a request for an investigation or action against such member may be initiated by the chief of staff, a department chairman, the Medical Executive Committee, Board of Directors, or the Chief Executive Officer.

2006 Medical Staff Bylaws – Exhibit TTT.

- 16 -

proctoring for any Clinical privileges that are used so infrequently as to make it difficult or unreliable to assess current competency without additional proctoring . . . ").[11]

E.  Sue Johnson-Phillippe's Tenure as the Hospital's CEO

Sue E. Johnson-Phillippe was appointed as the Hospital's CEO in 2005 and served as CEO until July of 2007.  During that time, she was employed by QHR.  The UTC asserts that organizational charts in evidence show that the medical staff was subordinate and reported to CEO Sue Johnson-Phillippe.  Various organizational charts from March of 2007 show Ms. Johnson-Phillippe at the top of the chart.  For example, one organizational chart shows Ms. Johnson-Phillippe, President and CEO, in the top box; Arthur Austin, MD, Senior Vice President Medical Staff Affairs, in a box directly below Ms. Johnson-Phillippe; and the Chief of Staff in a box to the side, above Dr. Austin, but below Ms. Johnson-Phillippe.  *See* Exhibit 150.  Another organizational chart shows the Board in a box above Ms. Johnson-Phillippe.  *Id.*  Later organizational charts for the Hospital dated January 1, 2008 show the Board in the top box; the CEO in a box directly below the Board; and the medical staff to the side with a direct line from the medical staff to the Board and a dotted line from the medical staff to the CEO.  *See* Exhibit 151.

Notwithstanding these organizational charts, the Corporate Bylaws, the 2006 Medical Staff Bylaws, and the Medical Staff Bylaws in effect in 2007, as applicable, defined the relationship between the CEO and the medical staff and their respective responsibilities.  *See* Exhibits P, TTT, and Q.  At all material times neither the Chief of Staff nor any other member of the medical staff was subordinate to the CEO with respect to the matters within the responsibility

---

[11] Proctoring is part of the process by which the medical staff evaluates physician performance.  It is discussed further below in the section relating to the grant of privileges to Dr. Schlicht.

of the medical staff under the 2006 Medical Staff Bylaws or Medical Staff Bylaws in effect in 2007 and 2008.

As part of her job as CEO, Ms. Johnson-Phillippe was actively involved in seeking out new revenue opportunities for the Hospital. She assisted with physician recruitment. During physician recruitment, the CEO gathered information on possible candidates and shared that information with other physicians in the community, the Hospital's medical director, and its nursing director. The Board authorized the CEO to recruit physicians and was kept apprised of recruitment efforts at monthly board meetings. The medical staff also provided input on the Hospital's need to recruit physicians within particular areas of practice.

Part of the recruitment process included an on-site visit to the Hospital by a prospective physician with his or her spouse to see whether there was a good fit. The CEO then proceeded with recruitment and salary negotiation at the Board's direction. The Hospital's legal counsel helped prepare and review all physician contracts. Physician contracts were signed before a physician was appointed to the Hospital's medical staff or granted privileges to perform procedures, subject to termination if such membership or grant of privileges was denied.

F.  The New Pain Management Service Line; Recruitment and Hiring of Dr. Schlicht

Before a new service line is brought to a hospital, there must be a demonstrated need for the service in the community served by the hospital, and the new service line must be financially feasible. Community need is determined through demographic studies. The hospital's CFO reviews the financial feasibility of bringing in a new service line. Feasibility takes into account the needs of the community and whether the new service line will be good for patients served by the hospital, not just whether the new service line will be profitable. Prospective physician candidates for the new service line must have the proper background and qualifications, and the

- 18 -

hospital must ensure that it has the proper support staff, policies, and procedures to support the new service line.

The Board approved pain management as a new service line for the Hospital based on demonstrated community need and financial feasibility. QHR did not support the new pain management service line to advance its own economic interests or those of the Hospital at the expense of patient care and safety. If QHR owed any duty to patients with respect to the Hospital bringing in pain management as a new service line, QHR did not breach that duty.

As early as January 2006, the medical staff discussed the need to recruit more specialists, including specialists in pain management. *See* MEC Minutes, January 10, 2006 - Exhibit C. In the spring of 2006, the Hospital retained Fox Hill Associates ("Fox Hill") to search for several physicians, including a pain management physician. *See* Exhibit JJJ. The position was described as a 100% pain management position. Fox Hill is one of QHR's strategic service partners. Ms. Johnson-Phillippe recommended using Fox Hill. During that same period, the Hospital was also in the process of developing a joint-venture surgical center known as the Alamogordo Surgery Center, JV.

Fox Hill sent the Hospital a candidate introduction letter for Dr. Christian Schlicht, DO, dated April 20, 2006 (the "Candidate Introduction Letter") referring Dr. Schlicht to the Hospital. *See* Exhibit 19. The Candidate Introduction Letter stated that Dr. Schlicht would like to interview in Alamogordo as soon as possible and could begin at the Hospital as soon as two weeks after giving notice at his current position. The Candidate Introduction Letter also indicated that Dr. Schlicht had two other job offers.

The Professional Information section of the Candidate Introduction Letter reported that Dr. Schlicht was currently the chief of minimally invasive spine surgery at the Veterans

- 19 -

Administration Medical Center (the "VA") in Albuquerque and was board certified by the American Academy of Pain Management, the American Board of Anesthesiology, and the American Board of Pain Medicine. *Id.* The Candidate Introduction Letter reported that Dr. Schlicht's "subspecialty interests are minimally invasive spine surgery and interventional spine care." *Id.* The Personal Profile section of the Candidate Introduction Letter reported that Dr. Schlicht "is an innovative physician" who "has developed and patented a new alternative treatment for disc fusion: percutaneous interpositional arthroplasty." *Id.*

A candidate introduction letter is the recruiter's attempt to interest a hospital in hiring a physician. Its contents may or may not be something the physician would attest as his or her own representations of accomplishments. Ms. Johnson-Phillippe read the Candidate Introduction Letter but took no action to confirm or investigate whether Dr. Schlicht really patented a new alternative treatment or whether Dr. Schlicht would request privileges to perform the new procedure at the Hospital. She shared the Candidate Introduction Letter with the team involved in recruiting a pain management physician, including Dr. Art Austin, Vice President of Medical Staff Affairs and a member of the Credentials Committee, but did not direct any of the medical staff at the Hospital to confirm whether Dr. Schlicht patented a new procedure or to determine whether Dr. Schlicht intended to bring the new procedure to the Hospital. Typically, Ms. Johnson-Phillippe and the physicians involved in reviewing a candidate would want to see the candidate's CV which would provide more substance. QHR was not charged with the responsibility of verifying information in the Candidate Introduction Letter or Dr. Schlicht's CV. Although in some hospitals verification of information in a candidate's CV may fall within the responsibility of the CEO, that was not so at the Hospital. At the Hospital, such responsibility was assigned to the medical staff and delegated by it to the Medical Staff Coordinator.

- 20 -

The procedure referenced in the Candidate Introduction Letter is not the PDA procedure that Dr. Schlicht performed on some of the UTC members. Ms. Johnson-Phillippe did not know what PDA was and did not know what the new patented procedure described in the Candidate Introduction Letter was. It was not her responsibility to know that or to investigate Dr. Schlicht's credentials. Other than the Candidate Introduction Letter, no other documentation potentially suggested that Dr. Schlicht intended to bring a new, invented procedure to the Hospital.

On April 21, 2006, one day after receiving the Candidate Introduction Letter, Ms. Johnson-Phillippe reported to the Board that she had "one excellent candidate expressing interest" in the pain management and anesthesia specialist position. *See* CEO Monthly Report to the Board of Trustees, Medical Executive Committee, and Senior Management and Directors dated April 21, 2005 - Exhibit 20. Dr. Art Austin also reported to the Board the enthusiasm "shown thus far for a potential pain management candidate." *See* Exhibit HHHH-5.

At its May 2006 meeting, Ms. Johnson-Phillippe and Dr. Austin updated the Board about recruitment efforts for a pain management physician. *See* Exhibit HHHH-10. The Board had a lengthy discussion of the benefits to the community and the Hospital of a pain management physician. *Id.* The Board's decision, supported by the CEO, to bring in pain management as a new service line to the Hospital was motivated by community need and enhancement of Hospital revenue. The Board also discussed and approved the retention of Equation Consulting to develop a business model and pro forma for several physician candidates, including a pain management physician. *Id.* The CEO and the Board hoped that the addition of pain management would enhance the Hospital's revenue, but neither the Board nor the CEO was motivated to achieve those revenues at the sacrifice of patient safety.

- 21 -

The Joint Finance/Executive Committee of the Board also discussed Dr. Schlicht's potential benefit to the community, the Hospital, and the Alamogordo Surgery Center, JV ("ASC, JV") at its May 2006 meeting.  *See* Exhibit 21.  The Board and the Joint Finance/Executive Committee had raised some concerns about the Hospital employing a physician instead of admitting independent physicians to the medical staff.  QHR's RVP, Bob Vento, reported to the Board that the hospital-employed physician model was becoming a more common practice in the hospital industry.  The Board approved issuing an employment agreement to Dr. Schlicht as a pain management specialist at its May 2006 meeting.  *See* Exhibit HHHH-10.  The Board did not feel forced to accept the employed physician model.

At the June 22, 2006 Joint Finance/Executive Committee meeting, Ms. Johnson-Phillippe gave an update of the physician recruitment efforts, and reported that staff was working with Equation Consulting on the economic analysis for the pain management physician, Dr. Schlicht.  *See* Exhibit UUU.  Ms. Johnson-Phillippe also reported to the Board in June that a letter of intent had been sent to Dr. Schlicht.  *See* June 26, 2006 Monthly Report – Exhibit JJJJ-14.  Continuing physician recruitment opportunities, including a pain management physician, were also discussed at the June 28, 2006 Board meeting.  *See* Exhibit HHHH-13.

At the Joint Finance/Executive Committee meeting held July 20, 2006, Ms. Johnson-Phillippe reported that an employment contract had been signed by the Hospital and Dr. Schlicht.  *See* IIII-7.  The Physician Employment Contract between the Hospital and Dr. Schlicht was signed by Ms. Johnson-Phillippe, as CEO of the Hospital, on July 24, 2006, and by Dr. Schlicht on July 22, 2006.  *See* Exhibit 22.  Dr. Schlicht's Physician Employment Contract incorrectly identifies Dr. Schlicht as an M.D., not a D.O.  *Id.*  The Hospital's legal counsel assisted in preparing Dr. Schlicht's Physician Employment Contract.  Dr. Schlicht was one of the Hospital's

- 22 -

first employed physicians. Dr. Schlicht was the Hospital's highest or one of its highest paid physicians. *See* The Hospital's 2007 Tax Return – Exhibit 8, reflecting Dr. Schlicht's salary of $450,589. The next highest paid physician reflected on the Hospital's 2007 tax return earned a salary of $384,461. *Id.*

The Hospital entered into an employment contract with Dr. Schlicht before he was granted any privileges to perform procedures on patients of the Hospital. This was done to avoid going through the privileging process if agreement could not be reached on the terms of an employment contract. If Dr. Schlicht was not subsequently granted privileges, the contract would terminate.

At its July 2006 meeting, the Board discussed the anticipated August arrival of the pain management physician and the "potential impact of interventional pain management services in the community." *See* Exhibit HHHH-20. CFO Jim Childers projected that the new pain management service line could generate over one million dollars in revenue. *Id.*

In connection with her physician recruiting efforts, Ms. Johnson-Phillippe contacted Dr. Bryant, an orthopedic surgeon with privileges at the Hospital, about providing additional manpower to assist with Dr. Bryant's practice. The Hospital entered into a Services and Management Agreement with Southwest Orthopaedic, P.C. (the "SWO Agreement") in August of 2006. *See* Exhibit LL. Southwest Orthopaedic, P.C. ("Southwest Ortho") is Dr. Bryant's professional corporation. *See* Exhibit T, Exhibit LL and Exhibit 29. Ms. Johnson-Phillippe signed the SWO Agreement on behalf of the Hospital as its CEO, and Dr. Bryant signed on behalf of Southwest Ortho. Under the SWO Agreement, the Hospital agreed to operate an outpatient pain management clinic and provide a physician to care for patients at the clinic. Dr. Bryant, through Southwest Ortho, agreed to provide "practice management and operational

- 23 -

services." SWO Agreement, Article I, Section 1.1. In a subsequent letter from Dr. Bryant to Ms. Johnson-Phillippe, Dr. Bryant indicated that he and Southwest Ortho were looking forward to associating with Dr. Schlicht. *See* Exhibit 30. Alamogordo Surgery Ventures, LLC ("ASV, LLC") was formed sometime in late summer or early fall of 2006 in connection with the start-up of the Alamogordo Surgery Center. *See* Exhibit VVV. GCRMC had a 60% interest in ASV, LLC; Dr. Schlicht had a 10% interest in ASV, LLC; and Dr. Bryant had a 5% interest in ASV, LLC. *See* Exhibit 170. It appears that ASV, LLC was set up for the purpose of encouraging physicians to invest in the joint venture and use the Alamogordo Surgery Center for outpatient/ambulatory surgery.

If QHR owed any duty to the UTC relating to the Hospital's recruitment and hiring of Dr. Schlicht, QHR did not breach any such duty.

G. Dr. Schlicht's Temporary Privileges

The Hospital's temporary privileges Policy # MS-C-9140, approved by the medical staff, the MEC, and the Board, allows the CEO to grant temporary privileges in only two circumstances. The first circumstance is to fulfill an important patient care need that mandates an immediate authorization for a limited period before the full credential information is verified and approved ("Immediate Patient Need"). *See* Policy # MS-C-9140 - Exhibit 25. The second circumstance is when an applicant has a "complete, clean application" awaiting review and approval by the MEC and the Board. ("Interim Clean Application Approval"). *Id.*

The CEO may grant temporary privileges based on Immediate Patient Need upon the recommendation of either the chief of the medical staff or the applicable clinical department chair without approval by the Credentials Committee, the MEC, or the Board, provided there is verification of current licensure and current competence. *Id.* The examples of Immediate Patient

- 24 -

Need set forth in the policy are where it is necessary for a licensed independent practitioner ("LIP") to cover for another physician who has become ill or takes a leave of absence or where a specific LIP has the necessary skills to provide care to a patient that a LIP currently privileged does not possess. *Id.*

The grant of Interim Clean Application Approval does not require the recommendation of either the chief of the medical staff or the applicable department chair, but may be granted only if the applicant's "complete, clean application is awaiting review and approval of the Medical Executive Committee and the Board of Directors." *Id.* The MEC does not review an application for medical staff privileges until after review and approval by the Credentials Committee.[12] The Court infers that the reason recommendation by the Chief of Staff or a department chair was not required for a grant of Interim Clean Application Approval is because the CEO would be acting based on the Credentials Committee's recommendation. At that point, the physician's appointment to the medical staff and grant of privileges would be awaiting review and approval by the MEC and the Board. Given that Interim Clean Application Approval is not based on an immediate, emergency need, it follows that more, rather than less, screening by medical staff would be required before the CEO may grant a physician Interim Clean Application Approval of temporary privileges. The CEO was responsible to ensure that the Credentials Committee approved the grant of the temporary privileges under the Interim Clean Application Approval procedure before the CEO granted the privileges.

To grant temporary privileges, whether under the Immediate Patient Need or Interim Clean Application Approval procedure, the medical staff office must have received:

1. Completed application and curriculum vitae (CV).
2. Written request for temporary privileges, including reason for request.
3. Response from the National Practitioner Data Bank (NPDB).

---

[12] *See* Medical Staff Bylaws, Section 4.3.B.1 and 2; 2006 Medical Staff Bylaws, Section 3.4.

- 25 -

4. Completed request for clinical privilege form.
5. Malpractice liability insurance face sheet and claims verification from the insurance company.
6. Copy of New Mexico license (and subsequent primary source verification).
7. Copy of DEA.
8. Copy of New Mexico Board of Pharmacy.
9. AMA profile.
10. Response from three professional references.
11. Medical Decree[.]
12. Copy of other Certifications (i.e. PALS, NRP)[.]

    Policy # MS-C-9140 – Exhibit 25.

By a letter to Dr. Schlicht dated August 9, 2006, signed by Dr. Frank Bryant, Chief of Staff, and Ms. Johnson-Phillippe, President and CEO, Dr. Schlicht was granted temporary privileges for a period of thirty days. *See* Exhibit 24. The Appointment Summary Sheet relating to the grant of temporary privileges reflected that many of the items required to grant temporary privileges were received *after* August 9, 2006. *See* Exhibit 28. The Review Credentials Sign-Off Form acknowledging that Dr. Schlicht had been granted temporary privileges reflected that Dr. Bryant, Chief of Staff, and Dr. Austin, Vice President of Medical Staff Affairs, each signed the form on August 28, 2006. *See* Exhibit W-88 and Exhibit PPP. The Chief of Surgery designee signed the form on August 26, 2008. *Id.* Ms. Johnson-Phillippe also signed the form as President/CEO. *Id.* Ms. Johnson-Phillippe's signature is not dated. *Id.* Given the privileging process at the Hospital and the signature dates on the Review Credentials Sign-Off Form acknowledging that temporary privileges had been granted to Dr. Schlicht, and having considered the credibility of the testimony, the Court finds that the August 9, 2006 date on the letter informing Dr. Schlicht that he had been granted temporary privileges is more likely than not a mistake or typographical error. The actual date the letter was issued was August 29, 2006, not August 9, 2006.

- 26 -

It is not clear from the letter granting temporary privileges to Dr. Schlicht or the testimony whether the privileges were granted because mandated by an Immediate Patient Need or constituted Interim Clean Application Approval. Ms. Johnson-Phillippe did not recall why Dr. Schlicht was granted temporary privileges, but suggested that perhaps temporary privileges were granted to Dr. Schlicht so he would be able to start as soon as he arrived at the Hospital. The Court infers that the temporary privileges were a grant of Interim Clean Application Approval. Because pain management was a new service line for the Hospital, there were no patients at the Hospital at that time undergoing any pain management procedures in need of immediate attention.

The CEO's grant of Interim Clean Application Approval to Dr. Schlicht to perform pain management procedures at the Hospital on August 29, 2006 violated the Hospital's temporary privileges policy. The Credentials Committee did not approve any privileges for Dr. Schlicht until September 5, 2006, a week after the grant of the temporary privileges. QHR breached its duty to the UTC in the grant of temporary privileges to Dr. Schlicht by granting the privileges before the Credentials Committee gave its approval.

Although Dr. Schlicht's first patients were scheduled for the week after August 30, 2006, *see* August 30, 2006 Board of Directors Meeting Minutes - Exhibit HHHH-30 (Dr. Austin reported that Dr. Schlicht was "expected to begin next week with approximately 40 patients scheduled."), Dr. Schlicht did not actually attend to a patient of the Hospital until after the Credentials Committee, the MEC, and the Board approved his grant of privileges.

H. Dr. Schlicht's Appointment to the Medical Staff and the Grant of Privileges to Dr. Schlicht

Any new procedure to be performed at the Hospital required separate credentialing. *See* Policy # MS-C-9000 – Exhibit 131. Policy # MS-C-9000 provides, in part:

Procedures, which have not been performed at Gerald Champion Regional Medical Center, previously, must be credentialed separately. The credentialing process for new procedures will include a review by the Medical Executive Committee and the Chief Nursing Officer. If the reviewing process discovers that special training of support staff is necessary, the physcan(s) requesting the procedure, the Clinical Department Head, and the Nursing Educator will designate a training program . . . . The new procedure will be credentialed when the Medical Executive Committee and the Chief Nursing Officer are satisfied that the staff is sufficiently trained to function safely and competently. [13]

*Id.*

The Hospital's Policy # MS-C-9020 places the burden on the physician-applicant to provide all necessary documents for membership and clinical privileges so that an "adequate evaluation of the applicant's qualifications and suitability for the clinical privileges and staff category requested" can be completed. *See* Exhibit 110. Dr. Schlicht filled out an Application for Medical Staff Appointment and Clinical Privileges at GCRMC ("Application for Medical Staff Appointment") on June 15, 2006. *See* Exhibit W-136-145. The Application for Medical Staff Appointment identified Dr. Schlicht's clinical specialty as "pain management." Dr. Schlicht listed Dr. Pace, Dr. Masel, and Dr. Echols as references. *Id.* at W-142.

Privileging requires that the applicant specifically delineate the privileges sought, and that the Credentials Committee and MEC specifically delineate which privileges are granted. Dr. Schlicht's Application for Medical Staff Membership and Privileges included a cover sheet delineating the privileges he sought. *See* Exhibit 80. The Hospital used a 7-page Delineation of Privileges form to approve the granting of privileges. A Delineation of Privileges form in pain management was prepared for Dr. Schlicht in August of 2006 using the VA delineation of privileges list that Dr. Schlicht included in his application. *See* Exhibit 147. The last page of the form, which is the signature page, states the following above the signatures:

---

[13] The UTC have not contended that the Chief Nursing Officer failed to perform the role required of him or her, and there was no evidence presented to support such a contention.

All privileges delineated have been individually considered and have been recommended and based on the Physician's specialty, licensure, specific training, experience, health status, current competence, and peer recommendations. *Id.*

The Delineation of Privileges form separately identifies each requested privilege. *Id.* Dr. Schlicht signed the Delineation of Privileges form on August 21, 2006 acknowledging that he was requesting "only those privileges for which, by education, training, current experience and demonstrated performance" he was "qualified to perform." *See* Exhibit CCCC.

Dianna Melendrez, Medical Staff Coordinator at the Hospital, gathered the background information and documents for Dr. Schlicht to be presented to the Credentials Committee in connection with Dr. Schlicht's employment, privileging and credentialing at the Hospital. She reported to Dr. Art Austin, Vice President of Medical Staff Affairs. She performed the administrative function of the Medical Staff administration, not the administrative function performed by the CEO. The Medical Staff Coordinator, not the CEO or the CEO's staff, "collects or verifies the references, licensure status, and other evidence submitted in support of the application." *See* Policy # MS-C-9000, ¶ C - Exhibit 131. Ms. Melendrez began preparing an Appointment Summary Sheet for Dr. Schlicht's application in July of 2006. *See* Exhibit 28. The Appointment Summary Sheet is a log summarizing such things as which of the application documents have been received and which required verifications have been completed. *Id.*

When reviewing a physician's application, the Credentials Committee and the MEC pay most attention to the physician's CV and board certifications, as well as the professional references. Little if any attention is paid to a recruiter's candidate introduction letter. It is not clear whether the Candidate Introduction Letter for Dr. Schlicht was included with Dr. Schlicht's application or in the Credentials Committee's review packet, but typically recruiting information was not included as part of the review packet. Ms. Johnson-Phillippe testified that the Candidate

- 29 -

Introduction Letter was not included in Credentials Committee's review packet. Dr. Austin, who participated in the recruitment of Dr. Schlicht, recalled asking Dr. Schlicht about the new procedure referenced in the Candidate Introduction Letter, that Dr. Schlicht said the procedure was an idea he was developing with Dr. Masel that involved using a metallic spacer before fusing the vertebrae together, and that the procedure did not involve PMMA. Dr. Austin was a member of the Credentials Committee. *See* Credentials Committee Minutes, September 5, 2006 - Exhibit B.

One of the requirements for the grant of privileges is "peer references familiar with the applicant's professional competence and ethical character." *See* Policy # MS-C-9000, ¶ A.2 – Exhibit 131. Dr. Pace, Dr. Masel, and "Dr. Echols/Dr. Laub" are listed on the Appointment Summary Sheet as Dr. Schlicht's references. *See* Exhibit 28. The earliest date on the Appointment Summary Sheet is July 3, 2006 noting receipt of the following items: 1) Application; 2) Attestation Statement; 3) Pharmacy Sample Signature; and 4) Release of Information Form. The latest date received noted on the Appointment Summary Sheet is August 28, 2006 for verification of current malpractice insurance. *Id.*

Dr. Masel sent a recommendation letter for Dr. Schlicht dated July 11, 2006 to Dr. Austin, Chief Medical Officer. *See* Exhibit QQ. Dr. Masel endorsed Dr. Schlicht "with the highest recommendation." *Id.* It is not clear whether Dr. Masel's recommendation letter was included with the Appointment Summary Sheet, the privileging packet, or the credentials file provided to the Credentials Committee.[14]

---

[14] The Appointment Summary Sheet does not show a date received for Dr. Masel's reference. *See* Exhibit 28. Yet, a copy of Dr. Masel's recommendation letter was included in Exhibit W, which is the material GCRMC produced to Molina Healthcare in connection with its investigation of Dr. Schlicht. *See* Exhibit W-229.

In mid-August 2006, Ms. Melendrez sent a form to Dr. Pace and to Dr. Echols requesting them to comment on Dr. Schlicht's requested privileges and to indicate which privileges they would or would not recommend for Dr. Schlicht. *See* Exhibit 124 and Exhibit RR. The privilege list sent to Dr. Pace for review identified the same privileges listed on the New Mexico VA Healthcare System, Albuquerque Current Provider Privilege Procedure List for Dr. Schlicht for Surgical Service-Minimally Invasive Spine Surgery. *See* Exhibit 124 and Exhibit RR.

Dr. Pace could not recommend Dr. Schlicht for several procedures, including annuloplasty and spinal arthroplasty, based on a lack of sufficient information to make a judgment about Dr. Schlicht's competence to perform those procedures. *See* Exhibit 124. Dr. Pace also indicated on the form by checking a box marked "yes" that Dr. Schlicht was hospitalized during the past five years, was under the care of a physician, and had health problems that may interfere with the applicant's practice of medicine. Dr. Pace provided no further explanation on the form for checking "yes" for these items. Ordinarily Ms. Melendrez would follow up with a referencing physician if any responses on the form raised questions about the applying physician. Referencing physicians sometimes complete the form in a hurry and might make an unintentional mistake. No evidence was presented to show that Ms. Melendrez followed up with Dr. Pace to clarify these "yes" responses. There is no evidence that health issues impaired Dr. Schlicht's ability to work as a physician.

Ms. Melendrez conducted a telephone interview of Dr. Echols. *See* Exhibit RR. Her notes indicated that Dr. Echols endorsed Dr. Schlicht as an "excellent physician. Very bright and intelligent. Well-liked by staff and peers. Has excellent skills." *Id.* The Appointment Summary Sheet noted that Dr. Echols would recommend Dr. Schlicht. Dr. Echols did not return a sheet individually commenting on each of Dr. Schlicht's requested privileges. *See* Exhibit 28.

- 31 -

Dr. Echols' endorsement of Dr. Schlicht carried a lot of weight with the members of the

Credentials Committee, the MEC, and the Board. Dr. Austin and Norm Arnold knew Dr. Echols

and valued his opinion. Dr. Echols had nothing bad to report about Dr. Schlicht and highly

recommended Dr. Schlicht. Dr. Echols worked at the VA, which was Dr. Schlicht's most recent

place of employment.

Ms. Melendrez requested a professional reference for Dr. Schlicht from Dr. Laub on

August 23, 2006. *See* Exhibit 125. Dr. Laub's recommendation letter reported that Dr. Schlicht

had served as a locum tenens physician for Dr. Laub from May to July of 2006. *Id.* Dr. Laub's

recommendation indicated that Dr. Schlicht was not able to obtain full Minimally Invasive Spine

Surgical Procedures privileges at the local surgical center due to the relatively short time Dr.

Schlicht served in Dr. Laub's practice, but that Dr. Schlicht was privileged to do "conventional

intervention and spinal/peripheral nerve stimulation." *Id.* Dr. Laub could not recommend Dr.

Schlicht for several privileges, including spinal arthroplasty and annuloplasty due to a lack of

sufficient information. *Id.* Dr. Laub's recommendation stated that Dr. Schlicht has "excellent

surgical abilities and intervention skills." *Id.* The Appointment Summary Sheet reflected that

Dr. Pace, Dr. Laub, and Dr. Echols each would recommend Dr. Schlicht. *See* Exhibit 28.

A cover sheet similar to the Appointment Summary Sheet accompanied the packet of

materials sent to the Credentials Committee. *Compare* Appointment Summary Sheet – Exhibit

28 *with* Application for Medical Staff Membership and Privileges – Exhibit 80. The coversheet

identified Dr. Pace, Dr. Laub, and Dr. Echols as professional references, and listed in the

comments section that Dr. Pace "would recommend," and Drs. Laub and Echols "would highly

recommend" Dr. Schlicht. *See* Exhibit 80. The items identified on the cover sheet, including

letters of recommendation, were included in the review packet given to the Credentials Committee and the MEC.

On September 5, 2006, the Credentials Committee considered and approved Dr. Schlicht's application for (Active Staff) Pain Medicine privileges as submitted, with David Masel, M.D. assigned as Dr. Schlicht's proctor, to be forwarded to the MEC for further review. *See* Credentials Committee Minutes dated September 5, 2006 – Exhibit B. On the same date, the MEC approved Dr. Schlicht's application for privileges as submitted, with David Masel, M.D., assigned as Dr. Schlicht's proctor. *See* Medical Executive Committee Minutes dated September 5, 2006 - Exhibit 32. The MEC signed the Approval Sheet for Dr. Schlicht's Delineation of Privileges, Pain Management, on September 8, 2006. *See* Exhibit CCCC. Ms. Johnson-Phillippe was present at both the Credentials Committee and the MEC meetings, and knew Dr. Masel was assigned as Dr. Schlicht's proctor. *See* Exhibit B and Exhibit 32. The Board approved the grant of privileges on September 27, 2006. *See* Exhibit CCCC. By a letter dated October 5, 2006, Sue Johnson-Phillippe informed Dr. Schlicht that his application for active staff membership in Pain Management was approved effective September 27, 2006. *See* Exhibit 34. Dr. Schlicht thereby became a member of the Hospital's medical staff.

Certain of the delineated privileges granted to Dr. Schlicht were not based on at least three professional references for each specific privilege as the medical staff ordinarily would require. For example, Dr. Schlicht was granted privileges to perform spinal arthroplasty and annuloplasty procedures that neither Dr. Laub nor Dr. Pace could recommend because of a lack of information or personal knowledge of Dr. Schlicht's competency to perform those procedures. *See* Exhibit CCCC. The pages delineating the privileges included a column to list the number of

times each procedure has been performed and a column for the location that the procedure was performed, but those columns were left blank. *Id.*

As part of the privileging process, Dr. Austin recalled reviewing a print out of all the procedures Dr. Schlicht had performed at the VA for the past several years and that the print out supported all of Dr. Schlicht's requested privileges. He testified that the documentation from the VA was a "big pile." The only evidence presented at trial as documentation of Dr. Schlicht's procedures performed at the VA was a six-page list of procedures identified by date and organized by procedure type. *See* Exhibit MMM.

In granting a physician's requested privileges, sometimes, the Credentials Committee, the MEC, and the Board used an Approval Sheet instead of the last page of the Delineation of Privileges form. *Compare* signed Approval Sheet attached to Delineation of Privileges, Pain Management – Exhibit CCCC *with* Delineation of Privileges, Pain Management - Exhibit 147 The Approval Sheet, unlike the last page of Exhibit 147, does not include the statement regarding individual consideration of privileges based on the physician's specialty, licensure, specific training, experience, health status, current competence, and peer recommendations. *See* Exhibit CCCC. However, by signing the Approval Sheet, such statement was implied. All requested procedures listed on the Privilege Delineation, Pain Management were granted. *Id.*

The Credentials Committee generally assigned an outside physician to serve as proctor when the requesting physician had a specialized area of practice less familiar to the medical staff at the Hospital. Proctoring includes direct observation of performance and/or chart review as determined by the Credentials Committee.[15] That was the situation with Dr. Schlicht who was

_____

[15] The Medical Staff Bylaws that went into effect on January 9, 2007, expressly provided that the initial appointment to the Hospital's medical staff conferred provisional status on the physician requiring proctoring for at least twelve months. *See* Medical Staff Bylaws, Sections 3.5.B and 3.5.D.1.

bringing a new service line to the Hospital.  The Credentials Committee designated Dr. Masel, a neurosurgeon from El Paso, as a proctor for Dr. Schlicht to perform chart reviews of procedures Dr. Schlicht performed.  Dr. Bryant was to directly observe Dr. Schlicht's performance.

QHR did not breach any duty to the UTC in connection with the September 2006 grant of privileges to Dr. Schlicht.  QHR did not participate in, nor was it responsible for, gathering the required recommendations and verifying Dr. Schlicht's license status and other documentation provided in support of his application for medical staff appointment.  Nor was QHR responsible for reviewing or evaluating the letters of recommendation.  The medical staff placed great weight on Dr. Echols' endorsement of Dr. Schlicht.  The Hospital had a process in place for considering and granting privileges, and the appropriate committees of the medical staff and the Board participated in and completed that process.

I.  Dr. Schlicht's Projected and Actual Performance at the Hospital

Dr. Schlicht started performing procedures at the Hospital in February of 2007.  Dr. Schlicht's first PDA procedure performed on a Hospital patient occurred in 2007. A physician practice overview for Dr. Schlicht prepared in February or March of 2007 compared the projected number of procedures Dr. Schlicht would perform with the actual number of procedures he did perform.  *See* Exhibit 23.  The chart reflects that Dr. Schlicht performed many more procedures than projected.  A billing assessment report prepared by a different consulting firm in June of 2007 suggested that Dr. Schlicht's practice was "consistent with a start-up that is ramping up."  *See* Exhibit 74.  Neither of these reports should have put the CEO on alert that there was any problem with Dr. Schlicht's practice or competency.  At the Board meeting held September 26, 2007, the Board approved a request for an additional spine instrument tray at a cost of $54,000 to meet the large volume of surgical procedures.  *See* Exhibit 42.

- 35 -

J.  Dr. Bryant, Dr. Schlicht, Minimally Invasive Spine Surgery, and the PDA Procedure

Dr. Schlicht worked with Dr. Bryant, an orthopedic surgeon who operated a clinic in conjunction with the Hospital.  *See* SWO Agreement – Exhibit T.  When Dr. Schlicht first came to the Hospital, Dr. Bryant was impressed with Dr. Schlicht and the new PDA procedure.  The two physicians together performed minimally invasive spine surgeries, including the PDA procedure, on patients of the Hospital.  On many procedures, Dr. Bryant was listed on the operating report as the lead surgeon with Dr. Schlicht as the assistant.  To serve as an assistant in a surgical procedure, a person need not be a surgeon; a nurse or a physician who is not a surgeon may serve as an assistant to a surgeon.  Dr. Schlicht also performed minimally invasive spine surgeries, including PDA, without Dr. Bryant's assistance.

Dr. Bryant and Dr. Schlicht performed the PDA procedure as therapy to treat patients, not to conduct systematic research to advance the science of medicine or for the purpose of testing or evaluating the procedure.  Neither doctor felt that the PDA procedure required a research protocol approved by an Institutional Review Board ("IRB") or research trials performed under the auspices of an IRB because, in their view, the procedure used a well-known medical device, PMMA, in a different way and was safe.  They considered the PDA procedure to involve acceptable off-label use of the material.  "Off-label" means use of an approved drug or medical device for something other than its label indication approved by the United States Food and Drug Administration.  PMMA is a "medical device."

In fact, the PDA procedure Dr. Bryant and Dr. Schlicht performed on members of the UTC was experimental and was not an appropriate off-label use of PMMA.  Its use in the manner in which Dr. Bryant and Dr. Schlicht were using PMMA was not supported by medical literature.  An IRB could not be empanelled in connection with the PDA procedure performed at

- 36 -

the Hospital because the physicians were not performing the PDA procedure for the purpose of conducting systematic research to advance the science of medicine.

Dr. Bryant considered the PDA procedure a minimally invasive spine surgery within Dr. Schlicht's granted privileges. Dr. Schlicht is not a surgeon and was neither qualified nor privileged to perform surgery. Even though minimally invasive spine surgery uses the word "surgery," procedures that fall under the description of minimally invasive spine surgery do not necessarily require a surgeon to perform them. For example, the diagnosis of pain states and treatment of pain through injections and other procedures, including kyphoplasty and vertebroplasty not near the spine, are minimally invasive spine surgery procedures but do not require a surgeon.

Dr. Austin understood the PDA procedure to be a minimally invasive procedure that need not be performed by a surgeon because it involved a very small incision that allowed the placement of a medical device (PMMA) within the space where the disc formerly resided. Like Dr. Bryant, Dr. Austin also believed that PDA fell within Dr. Schlicht's privileges. Dr. Austin did not view the PDA procedure as experimental. Dr. Austin regarded Dr. Schlicht as "more of a proceduralist." He did not consider Dr. Schlicht a surgeon. Dr. Ralph F. Rashbaum,[16] the UTC's expert in the area of spine pain management, spine surgery, and the research process required to bring experimental devices to market, distinguished pain management from surgery. Pain management consists of the diagnosis and treatment of pain states through imaging, diagnostic injections, therapeutic injections, and pain interventions. A pain management specialist can perform percutaneous intervention called kyphoplasty or vertebroplasty, and is capable of inserting an implant like a stimulator or pump, which requires a physician to cut the skin, but the incision is not near the spine or the nerve roots.

---

[16] Dr. Rashbaum is a board certified orthopedic surgeon and founder of the Texas Back Institute in Plano, Texas.

K.  The Kyphon connection to the PDA procedure

As part of a 100-Day Financial Turnaround project in February of 2007, the Hospital conducted a line item review of its expenses.  *See* Exhibit 50.  One focus of the project was to review expenses in an effort to identify expenses that could be reduced.  The review process associated the vendor, Kyphon, Inc. with spinal fusions and included a note to follow up with Dr. Bryant and Dr. Schlicht to "discuss opportunities."  *See* Exhibit 51.  The third quarter of 2007 shows a marked increase in kyphoplasty products and supplies purchased from Kyphon, Inc.  *See* Exhibit 54.1 ($40,845 purchased in the 2nd quarter and $144,039 purchased in the 3rd quarter). Kyphon, Inc. was a QHR strategic service partner.  QHR received an administrative fee for the Hospital's use of Kyphon, Inc. products in the amount of $4,334.67 in 2006 and $9,850.72 in 2007.  *See* Exhibits 55 and 56.  Kyphon, Inc. products are used for arthroplasty procedures, but not for spinal fusion.  Neither the increased use of Kyphon, Inc. products, nor the association of Kyphon, Inc. to spinal fusion in the review process should have alerted QHR that there was a potential problem with the procedures Dr. Schlicht was performing on patients of the Hospital. The use of particular products for particular procedures is a medical issue outside the scope of the CFO and CEO's knowledge and expertise.

L.  Dr. Masel's Experimental Surgery Assertion

Ms. Johnson-Phillippe resigned as CEO of the Hospital in July of 2007.  James Richardson became the interim CEO of the Hospital on July 19, 2007.  He served as interim CEO until March of 2008.  There was no overlap between the time Ms. Johnson-Phillippe left the Hospital and the date Mr. Richardson became the interim CEO.  Mr. Richardson has served as CEO for more than twenty hospitals, and was the first QHR CEO for several of QHR's

- 38 -

managed hospitals. He is experienced in the transition process when a new CEO comes to a hospital.

An issue came to Mr. Richardson's attention within a few days after he became interim CEO about whether Dr. Schlicht was performing experimental surgery on patients of the Hospital. The Hospital administration received a letter from Dr. Schlicht responding to a letter in which Dr. Masel asserted that Dr. Schlicht was improperly performing experimental surgery on patients of the Hospital. [17] *See* Exhibit 37. Dr. Masel was Dr. Schlicht's proctor charged with assessing his performance based on chart reviews. The interim CEO had only recently arrived at the Hospital and was not familiar with any of the medical staff. He was not aware that Dr. Masel was Dr. Schlicht's proctor. The transition period from one CEO to another is critical to the continuity of hospital operations. The incoming CEO must be made aware of key issues affecting the hospital.

Dr. Schlicht sent a letter to "Administration" dated July 21, 2007 in which Dr. Schlicht addressed Dr. Masel's accusations that he was "not a Spine Specialist" and was performing "experimental surgery" on patients of the Hospital. *See* Exhibit 37. In the letter Dr. Schlicht denied that he was improperly performing experimental surgery. He explained that he and Dr. Masel had a business relationship that concluded in May of 2007 after he and Dr. Masel had a disagreement over a patient referral. *Id.* Dr. Schlicht stated that he had referred a patient to Dr.

---

[17] Dr. Masel's letter was not introduced or admitted into evidence at trial, nor was Dr. Schlicht's first response to Dr. Masel's letter. Some of the contents of Dr. Masel's letter can be determined based on Dr. Schlicht's second response to Dr. Masel's letter. *See* Exhibit 37. Counsel informed the Court at trial that the special master appointed in related state court actions ruled that Dr. Masel's letter was privileged under the Review Organization Immunity Act, N.M.S.A. § 41-9-1 through § 41-9-7 ("ROIA"), and not discoverable. No party asked this Court to require production of Dr. Masel's letter or to determine whether the letter was privileged under the ROIA in the context of these proceedings. The Court could infer from the state court's exclusion of Dr. Masel's letter that the letter was part of Dr. Masel's one-year peer review. The Court need not make that inference to reach its ultimate decision.

Masel for an "open surgical opinion," but that Dr. Masel assumed he had made the initial referral of the patient to Dr. Schlicht and could, therefore, dictate the patient's care. *Id.* Dr. Schlicht claimed that, in fact, Dr. Masel fully endorsed the minimally invasive operation with the patient and the case manager. *Id.*

As part of his response letter, Dr. Schlicht attached email correspondence. In one of those emails, dated February 2, 2007, Dr. Masel praised Dr. Schlicht for taking good care of Dr. Masel's patients. Attached email correspondence from Dr. Masel dated between April 15, 2006 and April 30, 2007 indicated a very cordial relationship between the two physicians. *See* Exhibits AAA, BBB, CCC, DDD, EEE, FFF and GGG. In one email, Dr. Masel stated that "our patients say great things." *See* Exhibit BBB. The last attached email, from Dr. Schlicht to Dr. Masel dated May 7, 2007, suggested that Dr. Schlicht viewed their business and friendly relationship as ended: "I would like to hold off on any further development/business. I thank you for your previous commitment and wish you good luck in the future." *See* Exhibit 37 and Exhibit GGG.

In responding to Dr. Masel's allegation of "experimental surgery," Dr. Schlicht directed administration to an email from Dr. Masel indicating a CPT billing code to be used for "intervertebral disc prosthetic (for instance cage or methylmethacrylate)." *See* Exhibit AAA. Based on the CPT code, Dr. Schlicht concluded that Dr. Masel knew that the procedure is "not at all experimental." *See* Exhibit 37. The email is dated August 4, 2006 and describes the procedure as "a straightforward representation of PIA and has RVU status already assigned." *See* Exhibit AAA. Because the email references PIA, not PDA, it is not clear whether Dr. Masel's allegation of "experimental surgery" is a reference to PDA.

- 40 -

Dr. Masel's allegation that Dr. Schlicht was improperly performing "experimental surgery" on patients at the Hospital was highly unusual, and an explosive accusation. The accusation was made significantly more serious by the fact that it was made by Dr. Schlicht's proctor. Although Mr. Richardson was unaware that Dr. Masel was Dr. Schlicht's proctor, QHR was aware of such fact through the knowledge of the predecessor CEO Sue Johnson-Phillippe.

In response to Dr. Masel's assertion that Dr. Schlicht was improperly performing "experimental surgery" on patients of the Hospital, Mr. Richardson talked to Norm Arnold, Chairman of the Board; Dr. Bryant, Chief of Staff; Dr. Jones, chair of the Credentials Committee; and Dr. Austin, Vice-President of Medical Affairs. It is not clear whether Mr. Richardson was aware at that time that Dr. Bryant was also performing the PDA procedure. Mr. Richardson also reviewed Dr. Schlicht's privileging and credentials file.

In visiting with doctors at the Hospital with surgery credentials, Mr. Richardson learned that there was likely a competition/market share issue between Dr. Masel and Dr. Schlicht. The emails attached to Dr. Schlicht's response showed that Dr. Masel had previously praised Dr. Schlicht for taking good care of Dr. Masel's patients. Dr. Masel accused Dr. Schlicht of performing experimental surgery only after the two doctors had a business dispute. Mr. Richardson took no further action to investigate Dr. Masel's allegation of "experimental surgery." He did not contact Dr. Masel to inquire further, nor did Mr. Richardson ask the medical staff to do so. Mr. Richardson did not request the Chief of Staff to have the MEC initiate a focused review based on the assertions in Dr. Masel's letter.

Based on Dr. Schlicht's response to Dr. Masel's letter, including the referenced email correspondence between Dr. Schlicht and Dr. Masel, conversations with Dr. Bryant, Dr. Austin, and Dr. Jones, and his review of Dr. Schlicht's privileging and credentials file, Mr. Richardson

- 41 -

concluded that the accusation of experimental surgery was made as a result of a falling out between two doctors who had a business relationship and competed for market share, and that no further immediate action with respect to Dr. Schlicht was necessary.

Mr. Richardson's investigation regarding the experimental surgery accusation was inadequate.[18]  Although he consulted Dr. Bryant, the Hospital's Chief of Staff, Dr. Bryant was not disinterested.  Dr. Bryant was also performing the challenged procedure.  Dr. Masel's accusation therefore was really also an accusation directed to Dr. Bryant.  Although there is no evidence QHR was aware of it, an email Dr. Bryant wrote in December of 2007 alluding to the PDA procedure demonstrates Dr. Bryant's enthusiasm for the PDA procedure.  *See* Exhibit GGGG-134.[19]

Although Mr. Richardson consulted Dr. Jones about Dr. Schlicht, Dr. Jones was not told about the allegation of experimental surgery.  Dr. Jones only recalled an issue arising between Dr. Masel and Dr. Schlicht involving a falling out over some financial partnership of some kind and that Dr. Masel had negative things to say about Dr. Schlicht.  Dr. Jones could not remember whether the issue was brought to the Credentials Committee.  Further, Dr. Jones is not a surgeon

---

[18] General Donald B. Wagner, QHR's expert on the standard of care for hospital CEOs, testified that the type of letter Dr. Masel wrote, and Dr. Schlicht's response that Mr. Richardson read, are letters that the CEO ordinarily would not even see when they are written as part of the peer review process of a members of the Medical Staff.  However, once Mr. Richardson read Dr. Schlicht's response to Dr. Masel accusations, he could not ignore it.  He was required to take appropriate action to follow up.

[19] The email states, in part:

> Chris [Schlicht] and I hit the motherlode in surgery this AM.  We found the right combination of tools and steps to accomplish what we are absolutely certain no one else has done before. . . . [T]oday we have figured out a way to treat the degenerative disc/spine with disc height restoration, stabilization, and almost immediate pain relief ON AN OUTPATIENT BASIS using a novel combination of existing technologies!
>
> . . .
>
> I have been a little cautious to date, but after this AM's surgeries, there is no longer doubt.  I am ready to grab what I think may be the brass ring and move on to a new phase of professional satisfaction.

Exhibit GGGG - 134.

and has no specialized expertise in pain management or back surgery. Dr. Jones is a board certified physician in family medicine, and was previously board certified in hospice and palliative care.

Dr. Austin was aware that Dr. Masel had raised some concerns about Dr. Schlicht's medical judgment, but he was not aware that Dr. Masel had accused Dr. Schlicht of performing experimental surgery. No one at the hospital ever told Dr. Austin that Dr. Schlicht was performing experimental surgery. Like Dr. Jones, Dr. Austin is not a surgeon and has no specialized expertise in pain management or back surgery. Dr. Austin's area of practice is internal medicine.

While Mr. Richardson testified that he shared the concerns raised by Dr. Masel about Dr. Schlicht with Dr. Austin and others, it is unclear from the testimony at trial who actually read Dr. Masel's initial letter firsthand. Mr. Richardson offered conflicting testimony about whether he even saw Dr. Masel's letter: in his deposition Mr. Richardson testified that he was reasonably certain that he saw it, but at trial he testified he had not seen it. Seven years after the date of the letter, the best Mr. Richardson could say is that he does not know if he saw the letter. If Dr. Masel's letter was written as part of Dr. Schlicht's one-year peer review process, it is not the type of letter that would be sent directly to the CEO. A peer review letter ordinarily would be sent to the medical staff to the attention of the MEC. Neither Dr. Masel's letter, nor Dr. Schlicht's initial response to Dr. Masel's letter, were offered into evidence at trial.[20]

Mr. Richardson failed to inform the Board, or the Executive Committee of the Board, regarding Dr. Masel's accusation. Norm Arnold, chair of the Board, recalled that Dr. Masel's letter was brought to his attention, and believes that Mr. Richardson advised the members of the Board's Executive Committee of the letter at an executive session meeting. However, no

---

[20] *See footnote* 17.

executive session minutes mention the letter from Dr. Masel. If the matter was raised in a meeting of the Executive Committee, it is quite likely there would be a reference to it in the minutes. Mr. Arnold could not remember whether he ever learned that Dr. Masel had accused Dr. Schlicht of performing experimental surgery. Mr. Richardson did not identify Dr. Masel's allegation that Dr. Schlicht was performing experimental surgery as a "key event" to QHR's off-site team.

As CEO, Mr. Richardson had the authority to restrict or summarily suspend any or all of Dr. Schlicht's privileges if he found cause to believe that Dr. Schlicht's conduct required immediate action to reduce the likelihood of imminent danger to the health or safety of any individual, including a patient. *See* Medical Staff Bylaws, Section 6.6.B. The Chief of Staff, Vice Chief of Staff when acting as the Chief of Staff, MEC, and Chief of the Department of the affected medical staff member similarly had such authority. *Id*. Mr. Richardson could not, however, make the professional medical judgments necessary to summarily restrict or suspend Dr. Schlicht's privileges to perform the PDA procedure. Unlike a physician reporting to work intoxicated or some similar outrageous conduct, evaluating whether the PDA procedure posed an imminent threat required extensive medical knowledge. Therefore, Mr. Richardson could not summarily stop Dr. Schlicht from performing the PDA procedure.

However, Mr. Richardson had the ability to make a written request that the MEC initiate a focused review of Dr. Schlicht performing the PDA procedure on patients of the Hospital if it came to Mr. Richardson's attention that a physician was claiming the procedure was experimental or was unsafe. *See* Medical Staff Bylaws, Sections 6.1.A and 6.2 (enabling the CEO and others to make such a request when it appears a physician is doing something that may jeopardize the quality of patient care). If Mr. Richardson had asked the MEC to initiate an

- 44 -

investigation, the MEC would then have been required to determine whether to investigate the matter, and if it decided not to do so the Board could have directed the MEC to conduct the investigation. *See* Medical Staff Bylaws, Sections 6.2 and 6.4.[21]

QHR's role and responsibility included ensuring there was a procedure in place for the medical staff to evaluate claims that a member of the medical staff is jeopardizing patient safety, ensuring the procedure was followed, and making sure the right parties discussed and evaluated a physician's assertion that another physician is harming patients. An assertion by a physician's proctor that the physician is performing experimental surgery on the Hospital's patients is extremely significant. It requires an immediate and thorough investigation. Having received such an explosive allegation of this import from Dr. Schlicht's proctor, the actions Mr. Richardson took were inadequate. In response to Dr. Masel's assertion that Dr. Schlicht was improperly performing experimental surgery on patients of the Hospital, the CEO should have invoked the focused review procedure with the MEC and informed the Board. The MEC would have then decided whether, and how, to investigate Dr. Schlicht's use of the PDA procedure. QHR did not conform to the standard of care in the community when the interim CEO failed to request an MEC investigation of Dr. Masel's experimental surgery assertion and failed to inform the Executive Committee of the Board of the same.[22]

---

[21] Section 6.2 provides, in relevant part:
>   After discussion of the request for an investigation, the MEC may determine that an investigation commences or that no further investigation is warranted.
>   Medical Staff Bylaws, Section 6.2.
Section 6.4 provides, in relevant part:
>   If the MEC fails to investigate or initiate corrective action and the Board of Directors determines that its failure to do so is contrary to the weight of the evidence then available, the Board of Directors may, after consulting with the MEC, direct the MEC to investigate or initiate corrective action.
>   Medical Staff Bylaws, Section 6.4.
[22] Having considered all of the circumstances and the expert testimony regarding the standard of care for a hospital CEO, the Court has made a reasonable inference that the CEO should have invoked the focused review procedure contained in the Medical Staff Bylaws that he had the authority to invoke.

- 45 -

M.  The PowerPoint Presentations

In the fall of 2007, Dr. Bryant, and Dr. Schlicht prepared a power point presentation of the PDA procedure which they presented to the Board and medical staff at the Hospital.  During one of these presentations, Mr. Richardson questioned whether the procedure required an IRB.  Dr. Bryant, Dr. Schlicht, and Dr. Austin testified that an IRB was not required for the PDA procedure because PMMA had been around for a long time.  Mr. Richardson accepted these assurances even though Dr. Schlicht and Dr. Bryant were the doctors who were performing the PDA procedures, and Dr. Austin is not a surgeon.  Mr. Richardson did not take any further action to determine whether an IRB was required.

N.  Molina's Gross and Flagrant Violation Charge

On September 14, 2007, less than two months after the letter from Dr. Masel, the Hospital received a letter (the "Molina Letter") from Catharine Kincaid, M.D., Chief Medical Officer at Molina Healthcare of New Mexico ("Molina").  *See* Exhibit 44.  Molina is a medical insurance healthcare company.  Before issuing the Molina Letter, Molina requested information regarding Dr. Schlicht's certifications from the Hospital.  *See* Exhibit W-9.

Molina identified a "[l]evel IV gross and flagrant violation of acceptable medical practice, or service standard" based on its quality care review of a procedure performed by Dr. Schlicht on one of Molina's insureds.  *See* Exhibit 44.  Molina believed that Dr. Schlicht was not credentialed to perform the procedure.  *Id.*  The procedure at issue in the Molina Letter was not PDA.  Molina requested a "Corrective Action Plan (CAP) within 5 working days" of the date of the Molina Letter.  *Id.*

It is not unusual for an insurance company to question a charge or procedure for one of its insureds, but an assessment of a "gross and flagrant" violation is quite unusual.  If the

- 46 -

allegations against a physician by an insurance company are not resolved, the incident must be reported to the National Practitioner Data Bank and becomes a part of a physician's permanent record. That can have a material adverse effect on the physician's career.

Dr. Kincaid visited the Hospital in connection with her investigation of Dr. Schlicht and met with Dr. Austin and Ms. Melendrez. Mr. Richardson was not invited to participate in that meeting, which surprised Mr. Richardson. Mr. Richardson believed the Molina Letter was important, and a major issue or "key event," because it could result in the removal of an employed physician's privileges and the suspension of the physician from serving patients insured by Molina. The Molina Letter also raised serious physician due process and substantive issues. Mr. Richardson contacted legal counsel right away to assist with the Hospital's response to the Molina Letter and involved the medical staff leadership.

On-site QHR employees would participate in a monthly operating review call with offsite QHR employees to discuss issues at the Hospital. A QHR Monthly Operating Review Outline documenting a phone call of the monthly operating review committee on September 21, 2007 identified "Dr. Schlicht/Molina Issue" as a "Major Issue." *See* Exhibit 41. Norm Arnold believed that the Board was informed of the Molina Letter and that the issue was raised at an executive session meeting. A trip report prepared by QHR RVP Harry Jarvis on September 26, 2007 identified the following as a "key event:" "Medicaid HMO suspended employed anesthesiologist for procedure they perceived as beyond his capabilities; hospital and physician challenging." *See* Exhibit 59. This identified "key event" is a reference to the Molina Letter. The purpose of the trip identified in the trip report is to attend board meeting. *Id.* Norm Arnold testified that this type of issue would more likely be discussed at an executive session of the Board rather than at a regular Board meeting. Nothing about the Molina Letter is reflected in the

minutes of the Board or Executive Committee admitted in evidence. The executive session

meeting minutes from that time period are missing. The evidence is insufficient for the Court to

find that QHR failed to keep the Board apprised of the Molina Issue. The Court finds after

considering surrounding circumstances that QHR did inform the Executive Committee of the

Board about the Molina Letter.

Mr. Richardson requested and received from Molina an extension of 15 days within

which to deliver a response to the Molina Letter. *See* Exhibit W-568. The Hospital provided

Molina a copy of Dr. Schlicht's file. *See* Exhibit W.

On September 27, 2007, Dr. Bryant sent a letter to Dr. Kincaid vouching for Dr. Schlicht.

*See* Exhibit L. Dr. Bryant's letter stated that Dr. Schlicht completed his residency in

anesthesiology, was fellowship trained in interventional pain, and had received training in

minimally invasive spine surgery. *Id.* Dr. Bryant stated that Dr. Schlicht had privileges to

perform the procedure for which Molina complains and concluded that there was no basis for

Molina's allegation of a "gross and flagrant violation." *Id.*

On October 1, 2007, Dr. Echols sent a letter to Dr. Bryant sharing his "personal

observations of Dr. Schlicht." *See* Exhibit WW. Dr. Echols' letter stated that while Dr.

Schlicht's "skill set does not always fit easily into any one of the more traditionally characterized

specialties," Dr. Echols believed that Dr. Schlicht had clinical expertise and was well respected

among the surgeons and pain specialists with whom Dr. Schlicht worked. *Id.* Dr. Schlicht's

patient whose treatment was the subject of the Molina Letter sent a letter to Molina dated

October 10, 2007 complaining about Molina's actions. *See*. Exhibit ZZ.

The Hospital responded to the Molina Letter on October 4, 2007. *See* Exhibit XX and

Exhibit 145. The following persons signed the letter: 1) Mr. Richardson, CEO; 2) Dr. Austin,

- 48 -

Senior Vice President of Medical Staff Affairs; 3) Dr. Bryant, Chief of Staff; 4) Dr. Jones, Chair of the Credentials Committee; and 5) Dr. Pollard, Chief of Surgery.  The response letter referenced the letters from Dr. Bryant and Dr. Echols, stated that the Hospital was satisfied that Dr. Schlicht was privileged to perform the procedures in question, a "lumbar decompression and . . . facet fusions," and raised a concern that Molina act promptly to resolve the matter.  *Id.*  The letter asked Molina to temporarily suspend the summary suspension it imposed on Dr. Schlicht pending a more complete investigation.  *Id.*  The Hospital's legal counsel assisted in preparing the response letter.  Dr. Schlicht voluntarily agreed not to see any Molina patients until the matter was resolved.  *See* Exhibit 144 (Letter from Dr. Kincaid to Dr. Schlicht dated October 5, 2007 confirming removal of Dr. Schlicht's 29-day suspension during Molina's inquiry based on Dr. Schlicht's agreement not to see any Molina patients during the inquiry period).

On October 12, 2007, having received no response from Molina, Mr. Richardson threatened "aggressive legal and regulatory action against Molina" if Molina did not take prompt action to remove Dr. Schlicht's temporary suspension.  *See* Exhibit W-572 and W-573.  Molina lifted Dr. Schlicht's temporary suspension effective October 5, 2007, pending a final resolution. *See* Exhibit YY.

Molina completed its investigation and closed its file in December of 2007.  *See* Exhibit 104.  Molina changed its administrative policy to require that "all physicians requesting credentialing for minimally invasive spine surgery must have completed a residency in either neurosurgery or orthopedics."  *Id.*  As a result of this categorical policy change, Dr. Schlicht was no longer credentialed to perform minimally invasive spine surgery on Molina's insured patients. *Id.*  Molina considered Dr. Schlicht's credentials for pain management unchanged.  *Id.*  This resolution meant that the incident did not require reporting to the National Practitioner Data

- 49 -

Bank.  The Hospital did not change or revoke Dr. Schlicht's privileges with respect to minimally invasive spine surgery for non-Molina insured patients.

The interim CEO appropriately involved the medical staff to address the medical issues raised by the Molina Issue, and appropriately involved the Hospital's legal counsel to address the physician due process issues.  QHR did not breach a duty to the UTC in connection with how it handled the Molina Issue.

O.  Dr. Schlicht's Bogus Credentials

In October of 2007, "Benjamin Alli, MD, Ph.D., LL.D, FRCS" sent a letter to Ms. Melendrez, Medical Staff Coordinator, regarding Dr. Schlicht.  *See* Exhibit 69.  As found above, Ms. Melendrez reported to the medical staff, not the CEO.  The letter is facially bogus.  The header, from The Royal College of Physicians & Surgeons, USA, contains numerous grammatical errors, including:  "pursuance to your request;"  "The Royal College of Physicians and Surgeons of the United States of American;"  "Dr. Schlicht has impressive credential and well trained in his specialty;" and "[w]e hope that these informations meet your request."  *Id.*

A letter dated October 11, 2007 addressed to Dr. Schlicht from Sibu P. Saha, President of the International College of Surgeons, enclosed a temporary Certificate of Fellowship in neurosurgery for Dr. Schlicht.  *See* Exhibits 70 and 71.  The Certificate of Fellowship bears the name, "Christian Schlicht, M.D."  *See* Exhibit 71.  Dr. Schlicht is not an M.D. and is not a neurosurgeon.

It is not clear when, or if, Mr. Richardson saw the bogus letter or certificate.  At trial Mr. Richardson testified that he did not know if he saw the letter or the certificate but that there was a good possibility that he saw them.  Mr. Richardson pointed out that those types of letters and certificates normally would have gone to the medical staff credentialing office.  He agreed that

- 50 -

the letter is not credible. Even if he had seen the letter and certificates, Mr. Richardson does not consider them relevant because they were not used or relied upon in the credentialing and privileging process.

The Court finds that UTC did not prove by a preponderance of the evidence that Mr. Richard saw the bogus letter or certificate. Having seen Mr. Richardson's demeanor while testifying, the Court concludes that Mr. Richardson did not recall seeing the letter or certificate some seven years ago but was not entirely sure. Had he seen them, they should have triggered further investigation on his part. Bogus credentials for a physician performing procedures on a patient are a red flag requiring investigation regardless of whether they were used or relied upon in the credentialing and privileging process.

P.   Jim Heckert's Tenure as CEO and Dr. Schlicht's Departure

Jim Heckert became the CEO of the Hospital in March of 2008. Mr. Richardson did not brief Mr. Heckert about Dr. Masel's letter because he felt that issue had been fully resolved. Mr. Richardson did prepare a bullet point list for Mr. Heckert identifying 30 existing projects and issues, and he believes that an issue involving Dr. Schlicht would have been included in that list. Mr. Heckert understood that there had been some issue with Molina that had been resolved and that there had been some history of discord between Dr. Masel and Dr. Schlicht, but did not recall the specifics of either issue.

In July of 2008, Dr. Bryant and Dr. Schlicht had a meeting with Mr. Heckert regarding the Hospital's possible purchase of custom instrumentation for PDA that Dr. Bryant and Dr. Schlicht designed. *See* Exhibit 65. The Hospital did not purchase the instrumentation.

In the fall of 2008, Dr. Schlicht approached the Hospital administration about an expected bonus based on the measurement of his relative value units worked, known as "RVUs."

- 51 -

A review of Dr. Schlicht's practice performed at Mr. Heckert's direction determined that many of the procedures Dr. Schlicht performed were billed only at an assist level, which reduced Dr. Schlicht's credit for RVU by 80%. *See* Exhibit 67. For that reason, Dr. Schlicht did not receive any bonuses.

Dr. Schlicht left the Hospital in November of 2008 because he was unhappy that he did not receive bonuses. Through the date of Dr. Schlicht's departure, the Hospital had not received an unusual number of patient complaints about treatment they had received from Dr. Schlicht; the overall complication rates for the minimally invasive spine surgery procedures performed by Dr. Schlicht and Dr. Bryant were well within normal range. The medical staff and the community generally had "glowing comments" about Dr. Schlicht.

Shortly before Dr. Schlicht left the Hospital he told Dr. Bryant that there had been an error in translation of some German documents that overstated the amount of his training. Dr. Bryant was so shocked to learn of this that he did not tell anyone. The evidence is unclear regarding when the error in translation occurred or why Dr. Bryant was shocked by it.

Q.    Profit Motive

The Board and the CFO expected that the new pain management service line would generate substantial revenue for the Hospital. QHR developed a 100-Day Financial Turnaround project for the Hospital that included projected revenues from the new service line. QHR derived fees from products the Hospital purchased from QHR service partners for the new service line. After considering all of the evidence, the Court finds that QHR did not elevate Hospital profits, or fees QHR could earn, over patient health and safety. After carefully considering the evidence, the Court finds that QHR did not recommend the new pain management service line, or suggest Dr. Schlicht was a good candidate for hire, or fail to take any action relating to Dr. Schlicht, for the purpose of maximizing Hospital revenue or its fees at

- 52 -

the expense of patient safety.  QHR did not breach any duty by promoting an inappropriate

clinical procedure for the purpose of maximizing revenue at the expense of patient safety.

III.    DISCUSSION

A.    Jurisdiction[23]

Although the parties did not question this Court's jurisdiction, the Court has an

independent duty to examine its jurisdiction.  *See In re Digital Impact, Inc.,* 223 B.R. 1, 5

(Bankr.N.D.Okla. 1998)(acknowledging that the bankruptcy court "has an independent duty . . .

to determine the scope of its jurisdiction.")(citation omitted).[24]  The UTC's claims against QHR

are premised on the doctrines of corporate liability and ordinary negligence.  These are state law

tort claims.[25]

The UTC commenced these adversary proceedings by removing to this Court between

June 18, 2012 and September 12, 2012 forty-seven actions commenced in state court.  The UTC

commenced the state court actions before the Hospital filed its voluntary petition under Chapter

11 of the Bankruptcy Code.  Each state court action named the Hospital, QHR, and others as

---

[23] To examine its jurisdiction, the Court takes judicial notice of certain documents filed of record in the Hospital's
Chapter 11 case from which the facts stated below are derived. *See* Fed.R.Evid. 201(c)(1). Such facts are not in
dispute.  *See In re Theatre Row Phase II Assocs.,* 385 B.R. 511, 520 (Bankr.S.D.N.Y. 2008)("In a bankruptcy case,
the court can take judicial notice of all of the documents filed in the case although it must not make factual findings
about disputed facts from those documents.").   *See also St. Louis Baptist Temple, Inc. v. FDIC,* 605 F.2d 1169,
1172 (10th Cir. 1979)(the court "may . . . take judicial notice, whether requested or not, of its own records and files .
. .")(citations omitted).

[24] *Cf. Franklin Sav. Corp. v. United States (In re Franklin Sav. Corp.),* 385 F.3d 1279, 1286 n. 6 (10th Cir.
2004)("'[T]his court is under a continuing obligation to examine both its own jurisdiction and the jurisdiction of the
district court . . . '")(quoting *Local 514 Trans. Workers Union of Am. v. Keating,* 358 F.3d 743, 749 n. 6 (10th Cir.
2004)).

[25] Section 157(b)(5) of Title 28 provides that personal injury tort claims are to be tried in the district court. *See* 28
U.S.C. § 157(b)(5)("The district court shall order that all personal injury tort and wrongful death claims shall be
tried in the district court in which the bankruptcy case is pending . . ."). In *Stern v. Marshall,* 131 S.Ct. 2594, 180
L.Ed.2d 475 (2011), the United States Supreme Court held that this provision is not jurisdictional and may be
waived. *See Stern v. Marshall,* 131 S.Ct. at 2606-2607 (stating that "§157(b)(5) is not jurisdictional" and "does not
implicate questions of subject matter jurisdiction[,]" and finding that the defendant waived his objection to
jurisdiction by consenting to the court resolving the claim.).  Regardless of whether the UTC's claims constitute
personal injury tort claims, all parties have consented to having the claims tried in this Court.

- 53 -

defendants, and alleged that negligent acts by each defendant caused the injury allegedly suffered by each plaintiff.

The Court confirmed a Chapter 11 plan in the Hospital's bankruptcy case by an order confirming third amended plan entered August 7, 2012. *See* Case No. 11-11-13686 JA (Docket No. 712). The third amended plan became effective September 19, 2012. *See* Notice of (A) Entry of Order Confirming Third Amended Chapter 11 Plan of Reorganization for Otero County Hospital Association, Inc.; (B) Occurrence of Effective Date; and (C) Bar Dates for Asserting Administrative Claims, Fee Claims and Rejection Claims filed September 19, 2012 in Case No. 11-11-13686 JA (Docket No. 770). All but two of the removed state court actions were removed to this Court before entry of the confirmation order, and all were removed before the confirmed plan became effective. By confirming the third amended plan, the Court approved a global settlement between the UTC and the defendants in these adversary proceedings, except for the claims against QHR still at issue in the removed actions. The settlement did not become binding until the effective date of the confirmed plan. The settlement between the UTC and the Hospital involves payment of an agreed amount over a period of years. The settlement permits the UTC to reinstate their claims against the Hospital if the Hospital defaults under a note made by the Hospital in favor of a trustee acting for the benefit of the UTC. If that were to occur, the outcome of the UTC's claims against QHR may affect the amount of the Hospital's potential liability to the UTC.

The Court's jurisdiction is determined as of the date each adversary proceeding was commenced by removing a state court action to bankruptcy court. *See In re Bissonnet Investments, LLC,* 320 F.3d 520, 525 (5th Cir. 2003)("The existence of subject matter jurisdiction is determined at the time of removal.")(citing *Arnold v. Garlock,* 278 F.3d 426, 434 (5th Cir.

- 54 -

2002)); *Specialty Mills, Inc. v. Citizens State Bank,* 51 F.3d 770, 774 n. 5 (8th Cir. 1995)("Subject

matter jurisdiction should be determined at the time of removal, when federal jurisdiction was

invoked.")(citations omitted). Although a party may raise the issue of subject matter jurisdiction

at any time, the Court is "not required to 'constantly . . . revisit jurisdictional findings to

determine whether the effect of the litigation on the bankruptcy remains 'conceivable.'"

*Meritage Homes Corp. v. JPMorgan Chase Bank, N.A.,* 474 B.R. 526, 555 (Bankr.S.D.Ohio

2012)(quoting *In re WorldCom, Inc. Sec. Litig.,* 294 B.R. 553, 556 (S.D.N.Y. 2003)(citing

*Bissonnet,* 320 F.3d at 525)(remaining citations omitted)). Because each adversary proceeding

was commenced before the third amended plan became effective, the standard for assessing

jurisdiction in a Chapter 11 case prior to confirmation applies.

    Bankruptcy courts have original but not exclusive jurisdiction over "civil proceedings

arising under title 11, or arising in or related to" a bankruptcy case.[26] In a Chapter 11 case, prior

to confirmation of a plan, a civil proceeding is "related to" a bankruptcy case if "'the outcome . .

. could conceivably have any effect on the estate being administered in bankruptcy.'" *Gardner v.*

*United States (In re Gardner),* 913 F.2d 1515, 1518 (10th Cir. 1990)(quoting *Pacor, Inc. v.*

*Higgins,* 743 F.2d 984, 994 (3d Cir. 1984)). To fall within the bankruptcy court's "related to"

jurisdiction, the proceeding "need not be against the debtor or his property." *Gardner,* 913 F.2d

at 1518. A civil action is sufficiently "related to the bankruptcy if the outcome could alter the

debtor's rights, liabilities, options, or freedom of action in any way, thereby impacting on the

---

[26] *See* 28 U.S.C. § 1334(b)(providing that "the district courts shall have original but not exclusive
jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11."). 
Pursuant to 28 U.S.C. § 157(a), district courts may automatically refer all bankruptcy cases and
proceedings, and all proceedings arising in or related to a bankruptcy case to the bankruptcy judges in that
district. 28 U.S.C. § 157(a). The United States District Court for the District of New Mexico has referred
to this Court all cases and proceedings to the fullest extent permitted by 28 U.S.C. § 157(a). *See*
Administrative Order, Misc. No. 84-0324, entered March 19, 1992 in the United States District Court,
District of New Mexico.

handling and administration of the bankruptcy estate." *Id.* (citations omitted). Under this test, a bankruptcy court has jurisdiction to adjudicate claims between third parties where the outcome of the litigation could have a conceivable effect on the bankruptcy estate. *Personette v. Kennedy (In re Midgard Corp.),* 204 B.R. 764, 771 (10th Cir. BAP 1997)("[r]elated proceedings 'include . . . suits between third parties which have an effect on the bankruptcy estate.'")(quoting *Celotex Corp. v. Edwards,* 514 U.S. 300, 307 n.5, 115 S.Ct. 1493, 131 L.Ed.2d 403 (1995)).

 The potential effect each removed case could have on the bankruptcy estate as of the date the cases were removed satisfies the Tenth Circuit's test for "related to" jurisdiction. At the time of removal, at issue in each adversary proceeding was whether the Hospital, QHR, and others are liable for damages allegedly suffered by the UTC resulting from medical procedures performed at the Hospital. QHR pleaded the doctrine of comparative fault as a defense in each adversary proceeding. That defense, if found to be applicable, would require the trier of fact to apportion damages to each negligent party in an amount representing its percentage of fault. *See Gutierrez v. City of Albuquerque,* 125 N.M. 643, 647, 964 P.2d 807, 811 (1998) ("Under our comparative negligence system, each negligent party is charged an amount representing its percentage of fault.")(citing N.M.S.A. 1978 § 41-3A-1(B) (1987)). Thus, as of the time the state court actions were removed to this Court, adjudication of the UTC's claims against QHR could affect the amount of damages awarded against the Hospital, which would determine the amount of the UTC's allowed claims against the bankruptcy estate. Each removed action could, therefore, conceivably have an effect on the Hospital's Chapter 11 bankruptcy estate.

- 56 -

All parties in each adversary proceeding have expressly consented to this Court hearing and entering final judgments.[27] Thus, under 28 U.S.C. § 157(c)(2) the Court may hear and enter final judgments in each adversary proceeding.[28]

> ### B.     Whether UTC are bound by their position that neither Dr. Schlicht nor Dr. Bryant was a cause of UTC's injuries.

As a preliminary matter, the Court will address whether the UTC are bound by a denial of a request for admission, which potentially could be dispositive of all claims in the litigation. The UTC denied QHR's requests for admission that Dr. Schlicht and Dr. Bryant were "a cause" of the UTC's injuries. *See* Exhibit KKKK. The parties submitted post-trial briefs on the effect of the UTC's denials and whether the UTC may amend their responses to the requests for admission consistent with Fed.R.Civ.P. 36(b).[29]

"Unanswered requests for admission are deemed admitted." *Bergemann v. United States,* 820 F.2d 1117, 1120 (10th Cir. 1987)(citing *Rainbolt v. Johnson,* 669 F.2d 767, 768 (D.C.Cir. 1981)(remaining citation omitted)). *See also,* Fed.R.Civ.P. 36(a)(3)(providing that a matter is deemed admitted unless a written answer or objection is timely served on the requesting party). Conversely, affirmative denials of requests for admission do not have binding effect. *See Langer v. Monarch Life Ins. Co.,* 966 F.2d 786, 805 (3d Cir. 1992)(observing that "a denial of a Rule 36 request for admission simply leaves the denied proposition in dispute for trial."); *In re Agriprocessors, Inc.,*2013 WL 1332428, *6 (Bankr.N.D.Iowa Mar. 28, 2013)("Unlike

---

[27] *See, e.g.,* Adversary Proceeding No. 12-1204 - Docket Nos. 54 and 55.

[28] Section 157(c)(2) provides:

> Notwithstanding the provisions of paragraph (1) of this subsection, the district court, with the consent of all the parties to the proceeding, may refer a proceeding related to a case under title 11 to a bankruptcy judge to hear and determine and to enter appropriate orders and judgments, subject to review under section 158 of this title.
>
> 28 U.S.C. § 157(c)(2).

[29] *See* Quorum Health Resources, LLC's Argument Regarding Requests for Admissions (Docket No. 274); United Tort Claimants' Response Brief to Defendant Quorum Health Resources, LLC's Argument Regarding Requests for Admissions (Docket No. 275); and Quorum Health Resources, LLC's Reply Re: Argument Regarding Requests for Admissions (Docket No. 276).

admissions, denials of requests for admissions do not have conclusive effect.")(citing Fed.R.Civ.P. 36(b)).[30]

Because the denial of a request for admission is not binding, the UTC need not seek to withdraw their denials of QHR's requests for admission. QHR concedes that Fed.R.Civ.P. 36 distinguishes between the binding effect of admissions based on a failure to respond and the effect of denials, but nevertheless urges the Court to exercise its discretion to hold the UTC to the positions taken in their briefs as binding admissions. *See U. S. Energy Corp. v. Nukem, Inc.,* 400 F.3d 822, 833 n. 4 (10th Cir. 2005)(observing that "[s]tatements in briefs 'may be considered admissions in the court's discretion'")(quoting *Guidry v. Sheet Metal Workers Int'l Assoc.,* 10 F.3d 700, 716 (10th Cir. 1993)); *American Title Ins. Co. v. Lacelaw Corp.,* 861 F.2d 224, 227 (9th Cir. 1988)(holding "that statements of fact contained in a brief *may* be considered admissions of the party in the discretion of the district court.")(emphasis in original).

A judicial admission is a "formal admission[ ] . . . which ha[s] the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact." *Guidry,* 10 F.3d at 716, *abrogated in part on other grounds on reh'g,* 39 F.3d 1078 (10th Cir. 1994)(en banc)(quoting *Lacelaw,* 861 F.2d at 226)(additional quotation marks and additional citation omitted). Propositions of law and legal argument do not constitute judicial admissions. *Id. See also, In re Brock,* 587 Fed.Appx. 485, 490 (10th Cir. 2014)(the judicial admission doctrine "does not apply to 'proposition[s] of law.'")(quoting *Guidry,* 10 F.3d at 716). The Court declines to

---

[30] Rule 36(b) provides:
> A matter admitted under this rule is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended. Subject to Rule 16(e), the court may permit withdrawal or amendment if it would promote the presentation of the merits of the action and if the court is not persuaded that it would prejudice the requesting party in maintaining or defending the action on the merits. An admission under this rule is not an admission for any other purpose and cannot be used against the party in any other proceeding.
> Fed.R.Civ.P. 36(b), made applicable to adversary proceedings by Fed.R.Bankr.P. 7036.

exercise its discretion to treat the UTC's now retracted position that the physicians were not "a cause" of their injuries as a binding factual determination. The Court did not rely on UTC's now retracted position, and has determined justice is best served by deciding these cases on the merits.

    C.    <u>Negligence Under New Mexico Law: Duty and Breach</u>

The UTC's complaint against QHR is for negligence in the operation of the Hospital. In support of its negligence claims, the UTC point to various commissions and omissions which fall into three general categories: (1) employing Dr. Schlicht; (2) granting Dr. Schlicht privileges to perform procedures on patients at the Hospital; and (3) thereafter allowing Dr. Schlicht to continue to perform procedures at the Hospital by not suspending or revoking his privileges. Because the UTC's "negligence claims are pendent state-law claims, we apply the substantive law of the forum state, New Mexico." *Henderson v. Bd. of Cnty. Comm'rs for San Miguel Cnty.*, 534 Fed.Appx. 686, 688 (10th Cir. 2013)(citing *Lytle v. City of Haysville*, 138 F.3d 857, 868 (10th Cir.1998)). "New Mexico generally follows the doctrine of *lex loci delicti*, . . . meaning the law of the place where the . . . wrong took place," to determine which state's law to apply to a tort claim. *Gilmore v. Gilmore (In re Estate of Gilmore)*, 124 N.M. 119, 122, 946 P.2d 1130, 1133 (Ct.App. 1997)(quoting *Torres v. State*, 119 N.M. 609, 613, 894 P.2d 386, 390 (1995) and *Black's Law Dictionary* 630 (abr. 6th ed. 1991)(internal quotation marks omitted)). The alleged negligence occurred at the Hospital in Alamogordo, New Mexico. The Court will, therefore, apply New Mexico law.

A claim for negligence under New Mexico law "requires that the plaintiff establish four elements: (1) defendant's duty to the plaintiff, (2) breach of that duty, typically based on a reasonable standard of care, (3) injury to the plaintiff [*i.e.* damages], and (4) the breach of duty

- 59 -

as cause of the injury." *Zamora v. St. Vincent Hosp.,* 335 P.3d 1243, 1249 (N.M. 2014)(citation

omitted). The causation element requires that breach of the duty is both a proximate cause and a

cause in fact of the plaintiff's damages. *Herrera v. Quality Pontiac*, 134 N.M. 43, 48, 73 P.3d

181, 186 (2003). As the Court explained above, only duty and breach of duty are at issue here.

### 1. Whether QHR Owed a Duty to UTC

The Court is faced with the difficult question of whether a hospital management

company—along with the hospital and its physicians—owes a direct duty to patients. It is an

issue of first impression in New Mexico, and no other court appears to have directly addressed it

in a reported decision. This Court "'must endeavor to predict how [the New Mexico Supreme

C]ourt would rule' by considering the rulings of that state's intermediate courts, or in light of

decisions from other jurisdictions, statutes, or treatises." *Hausler v. Felton,* 2012 WL 120057,

*4, 457 Fed.Appx. 727, 731 (10th Cir. 2012) (quoting *Johnson v. Riddle*, 305 F.3d 1107, 1118-19

(10th Cir. 2002)(remaining citation omitted)).

The issue of whether a plaintiff owes a duty to a defendant is to be decided as a matter of

law based on established legal policy. *See Rodriguez v. Del Sol Shopping Center Associates,

L.P.,* 326 P.3d 465, 473 (N.M. 2014)("courts should focus on policy considerations when

determining the scope or existence of a duty of care."). *See also Solon v. WEK Drilling Co.,

Inc.,* 113 N.M. 566, 571, 829 P.2d 645, 650 (1992) ("It is thoroughly settled in New Mexico …

that whether the defendant owes a duty to the plaintiff is a question of law.")(citations omitted).

According to the UTC, the doctrines of corporate liability and ordinary negligence both give rise

to a direct duty of care on the part of QHR to patients of the Hospital, including the UTC.

- 60 -

(a) _Duty Under the Doctrine of Corporate Liability_

The proposition that a hospital owes a duty of care directly to its patients is well established under the doctrine of corporate liability. UTC would have the Court extend that doctrine to hospital management companies, like QHR.

The doctrine of corporate liability, also known as "corporate negligence," recognizes a hospital's direct, non-delegable duty of care to its patients. _See, Diaz v. Feil,_ 118 N.M. 385, 389, 881 P.2d 745, 749 (Ct.App. 1994)("[I]t is beyond question in New Mexico that a hospital owes an independent duty of care to patients at the hospital.")(citations omitted). This now well-established doctrine was first recognized in _Darling v. Charleston Cmty. Hosp._, 33 Ill.2d 326, 211 N.E.2d 253 (1965), _cert. denied_ 383 U.S. 946, 86 S.Ct. 1204, 16 L.Ed.2d 209 (1966). _See_ M. Nathanson, _Hospital Corporate Negligence: Enforcing the Hospital's Role of Administrator_, 28 Tort & Ins. L.J. 575, 579 (1993) ("_Darling_ was the first case to hold that a hospital has an independent duty to supervise the physicians who practice within its walls."). In _Darling,_ the Illinois Supreme Court determined that a hospital could breach a duty to a patient by not requiring emergency room nurses to test circulation in the patient's leg to detect a progressive gangrenous condition or to require consultations between the nursing and medical staff as needed. _Darling,_ 33 Ill.2d at 332-333, 211 N.E.2d at 257-58. Although some jurisdictions have extended the hospital corporate liability doctrine to HMOs and other healthcare providers,[31] the Court has found no cases that apply the doctrine to hospital management companies, nor have the UTC cited any such case.

---

[31] _See, e.g., Petrovich v. Share Health Plan of Ill., Inc.,_ 296 Ill.App.3d 849, 696 N.E.2d 356, 360-61 (1998), _aff'd,_ 188 Ill.2d 17, 719 N.E.2d 756 (1999) ("HMOs can be held liable for medical malpractice based on . . . corporate negligence as a result of negligent selection and control of the physician who rendered care . . . or corporate negligence as a result of the corporation's independent acts of negligence.")(citation omitted); _Sokolsky v. Eidelman,_ 93 A.3d 858, 869 (Pa.Super.Ct. 2014)(noting that the theory of corporate negligence has been applied in Pennsylvania to a health maintenance organization and a professional medical corporation).

- 61 -

In New Mexico, hospitals owe a duty to patients to exercise ordinary care under the doctrine of corporate negligence in granting staff privileges and supervising medical treatment. *Eckhardt v. Charter Hosp. of Albuquerque, Inc.,* 124 N.M. 549, 559, 953 P.2d 722, 732 (Ct.App. 1997)("New Mexico law . . . recognizes that the doctrine of corporate negligence may impose liability on a hospital for the negligent granting of staff privileges or the negligent supervision of treatment.")(citation omitted).[32] This is generally consistent with corporate liability cases from other jurisdictions, which typically involve negligent hiring and privileging physicians.[33] Some courts have amplified these duties to include the "duty to exercise reasonable care in the procurement and maintenance of equipment; the duty to exercise reasonable care in granting, renewing, and extending staff privileges; the duty to monitor and review patients' treatment and progress; and the duty to make and enforce rules." *McVay v. Rich*, 255 Kan. 371, 874 P.2d 641, 644 (1994), citing Mark E. Milsop, *Corporate Negligence: Defining the Duty Owed By Hospitals to Their Patients,* 30 Duq.L.Rev., 639 at 648-56 (1992).[34] Similarly, in Pennsylvania, hospitals owe to their patients: "'(1) a duty to use reasonable care in the maintenance of safe and adequate facilities and equipment; (2) a duty to select and retain only competent physicians; (3) a duty to oversee all persons who practice medicine within its walls as to patient care; and (4) a duty to formulate, adopt and enforce adequate rules and policies to ensure quality care for the patients.'"

---

[32] *See also, Cooper v. Curry,* 92 N.M. 417, 420, 589 P.2d 201, 204 (Ct.App. 1978)(acknowledging the corporate negligence theory, but pointing out that a hospital's liability under this theory "has been limited to the negligent granting of staff privileges or the negligent supervision of treatment.")(citations omitted).

[33] *See, e.g., Larson v. Wasemiller,* 738 N.W.2d 300, 306 n. 3 (Minn. 2007)(collecting cases from 27 states recognizing the tort of negligent credentialing); *Gafner v. Down East Cmty. Hosp.,* 735 A.2d 969, 979 (Me. 1999)(observing that "most courts that have recognized the cause of action referred to as corporate liability have grounded the claim upon the responsibility of the facility to assure that physicians practicing in the facility are properly credentialed and licensed.").

[34] *See also Johnson v. Misericordia Cmty. Hosp.,* 99 Wis.2d 708, 725, 301 N.W.2d 156, 165 (1981)(explaining that cases applying the corporate liability doctrine "hold that a hospital has a direct and independent responsibility to its patients, over and above that of the physicians and surgeons practicing therein, to take responsible steps to (1) insure that its medical staff is qualified for the privileges granted and/or (2) to evaluate the care provided.").

- 62 -

*Sokolsky,* 93 A.3d at 869 (quoting *Thompson v. Nason Hosp.*, 527 Pa. 330, 591 A.2d 703, 707-708 (1991)).

Several policies reasons underlie the duty component of the corporate negligence doctrine. First, patients tend to look to the hospital itself—rather than the individual physicians practicing within the hospital—as their healthcare provider while receiving treatment at the hospital. *See Malanowski v. Jabamoni,* 293 Ill.App.3d 720, 729, 688 N.E.2d 732, 738 (Ct.App. 1997)(explaining that "hospitals today assume a much greater role in coordinating the total healthcare of patients, leading the public to rely on the hospital, itself, as the heath care provider.").[35] Further, "the hospital is in a superior position to supervise and monitor physician performance and is, consequently, the only entity that can realistically provide quality control" to protect its patients. *Insinga v. LaBella*, 543 So.2d 209, 214 (Fla. 1989). In addition, because the corporate liability doctrine imposes on the hospital a direct duty of care, a patient may be able to hold a hospital liable in circumstances in which "the physicians who allegedly caused the injuries were independent contractors rather than employees, rendering the theory of respondeat superior inapplicable." *Harris v. Extendicare Homes, Inc.*, 829 F.Supp.2d 1023, 1029 (W.D. Wash. 2011)(citations omitted).

After considering the policies underlying the corporate liability doctrine, the Court is convinced that a hospital management company such as QHR does not owe the same duty of care to patients as a hospital. Even though patients may tend to consider the hospital itself, rather than any individual physician practicing at the hospital, as their healthcare provider while

---

[35] *See also,* Martin C. McWilliams, Jr. & Hamilton E. Russell, III, *Hospital Liability for Torts of Independent Contractor Physicians,* 47 S.C.L.Rev. 431, 473 (1996) (explaining that "the hospital itself has come to be perceived as the provider of medical services. According to this view, patients come to the hospital to be cured, and the doctors who practice there are the hospital's instrumentalities, regardless of the nature of the private arrangements between the hospital and the physician. Whether or not this perception is accurate seemingly matters little when weighed against the momentum of changing public perception and attendant public policy.").

- 63 -

receiving treatment at the hospital, they do not regard hospital administrators as the providers of their medical care. Typically, patients are unaware of the existence of a separate hospital management company. Hospital patients would have no reason to know that a hospital management company, like QHR, provided administrative services to the Hospital.

In addition, unlike hospitals which exercise a fair amount of control over employee and non-employee/independent contractor physicians through their medical staff, hospital management companies are not in a position to supervise, monitor, or evaluate physician performance. A hospital management company's role in assuring the quality of patient care at a hospital is much narrower than that of the hospital itself. The hospital management company does not assess the competency of physicians or nurses, nor does it make any decisions requiring professional medical judgments. The Court will not, therefore, impose the same duty that a hospital owes to a patient under the doctrine of corporate liability on a hospital management company, such as the duty of care in granting staff privileges and supervising medical treatment.

The inapplicability of the corporate liability doctrine to hospital management companies does not, however, mean that hospital management companies can never owe a duty to patients under ordinary negligence principals. When applied to a defendant-hospital's own actions, corporate negligence is really "no more than the application of common law principles of negligence . . ." *Blanton v. Moses H. Cone Mem'l Hosp., Inc.,* 319 N.C. 372, 375, 354 S.E.2d 455, 457 (1987). *See also, Harris,* 829 F.Supp.2d at 1029-1030 (finding that although the policy rationale for corporate negligence was inapplicable, the theory was unnecessary because the court would allow plaintiff to pursue direct negligence claims for negligent hiring, retention, training and supervision against the nursing home operator based on its own alleged negligence); *McClellan v. Health Maint. Org. of Pa.,* 413 Pa.Super. 128, 140, 604 A.2d 1053, 1059 (Super.

- 64 -

Ct. 1992)(observing that "[i]t would appear unnecessary . . . to extend the theory of corporate negligence to . . . HMOs in order to find that such HMOs have a non-delegable duty to select and retain only competent primary care physicians.").  *Cf. Hohenleitner v. Quorum Health Res., Inc.,* 435 Mass. 424, 438 n. 11, 758 N.E.2d 616, 626 n.11 (2001)(leaving open the question of whether QHR could be held liable for its own negligence in failing to properly train or supervise the nursing staff, or failing to implement hospital policy, because the plaintiff did not assert a direct negligence claim).  The Court will therefore examine whether QHR, based on its own conduct, owes a duty to the UTC under ordinary negligence principles, and, if so, the scope of that duty.

(b) *Duty of Care Under Ordinary Negligence Principles*

The UTC argue that under ordinary negligence principles, QHR owed a duty to patients in connection with the employment, privileging, retention, and supervision of Dr. Schlicht.  QHR counters that it had no duty to patients with respect to those activities—and therefore has no liability in this case—because its function was strictly limited to managing administrative, non-medical matters at the Hospital.

The duty component in many New Mexico negligence cases traditionally involved two concepts: foreseeability and policy.[36]  The New Mexico Supreme Court recently clarified the duty analysis in *Del Sol,* 326 P.3d 465.  *Del Sol* overruled prior cases holding that foreseeability considerations can support a court's determination that no duty exists or that an existing duty should be limited.  The court reasoned that considering foreseeability and remoteness necessarily

---

[36] *See, e.g., Herrera,* 134 N.M. at 52, 73 P.3d at 190 (observing that "New Mexico has adopted and applied for decades the majority view of *Palsgraf,* that a negligent actor only owes a duty to those whose injuries are a foreseeable result of the negligence[,]" and stating further that "[t]his court has consistently relied on the principle of foreseeability, along with policy concerns, to determine whether a defendant owed a duty to a particular plaintiff or class of plaintiffs."); *Chavez v. Desert Eagle Distrib. Co.,* 141 N.M. 116, 120, 151 P.3d 77, 81 (Ct.App. 2006), *overruled by Del Sol,* 326 P.3d 465 (2014) ("In New Mexico, the question of whether a common law duty exists requires consideration of both foreseeability and policy.")(citations omitted).

- 65 -

invites a discussion of particularized facts, which is inconsistent with the notion that the duty determination is a question of law. *Id.* at 471. Factual details relevant to "whether to modify the duty of ordinary care or exempt a defendant from that duty" relate to whether there has been a breach of duty, not to the existence of a duty. *Id.* Today, the determination of whether a duty exists must be based on policy considerations. *Del Sol,* 326 P.3d at 474 (concluding that "courts must articulate specific policy reasons, unrelated to foreseeability considerations, when deciding whether a defendant does or does not have a duty or that an existing duty should be limited").

"The question of policy is answered by reference to legal precedent, statutes, and other principles of law." *Provencio v. Wenrich*, 150 N.M. 457, 261 P.3d 1089, 1094 (2011)(citation and internal quotation marks omitted), *overruled on other grounds by Del Sol,* 326 P.3d 465). Since there is no New Mexico or other reported case law directly relating to the duty owed by hospital management companies to patients of a hospital, the Court begins with several general propositions.

Absent "a relationship … that legally obligates a defendant to protect a plaintiff's interest, . . . there exists no general duty to protect others from harm." *Thompson v. Potter,* 268 P.3d 57, 63 (N.M. Ct.App. 2011)(citation and internal quotation marks omitted). A duty to protect another from harm can be imposed based on a special relationship between the parties, which "typically involves situations where there is a supervisory or treatment relationship, or where there is direct custody and control over another." *Id.* at 65 (citation omitted).[37] However, an actor generally will have no duty to prevent injury to others where the actor is not authorized

---

[37] *See also Johnstone v. City of Albuquerque,* 140 N.M. 596, 600, 145 P.3d 76, 80 (Ct. App. 2006) ("To impose a duty, a relationship must exist that legally obligates Defendant to protect Plaintiff's interest.")(citation omitted). *Cf. Baldonado v. El Paso Natural Gas Co.,* 143 N.M. 297, 303, 176 P.3d 286, 292 (Ct. App. 2006), *aff'd,* 143 N.M. 288, 176 P.3d 277 (2007)(observing that "[a] defendant who seeks shelter from generally applicable rules of tort liability must demonstrate that the exception is justified by overriding policy considerations.") (internal quotation marks and citation omitted).

- 66 -

to exercise control over the instrumentality or individual who caused the injury. *Klopp v. Wackenhut Corp.*, 113 N.M. 153, 161, 824 P.2d 293, 301 (1992)(finding no liability where the defendant had no authority to control the premises where the injury occurred).

When a person does choose to act, the "actor ordinarily has a duty to exercise reasonable care when the actor's conduct creates or increases a risk of physical harm." Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 7 (2010).[38] *See also Davis v. Bd. of Cnty. Comm'rs of Dona Ana Cnty,* 127 N.M. 785, 791, 987 P.2d 1172, 1178 (Ct.App. 1999)("[E]very person has a duty to exercise ordinary care for the safety of others when that person does choose to act.")(citations and internal quotation marks omitted). The Court may determine, eliminate, or limit such duty only if it "articulate[s] specific policy reasons[ ] unrelated to foreseeability considerations." *Del Sol*, 326 P.3d at 474.

Although the ultimate determination of whether a defendant owes a duty to a plaintiff is a question of law, the Court may also consider "the relationship of the parties, the nature of the plaintiff's interest[,] and the defendant's conduct," to the extent those factors affect policy and not foreseeability. *Johnstone*, 140 N.M. at 600, 145 P.3d at 80. *See also Sambrano v. Savage Arms, Inc.,* 338 P.3d 103, 106 (N.M. Ct.App. 2014)(J. Vigil, concurring)(citing *Del Sol* and concluding that based on public policy and the nonexistent relationship between the parties, a firearm manufacturer does not owe a duty to the victim of a home invasion because the firearm manufacturer has no ability to control the risk of harm); *Brown v. Kellogg*, 340 P.3d 1274, 1275

---

[38] The New Mexico Supreme Court adopted Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 7, along with comment j of that section, in *Del Sol*, 326 P.3d 465. That entire section provides:

> (a) An actor ordinarily has a duty to exercise reasonable care when the actor's conduct creates a risk of physical harm.
> (b) In exceptional cases, when an articulated countervailing principle or policy warrants denying or limiting liability in a particular class of cases, a court may decide that the defendant has no duty or that the ordinary duty of reasonable care requires modification.
> Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 7 (2010).

- 67 -

(N.M. Ct.App. 2014), *cert. denied,* 339 P.3d 841 (2014)(citing *Del Sol* for the proposition that courts should consider public policy and the competing interests of the parties to determine whether a duty exists).

Here, QHR asserts that it had no relationship with the Hospital's patients. QHR points out that its role at the Hospital was administrative and that it did not have control over credentialing, privileging, medical decisions, or the supervision of a physician's care of patients. For example, the Hospital Corporate Bylaws "delegate to the medical staff the responsibility and authority to investigate and evaluate all matters relating to medical staff membership status, clinical privileges, and corrective action." Corporate Bylaws, Section 7.3-1. The Services Agreement between QHR and the Hospital also provides that "[a]ll matters requiring professional medical judgments shall remain the responsibility of the Board, the Medical Staff and allied health professionals[,]" and that "QHR shall not in any way be responsible for the credentialing of any healthcare professionals on staff" at GCRMC. *Id.* at Section 4.2.[39]

The Court agrees that the role of a hospital management company in connection with a hospital employing, privileging, and supervising physicians is considerably narrower than that of the hospital. A hospital's medical staff is primarily responsible for the quality of patient care,[40] and the hospital board is ultimately responsible for all decisions of the hospital, including the

---

[39] *See also* Services Agreement, Section 1.2 – Exhibit 6 (noting that QHR was retained to "perform . . . administrative services . . . that are related to the non-medical aspects of the Hospital's business" and that "QHR ha[d] no right to direct the Hospital or the Hospital employees in the performance of their medical judgments or duties").

[40] *See* N.M.A.C. 7.7.2.26(A)(1)("The medical staff shall be responsible to the governing body of the hospital for the quality of all medical care provided patients in the hospital and for the ethical and professional practices of its members."). *Cf.* 42 C.F.R. § 482.12(a)(5)(requiring that the governing body "[e]nsure that the medical staff is accountable to the governing body for the quality of care provided to patients.").

appointment of medical staff.[41]  For example, while a hospital's management company can review the financial terms of a physician's proposed employment contract, only the medical staff can evaluate: (1) whether a physician is sufficiently competent and qualified to be employed at the hospital; and (2) whether a physician has the necessary expertise to be privileged to perform procedures at the hospital.  Similarly, if a question arises as to the safety of a medical procedure performed by the physician at the hospital, the hospital's medical staff must evaluate the quality of care the physician is providing.  Because hospital management companies such as QHR are not permitted to, or even capable of, making those professional medical judgments, they do not have a duty to evaluate either the competency of a physician or the care the physician provides to the hospital's patients.  This is consistent with the policy that only physicians can make medical judgments. *See* N.M.A.C. 7.7.2.26(A)(1)(providing that the medical staff is responsible to the governing body for the quality of medical care provided to the hospital's patients).  It is also consistent with the policy that generally an actor's duty with respect to an activity is limited by the extent of its control over that activity.  *See Klopp,* 113 N.M. at 160-161, 824 P.2d at 300-301 (explaining that although "[t]he tort liability . . . is not limited to the affirmative obligations of the contract of service . . . . the liability of an employee or agent for injuries caused by dangerous conditions on occupied premises is directly related to actual control over the premises.").

With that said, the Court is not convinced that the role of a hospital management company charged with discharging the responsibilities of the hospital's chief executive officer is so limited, nor its relationship with the hospital's patients so tenuous, that it owes no direct duty

---

[41] *See* N.M.A.C. 7.7.2.18(A)("The hospital shall have an effective governing body, which is legally responsible for the management and provision of all hospital services, maintenance of the hospital services and the quality thereof."); N.M.A.C. 7.7.2.18(F)("The governing body shall appoint members of the medical staff in accordance with the approved medical staff by-laws."); N.M.A.C. 7.7.2.26(C)(1) ("[M]edical staff appointments shall be made by the governing body, taking into account recommendations made by the active medical staff."). *Cf.* 42 C.F.R. § 482.12 ("There must be an effective governing body that is legally responsible for the conduct of the hospital.").

- 69 -

to patients.  Patients have an interest in receiving safe and effective healthcare from the physicians who treat them at the hospital.  Hospital management companies play an active role in achieving that goal.  For example, the regulations governing hospitals provide that a hospital's chief executive officer/administrator must:

> (1) keep the governing body fully informed about the quality of patient care, the management and financial status of the hospital, survey results and the adequacy of physical plant, equipment and personnel;

> (2) organize the day-to-day functions of the hospital; [and]
> . . .
> (5) ensure that there is sufficient communication among the governing body, medical staff, nursing services and other services, hold interdepartmental and departmental meetings, where appropriate, attend or be represented at the meetings on a regular basis, and report to the governing body on the pertinent activities of the hospital.

N.M.A.C. 7.7.2.20(C)(1), (2), and (5).

The objective of those regulations is to "[e]stablish standards for licensing hospitals in order to ensure that hospital patients receive adequate care and treatment and that the health and safety of patients and hospital employees are protected."  *Id.* at 7.7.2.6(A).  The Hospital's Corporate Bylaws likewise provide that the CEO shall "be responsible for implementing established policies in the operation of the hospital" and "provide liaison among the board, the medical staff and the departments of the hospital."  Corporate Bylaws, Section 5.6, subparagraphs (A) and (B).  Patient safety is the dual responsibility of the medical staff and the hospital administrators, who have the unique ability to coordinate across departments when potential problems arise.

Like the hospital itself, a hospital management company is responsible to make sure procedures are in place to protect hospital patients, and to make sure that the procedures are being followed.  A hospital management company also must ensure the hospital is in compliance with applicable state and federal regulations, including those designed to protect patient safety.

- 70 -

Where a hospital management company employs the on-site CEO and CFO, the hospital management company is charged with discharging the responsibilities of the hospital's CEO and CFO. A hospital management company, such as QHR, provides specialized knowledge and expertise in the administrative, non-medical aspects of hospital management beyond the expertise that a hospital-employed CEO and CFO would have.

The Court concludes that a hospital management company, like QHR, retained to discharge the duties of the hospital's CEO and CFO and to provide other non-medical administrative services, owes a duty of care, consistent with its role, administrative responsibilities, and control, to ensure that the hospital implements and follows appropriate procedures to protect the health and safety of the hospital's patients. That duty flows directly to patients—who are the intended beneficiaries of such procedures—and includes: (1) the duty to appropriately involve medical staff in evaluating medical issues; and (2) the duty to inform the board and the medical staff about issues relating to patient safety known or that should be known by the hospital management company.[42] Taking into account the role and specialized expertise of a hospital management company and the relationship between hospital administrators, the medical staff, and the board, the Court bases this conclusion on: (a) the public policies embodied in applicable state and federal regulations; and (b) the public policy of ensuring that hospital management companies as well as the hospital's board and medical staff keep the quality of healthcare the hospital provides to its patients as their primary focus.

Although some of the duties of a hospital management company overlap with the duties of a hospital under the corporate negligence doctrine, the duties of a hospital management company are narrower. The duty a hospital management company owes to the hospital's

[42] The Court is not concluding that a hospital's chief executive officer personally owes this duty to patients. Whether a hospital's chief executive officer personally owes a duty to patients involves additional policy considerations.

patients is necessarily limited by its specialized role. For example, a hospital management company does not owe a duty to patients to evaluate the competency or qualifications of physicians or nurses or to judge the quality of care they provide. A hospital management company does not make medical judgments and does not determine the medical aspects of a patient's access to care at the hospital.

QHR asserts that recognizing a hospital management company's duty of care directly to patients could have a chilling effect on such companies' willingness to provide services to rural hospitals in need of their specialized expertise. The Court is mindful of this legitimate concern, but disagrees that this is a sufficient policy reason to limit the duty of ordinary care. Any potential chilling effect is mitigated by principles of causation and comparative fault.[43] Even though a hospital management company may share some responsibility for patient safety, its ultimate liability will be limited to those acts that have a sufficient causal link to a patient's injury, and the extent of its liability generally will be limited by proportional fault under principles of comparative fault. The Court will address QHR's specific responsibilities with respect to the employment, privileging, and supervision of Dr. Schlicht in the section relating to whether QHR breached any duties to the UTC.

2.    Whether QHR Breached Any Duties to the UTC

The breach of duty element of a negligence claim is based on the failure to conform to the required standard of care. *Payne v. Hall,* 136 N.M. 380, 386, 98 P.3d 1030, 1036 (Ct.App. 2004)(breach of duty is based on the failure to conform to the required standard), *rev'd on other grounds,* 139 N.M. 659, 137 P.3d 599 (2006). Breach of duty is a question of fact. *Herrera,* 134 N.M. at 57, 73 P.3d at 195 ("The finder of fact must determine whether Defendant breached the

---

[43] New Mexico has adopted the doctrine of comparative fault. *See* NMSA 1978, § 41–3A–1 (1987); *Herrera*, 134 N.M. at 50, 73 P.3d at 188. As discussed below, the Court has determined it will apply that doctrine to determine the amount of any damages it awards the UTC.

- 72 -

duty of ordinary care . . . "); *Lessard v. Coronado Paint & Decorating Center, Inc*., 142 N.M.

583, 168 P.3d 155, 165 (Ct.App. 2007)("breach of duty and proximate cause are questions of

fact").

Ordinarily, expert testimony is necessary to establish whether the defendant failed to

conform with the standard of care in malpractice cases against physicians, lawyers, accountants,

and other professionals. *See Buke, LLC v. Cross Country Auto Sales, LLC*, 331 P.3d 942, 954

(N.M. Ct.App. 2014), *cert. denied,* 331 P.3d 923 (2014) (stating that expert testimony is

generally required to explain the applicable standard of conduct in professional malpractice

actions). "The standard of conduct in a professional negligence case 'is measured by the duty to

apply the knowledge, care, and skill of reasonably well-qualified professionals practicing under

similar circumstances.'" *Id.* at 953 (quoting *Adobe Masters, Inc. v. Downey*, 118 N.M. 547, 883

P.2d 133 (1994)). Both the UTC and QHR presented expert testimony on the required standard

of care.

"[I]f negligence can be determined by resort to common knowledge ordinarily possessed

by an average person," sometimes expressed as within the common knowledge of a layperson

factfinder, and the ordinary negligence standard of care applies, expert testimony regarding the

standard of care is not essential. *Zamora*, 335 P.3d at 1250 (quoting *Pharmaseal Labs., Inc. v.

Goffe,* 90 N.M. 753, 758, 568 P.2d 589, 594 (1977)).[44] *See also Richter v. Presbyterian*

---

[44] For example, failure to conform to the required standard of care in the communication of the diagnosis
by one doctor to another due to a clerical error is within the common knowledge of a lay person and does
not require expert testimony. *Zamora*, 335 P.3d at 1249-51. Likewise, expert testimony is not required to
establish that "a surgeon's failure to sterilize his instruments or to remove a sponge from the incision
before closing it" does not conform to the required standard of care. *Goffe v. Pharmaseal Laboratories,
Inc.*, 90 N.M. 764, 568 P.2d 600, 608 (N.M. Ct.App. 1976), *rev'd in part on other grounds*, 90 N.M. 753,
568 P.2d 589 (citation omitted). On the other hand, whether prison officials acted reasonably in
monitoring inmates to secure the safety of an inmate requires expert testimony, *Villalobos v. Bd. of Cnty.
Comm'rs of Dona Ana Cnty.*, 322 P.3d 439 (N.M. Ct.App. 2014), as do conflict of interest claims alleged
against a professional. *Buke*, 331 P.3d at 955.

*Healthcare Services,* 326 P.3d 50, 57 (N.M. Ct.App.), *cert. denied,* 326 P.3d 1111 (2014)("expert testimony will not be required if the asserted negligence is based on a standard of reasonable care which does not require professional interpretation."). To establish whether a defendant breached a duty of ordinary care, where expert testimony is not required, the plaintiff must establish what a reasonable person would have done under the circumstances. *Richter,* 326 P.3d at 57.[45]

The UTC identify numerous breaches of QHR's duty to them, which generally fall into the following categories: (1) breach of duty in connection with the Hospital bringing in pain management as a new service line; (2) breach of duty in the hiring of Dr. Schlicht; (3) breach of duty in the temporary privileging of Dr. Schlicht and in the privileging and appointment of Dr. Schlicht to the medical staff; (4) breach of duty by failing to adequately investigate Dr. Masel's assertion that Dr. Schlicht was performing experimental surgery at the Hospital; (5) breach of duty by sacrificing patient health and safety to achieve greater revenues for the Hospital and fees for QHR; (6) breach of duty by failing to empanel an IRB; (7) breach of duty in the handling of the Molina Issue; and (8) breach of duty by failing to take appropriate action in response to bogus credentials received for Dr. Schlicht. The Court will separately address each of these asserted breaches.[46]

---

[45] The New Mexico Uniform Jury Instructions define "ordinary care" as follows:

"Ordinary care" is that care which a reasonably prudent person would use in the conduct of the person's own affairs. What constitutes "ordinary care" varies with the nature of what is being done.

As the risk of danger that should reasonably be foreseen increases, the amount of care required also increases. In deciding whether ordinary care has been used, the conduct in question must be considered in the light of all the surrounding circumstances.

NMRA, Civ., UJI 13-1603.
[46] The Court's finding of no breach of duty should not be construed as a finding that the actions in question necessarily fall within the Court's narrow articulation of QHR's duty to the UTC. It is simply a determination that the actions of which the UTC complain are insufficient to support their claim.

- 74 -

(a) *The Pain Management New Service Line*

The UTC complain that QHR failed to conform to the standard of care for bringing in pain management as a new service line in the Hospital. To bring in a new service line, there must be a demonstrated community need and it must be financially feasible. The CEO plays a role in investigating whether a new service line is appropriate. UTC argues that QHR, clouded by a desire for its own financial gain, failed to properly investigate pain management as a new service line at the Hospital. This Court disagrees.

The Court has found that QHR appropriately discharged its responsibility in the assessment of whether the Hospital should bring in the new service line. The Hospital followed its policies and procedures in deciding to bring in the new service line. QHR did not breach any duty to the UTC regarding the addition of the pain management service line for patients of the Hospital.

(b) *The Recruitment and Hiring of Dr. Schlicht*

The UTC assert that QHR breached a duty to them in connection with the recruitment and hiring of Dr. Schlicht. The UTC claim that the CEO failed to take appropriate action in response to the Candidate Introduction Letter, which touted a "new patented procedure" that Dr. Schlicht "invented." The UTC contend further that it was not appropriate for the CEO to announce to the Board that there was "one excellent candidate" for the pain management position just one day after receiving the Candidate Introduction Letter and before there was any investigation of the candidate. This Court disagrees.

The regular process for the Hospital's employment of a physician was followed. The Board approved the issuance of an employment contract to Dr. Schlicht. *See* Board of Directors Meeting Minutes – May 31, 2006 - Exhibit HHHH-7. Dr. Schlicht visited the Hospital

consistent with the usual protocol.  QHR did not breach any duty to the UTC in connection with the Hospital's employment of Dr. Schlicht.

(c) *The Grant of Dr. Schlicht's Temporary Privileges*

The UTC complain that the CEO inappropriately granted Dr. Schlicht temporary privileges because, contrary to policies and procedures in place, the Hospital did not receive numerous items before August 9, 2006 when the CEO granted Dr. Schlicht's temporary privileges.  The Court has found that the temporary privileges were granted August 29, 2006, not August 9, 2006.  The required documents were received by August 29, 2006.  However, the Court has also found that under the Hospital's policy permitting the CEO to grant the type of temporary privileges granted to Dr. Schlicht, the Credentials Committee's prior approval of the privileges was required.   The CEO granted Dr. Schlicht temporary privileges without such prior approval in violation of the policy.

The UTC provided no expert testimony to support a finding that the CEO's grant of temporary privileges without the required approval of the Credentials Committee failed to conform to the standard of care.  Such testimony was not required.  It is within the realm of lay knowledge to determine whether a CEO's decision to grant temporary privileges to permit a physician to perform procedures on patients, without the required approval of the Credentials Committee comprised of medical experts, would constitute an exercise of ordinary care in light of all the surrounding circumstances.

By failing to obtain the Credentials Committee's approval before granting temporary privileges to Dr. Schlicht, QHR breached a duty to the UTC to ensure that the temporary privileging procedures in place to protect patient safety were followed before the CEO granted

- 76 -

the privileges.  However, Dr. Schlicht did not perform any procedures on any members of the UTC under the temporary privileges.

(d) _The Privileging and Appointment of Dr. Schlicht to the Hospital's Medical Staff_

The UTC assert QHR breached a duty to them in connection with the privileging and appointment of Dr. Schlicht to the Hospital's medical staff.  The UTC complain that the Hospital improperly used the list of Dr. Schlicht's privileges at the VA when requesting recommendations on Dr. Schlicht's competency to perform certain procedures, and did not obtain at least three physician's references for each privileged procedure as required.  Four of the itemized procedures that Dr. Schlicht was ultimately granted privileges to perform were procedures that two of the recommending physicians could not recommend because they had not had the opportunity to observe Dr. Schlicht performing those procedures.  Dr. Echols, who supervised Dr. Schlicht at the VA, gave his recommendation in a telephone interview and did not submit a procedure by procedure recommendation form.  Dr. Austin, who participated in the privileging process conducted by the Credentials Committee recalled reviewing a "big pile" of documents that supported all of Dr. Schlicht's requested privileges, yet no exhibit matching this description was offered into evidence at trial.

Based on all of the evidence at trial, the Court is not convinced that QHR breached any duty to the UTC in connection with the issuance of Dr. Schlicht's privileges.  The CEO had the responsibility to make sure the Credentials Committee, MEC, and Board all approved the privileges, as required by the Hospital's procedure for granting privileges.  Verification and evaluation of credentials and references was the duty of the medical staff's administrative support staff, not the CEO.  The issues the UTC identify with respect to Dr. Schlicht's privileges are not the types of issues that QHR, through its CEO or otherwise, had the responsibility to

- 77 -

detect. QHR did not breach a duty to UTC in connection with Dr. Schlicht's privileging and appointment to the Hospital's medical staff.

      (e) *Dr. Masel's Assertion that Dr. Schlicht was Performing Experimental Surgery*

      Within a few days after Mr. Richardson took over as interim CEO, the Hospital received a letter from Dr. Schlicht responding to a letter in which Dr. Masel asserted that Dr. Schlicht was "not a Spine Specialist" and was improperly performing "experimental surgery" on patients of the Hospital. *See* Exhibit 37. Dr. Masel was Dr. Schlicht's proctor charged with assessing his performance based on chart reviews. The interim CEO had only recently arrived at the Hospital and was not familiar with any of the medical staff. He was not aware that Dr. Masel was Dr. Schlicht's proctor. The transition period between incoming and outgoing CEOs is critical to the continuity of hospital operations.

      Unlike the response made to Molina's assessment of a gross and flagrant violation by Dr. Schlicht, the interim CEO did not designate Dr. Masel's experimental surgery assertion as a "key event" to QHR. QHR's RVP and RAVP were unaware of the matter, and did not lend their expertise in dealing with the issue. The interim CEO conducted his own investigation by: (1) reviewing email correspondence suggesting that Dr. Masel had praised Dr. Schlicht until the two of them had a falling out and ended their business relationship; (2) consulting Dr. Austin, Dr. Bryant, Dr. Schlicht, and Dr. Jones; and (3) reviewing Dr. Schlicht's credentialing file. After conducting this review, the interim CEO dismissed Dr. Masel's experimental surgery assertion as the byproduct of a business dispute between Dr. Masel and Dr. Schlicht over the treatment of a patient and their competition over market share, and concluded that no further action was necessary.

      The physicians the interim CEO consulted were not qualified to evaluate Dr. Masel's assertion of experimental surgery. Dr. Austin and Dr. Jones are not surgeons and have no

- 78 -

expertise in pain management or back surgery; consequently they did not have the expertise to properly evaluate Dr. Masel's assertion. Dr. Austin is an internal medicine physician. Dr. Jones is a family medicine physician. Furthermore, the evidence indicates that although Dr. Austin and Dr. Jones were aware that Dr. Masel raised some concerns about Dr. Schlicht, neither Dr. Austin nor Dr. Jones were told that Dr. Schlicht was allegedly performing experimental surgery on Hospital patients. Dr. Bryant was not objective because he and Dr. Schlicht performed PDA procedures together. Dr. Bryant thus had a strong incentive to defend the propriety of the procedures.

An assertion by a proctor that the physician he is proctoring is improperly performing experimental surgery on Hospital patients is a major red flag that requires an appropriate investigation. One of QHR's experts in hospital administration, General Donald Wagner, emphasized that the import of Dr. Masel's experimental surgery assertion must be viewed in the context of the surrounding circumstances. General Wagner explained that the interim CEO had only recently arrived at the Hospital, would not have been familiar with any of the staff, and would have had to rely on the medical staff, administrative staff, and the Board to gain an understanding of the potential issues. Although Mr. Richardson had just arrived at the Hospital, was not familiar with the medical staff, and was not aware that Dr. Masel was Dr. Schlicht's proctor, the Court attributes the collective knowledge of the successive QHR-employed chief executive officers to QHR. *See Sawyer v. Mid-Continent Petroleum Corp.,* 236 F.2d 518, 520 (10th Cir. 1956)(acknowledging that because "a corporation can act only through its officers, agents and employees, it is necessarily chargeable with the composite knowledge of its officers and agents acting within the scope of their authority.")(citations omitted); 3 *Fletcher Cyclopedia Corporations,* § 790 ("The knowledge necessary to adversely affect the corporation does not

have to be possessed by a single corporate agent; the cumulative knowledge of several agents can be imputed to the corporation.").  The Court also takes into account QHR's entire experience providing management services to the Hospital in assessing whether QHR breached a duty to the UTC.  QHR had been managing the Hospital for some 18 months before Mr. Richardson became the interim CEO.  Sue Johnson-Phillippe, the CEO Mr. Richardson replaced, was aware that Dr. Masel was Dr. Schlicht's proctor.  Her knowledge is imputed to QHR.  *See Western Diversified Services, Inc. v. Hyundai Motor America, Inc.,* 427 F.3d 1269, 1276 (10th Cir. 2005)("It is well established that a corporation is chargeable with the knowledge of its agents and employees acting within the scope of their authority.")(citing *Sawyer,* 236 F.2d at 520); *Magnum Foods, Inc. v. Continental Cas. Co.,* 36 F.3d 1491, 1501 n. 10 (10th Cir. 1994)(applying Oklahoma law and stating that, "in such cases of direct corporate liability, knowledge may be imputed to a corporate employer from information obtained by its supervisory employees and agents—including *but not limited to* officers and directors—in the course and scope of their employment.")(citation omitted)(emphasis in original).

Based on the serious nature of Dr. Masel's experimental surgery assertion, the fact that the physician making the assertion was Dr. Schlicht's proctor charged with evaluating Dr. Schlicht's performance, and the nature of the inquiry the interim CEO made of members of the medical staff, the Court concludes that the interim CEO should not have dismissed the matter based on his limited investigation.  Under the circumstances, QHR through its interim CEO should have informed the Board or its Executive Committee of Dr. Masel's assertion, made a written request of the MEC to conduct a focused review of the matter pursuant to Section 6.2 of the Medical Staff Bylaws, and then informed the Board or its Executive Committee that such request had been made.  By failing to do so, QHR did not conform to the required standard of

care and breached its duty of care to the UTC to: (1) appropriately involve medical staff in evaluating medical issues; and (2) inform the Board about material issues relating to patient safety.

QHR relies on *Dodd-Anderson v. Henderson,* 107 F.3d 20 (10th Cir. 1997)(Table), for the proposition that the assumed duty in the Restatement (Second) of Torts § 324A[47] is inapplicable to medical malpractice cases and cannot be relied upon to establish a duty based on any administrative responsibility to oversee hospital medical staff. In *Dodd-Anderson,* the plaintiff asserted that the chief of staff undertook the hospital's duty to oversee the medical staff, so that the chief of staff should be held liable for his negligence in failing to supervise and revoke the treating physician's privileges. *Dodd-Anderson,* 107 F.3d at *3. The *Dodd-Anderson* court found that the obligations of the chief of staff were defined by the hospital's bylaws, which did not obligate the chief of staff to supervise other physicians, and concluded that he "had no duty arising out of his administrative position" to suspend the treating physician. *Id.* at *4. The *Dodd-Anderson* court also noted that there was no evidence in the record indicating that the chief of staff had any knowledge that would show that the treating physician was incompetent. *Id.* at *3.

---

[47] The Restatement (Second) of Torts § 324A provides:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>> (a) his failure to exercise reasonable care increases the risk of such harm, or
>> (b) he has undertaken to perform a duty owed by the other to the third person, or
>> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Restatement (Second) of Torts § 324A (1965).
The Court is not relying on this section of the Restatement in finding that QHR owed a duty to the UTC.

Here, unlike in *Dodd-Anderson,* QHR through its interim CEO had knowledge of an assertion by Dr. Schlicht's proctor that Dr. Schlicht was performing experimental surgery on patients of the Hospital. The assertion alone was not sufficient for the interim CEO to invoke the summary suspension provision under the Medical Bylaws. But it was such an explosive assertion by a physician's proctor that it required a more thorough investigation. QHR breached the standard of care by failing to involve appropriate medical staff to conduct an investigation consistent with their responsibility under the Medical Staff Bylaws. The CEO had the authority and responsibility to request a focused review of Dr. Schlicht's conduct. *See* Medical Staff Bylaws, Sections 6.1 and 6.2. In concluding that QHR breached its duty to the UTC, the Court is relying on the role and responsibility of QHR as a hospital management company charged with the responsibility of the CEO of a hospital. That responsibility is rooted in New Mexico state and federal regulations governing hospitals, the Hospital's Corporate and Medical Staff Bylaws, and expert testimony regarding the standard of care of a hospital's CEO.

(f) *The PDA Presentations and the Failure to Empanel an Institutional Review Board*

The UTC urge that QHR breached a duty by failing to empanel an IRB to oversee the PDA procedures Dr. Schlicht and Dr. Bryant performed at the Hospital. Sometime after the Hospital received Dr. Masel's letter and Dr. Schlicht's responses, the interim CEO attended one of Dr. Bryant and Dr. Schlicht's power point presentations of the PDA procedure. The CEO questioned the physicians present about whether an IRB was required. Dr. Schlicht, Dr. Bryant, and Dr. Austin assured the interim CEO that an IRB was not required, and that the procedure involved appropriate off label use of an accepted medical device, PMMA.

QHR did not breach a duty to the UTC by failing to submit the PDA procedure to an IRB. Federal regulations governing IRBs were enacted to protect human subjects in connection

- 82 -

with experimental medical procedures.  *See* Title 45. Public Welfare; Part 46. Protection of

Human Subjects; Subpart A. Basic HHS Policy for Protection of Human Research Subjects.  The

policy applies to "to all research involving human subjects. . . "  45 C.F.R. § 46.101(a).

"Research means a systematic investigation, including research development, testing and

evaluation, designed to develop or contribute to generalizable knowledge."  45 C.F.R. §

46.102(d).  The regulations define an IRB as "an institutional review board established in accord

with and for the purposes expressed in this policy."  45 C.F.R. § 46.102(g).

Ordinarily, a new procedure must be submitted to an IRB when a physician intends to

conduct research through a systematic investigation to determine the efficacy and safety of

experimental medical procedures performed on human subjects or wants to participate in a

research study involving clinical trials on human patients.  Neither Dr. Bryant nor Dr. Schlicht

developed a research protocol, or intended to conduct research through a systematic investigation

involving testing and evaluation.  Rather, they were treating patients using a well-known medical

device, PMMA, in a different way.  Because the physicians did not view the procedure as

research designed to develop or contribute to generalizable knowledge, they did not believe it

was necessary to submit the procedure to an IRB.

Although the PDA procedure was experimental and was not an appropriate off label use

of PMMA, and should not have been conducted at all without a systematic investigation

involving testing and evaluation approved by an IRB, QHR did not breach any duty by failing to

empanel an IRB.  An IRB could not be empanelled because neither Dr. Bryant nor Dr. Schlicht

intended to conduct research.  Physicians who treat their patients using an approved medical

- 83 -

device in a new, unapproved way may subject themselves to potential malpractice claims[48] but are not engaging in an activity requiring oversight by an IRB.

    (g) *The Molina Issue*

    About one month after Dr. Schlicht sent his second response to Dr. Masel's letter, Molina, a healthcare insurance provider, issued a letter alleging a "gross and flagrant violation" by Dr. Schlicht in the treatment of one of its insureds. *See* Exhibit 44. The procedure in question was not a PDA procedure.

    The Court has found that QHR properly handled the Molina Issue. The Molina Issue involved both due process issues for the physician involved and medical judgments to assess the merits of Molina's gross and flagrant violation charge. The interim CEO immediately contacted legal counsel to advise the Hospital on how to respond to address the due process issues. The interim CEO appropriately involved the medical staff to address the medical issues. The CEO appropriately flagged the issue to QHR corporate as a "key event" so QHR could apply its considerable corporate expertise to the problem. And while there is no report of the incident in the Board minutes, Norm Arnold testified that this type of issue would have been discussed at an Executive Session rather than at a meeting of the full Board. The evidence is insufficient for the Court to find that QHR failed to keep the Board apprised of the Molina Issue. QHR did not breach a duty to UTC in connection with how it handled the Molina Issue.

    (h) *Sacrificing Patient Safety for Financial Gain*

    The UTC assert that QHR breached a duty to them by improperly influencing the Board, which relied on QHR's advice and recommendations, to approve the new pain management

---

[48] *Cf. Staudt v. Froedtert Mem'l Lutheran Hosp.,* 217 Wis.2d 773, 779, 580 N.W.2d 361, 364 (Ct.App. 1998)(acknowledging that physicians are subject to liability if they commit malpractice in their medical treatment decisions, but nothing "prevents a physician in the course of his or her medical practice from using an approved drug or medical device for an 'unapproved' purpose").

- 84 -

service line, employ Dr. Schlicht, and permit him to continue to perform the untested PDA procedure on patients. The UTC maintain that QHR influenced the Board in those matters to elevate profitability over patient safety so that the Hospital would continue to retain QHR and pay its fees, and so that QHR would earn additional fees through the Hospital's use of its service partners. The testimony of several of the UTC's experts supports this conclusion.

The Court concludes that QHR did not breach a duty to the UTC by improperly sacrificing patient safety for financial gain or by influencing the Board to do so. A hospital management company's duty to patients is to ensure the hospital implements and follows appropriate procedures to protect the health and safety patients, consistent with the management company's role, responsibilities, and control. An improper profit motive behind improperly influencing a board to elevate gain over patient safety is relevant to whether a breach of duty occurred, but must be considered in the context of whether the improper profit motive caused the hospital to fail to implement or follow a process or procedure aimed at protecting patients. The Court has already determined that QHR did not breach a duty to UTC in connection with: 1) the Hospital's approval of a new service line; 2) the employment of Dr. Schlicht; 3) the grant of privileges to Dr. Schlicht in connection with his appointment to the Hospital's medical staff; 4) the Hospital not empanelling an IRB; and 5) the Hospital's response to Molina's gross and flagrant violation charge. Where the Court found a breach of duty, those findings were not predicated on an improper profit motive. After carefully considering the evidence, the Court found that QHR's actions were not motivated by emphasizing financial gain over patient safety, nor did QHR influence the Board to do so.

(i) _The Bogus Certificates_

On the heels of the Molina issue, the Hospital's medical staff received copies of certificates and letters relating to Dr. Schlicht's credentials that are facially bogus. No action was taken in response. Because the Court has not found that the CEO or any member of his staff ever saw the bogus credentials, QHR did not breach a duty to UTC by failing to act in response.

In sum, the Court finds and concludes that QHR breached its duty of care to the UTC by not appropriately involving medical staff (the MEC) in evaluating Dr. Masel's experimental surgery assertion, by not informing the Board or its Executive Committee of Dr. Masel's assertion, and by not informing the Board a request for investigation had been made to the MEC. QHR also breached a duty to the UTC by granting Dr. Schlicht temporary privileges, although Dr. Schlicht did not perform any procedures on patients under the temporary privileges. QHR did not otherwise a breach a duty to the UTC.

3.    Whether Comparative Fault or Joint and Several Liability Applies

The UTC contend that the doctrine of joint and several liability applies based on the public policy exception to comparative fault. According to the UTC, the PDA procedure was an inherently dangerous activity over which QHR had control. The UTC alternatively argues that public policy demands the application of joint and several liability because QHR was the gatekeeper for the Hospital and the "but for" cause of all the UTC's injuries.

"Under the theory of joint and several liability, each tortfeasor is liable for the entire injury, regardless of proportional fault, leaving it to the defendants to sort out among themselves individual responsibility based on theories of proportional indemnification or contribution." _Payne v. Hall_, 139 N.M. 659, 664, 137 P.3d 599, 604 (2006). If several liability—also known as

comparative fault— applies, "each tortfeasor is severally responsible for its own percentage of comparative fault for that injury."  *Id*. at 603.

With limited exceptions, New Mexico has abolished joint and several liability in favor of pure comparative fault.  *See* N.M.S.A. 1978 § 41-3A-1 (Repl. Pamp. 1996);[49] *Scott v. Rizzo,* 96 N.M. 682, 689-690, 634 P.2d 1234, 1241-1242 (1981), *overruled on other grounds by Herrera,* 73 P.3d 181 (adopting rule of comparative negligence); *Bartlett v. New Mexico Welding Supply, Inc.,* 98 N.M. 152, 646 P.2d 579 (Ct.App. 1982)("Joint and several liability is not to be retained in our pure comparative negligence system on a theory of one indivisible wrong.  The concept of one indivisible wrong . . . is obsolete, and is not to be applied in comparative negligence cases in New Mexico.")(citations omitted).  Under the doctrine of comparative fault, "when concurrent tortfeasors negligently cause a single, *indivisible* injury, the general rule is that each tortfeasor is severally responsible for its own comparative fault for that injury."  *Gulf Ins. Co. v. Cottone,* 140 N.M. 728, 734, 148 P.3d 814, 821 (Ct.App. 2006)(emphasis in original)(additional quotation marks and citation omitted).  *See also, Garcia v. Gordon*, 136 N.M. 394, 397, 98 P.3d 1044, 1047 (Ct. App. 2004)(noting that comparative fault of two or more persons causing a single injury "holds all parties fully responsible for their own respective acts to the degree that those acts have caused harm.")(additional quotation marks and citation omitted).

---

[49] Section 41-3A-1(A) and (B) provide:

> A. In any cause of action to which the doctrine of comparative fault applies, the doctrine imposing joint and several liability upon two or more wrongdoers whose conduct proximately caused an injury to any plaintiff is abolished except as otherwise provided hereafter.  The liability of any such defendants shall be several.

> B. In causes of action to which several liability applies, any defendant who establishes that the fault of another is a proximate cause of a plaintiff's injury shall be liable only for that portion of the total dollar amount awarded as damages to the plaintiff that is equal to the ratio of such defendant's fault to the total fault attributed to all persons, including plaintiffs, defendants and persons not party to the action.

> N.M.S.A. 1978 § 41-3A-1(A) and (B) (Repl. Pamp. 1996).

- 87 -

The New Mexico statute codifying comparative fault enumerates four exceptions which impose joint and several liability. In situations involving concurrent tortfeasors (*i.e.* two or more parties who cause a single, indivisible injury), "[e]xceptions are made for [1] intentional torts, [2] vicarious liability, [3] products liability cases, and [4] other situations having a sound basis in public policy." *Saiz v. Belen Sch. Dist.*, 113 N.M. 387, 400, 827 P.2d 102, 115 (1992)(citing N.M.S.A. 1978 41–3A–1(C)(additional internal quotation marks omitted).[50] Of the identified exceptions, only the public policy exception is at issue here.[51]

(a) *Inherently Dangerous Activity Exception*

The New Mexico Supreme Court addressed the inherently dangerous activity exception to joint and several liability in *Saiz v. Belen School Dist.*, 113 N.M. 387, 827 P.2d 102 (1992). Whether an activity is inherently dangerous is a question of law, although "there may be gray areas requiring fact-finding." *Id.* at 396, 111. In *Saiz*, the New Mexico Supreme Court held

> that one who employs an independent contractor to do work that the employer as a matter of law should recognize as likely to create a peculiar risk of physical harm to others unless reasonable precautions are taken is liable for physical harm to others caused by an absence of those precautions. The employer cannot delegate the responsibility for taking the precautions.

> *Id*. at 395, 110.

The holding in *Saiz* does not apply to the UTC's claims against QHR because QHR was the independent contractor of the Hospital, not the party employing an independent contractor.

---

[50] Section 41-3A-1(C) provides:
  The doctrine imposing joint and several liability shall apply:
      (1) to any person or persons who acted with the intention of inflicting injury or damage;
      (2) to any persons whose relationship to each other would make one person vicariously liable for the acts of the other, but only to that portion of the total liability attributed to those persons;
      (3) to any persons strictly liable for the manufacture and sale of a defective product, but only to that portion of the total liability attributed to those persons; or
      (4) to situations not covered by any of the foregoing and having a sound basis in public policy.
  N.M.S.A. 1978 § 41-3A-1(C) (Repl. Pamp. 1996).
[51] UTC has abandoned the argument that joint and several liability applies under the successive tortfeasor doctrine.

- 88 -

The New Mexico Court of Appeals expounded upon the holding in *Saiz* in *Enriquez v. Cochran*, 126 N.M. 196, 967 P.2d 1136 (Ct.App. 1998) and *Gulf Ins. Co. v. Cottone*, 140 N.M. 728, 148 P.3d 814 (Ct.App. 2006).  *Enriquez* held that to determine whether the inherently dangerous activity exception to comparative fault applies, the court should not focus on the relationship between the employer and the independent contractor.  *Enriquez*, 126 N.M. at 223, 967 P.2d at 1163.  Instead, the proper focus of inquiry is "the connection of the parties to the inherently dangerous activity and their respective ability to control or influence how the work is to be done and how the peculiar risks raised by the activity are to be handled."  *Id.* at 223-224, 1163-1164.  In *Cottone,* the court explained further:

> If a party has the authority to control the manner in which an inherently dangerous activity is conducted, that party has a corresponding nondelegable duty to take the precautions necessary to protect others from any peculiar risk of physical harm arising from such activity.

> *Cottone*, 140 N.M. at 735, 148 P.3d at 821 (citations omitted).

A court need not reach the question of whether the activity in question is an inherently dangerous activity if the party alleged to be negligent had no ability to control or influence how the dangerous activity was undertaken.  *Id*. at 736, 822.  In that event, the inherently dangerous activity exception does not apply.  *Id*.

This Court need not reach the question of whether the activity in question was an inherently dangerous activity[52] because even if it were, QHR had no ability to control or influence how the activity was undertaken.  The UTC argues that QHR had the ability to control the PDA procedures by paying attention to numerous red flags, by properly privileging Dr. Schlicht, by requiring an IRB, and by stopping the procedures.  The Court disagrees.

---

[52] If a court determines the defendant had sufficient control over the activity in question, it must then apply a three-prong test to assess whether the activity is inherently dangerous.  *See Gabaldon v. Erisa Mortg. Co.,* 128 N.M. 84, 87, 990 P.2d 197, 200 (1999)(adopting a "three-prong test to determine whether an activity is inherently dangerous.").

- 89 -

As the Court explained above, QHR had control over certain aspects of the Hospital's operations in its role as administrator. QHR had the ability to ensure compliance with administrative processes directed at patient safety, and to appropriately involve medical staff in evaluating medical issues. However, QHR's ability to take these administrative actions does not translate into control over how physicians practice medicine. QHR did not have the ability to control or influence how a physician performed any particular medical procedure or to manage the corresponding medical risks, nor should it have been expected to bargain for such control. Only the Hospital's physicians, not its administrators, were able to make medical judgments and evaluate the safety of the PDA procedures. *See* N.M.A.C. 7.7.2.26(A)(1)("The medical staff shall be responsible to the governing body of the hospital for the quality of all medical care provided patients in the hospital and for the ethical and professional practices of its members."). Further, although QHR could ask the MEC to conduct a focused review of Dr. Schlicht, it was up to the MEC and the Board, not QHR, to decide whether to conduct such a review. In addition, if the MEC conducted a focused review, the medical staff and the Board, not QHR, would control whether Dr. Schlicht would be allowed to perform the PDA procedure.

In addition, QHR did not have the ability to stop Dr. Schlicht or Dr. Bryant from performing the PDA procedure. A summary suspension of Dr. Schlicht's or Dr. Bryant's privileges to perform the PDA procedure on patients based on the nature of the procedure would require the exercise of professional medical judgment.[53] QHR was not capable of making those judgments and had no responsibility to do so. That was the responsibility of the Hospital's medical staff and Board.

Having determined QHR lacked the requisite control over the PDA procedure to trigger the inherently dangerous activity exception to joint and several liability, the Court need not

---

[53] The summary suspension of privileges procedure under the Medical Staff Bylaws is discussed above.

- 90 -

address its level of danger.  The "inherently dangerous activity" public policy exception to comparative fault does not apply in this case.

(b) _Generalized Public Policy Exception_

The UTC contends additional policy reasons call for the application of joint and several liability.  According to the UTC, QHR was the gatekeeper of the Hospital, and but for QHR's negligent acts, none of the patients would have been injured.  The UTC therefore asserts that QHR should be responsible for 100% of the damages in this case.

This argument is unavailing for several reasons.  First, characterizing QHR as the initial gatekeeper and but for cause of all injuries is really just another way of asserting the successive tortfeasor exception to comparative fault, which the UTC has abandoned.  _See Payne,_ 139 N.M. at 664, 137 P.3d at 604 (Under the successive tortfeasor exception, the original tortfeasor is responsible for any subsequent, distinct injuries flowing from the original wrongdoing).  Second, equating joint and several liability with "but for" causation would effectively abolish the doctrine of comparative fault.  "But for" causation will exist anytime damages are awarded on a negligence claim.[54]  Finally, and perhaps most importantly, applying joint and several liability in this case is not good policy.  A hospital management company is not expected to make professional medical judgments about the safety or efficacy of a medical procedure.  That is the responsibility of the medical staff and physicians performing procedures on patients.  There is no compelling reason to depart from the basic tenet of comparative fault to hold a hospital management company 100% responsible for injuries caused by a medical procedure that required a professional medical judgment to determine whether and how the procedure should be

---

[54] The causation element of a negligence claim requires both cause in fact and proximate cause.  "But for" causation is considered in connection with the cause in fact requirement.  _See Chamberland v. Roswell Osteopathic Clinic, Inc._, 130 N.M. 532, 536, 27 P.3d 1019, 1023 (Ct. App. 2001)(explaining that "causation initiated by some negligent act or omission of the defendant . . . is the cause in fact or the 'but for' cause of plaintiff's injury.")(citation omitted).

performed. "[C]omparative fault principles reflect[ ] the more humane, the more fundamentally just system of apportioning liability in accordance with respective fault . . . ." *Rizzo*, 96 N.M. at 689, 634 P.2d at 1241.[55]

The Court therefore concludes that public policy requires the application of comparative fault rather than joint and several liability in this case. Because apportionment of fault involves causation and apportionment of damages, the relative percentage of fault will be determined in a later phase of the trial. *See Rizzo,* 96 N.M. at 682, 634 P.2d at 1240 ("The thrust of the comparative negligence doctrine is to accomplish (1) apportionment of fault between or among negligent parties whose negligence proximately causes any part of a loss or injury, and (2) apportionment of the total damages resulting from such loss or injury in proportion to the fault of each party.").

## IV.    CONCLUSION

QHR breached its non-delegable duty of care to the UTC to prevent an unreasonable risk of harm by: 1) granting temporary privileges to Dr. Schlicht before obtaining the Credentials Committee's approval; and 2) failing to involve the medical staff by requesting the MEC to conduct a focused review of Dr. Schlicht after learning that Dr. Schlicht's proctor asserted that Dr. Schlicht was performing experimental surgery on patients of the Hospital, and failing to apprise the Board of the proctor's assertion. After requesting the MEC to conduct an investigation QHR should also have informed the Board that it had done so. If the Court awards

---

[55] Although the exact form of comparative fault adopted in *Rizzo* has been superseded by statute, *see* N.M.S.A. 1978 § 41-3A-1, the fundamental policy reason underlying comparative fault has not changed.

damages to the UTC, the Court will apply the doctrine of comparative fault in determining the
amount.

_____
ROBERT H. JACOBVITZ
United States Bankruptcy Judge

Date entered on docket:  March 18, 2015

COPY TO:

All counsel of record