# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW MEXICO

In re:  OTERO COUNTY HOSPITAL                          Case No. 11-11-13686 JL
        ASSOCIATION, INC.,

        Debtor.

UNITED TORT CLAIMANTS, as
individuals,

        Plaintiffs,
                                        Consolidated Misc. Adv. No. 13-00007
                                        Adversary Nos:

        v.                              12-1204j through 12-1207j,
                                        12-1209j, 12-1210, 12-1212
                                        through 12-1215j, 12-1221j,
                                        12-1235j, 12-1238j through
                                        12-1241j, 12-1243j, 12-1244j,
                                        12-1246j, 12-1248j, 12-1249j,
                                        12-1261j, 12-1271j, 12-1276j and
                                        12-1278j.

QUORUM HEALTH RESOURCES, LLC,

        Defendant.

## MEMORANDUM OPINION

THIS MATTER is before the Court following a trial on the merits of the second phase of

this litigation involving negligence claims against Quorum Health Resources, LLC ("QHR").

The United Tort Claimants (the "UTC")[1] and QHR were represented at trial by counsel as noted

on the record.

As recited in the Court's Amended Memorandum Opinion ("Amended Memorandum

Opinion" – Docket No. 286) entered following the trial on the liability phase of this litigation,

---

[1] The UTC consists of all of the plaintiffs named in the adversary proceedings identified by number in the above caption.

this case stems from the suffering of dozens of patients who unwittingly were subjected to experimental procedures on their lower backs by a doctor tasked with alleviating pain. The hospital, doctors, and others involved have reached settlements with the patients. The sole remaining defendant is QHR, the hospital management company that provided non-medical administrative services to the hospital. The Court determined in phase one of the litigation that QHR owed a direct duty to the UTC and breached that duty in two respects: (1) in connection with the granting of temporary privileges to Dr. Christian Schlicht; and (2) by failing to make a formal request that the hospital's medical executive committee initiate an investigation of Dr. Schlicht (*i.e.,* a focused review under the medical staff bylaws) after learning that Dr. Schlicht's proctor asserted Dr. Schlicht was performing experimental surgery on patients of the hospital, and failing to apprise the hospital's board of the proctor's assertion. *See* Amended Memorandum Opinion. The Court also determined that the doctrine of comparative fault, rather than joint and several liability, applies to any assessment of damages against QHR. *Id.*

The Court held a trial on the merits of the second phase of the litigation to determine causation; and, if QHR's breach of duty caused harm to the UTC, to determine QHR's comparative fault. After considering the evidence, the Court concludes that, while there is a lack of causation with respect to QHR's breach in granting Dr. Schlicht temporary privileges, the UTC has proven the causation element of their claims regarding QHR's breach in failing to request a focused review of Dr. Schlicht. A focused review would have involved an outside physician independent from the hospital with the necessary expertise to evaluate the procedures and Dr. Schlicht's qualifications, and would have stopped the procedures that caused the UTC harm. Because of QHR's breach, Dr. Schlicht was permitted to continue performing the procedures that form the basis of the UTC's claims.

Even so, the physicians and the hospital bear the majority of the responsibility for the harm. The Court has determined that QHR's percentage of fault for the UTC's injuries stemming from its breach is 16.5%.

I.  PROCEDURAL HISTORY; TREATMENT OF EVIDENCE PREVIOUSLY ADMITTED AND FINDINGS OF FACT PREVIOUSLY ENTERED IN THE CORPORATE LIABILITY PHASE OF THE LITIGATION

In the summer of 2012, the UTC removed certain negligence actions pending in state court to this Court in connection with Otero County Hospital Association, Inc.'s Chapter 11 bankruptcy case. A year later, on the parties' stipulation, the Court consolidated certain portions of the UTC's claims against QHR for purposes of conducting a separate consolidated trial "on the liability issues relating to QHR," defined in the consolidation order as the "Corporate Liability Issues." *See* Order Resulting from Hearing on Motion to Establish Discovery and Case Management Procedures ("Case Management Order"), Adversary Proceeding No. 12-1204 – Docket No. 44.[2] The Case Management Order expressly clarified that Corporate Liability Issues "do not include issues regarding whether any medical providers committed malpractice or any issues with respect to damages." *See* Case Management Order, n. 1. An Amended Case Management Order for Trial on the Bifurcated Issue of Corporate Liability ("Amended Case Management Order") entered July 18, 2014 echoed the Case Management Order's deferral of issues to the second phase of the trial other than the Corporate Liability Issues. *See* Docket No. 199.

Following the Court's decision on the Corporate Liability Issues, consisting of the duty and breach of duty elements of the UTC's negligence claims, and determining that comparative fault applies to the UTC's claims, the UTC and QHR attended a mediation in an effort to resolve

---

[2] An identical Case Management Order was entered in each of the forty-seven adversary proceedings initiated upon removal of the individual state court lawsuits.

all remaining claims. *See* Mediation Order – Docket No. 327.[3]   The mediation was not successful.

QHR sought to dismiss several of the UTC's claims based on the timing of the two breaches in relation to the dates certain members of the UTC underwent their procedures and based on the type of procedure certain members of the UTC received. *See* Quorum Health Resources, LLC's Combined Motion for Summary Judgment and Statement of Facts ("QHR's Motion for Summary Judgment") – Docket No. 317.   The Court dismissed the claims of members of the UTC whose medical procedures occurred before July 21, 2007. *See* Order Granting, in part, and Denying, in part, Quorum Health Resources, LLC's Combined Motion for Summary Judgment and Statement of Facts – Docket No. 345.[4]  On a motion for reconsideration filed by the UTC, the Court determined that the UTC waived its argument that the breach in granting temporary privileges to Dr. Schlicht caused harm to the UTC with respect to those members of the UTC that were the subject of QHR's Motion for Summary Judgment, but that other members of the UTC against whom final judgments have not been granted may present evidence at the trial on causation and comparative fault to establish such a causal link. *See* Docket No. 469.

With the agreement of the parties, the Court again consolidated the adversary proceedings for a separate trial on causation and comparative fault issues. *See* Order Consolidating Adversary Proceedings for (1) a Trial on Causation and Comparative Fault Issues; (2) Certain Pretrial Discovery; and (3) Certain Pre-trial Matters Relating to Damages

---

[3] *See also* Amendment to the Mediation Order (Docket No. 336); Order Denying Quorum Health Resources, LLC's Motion to Postpone Mediation from July 14, 2016 to August 10, 2015 (Docket No. 383).
[4] The claims of the following members of the UTC were dismissed:  Edna O. Chavez and John I. Chavez; Maria Nora Coyazo; James Cross and Wanda Cross; Marjorie Curtis; Dale Fox and Phyllis Fox; Darrell Gilmore and Susan Gilmore; Melissa Mackechnie; John O'Byrne and Laverne O'Byrne; Judy Ferguson; Barbara Olson; Estate of Susan Schwarzenegger; James Rogers, as Personal Representative of the Estate of David Warden; Ronald Whiteley and Marilyn Whiteley.

("Consolidation Order") – Docket No. 297. The Consolidation Order defined causation and comparative fault issues to mean "the causation element the UTC must prove to establish their claims and the comparative fault defense QHR must prove to limit any awards of damages to its own percentage of comparative fault." *Id.* The Court also entered a Case Management Order for Trial on Causation and Comparative Fault Issues ("CMO"). *See* Docket No. 298.[5] The CMO provided that "[a]ll evidence admitted at the trial on the Corporate Liability Issues is deemed admitted for purposes of the Causation and Comparative Fault Trial." *Id.* All evidence admitted in the consolidated trial on corporate liability is, therefore, part of the evidence for the Court to consider in this second phase of the litigation regarding causation and comparative fault. In addition, the Court's findings of fact made as part of its Amended Memorandum Opinion are established for purposes of the consolidated trial on causation and comparative fault. *See* Pretrial Order for Comparative Fault and Causation Trial – Docket No. 517.

The Court held a trial on the merits of the consolidated adversary proceedings on the issues of causation and comparative fault and took the matter under advisement. QHR agreed to the UTC's motion to dismiss the claims of Joel and Vivian Crossno and Mickie Frances.[6] On the Court's request, the parties submitted post-trial briefs. *See* Scheduling Order Following Trial on Causation and Comparative Fault (Docket No. 526).[7]

---

[5] The deadlines and/or the trial dates fixed in the CMO were extended several times. *See* Docket Nos. 473, 491, and 496.
[6] The Court will enter a separate order in Adversary Proceeding No. 12-1078j dismissing those claims.
[7] The parties filed the following post-trial briefs:
      United Tort Claimants Post-Trial Brief (Docket No. 531)
      Quorum Health Resources, LLC's Post-Trial Brief in Response to the UTC's Post-Trial Brief in Chief (Docket No. 536)
      Quorum Health Resources, LLC's Post-Trial Brief in Chief (Docket No. 532)
      United Tort Claimants Response to QHR's Post-Trial Brief in Chief (Docket No. 535)
      Quorum Health Resources, LLC's Post-Trial Brief in Reply to the UTC's Opposition to Quorum Health Resources, LLC's Post-Trial Brief in Chief (Docket No. 539)
      The parties also filed proposed findings of fact and conclusions of law. *See* Quorum Health Resources, LLC's Proposed Findings of Fact and Conclusions of Law Following February 1-4, 2016 Trial on Causation and

## II.    FINDINGS OF FACT

All of the Court's findings of fact set forth in the Amended Memorandum Opinion are incorporated herein by reference.[8]  In reaching its earlier determinations regarding QHR's breaches of duty in granting temporary privileges to Dr. Schlicht and in failing to request a focused review of Dr. Schlicht, the Court relied on the role and responsibility of QHR as a hospital management company charged with the responsibility of the chief executive officer ("CEO") of the hospital regarding the standard of care of a hospital CEO.  *See* Amended Memorandum Opinion, p. 82.  The Court makes these findings of fact from evidence admitted in both phases of the trial.

### The Agreement for Hospital Administrative Services.

The Agreement for Hospital Administrative Services ("Services Agreement") between Otero County Hospital Association, d/b/a Gerald Champion Regional Medical Center ("Hospital" or "GCRMC") and QHR provides that QHR will provide the Hospital with a CEO and a CFO, collectively referred to in the Services Agreement as "Special Employees."  *See* Exhibit 6.  The Services Agreement defines the relationship between the Hospital and QHR as "one of principal and agent," and provides further that the Special Employees "function as borrowed employees of the Hospital" serving "under the direction, control, and supervision of the Board."  *Id.* at ¶¶ 1.2 and 2.1.1.  *See also,* Services Agreement, ¶ 2.2 (providing that the CEO acts "[o]n behalf of, and at the specific direction of, the Board" and "oversee[s] the execution and performance of the administrative functions of the Hospital. . .").

---

Comparative Fault (Docket No. 541); Notice of Lodging of (Proposed) Findings of Fact and Conclusions of Law, filed by the UTC (Docket No. 540).

[8] In this Memorandum Opinion, without limiting the incorporation of those facts by reference, the Court has repeated some findings of fact made in the Amended Memorandum Opinion.

The Services Agreement provides that the CEO reports to and is accountable "directly (and only to) the Board." *Id.* at ¶ 2.2. The Services Agreement provides further that (1) QHR has no right to direct the Hospital or its employees in the performance of their professional medical judgments or duties; (2) all matters requiring professional medical judgments remain the responsibility of the medical staff and Board; and (3) Special Employees may rely on the Board and medical staff for their professional competence and training and supervision of the medical staff. *Id.* at ¶¶ 1.2, 2.2, 4.2. QHR's account executive team (such as the Regional Vice President ("RVP") and Regional Associate Vice President ("RAVP")) assigned under the Services Agreement to assist the Hospital are responsible for, among other things, "assist[ing] the Board in evaluating the performance of the Special Employees"; and "provid[ing] consultation in preparing material for Board decisions, operational issues/problems, special projects and leadership development." *Id.* at ¶ 3.2.

A rural, regional hospital like GCRMC would use the services of a management company like QHR because it would not be able to bring within its own organization the wide range of experience and expertise necessary to meet today's healthcare and management challenges. QHR bills itself as an expert in hospital administration. *See* Exhibit 7 (touting QHR's "expertise in virtually all areas of hospital operations and management.").

<u>The import of granting temporary privileges.</u>

QHR's internal guidelines disfavored the granting of temporary privileges: "Once their 'in,' hard to get 'out.'" *See* Exhibit 26. Temporary privileges are used when there is an immediate need to fix a problem. The granting of privileges through the credentialing process requires a much more careful review, regardless of whether temporary privileges are granted. The Hospital's credentialing process was substandard as it related to Dr. Schlicht; there was a

-7-

lack of scrutiny in considering whether to grant physician privileges, and granting Dr. Schlicht privileges to perform minimally invasive spine surgery fell below the standard of care for the medical staff.  Even though a credentialing committee does not review a request for temporary privileges, knowing that temporary privileges were granted might cause a credentialing committee to assume that a complete and clean application was done.

However, the grant of temporary privileges to Dr. Schlicht did not affect the thoroughness of the Credentials Committee's and Medical Executive Committee's ("MECs") review in the grant of privileges to Dr. Schlicht on a non-temporary basis; nor did it affect their decision to grant privileges to Dr. Schlicht.  Dr. Schlicht did not attend to a patient at the Hospital until after the Credentials Committee, the MEC, and the Board approved his grant of privileges effective September 27, 2006.  QHR did not participate in and was not responsible for gathering the required recommendations, verifying Dr. Schlicht's license status, reviewing the other documentation provided in support of Dr. Schlicht's application for medical staff appointment, or evaluating the letters of recommendation. *See* Amended Memorandum Opinion, p. 35.  The Credentials Committee and the MEC were primarily swayed in granting privileges to Dr. Schlicht by Dr. Echols's endorsement of Dr. Schlicht.  *See* Amended Memorandum Opinion, pp. 32 and 35 ("Dr. Echols' endorsement of Dr. Schlicht carried a lot of weight with the members of the Credentials Committee, the MEC, and the Board."  Further, QHR did not breach any duty to the UTC in connection with the review and grant of Dr. Schlicht's requested privileges on a non-temporary basis.  *See* Amended Memorandum Opinion, p. 35.

Any breach in the standard of care by the Credentials Committee or the MEC in granting Dr. Schlicht's privileges is the responsibility of the Hospital, and is not reasonably connected to QHR's breach in granting Dr. Schlicht temporary privileges.  Notwithstanding Dr. Keith

-8-

Harvie's expert testimony that granting temporary privileges made it easier for the Credentials Committee to approve Dr. Schlicht's requested privileges, the grant of temporary privileges to Dr. Schlicht is not reasonably connected as a significant link to the UTC's injuries.

The CEO's obligation to report key events to QHR.

QHR's operating practices obligated the CEO and CFO to notify QHR's regional office of certain key events. *See* Exhibit 38. A "key event" is a "uniquely important term" for QHR because it is used to identify potential, major problems. The purpose of the key events notification requirement is so QHR's regional office and other QHR consultants can "provide a high level of service to QHR's clients in a timely manner." Exhibit 38, p. 18, Item 15. QHR's client in this instance was the Hospital. RVPs and AVPs use trip reports as a way to communicate key events to QHR. Among the key events the CEO was required to report to QHR's regional office are: upcoming Medicare and Medicare surveys and survey results, audits by government agencies, lawsuits in which QHR or a QHR employee is a named defendant, and changes or cancellations in insurance. *See* Exhibit 38, key events 1., 2., 3., 7., and 11. The following is also identified by QHR as a "key event" that must be reported to the QHR regional office:

> Other incidents, which could create serious problems for the hospital or QHR (e.g. significant news articles, potential violation of bond covenants, medical staff dispute, inability to make payroll, etc.).

> *Id.,* key event 13.

Something occurring within the Hospital that raises a concern about the quality of care could fall within this type of key event to be reported to QHR.

The CEO did not designate as a key event Dr. Masel's assertion that Dr. Schlicht was improperly performing experimental surgery on patients at the Hospital and acting outside his

scope.  *See* Amended Memorandum Opinion, pp.44 and 78.  Harry Jarvis, who served as an RAVP for QHR, does not view Dr. Masel's assertion as a key event per QHR's policy definition of key events, but agrees that the RVP should have been shown Dr. Schlicht's letter responding to Dr. Masel's assertion, which Dr. Schlicht addressed to "administration."  *See* Exhibit 37.  Bob Vento, who served as an RVP for many of QHR's managed hospitals, agrees that assertions that a physician employed by the Hospital is performing experimental surgery on the Hospital's patients could rise to the level of a key event, but believes Dr. Schlicht's letter might not have been something that would have "bubbled up" the chain to QHR.  In any event, Dr. Masel's assertion that Dr. Schlicht was performing experimental surgery on the Hospital's patients did not get reported to the offsite QHR team.

Because an assertion that a Hospital-employed physician is improperly performing "experimental surgery" is so explosive, and, if true, could create serious problems for the Hospital, the CEO was obligated under QHR's policies to report the assertion of "experimental surgery" as a key event to the QHR off-site team.  Had such assertion been reported to QHR as a key event, QHR would have been able to lend its administrative expertise to the Hospital's Board and the CEO to suggest a course of action.

<u>Who knew about Dr. Masel's assertions and what was done in response?</u>

Dr. Schlicht's written response to Dr. Masel's assertion that Dr. Schlicht was "not a Spine Specialist" and was performing "experimental surgery" on the Hospital's patents was addressed to "administration." *See* Exhibit 37.  Mr. James Richardson, the interim CEO at the Hospital, saw the letter, but did not recall that there was any particular sense of urgency at the time about the letter as a whole.  Mr. Richardson was, however, concerned about the assertion of experimental surgery, so he approached Dr. Arthur Austin, Senior Vice President of Medical

-10-

Staff Affairs. Dr. Austin indicated that the medical staff was addressing certain issues concerning Dr. Schlicht and were continuing to consider them. Based on what he learned from Dr. Austin, Mr. Richardson was satisfied at the time that the issue was being addressed by the medical staff.

Dianna Melendrez worked at the Hospital from 1989 to 2010, and served as medical staff coordinator, beginning in 2005. As medical staff coordinator, Ms. Melendrez gathered information to present to the Credentials Committee, the MEC and the Hospital board regarding physicians applying for privileges at the Hospital. Her office is located next door to the CEO. Dr. Austin was her immediate supervisor. Ms. Melendrez reported to the medical staff, not to the CEO.

In 2007, the Hospital began conducting an annual peer review process for Dr. Schlicht. As part of that process, Ms. Melendrez sent out requests for information to gather the information needed to present to the Credentials Committee, the MEC, and the Hospital board. She sent a review form to Dr. David Masel, Dr. Schlicht's proctor.[9] Dr. Masel performed his obligation as proctor by completing and submitting his report. The report Ms. Melendrez received from Dr. Masel as part of Dr. Schlicht's one-year review had an adverse comment about Dr. Schlicht. Dr. Masel's report was the first time Ms. Melendrez had ever received an adverse annual review report. She took it to Dr. Austin, who instructed her to take it to the Chief Quality Officer, Monica Arrowsmith. Together, Ms. Melendrez, Dr. Austin, and Ms. Arrowsmith called Dr. Masel to follow up. Dr. Masel thanked them for the call and described his concerns about Dr. Schlicht. Ms. Melendrez's understanding of that phone call is that Dr. Masel felt that Dr.

---

[9] A proctor is an outside physician assigned by the Credentials Committee to observe and evaluate the performance of a physician employed by the Hospital. *See* Amended Memorandum Opinion, p. 34. Proctoring includes direct observation of performance and/or chart review as determined by the Credentials Committee. *Id.* The Credentials Committee designated Dr. Masel, a neurosurgeon from El Paso, as Dr. Schlicht's proctor. *Id.* at p. 35.

Schlicht was practicing beyond his scope; Dr. Masel was also concerned about the procedures Dr. Schlicht was performing. She typed up her notes from the telephone conversation. Monica Arrowsmith then followed up with Dr. Austin and Sue Johnson Phillippe, the CEO at the time.

A closed-door meeting took place shortly thereafter. Mr. Richardson, the CEO who replaced Ms. Phillippe, was present. Dr. Austin knew that Dr. Masel had concerns about Dr. Schlicht, including concerns about his medical judgment. Dr. Austin and Mr. Richardson concluded that Dr. Masel's concerns were motivated by a business deal with Dr. Schlicht that did not end well. No further investigation took place at that time.

Ms. Melendrez completed gathering the information for Dr. Schlicht's annual review process and presented the material to the Credentials Committee, including her typed notes of the telephone conversation with Dr. Masel. Based on Ms. Melendrez's testimony and Dr. Schlicht's second response letter addressed to "Administration" dated July 21, 2007 (*See* Exhibit 37), the Court makes the following findings: (1) Dr. Schlicht was responding to the report Dr. Masel provided to the Hospital as part of Dr. Schlicht's annual peer review process; (2) Dr. Masel's report included an assertion that Dr. Schlicht was improperly performing experimental surgery on the Hospital's patients, was not a spine specialist, and was practicing beyond the scope of his training; and (3) the Credentials Committee and the MEC received Dr. Masel's report and Ms. Melendrez's notes from the telephone conversation with Dr. Masel as part of the annual peer review process. With knowledge of Dr. Masel's assertion through the annual peer review process that Dr. Schlicht was performing experimental surgery and practicing beyond his scope, the physicians on the Credentials Committee and the MEC had an obligation to request a focused review of Dr. Schlicht. Ultimately, neither the Credentials Committee nor the MEC took any action against Dr. Schlicht as a result of the annual peer review process, and the MEC did not

-12-

conduct a focused review. The MEC approved Dr. Schlicht's one-year annual review on June 10, 2008. *See* Exhibit S.[10]

Requesting a focused review.

Under the Medical Staff Bylaws, a "Focused Review of Medical Staff Member Conduct" process may be invoked if it appears that the conduct of a physician with medical staff privileges jeopardizes or may jeopardize patient safety, or there are competency issues. *See* Medical Staff Bylaws, Article VI (Amended Memorandum Opinion, p. 15). The focused review process is initiated upon a written request submitted to the Chief of Staff, who reviews the request for a focused review and apprises the MEC of the request. *See* Medical Staff Bylaws, Section 6.2. Anyone can request a focused review. *See* Medical Staff Bylaws, Section 6.1.A and 6.2. *See also,* Amended Memorandum Opinion, pp. 15-16 ("The Medical Staff Bylaws do not limit who may initiate a request for focused review.").

The MEC and, ultimately, the Board determines whether to conduct a focused review. If the MEC decides a focused review should be undertaken, the MEC can either conduct the investigation itself, or assign an ad hoc panel of people who may be specialists. *See,* Medical Staff Bylaws, Section 6.2. The MEC can also engage an outside independent expert to conduct the investigation. A focused review can consist of a review of patient charts, which can also be sent out for an outside review.

_____

[10] The MEC's approval of Dr. Schlicht's one-year evaluation identifies Dr. Schlicht as a D.O for interventional pain management/minimally invasive spine medicine. *Id.* Even though the Hospital received Dr. Masel's one-year evaluation report sometime in July of 2007, the minutes of the MEC meetings for July, August, September, and October 2007 make no reference to Dr. Schlicht's one-year evaluation. *See* Exhibit 183.

<u>Whether the MEC would have conducted a focused review had the CEO made such a request.</u>

Members of the MEC were aware of Dr. Masel's assertion about the impropriety of the procedures Dr. Schlicht was performing on the Hospital's patients and Dr. Masel's concern that Dr. Schlicht was practicing beyond his scope, yet in June of 2008, the MEC renewed Dr. Schlicht's privileges at the Hospital and never conducted a focused review. The Hospital is a relatively small hospital in a small community where a limited number of physicians work. Those physicians depend upon one another, work closely on a daily basis, and develop personal working relationships. Dr. Bryant, who was Chief of Staff at the Hospital and Chair of the MEC, was also performing the procedure in question with Dr. Schlicht. Thus, any investigation of the propriety of the procedure necessarily would have also involved an investigation of the safety of medical care provided by the Hospital's Chief of Staff and Chair of the MEC. At around that time, there had also been a business dispute between Dr. Schlicht and his proctor, Dr. Masel, relating to patient referrals. It was in this environment and under these circumstances that the MEC did not conduct a focused review despite its knowledge of Dr. Masel's assertions.

Had the CEO made a formal written request that the MEC conduct a focused review of Dr. Schlicht, his request would have carried significant weight. The CEO, who is the administrative head of the entire organization, speaks with high authority. His request for a focused review would have represented a strong message to the physician leadership at the Hospital of the need to thoroughly investigate the assertions that Dr. Schlicht was acting beyond his scope of training and performing improper experimental surgery. The CEO, as an outsider relative to the medical staff, can often serve as the "bad guy" to push the medical staff to take appropriate action they might not otherwise be inclined to take. Had the CEO made a formal written request that the MEC conduct a focused review of Dr. Schlicht, it is likely the MEC

-14-

would have taken additional action rather than simply completing its regular process of annual peer review. Any reasonably prudent medical executive committee would have done so had the CEO requested one, given the CEO's top administrative position at the Hospital, the serious nature of the safety concern, the large number of patients involved, and the fact that the physician's proctor raised the concern. It is likely the MEC would have acted accordingly.

<u>What the MEC and Hospital would have done had a focused review been requested?</u>

If the MEC had conducted a focused review regarding whether Dr. Schlicht was improperly preforming experimental surgery on Hospital patients, physicians on the MEC likely would have first conducted a literature search on the procedure and on the use of polymethylmethacrylate ("PMMA"). If a literature search had been conducted, it would have shown use of PMMA in the cervical intervertebral disc space (the neck) and elsewhere, including as a bone cement used in hip replacement surgery. A CPT billing code for the use of methyl methacrylate (a similar substance) in the intervertebral disc space existed at that time. On the other hand, there was no literature available at that time that supported the use of PMMA in the way Dr. Schlicht and Dr. Bryant were using it.

Had the MEC conducted a focused review and acted in a reasonably prudent manner, there are several reasons why the MEC likely would have engaged an outside physician with the necessary expertise to evaluate Dr. Schlicht's privileges and the procedure in question. First, there was no medical staff member at the Hospital with sufficient expertise available to evaluate the procedure Dr. Schlicht was performing that involved injection of PMMA in the lumbar intervertebral disc space, sometimes called percutaneous disc arthroplasty (the "PDA procedure"). The MEC could not look to Dr. Bryant to assess the PDA procedure because he was also performing the PDA procedure. Dr. Bryant would have been required to recuse himself

-15-

from participating in any focused review. Second, the literature review would have been inconclusive. Third, the potential safety issue affecting a large number of the Hospital's patients was serious, and was raised by Dr. Schlicht's physician proctor charged with evaluating his performance. Such a charge by a physician's proctor carries significant weight. Finally, the type of adverse report Dr. Masel made was very unusual.

Once complications from the PDA procedure surfaced, Dr. William Lloyd Pollard, who served at one time as the Chairman of Surgery at the Hospital, immediately recognized that the Hospital needed to put a hold on the PDA procedures. He recalls stating, "Hey, you guys need to put a hold on this until we figure out what is going on." Deposition of William Pollard, M.D. dated January 22, 2015 ("Pollard Deposition"), p. 13, lines 4-5. He also quickly determined that no one inside the Hospital could properly evaluate the procedure, and that an outside evaluation was necessary. *See* Pollard Deposition, p. 13. Lines 23 – 25 (at the conclusion of a meeting with the then CEO, Jim Heckert, they determined that "this has to stop until we get an outside evaluation of what the hell is going on."). Mr. Heckert, the CEO at the time complications from the PDA procedure were made known to the Hospital, agreed to immediately suspend the procedures.

Had a focused review been conducted and completed, the PDA procedure would have been stopped upon completion of the focused review. An independent outside physician qualified to evaluate the PDA procedure, such as Dr. Ralph F. Rashbaum, would have made sure the Hospital stopped performing the procedure.

In addition, had a focused review been conducted and completed, the Hospital would have revoked Dr. Schlicht's privileges to perform any procedures at the Hospital. Dr. Schlicht's lapse in medical judgment in conducting the PDA procedure was serious. The PDA procedure

was experimental, was not supported by the medical literature, subjected patients to dangerous risks, and was not an appropriate off-label use of PMMA. It should never have been performed on any patient unless it was approved by an Institutional Review Board ("IRB") for the purpose of conducting systematic research to advance the science of medicine and performed under the auspices of an IRB. There is no evidence an IRB would have approved clinical trials involving the PDA procedure. Dr. Schlicht's lapse in medical judgment was so serious that the Court infers that Dr. Schlicht would not have been permitted to continue working at the Hospital at all following completion of a focused review.

Members of the UTC undergoing procedures on or before September 21, 2007.

The MEC would have taken two months to complete a focused review. There is insufficient evidence that the MEC would have suspended Dr. Schlicht's or Dr. Bryant's privileges to perform the PDA procedure or any other procedures pending the outcome of a focused review. The medical staff did not perceive any urgency when they learned of Dr. Masel's report. Dr. Pollard's reaction that the Hospital would have immediately put a hold on the procedures was based on knowledge of reported complications from the PDA procedure that occurred much later. The CEO could not summarily suspend Dr. Schlicht's privileges pending the outcome of the focused review; doing so would require a medical judgment the CEO could not make. For these reasons, QHR's breach did not contribute and is not reasonably connected as a significant link to the injuries of those members of the UTC stemming from procedures at the Hospital performed on or before September 21, 2007 (within two months after the date of Dr. Schlicht's letter responding to Dr. Masel's assertions).

<u>Cause relating to QHR's breach of the standard of care.</u>

The PDA procedure and other procedures Dr. Schlicht performed beyond his scope of training caused harm to the UTC. Because of the CEO's failure to request a focused review, Dr. Schlicht was permitted to continue performing the PDA procedure and to perform other procedures beyond his qualifications after September 21, 2007. Dr. Bryant was also allowed to continue performing the PDA procedure after September 21, 2007. QHR's failure to request that the MEC conduct a focused review of Dr. Schlicht and the PDA procedure contributed and is reasonably connected as a significant link to the injuries that members of the UTC suffered as a result of (1) the PDA procedure performed on members of the UTC after September 21, 2007; and (2) other procedures that Dr. Schlicht performed on members of the UTC after September 21, 2007 as the lead physician for which he would be liable for committing medical negligence.

QHR's failure to request that the MEC conduct a focused review of Dr. Schlicht and the PDA procedure did not contribute and is not reasonably connected as a significant link to the injuries members of the UTC suffered as a result of (1) a PDA procedure or any other procedure performed on or before September 21, 2007; or (2) any procedures Dr. Bryant performed on members of the UTC as the lead physician other than the PDA procedure.

<u>Breaches of Standards of Care and Cause Relating to the Hospital and Drs. Schlicht and Bryant.</u>

The PDA procedure was an experimental procedure and should not have been performed at the Hospital on any patients. Under the PDA procedure, PMMA was injected into the intervertebral disc space of the lumbar spine in a hot, liquid form. PMMA should never be put into the intervertebral disc space of the lumbar spine in a liquid form. Dr. Schlicht breached the standard of care by performing the PDA procedure involving PMMA. He also breached the standard of care by performing procedures as lead physician, other than the PDA procedure, that

-18-

he was not qualified to perform.  Dr. Bryant began working collaboratively with Dr. Schlicht in

late 2006 and in 2007.  Dr. Bryant breached the standard of care in performing the PDA

procedures.  These breaches of the standard of care contributed and are reasonably connected as

a significant link to the injuries members of the UTC suffered as a result of the PDA procedures.

If Dr. Schlicht's and Dr. Bryant's performance of the PDA procedure on members of the UTC

did not breach of the applicable standard of care or was not reasonably connected as a significant

link to the UTC's injuries, then the CEO's failure to request a focused review to investigate

whether to put a stop to those procedures would not be reasonably connected as a significant link

to the injuries.  If Dr. Schlicht's and Dr. Bryant's performance of the PDA procedure on patients

did not breach the applicable standard of care, the MEC likely would not have taken any action

to suspend or restrict Dr. Schlicht's privileges even if the CEO had requested a focused review.

The UTC had good reason for their judicial admissions that Drs. Schlicht and Bryant

breached the standard of care and caused the UTC's harm.  If Dr. Schlicht's and Dr. Bryant's

performance of the PDA procedure on patients did not breach the applicable standard of care, the

MEC likely would not have taken any action to suspend or restrict Dr. Schlicht's privileges even

if the CEO had requested a focused review.  Further, if the procedures Dr. Schlicht and Dr.

Bryant performed on the UTC was not a proximate cause of the UTC's injuries, then the CEO's

failure to request a focused review to investigate whether to put a stop to those procedures

likewise could not be a cause of the injuries.

The Hospital breached the standard of care when the MEC failed to conduct a focused

review even in the absence of a request by the CEO.  The Hospital breached the standard of care

when the Credentials Committee and the MEC failed to take any action as part of the annual peer

review process to limit Dr. Schlicht's privileges when they knew that Dr. Schlicht's proctor had

raised concerns that Dr. Schlicht was practicing beyond his scope of training and was performing experimental surgery on the Hospital's patients.

Members of the MEC, including Dr. Austin, Vice President of Medical Staff Affairs; and Dr. John Jones, chair of the Credentials Committee, knew Dr. Schlicht's proctor raised serious issues concerning Dr. Schlicht, including concerns about his improperly performing experimental surgery and acting outside the scope of his training. Other than Dr. Bryant, who would need to recuse himself, the members of the MEC did not have the expertise to evaluate the proctor's concerns. Yet, neither the Credentials Committee nor the MEC took any action to conduct a focused review or limit Dr. Schlicht's privileges following his annual review. This failure falls below the standard of care even in the absence of the CEO requesting a focused review. These breaches of the standard of care contributed and are reasonably connected as a significant link to the injuries to the UTC.

Dr. Schlicht's bogus credentials.

Following the unfavorable one-year peer review report from Dr. Masel, the Hospital received a letter from "Benjamin Alli, MD, Ph.D., LL.D, FRCS" and a temporary Certificate of Fellowship in neurosurgery for Dr. Schlicht. *See* Exhibits 69 and 71. These documents are facially bogus. *See* Amended Memorandum Opinion p. 50. Shortly before Dr. Schlicht left the Hospital, he confessed to Dr. Bryant that an error in translation of some German documents overstated the amount of Dr. Schlicht's training, that the documents were not what they purported to be, and were false. Dr. Schlicht deliberately set out to mislead the Hospital and medical staff about his credentials. At his deposition taken in connection with the UTC's claims, Dr. Schlicht took the Fifth Amendment on advice of counsel and did not answer most of the questions posed to him. Dr. Schlicht left the Hospital in late 2008. When Dr. Bryant learned

-20-

from Dr. Schlicht that an error in translation overstated his training, Dr. Bryant was shocked and stunned.

Apportionment of fault for PDA procedures performed after September 21, 2007.

Dr. Schlicht and Dr. Bryant together are 67% at fault for the injuries to members of the UTC caused by their breaches of the standard of care in connection with claims of patients undergoing PDA procedures after September 21, 2007. The Hospital's fault connected to its respondeat superior liability is included in the allocation of fault to Dr. Schlicht. No percentage fault is attributed to Dr. Bryant for non-PDA procedures he performed. The physicians who performed the procedures on the UTC, particularly Dr. Schlicht, are primarily at fault for causing the harm. Dr. Schlicht developed the PDA procedure that caused the harm, performed the PDA procedure on the UTC, and presented bogus credentials to the Credentials Committee upon which it and Dr. Bryant relied. Dr. Bryant, an orthopedic surgeon, Chief of Staff, and Chair of the MEC, assisted in performing the PDA procedure on some of the patients. Dr. Schlicht and Dr. Bryant convinced members of the medical staff that the PDA procedure was safe, and convinced them and the CEO that Dr. Masel's report resulted from a business dispute between doctors and was not based in fact.

The Hospital and QHR are each 16.5% (about 1/6 each) at fault for the injuries to the UTC caused by their breaches of the standard of care with respect to claims of patients undergoing PDA procedures after September 21, 2007. This percentage of fault attributed to the Hospital is exclusive of the Hospital's imputed fault under respondeat superior, which has been included in the fault attributed to Dr. Schlicht.

For procedures other than the PDA procedure that Dr. Schlicht negligently performed as lead physician on members of the UTC after September 21, 2007, Dr. Schlicht is 67% at fault. The Hospital and QHR each remain 16.5% at fault for those injuries.

Any facts contained in the discussion section below that are not specifically set forth as facts in this section of the Court's Memorandum Opinion are incorporated herein by reference as additional findings of fact.

II.     DISCUSSION.

The Court makes the following conclusions of law:

A.     Rule 52(c) Motion for Judgment on Partial Findings.

Even though the UTC, as plaintiffs, ordinarily would have presented their case in chief first, the Court deferred to the parties' agreement that QHR would present its case in chief first. After QHR rested, the UTC made an oral motion for the Court to rule in its favor, arguing that QHR failed to meet its burden on its affirmative defense of comparative fault.  A request for judgment of this nature is governed by Fed.R.Civ.P. 52(c), made applicable to this proceeding by Fed.R.Bankr.P. 7052.[11]   It provides, in part:

> If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.
>
> Fed.R.Civ.P. 52(c).

---

[11] The UTC moved for a directed verdict.  Because there is no jury, Fed.R.Civ.P. 50(a), governing motions for judgment as a matter of law (familiarly known as motions for directed verdict), is inapplicable.  *See* Fed.R.Civ.P. 50(a) ("If a party has been fully heard on an issue *during a jury trial* and the court finds that a reasonable *jury* would not have a legally sufficient evidentiary basis to find for the party on that issue . . .") (emphasis added).  The Court will treat the UTC's motion as a motion under Rule 52(c).

The Court has discretion under this rule to "decline to render any judgment until the close of the evidence." *Id.*[12] If the Court defers its ruling until after the trial has been completed, "it need not limit itself to the state of the record as it existed at the time the motion was made." *MacArthur Co. v. Cupit (In re Cupit),* 514 B.R. 42, 48 n.1 (Bankr. D. Colo. 2014) (citing *Shearer v. Oberdick (In re Oberdick),* 490 B.R. 687, 697 (Bankr. W.D. Pa. 2013)) (remaining citations omitted).[13]

The Court exercises its discretion under Rule 52(c) to defer its ruling on the UTC's request for judgment on partial findings until the close of all evidence. A decision on the Rule 52(c) motion after deferral is "tantamount to making a decision on the case after trial on the complete trial record, as if no such motion[ ] had ever been made," so that a separate consideration of a motion for judgment on partial findings is "pointless." *Oberdick,* 490 B.R. at 697. The practical effect of the Court's deferral of a Rule 52(c) motion and its entry of judgment based on the totality of the evidence admitted at trial is denial of the motion. *Id.* (noting that the court has the discretion to consider the entire record once the non-moving party has presented its evidence, "thereby effectively denying the Rule 52(c) motions.") (citations omitted). *Cf. Duval v. Midwest Auto City, Inc.,* 578 F.2d 721, 724 (8th Cir. 2008) (once the nonmoving party has presented evidence on his own behalf, the nonmoving party is "foreclosed from raising any issue

---

[12] *See also Nulf v. Int'l Paper Co.,* 656 F.2d 553, 562 (10th Cir. 1981) (stating that "[i]t is within the discretionary power of the trial judge to either act upon the motion immediately or to reserve his decision until later." (internal quotation marks and citation omitted); *EBC, Inc. v. Clark Bldg. Systems, Inc.,* 618 F.3d 253, 272 (3d Cir. 2010) (stating that "the court may opt to reserve judgment until all the evidence is in or until the close of the non-movant's case-in-chief.") (citation omitted); 9C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2573.1 (3d ed. 2008) ("The trial court is not obliged to determine finally whether the nonmovant's claim or defense is sufficient on a motion under Rule 52(c).").

[13] *See also Gaffney v. Riverboat Services of Indiana, Inc.,* 451 F.3d 424, 451 n.29 (7th Cir. 2006) (rejecting the argument that the appellate court must review the request for partial judgment on the pleadings based solely on the record at the close of plaintiff's case and stating that nothing in the rule prevents the court "from evaluating the record as a whole.") (citation omitted); *Bacon v. United States,* 2007 WL 4224639, *5 n.10 (N.D.N.Y. Nov. 27, 2007) (denying Rule 52(c) motion because the Court preferred to issue its decision based on all the evidence at trial).

-23-

concerning the sufficiency of the evidence as it stood at the close of [the opposing party's] case"
and waives is right to judgment of dismissal under Rule 52(c)). The Court will base its decision
on the totality of the admitted evidence presented by both parties, effectively denying the UTC's
oral motion for judgment on partial findings.

B. Causation

Under New Mexico law, to prove a negligence claim generally "requires the existence of
a duty from a defendant to a plaintiff, breach of that duty, which is typically based upon a
standard of reasonable care, and the breach being a proximate cause and cause in fact of the
plaintiff's damages." *Herrera v. Quality Pontiac,* 134 N.M. 43, 47-48, 73 P.3d 181, 185-186
(2003). *See also Zamora v. St. Vincent Hosp.,* 2014-NMSC-035, ¶ 22, 335 P.3d 1243, 1249
(2014) (same). Following phase one of the trial, the Court ruled on the duty and breach of duty
elements of the UTC's negligence claims, and further ruled that the doctrine of comparative fault
applies in awarding damages. In this second phase of the trial, the Court will consider whether
the causation element of negligence has been satisfied. If so, the Court will also assign
percentages of fault under the doctrine of comparative fault.

Causation has two components: (1) cause in fact and (2) proximate cause. *See Herrera,*
134 N.M. at 48, 73 P.3d at 186 (the breach must be "a proximate cause and cause in fact"). *See
also Romero v. Giant Stop-N-Go of N.M., Inc.,* 146 N.M. 520, 522, 212 P.3d 408, 410 (Ct. App.
2009) ("It is axiomatic that a negligence action requires . . . that the breach was a cause in fact
and proximate cause of the plaintiff's damages.") (citation omitted). The "cause in fact"
requirement only requires that the act or omission be "a cause." New Mexico UJI 13-305. *See
also Chamberland v. Roswell Osteopathic Clinic, Inc.,* 130 N.M. 532, 536, 27 P.3d 1019, 1023
(Ct. App. 2001) ("To establish liability, there must be a chain of causation initiated by some

negligent act or omission of the defendant, which in legal terms is the cause in fact or the 'but for' cause of plaintiff's injury.") (citing UJI 13-305). An act or omission is a cause if it "contributes to bringing about the injury." *Id.*

New Mexico Uniform Jury Instruction 13-305, titled "Causation (*Proximate Cause),* no longer uses the phrase "proximate cause" in the instruction itself, yet the concept (and the standard) is the same as the previous instruction. *See* Committee Commentary to NMRA, Civ. UJI 13-305 ("The changes to this instruction approved in 2004, including elimination of the word 'proximate,' are intended to make the instruction clearer to the jury and do not signal any change in the law of proximate cause."). An act or omission satisfies the proximate cause requirement if it is "reasonably connected as a significant link to the injury." New Mexico UJI 13-305. "It need not be the only explanation for the injury, nor the reason that it is nearest in time or place." *Id.* Proximate cause is a question of fact. *Herrera,* 134 N.M. at 48, 73 P.3d at 186 ("proximate cause is generally a question of fact for the jury.") (citation omitted); *Calkins v. Cox Estates,* 110 N.M. 59, 61, 792 P.2d 36, 38 (1990) ("proximate cause is a question of fact.") (emphasis omitted); *Armstrong v. Indus. Elec. & Equip. Serv.,* 97 N.M. 272, 276, 639 P.2d 81, 85 (Ct. App. 1981) ("Negligence and causal connection are generally fact questions for the jury, unless reasonable minds cannot differ.") (citation omitted). Causation also incorporates the concept of foreseeability. *Herrera,* 134 N.M. at 48, 73 P.3d at 186 (the question of foreseeability is integral to proximate cause) (citation omitted). Foreseeability with respect to causation considers whether the manner of harm to the plaintiff was the foreseeable result of the breach. *See Calkins,* 110 N.M. at 61, 792 P.2d at 38 ("In determining proximate cause, an element of foreseeability is also present—the question then is whether the injury to petitioner was a foreseeable result of respondent's breach, i.e. what manner of harm is foreseeable?"). *See also*

-25-

*Herrera,* 134 N.M at 48, 73 P.3d at 186 ("The proximate causation element . . . is concerned with whether and to what extent the defendant's conduct foreseeably and substantially caused the specific injury that actually occurred.") (quoting *McCain v. Fla. Power Corp.,* 593 So.2d 500, 502 (Fla. 1992) (citations and footnote omitted)).

      1.   <u>Whether the granting of temporary privileges caused harm.</u>

The first breach relates to the granting of temporary privileges to Dr. Schlicht. The UTC asserts that QHR's breach in granting temporary privileges caused the UTC harm. They contend that granting temporary privileges "let the fox in the henhouse," and that, if Dr. Schlicht had not been granted temporary privileges, he never would have been able to perform the procedures that caused the UTC harm. Such logic would arguably satisfy the requirement for causation in some cases. But the evidence before the Court is insufficient to establish that QHR's breach in granting Dr. Schlicht temporary privileges was reasonably connected to the Credentials Committee's or the MEC's grant of privileges to Dr. Schlicht.

Notwithstanding Dr. Harvie's expert testimony that granting privileges made it easier for the Credentials Committee to approve Dr. Schlicht's requested privileges, the thoroughness of that review (or lack thereof) cannot be attributed to QHR's breach. The protocol for evaluating a physicians requested privileges required the review of the Hospital's medical staff through its Credentials Committee and its MEC. Dr. Schlicht did not perform any procedures on the Hospital's patients under his temporary privileges. The Court has found that the Credentials Committee and the MEC were swayed by Dr. Echols' strong recommendation of Dr. Schlicht. QHR's breach in granting Dr. Schlicht temporary privileges is not reasonably connected to the injuries the UTC suffered. The UTC has therefore failed to establish causation with respect to the grant of temporary privileges.

2.  <u>Whether the Special Employee/Borrowed Servant Doctrine applies.</u>

QHR argues that under the special employee or borrowed servant doctrine, QHR is not responsible for any breach of duty attributable to the CEO's acts or omissions because the CEO was a special employee of the Hospital. QHR points out that the Services Agreement provides that (i) the CEO is a special employee of the Hospital who functions as borrowed Hospital employee serving under the direction, control, and supervision of the Hospital's Board; (ii) the CEO reports to and is accountable directly (and only to) the Board; and (iii) the relationship between the Hospital and QHR is one of principal and agent.

QHR directs the Court to New Mexico case law regarding the special employee doctrine, also sometimes known as the loaned servant doctrine or some similar variant. *See, e.g., Bain v. IMC Global Operations, Inc.,* 236 Fed.Appx. 423, 426 (10th Cir. 2007) ("special employee"); *Hamberg v. Sandia Corp.,* 143 N.M. 601, 603, 179 P.3d 1209, 1211 (2008) ("special employee"); *Weese v. Stoddard,* 63 N.M. 20, 22, 312 P.2d 545, 547 (1956) ("special servant"); *Los Ranchitos v. Tierra Grande, Inc.,* 116 N.M. 222, 226, 881 P.2d 263, 267 (Ct. App. 1993) (considering whether the tortfeasor was a "servant . . . loaned to the service of another").

The special employee doctrine stems from the concept of respondeat superior, where an employer's liability arises, not based on its own conduct, but that of its employee. *See Dodds v. Richardson,* 614 F.3d 1185, 1195 (10th Cir. 2010) (explaining that "*respondeat superior* imposes liability for public policy reasons upon masters though they are not at fault in any way"). The special employee doctrine creates an exception to imposing liability under respondeat superior on a "general employer" for actions of its employee that are within the scope of the employee's employment by a "special employer." Under the special employee doctrine, an employer who would otherwise be held vicariously liable for the negligence of its employee escapes liability.

-27-

*See Los Ranchitos,* 116 N.M. at 226, 861 P.2d at 267 (1993) ("As a general rule, an employer is not liable under respondeat superior for an injury negligently caused by a servant if the servant is not acting at the time as the servant of that employer . . .") (citation omitted). The special employee doctrine applies where the employee "is not acting at the time as the [employee] of that employer, and the evidence shows that the employee has been loaned to the service of another who controls the manner and details of the employee's work." *Id.* (citing *Brown v. Pot Creek Logging & Lumber Co.,* 73 N.M. 178, 184-85, 368 P.2d 602, 606-608 (1963)).

A three-prong test used to determine special employer status considers whether: "'(1) the employee has made a contract of hire, express or implied, with the special employer; (2) the work being done is essentially that of the special employer; and (3) the special employer has the right to control the details of the work.'" *Hamberg,* 143 N.M. at 604, 179 P.3d at 2008 (quoting *Rivera v. Sagebrush Sales, Inc.,* 118 N.M. 676, 678–79, 884 P.2d 832, 834–35 (Ct. App. 1994)).[14] *See also Bain,* 236 Fed. Appx. at 426 (decided before *Hamburg,* and articulating the following two-part test: "*One,* for which employer is work being performed at the time of the tortious conduct, and *two,* which employer had the power to control the work performed and the conduct of the employee.") (citing *Dunham v. Walker,* 60 N.M. 143, 288 P.2d 684, 689 (1955) (remaining citation omitted)). The control component of the test "recognizes that the general employer and the special employer may both exercise control over the employee and both benefit to some degree from the employee's work." *Hamberg*, 143 N.M. at 604, 179 P.3d at 1212 (internal citations and quotation marks omitted). The general employer must lack the right to control the employee's work to escape liability. To satisfy this control element, QHR must show not that the Hospital maintained control over the CEO's work, but rather that QHR lacked the

---

[14] *See also Dessauer v. Mem'l Gen. Hosp.,* 96 N.M. 92, 628 P.2d 337 (Ct. App. 1981) (applying a three-part special employee/borrowed servant test in a non-worker's compensation case).

right to control the CEO's work. *Cf. Hamberg,* 143 N.M. at 604, 179 P.3d at 1212 (to establish that an employer is not a special employer immune from tort liability under the Worker's Compensation Act, the plaintiff must show not that the general employer "retained some control over his work, but rather that Defendant lacked the right to control his work."). The terms of the Services Agreement between QHR and the Hospital is not determinative. *Hamberg,* 143 N.M. at 605, 179 P.3d at 1213 ("we look to the relationship's actual circumstances, not to how the parties define the relationship in their contracts.") (citation omitted).

QHR's argument that the special employee doctrine absolves it of any responsibility fails for two reasons. First, because the special employee doctrine governs whether an employer is liable under respondeat superior for injuries caused by an employee, it is more properly assessed as part of the duty and breach elements of a negligence claim, not causation. The trial was bifurcated into phases, so that duty and breach were tried in phase 1, and causation and comparative fault were tried in phase 2. Although separating duty and breach from causation is unusual,[15] it is how the parties agreed and the Court decided to proceed. *Id.* The Court already determined that QHR owed a direct duty to the UTC and breached that duty through the CEO's granting of temporary privileges and failure to request a focused review. Even though QHR's breach is based on the acts and omissions of its CEO, it is too late for QHR to raise this issue in the second phase of the trial, which is limited to causation and comparative fault.

Second, even if the special employee doctrine relates to causation, it does not shield QHR of liability for the CEO's failure to request a focused review. The CEO was obligated under QHR's policies and procedures to report key events to QHR even while the CEO worked for the Hospital. The CEO's duty to report key events to QHR would apprise it of "incidents which

---

[15] *Cf. Herrera,* 134 N.M. at 51, 73 P.3d at 189 (observing that "it would be an unusual case which purely addressed duty or proximate cause.") (citation omitted).

Case 13-00007-j    Doc 545    Filed 12/23/16    Entered 12/23/16 13:18:43 Page 29 of 45

could create serious problems for the hospital or QHR." *See* Exhibit 38, p. 18. That would benefit both QHR and the Hospital by enabling QHR to better lend its expertise in advising the Hospital's Board in dealing with those types of difficult situations. The CEO should have (but did not) report Dr. Masel's assertion of improper experimental surgery up the chain to QHR as a key event. Because of that failure, QHR was not able to lend its expertise in evaluating a proper course of action. By its own policies, QHR had the ability to control this aspect of the CEO's work. The CEO's failure to act also violated the CEO's obligation to QHR. QHR therefore remains responsible for the breach in failing to request a focused review.

     3.   <u>Whether the failure to request a focused review caused harm.</u>

     QHR argues that the CEO's failure to request that the MEC conduct a focused review did not cause the UTC harm for two reasons: first, there is no evidence the MEC would have conducted a focused review even if the CEO asked it to so; and, second, there is no evidence that the MEC would have stopped Dr. Schlicht from performing the PDA procedure or otherwise restricted Dr. Schlicht's privileges even if the MEC had conducted a focused review. QHR maintains that any finding to the contrary would be mere speculation and conjecture. QHR reasons that the best evidence of what the MEC would have done had the CEO requested a focused review is what it actually did. QHR reasons further that because the Credentials Committee and the MEC had the information from Dr. Masel that this Court determined should have triggered the CEO to request a focused review, yet did nothing to restrict Dr. Schlicht's privileges or stop the procedure, QHR cannot be held responsible.

     QHR urges the Court to apply, by analogy, case law in the patient informed consent area that holds that if a patient is already aware of the material risks of a medical procedure or medication, a physician has no responsibility to warn the patient of those risks. Here, the MEC

was already aware of Dr. Masel's report on the risks associated with Dr. Schlicht performing the PDA procedure and itself had a duty to conduct a focused review if appropriate. QHR argues that the Court therefore should conclude that the CEO had no responsibility to ask the MEC to conduct a focused review of those asserted risks and should find that the CEO's failure to request a focused review was not a cause of the MEC's failure to act.

The UTC counters that the Court should apply a "reasonable person" standard to determine what a reasonable medical executive committee would have done had a focused review been requested, and argues that a reasonable medical executive committee would have conducted a focused review had the CEO requested it. The UTC also relies on patient informed consent case law by analogy.

When considering proximate cause, the fact finder may make reasonable inferences from the evidence, but must refrain from speculation and conjecture. *See Tafoya v. Seay Bros. Corp.,* 119 N.M. 350, 353, 890 P.2d 803, 806 (1995) (finding that plaintiff established proximate cause where "[t]he jury could reasonably infer without speculation"); *Bolt v. Davis,* 70 N.M. 449, 459, 374, P.2d 648, 655 (1962) (evidence means "facts as distinguished from speculation, and the mere possibility with respect to negligence or proximate cause is not 'evidence'. . .") (citation omitted); *Sanders v. Atchison, Topeka & Santa Fe Ry. Co.,* 65 N.M. 286, 289, 336 P.2d 324, 326-27 (1959) ("the burden rests upon the plaintiff to introduce evidence to remove the cause from the realm of speculation and to give it a solid foundation upon facts."); *Lopez v. Martinez,* 2014 WL 7187065, *6 (N.M. Ct. App. Nov. 17, 2014) (concluding that there was no sufficient evidentiary basis to find causation, where "any causal connection . . . would have been based not on the evidence and testimony given, but rather on conjecture and speculation."). Yet, "[a]ll that is required is that the circumstances as shown by the evidence should be sufficiently strong that a

-31-

[fact finder] might properly, on the grounds of probability as distinguished from certainty, exclude the inference favorable to the defendant." *Sanders,* 65 N.M. at 289, 336 P.2d at 327. As discussed below, the Court has determined that there is sufficient evidence from which to infer cause in fact and proximate cause.

>    (a) <u>Whether principles found in informed consent cases should be applied to assess causation.</u>

The seminal case in New Mexico on the patient informed consent doctrine is *Gerety v. Demers,* 92 N.M. 396, 589 P.2d 180 (1978). Both QHR and the UTC rely on *Gerety.* The UTC relies on *Gerety,* by analogy, in support of its assertion that the Court should apply an objective test in determining what would have happened had the CEO requested a focused review. QHR relies on *Gerety*, by analogy, in support of its position that because the MEC knew about the risks described in Dr. Masel's report, it would not have acted differently had the CEO requested a focused review to evaluate those risks.

*Gerety* holds that the standard for determining what disclosures a physician is required to make to a patient "'is not subjective as to either the physician or the patient; it remains objective with due regard for the patient's informational needs and with suitable leeway for the physician's situation.'" *Id.* at 92, 410 (quoting *Canterbury v. Spence*, 150 U.S. App. D.C. 263, 464 F.2d 772, 787-88 (1972), *cert. denied* 409 U.S. 1064, 93 S. Ct. 560, 34 L.Ed.2d 518 (1972)). The causation element in determining patient informed consent claims is to be resolved "'on an objective basis: in terms of what a prudent person in the patient's position would have decided if suitably informed of all perils bearing significance.'" *Gerety*. 92 N.M. at 410, 589 P.2d at 194 (quoting *Canterbury,* 464 F.2d at 790-91). The rationale for applying an objective standard to determine causation is to avoid decisions that place too much weight on an assessment of the patient's self-serving hindsight testimony. *Gerety,* 92 N.M. at 410, 589 P.2d at 194

(Determining causation "simply on the assessment of the patient's credibility is unsatisfactory. . . . It places the physician in jeopardy of the patient's hindsight and bitterness," because the patient's testimony would "threaten to dominate the findings.") (internal quotation marks and citations omitted).

Nevertheless, "'the physician bears no responsibility for discussion of hazards the patient has already discovered, or those having no apparent materiality to [the] patients' decision on therapy.'" *Gerety,* 92 N.M. at 410, 589 P.2d at 194 (quoting *Canterbury,* 464 F.2d at 788). *See also Dills v. New Mexico Heart Institute, P.A.,* 2016-NMCA-023, 367 P.3d 467 (Ct. App. 2015), *cert den.,* 370 P.3d 1212 (2016) (physician does not need to disclose information to a patient that the patient already knows). *Cf. Kirkbride v. Terex USA, LLC,* 798 F.3d 1343, 1350 (10th Cir. 2015) (no causation where plaintiff did not read the manual and candidly questioned why anyone would read a manual; there was no evidence that a better warning would have prevented plaintiff's injury); *Clark v. Continental Tank Co.,* 744 P.2d 949, 954 (Okla. 1987) (plaintiff was not entitled to jury instruction regarding adequacy of the warning "because a warning would not have instructed or informed the plaintiff of anything he did not already know.").

The Court is not persuaded by QHR's argument that the MEC's failure to act despite its knowledge of Dr. Masel's report is the best evidence of what it would have done following a focused review request from the CEO. Nor is the Court persuaded that the MEC's knowledge of the contents of Dr. Masel's report should relieve the CEO of responsibility to request a focused review under the facts and circumstances present here. Gerald Champion is a relatively small hospital, in a small community, with a small medical staff. Its physicians depend upon one another, work closely on a daily basis, and necessarily develop close personal working relationships. Dr. Bryant, who was Chief of Staff at the Hospital and Chair of the MEC, was

-33-

performing the PDA procedure with Dr. Schlicht. Thus, if members of the MEC launched an investigation into the propriety of the PDA procedure it necessarily would involve investigating the medical judgment of their boss, the Hospital's Chief of Staff and Chair of the MEC. The CEO, as an outsider relative to the medical staff, can often serve as the "bad guy" to push the medical staff to take appropriate action they might not otherwise be inclined to take. That is particularly true here, where the action would involve an investigation of the safety of a medical procedure being performed by Chief of Staff and head of the MEC. Had the CEO made a formal written request that the MEC conduct a focused review of Dr. Schlicht and the PDA procedure, his request would have carried significant weight. It would have sent a strong message to the physician leadership at the Hospital of the need to investigate thoroughly the assertions that Dr. Schlicht was acting beyond his scope of training and performing improper experimental surgery.

The Court has found that a reasonably prudent medical executive committee in the MEC's position would have conducted a focused review of Dr. Schlicht continuing to perform the PDA procedure on Hospital patients had the CEO made a formal written request that it do so. Other than Dr. Bryant (who would have recused himself from the MEC's deliberations due to a conflict of interest), the medical staff did not have the expertise to evaluate Dr. Masel's assessment and to conclude it was just the product of a business dispute. Further, Dr. Masel's adverse report was highly unusual, asserted that Dr. Schlicht was putting a large number of Hospital patients at serious risk, and carried particular weight because Dr. Masel was Dr. Schlicht's proctor charged with evaluating his performance. Unlike the members of the MEC (excluding Dr. Bryant), Dr. Masel did have the expertise to evaluate Dr. Schlicht and the PDA procedure. Had members of the MEC conducted a literature review it would have been inconclusive. In these circumstances, a reasonably prudent medical executive committee would

-34-

have engaged an outside independent expert to evaluate the PDA procedure and whether Dr. Schlicht was operating outside the scope of his training.

As with informed consent, some of the same concerns about assessing the credibility of hindsight self-serving testimony would have been existed here had members of the MEC testified about whether they would have conducted a focused review following a formal request by the CEO. Absent persuasive testimony to the contrary, under the facts and circumstances of this case, the Court has inferred that the MEC, like a reasonably prudent medical executive committee, would have conducted a focused review had the CEO made a formal written request.

(b) <u>Whether QHR's breach in failing to request a focused review was the legal and proximate cause of the UTC's injuries.</u>

The CEO concluded after conferring with Dr. Austin that Dr. Masel's assertions were motivated by a business deal with Dr. Schlicht that did not end well. At least in part because the CEO did not request the MEC to conduct a focused review, no further investigation into Dr. Schlicht occurred in July 2007. In fact, the MEC did not approve Dr. Schlicht's annual peer review until nearly ten months later. The CEO's inaction in July 2007 contributed to the delay. Had the CEO made a request of the MEC to conduct a focused review of Dr. Schlicht and the PDA procedure, the MEC would have enlisted the assistance of a qualified, outside physician, such as Dr. Rashbaum, to evaluate the procedures. After completion of the focused review by September 21, 2007, a qualified, outside physician, such as Dr. Rashbaum, would have made sure that the Hospital stopped performing the procedure. In addition, as the Court has found, the seriousness of Dr. Schlicht's lapse in medical judgment would have resulted in revocation of his privileges to perform any procedures at the Hospital.

For these reasons, the CEO's failure to request a focused review was both the cause in fact and proximate cause of the UTC's injuries stemming from PDA procedures performed after

September 21, 2007.  It is also the cause in fact and proximate cause of any injuries stemming from non-PDA negligent procedures Dr. Schlicht performed as lead physician after that date. Had the MEC conducted a focused review, the PDA procedure would have been stopped. Because the MEC failed to put a stop to the procedures, Dr. Schlicht and Dr. Bryant continued to perform the procedures that caused the UTC harm.

### C.   Comparative Fault.

 "The thrust of the comparative negligence doctrine is to accomplish (1) apportionment of fault between or among negligent parties whose negligence proximately causes any part of a loss or injury; and (2) apportionment of the total damages resulting from such loss or injury in proportion to the fault of each party." *Scott v. Rizzo,* 96 N.M. 682, 688, 634 P.2d 1234, 1240 (1981).  New Mexico's statutory codification of comparative fault provides:

> [A]ny defendant who establishes that the fault of another is a proximate cause of a plaintiff's injury shall be liable only for that portion of the total dollar amount awarded as damages to the plaintiff that is equal to the ratio of such defendant's fault to the total fault attributed to all persons, including plaintiffs, defendants, and persons not party to the action.

N.M.S.A. 1978, § 41-3A-1(B).

Under comparative fault, "each tortfeasor is severally responsible for its own percentage of comparative fault for that injury." *Gulf Ins. Co. v. Cottone,* 140 N.M. 728, 734, 148 P.3d 814, 820 (Ct. App. 2006) (additional quotation marks and citation omitted).  *See also Garcia v. Gordon*, 136 N.M. 394, 397, 98 P.3d 1044, 1047 (Ct. App. 2004) (noting that comparative fault of two or more persons causing a single injury "holds all parties fully responsible for their own respective acts to the degree that those acts have caused harm.") (additional quotation marks and citation omitted).

Comparative fault is an affirmative defense for which the party asserting it bears the burden of persuasion. *See Jaramillo v. Kellogg,* 126 N.M. 84, 86, 966 P.2d 792, 795 (Ct. App. 1998) (acknowledging that comparative negligence is an affirmative defense); *Tafoya,* 119 N.M. at 352, 890 P.2d at 805 ("The party alleging an affirmative defense has the burden of persuasion.") (citation omitted). *See also* New Mexico UJI 13-302D (defendant has the burden of proving that the negligence of others was a cause of the injuries). QHR contends that the Hospital, Dr. Schlicht, and Dr. Bryant should each be assigned a portion of fault for the harm caused to the UTC. To establish the negligence of each of these non-parties for purposes of assigning comparative fault, QHR had to show: (1) a duty to the UTC; (2) a breach of that duty by departing from the proper standard of care; and (3) causation. *Kellogg,* 126 N.M. at 86, 966 P.2d at 794.

QHR points out that the UTC's complaints contain allegations that Drs. Schlicht and Bryant and the Hospital breached the standard of care and caused the UTC harm. *See, e.g.,* Adversary Proceeding No. 12-1204. Factual allegations in a complaint can constitute judicial admissions, "which have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact." *Guidry v. Sheet Metal Workers Int'l Ass'n,* 10 F.3d 700, 716 (10th Cir. 1993) (internal quotation marks and citation omitted). *See also Grynberg v. Bar S. Services, Inc.,* 527 Fed. Appx. 736, 739 (10th Cir. 2013) (relying on *Guidry* and determining that the judicial admissions contained in the plaintiff's complaint and answer to the counterclaim were binding admissions); *Bellefonte Re Ins. Co. v. Argonaut Ins. Co.,* 757 F.2d 523, 528 (2d Cir. 1985) ("A party's assertion of fact in a pleading is a judicial admission by which it normally is bound throughout the course of the proceeding.") (citations omitted); *Sicor Ltd. v. Cetus Corp.,* F.3d 848, 859 (9th Cir. 1995) ("a statement in a complaint may serve as a judicial admission.")

-37-

(citation omitted). The UTC counters that allegations in a complaint are not evidence. But a judicial admission "is not itself evidence," it simply "has the effect of withdrawing a fact from contention." *Martinez v. Bally's Louisiana, Inc.,* 244 F.3d 474, 476 (5th Cir. 2001). Judicial admissions are formal, deliberate admissions of fact that are conclusive in the litigation in which the admissions are made. *See U.S. Energy Corp. v. Nukem, Inc.,* 400 F.3d 822, 833 n.4 (10th Cir. 2005) ("Judicial admissions are formal, deliberate declarations which a party or his attorney makes in a judicial proceeding . . .") (internal quotation marks and citation omitted). Unless a party amends or is allowed to withdraw a factual statement contained in its pleading, such factual assertions "are considered judicial admissions conclusively binding on the party who made them." *American Title Ins. Co. v. Lacelaw Corp.,* 861 F.2d 224, 226 (9th Cir. 1988). The UTC has not amended their pleadings or otherwise withdrawn the factual assertions contained in their complaints. Consequently, they remain bound by the judicial admissions contained in the complaints. These judicial admissions establish the breach of duty and causation elements of negligence claims against Dr. Schlicht, Dr. Bryant, and the Hospital.

The UTC had good reason for its judicial admissions that Drs. Schlicht and Bryant breached the standard of care and caused the UTC's harm. If Dr. Schlicht's and Dr. Bryant's performance of the PDA procedure on patients did not breach the applicable standard of care, the MEC likely would not have taken any action to suspend or restrict Dr. Schlicht's privileges even if the CEO had requested a focused review. Further, if the procedures Dr. Schlicht and Dr. Bryant performed on the UTC was not a proximate cause of the UTC's injuries, then the CEO's failure to request a focused review to investigate whether to put a stop to those procedures likewise could not be a cause of the injuries.

Nevertheless, even if the Court did not treat UTC's factual allegations in the complaints as judicial admissions, there is sufficient evidence before the Court to establish the negligence of Dr. Schlicht, Dr. Bryant, and the Hospital for purposes of comparative fault. As for the duty component, the Court determines duty as a matter of law. *See Solon v. WEK Drilling Co., Inc.,* 113 N.M. 566, 571, 829 P.2d 645, 650 (1992) ("It is thoroughly settled in New Mexico . . . that whether the defendant owes a duty to the plaintiff is a question of law.") (citations omitted); *Herrera,* 134 N.M. at 48, 73 P.3d at 186 ("Whether a duty exists is a question of law for the courts to decide.") (citation and internal quotation marks omitted). The Hospital, Dr. Bryant, and Dr. Schlicht each owed a duty of care directly to the UTC. *See, Diaz v. Feil,* 118 N.M. 385, 389, 881 P.2d 745, 749 (Ct. App. 1994) ("[I]t is beyond question in New Mexico that a hospital owes an independent duty of care to patients at the hospital.") (citations omitted);[16] *Salopek v. Friedman,* 308 P.3d 139, 144, 2013-NMCA-087, ¶ 7 (N.M. Ct. App. 2013) ("It is well established that a doctor owes a general duty to provide competent care in treating a patient's medical condition.") (citation and internal quotation marks omitted); *Lester ex rel. Mavrogenis v. Hall,* 126 N.M. 404, 409, 970 P.2d 590, 595 (1998) (stating that the general rule is that physicians owe a duty to their patients, but not to third parties).

QHR asserts that the following non-parties must be assigned a portion of fault for the UTC's injuries: (1) Dr. Schlicht; (2) Dr. Bryant; and (3) the Hospital. Because Dr. Schlicht was employed by the Hospital, his portion of fault, if any, would be attributable to the Hospital.

---

[16] The Hospital's duty is based on the doctrine of corporate liability, which recognizes a hospital's direct, non-delegable duty of care to its patients. *See* Amended Memorandum Opinion, p. 61 (citing *Diaz,* 118 N.M. at 389, 881 P.2d at 749).

1.    Dr. Schlicht and Dr. Bryant:  breach and causation.

In cases involving medical negligence, expert testimony is generally required to establish that the physician departed from the recognized standard of care.  *See Kellogg,* 126 N.M. at 86, 966 P.2d at 794 ("Medical malpractice cases usually require expert medical testimony to establish departure from recognized standards in the community.") (citing *Lopez v. Southwest Community Health Servs.,* 114 N.M. 2, 7, 833 P.2d 1183, 1188 (Ct. App. 1992)).  The expert testimony of Dr. Harvie, who was qualified as an expert regarding the roles and obligations of surgeons, the types of surgeries at issue in this case, and the proper standard of care for those surgeries, established that Dr. Schlicht departed from the standard of care by performing procedures beyond his scope of training and by performing the PDA procedure.  Dr. Anthony Haftel similarly opined that Dr. Schlicht performed procedures on the UTC outside the scope of his competence as a pain specialist.  The expert testimony of Dr. Harvie likewise established that Dr. Bryant fell below the standard of care by performing the PDA procedure.  In phase 1 of the trial, Dr. Rashbaum condemned the PDA procedure as improper experimental surgery that breached the standard of care measured by any applicable standard. Independently of UTC's judicial admissions, the Court therefore concludes from this evidence that Dr. Schlicht and Dr. Bryant breached the applicable standard of care by performing the PDA procedure on Hospital patients.  Dr. Schlicht's and Dr. Bryant's breach was both the cause in fact and proximate cause of the injuries of those members of the UTC undergoing the PDA procedure.  Dr. Schlicht likewise breached the standard of care in performing non-PDA procedures beyond his qualifications that he was not surgically trained to perform.  Dr. Schlicht's breach of the standard of care in performing non-PDA procedures that were beyond his scope of training was both the

-40-

cause in fact and the proximate cause of the injuries to members of the UTC who underwent

such a procedure after September 21, 2007.

2.     Hospital: breach and causation.

The facts show that some of the medical staff at the Hospital, the Credentials Committee,

and the MEC received information from Dr. Masel as part of Dr. Schlicht's annual peer review

process that was unfavorable.   The Credentials Committee and the MEC were aware that Dr.

Schlicht's proctor raised serious concerns about whether Dr. Schlicht was operating outside his

credentials and improperly performing experimental surgery on Hospital patients.  Dr. Harvie

testified that the Hospital's failure to act on that information departed from the standard of care.

The Hospital's failure to restrict Dr. Schlicht's privileges as a result of the peer review process,

and the MEC's failure to conduct a focused review even in the absence of a request from the

CEO, breached the applicable standard of care and was both the cause in fact and proximate

cause of the UTC's injuries.  The breach allowed Dr. Schlicht to continue performing the

procedures that caused the UTC harm after September 21, 2007.

3.     Apportionment of fault.

Having established that QHR, Dr. Schlicht, Dr. Bryant, and the Hospital each contributed

to the harm to the UTC, the Court must apportion fault among each actor based on a percentage

of fault.  The percentage of fault is based on the degree of fault of each actor that contributed to

the harm.  *See Bartlett v. New Mexico Welding Supply, Inc.,* 98 N.M. 152, 159, 646 P.2d 579,

586 (Ct. App. 1982) ("comparative negligence . . . holds all parties fully responsible for their

own respective acts to the degree that those acts have caused harm.") (citation omitted).

Ordinarily, this allocation of fault is a question for the jury. *See Safeway, Inc. v. Rooter 2000

Plumbing & Drain SSS,* 368 P.3d 389, 393, 2016-NMSC-009, ¶5 (2016) (reviewing special

-41-

verdict forms, including a jury question asking to compare the negligence of two entities and find a percentage for each). But in the absence of a jury, the Court will exercise its discretion in assigning a percentage of fault.

The UTC stresses that QHR was the expert in hospital management, and suggest that, because QHR could have stopped the procedures from happening, it should be held 100% at fault for the harm. The UTC relies in part on *Reichert v. Atler,* 117 N.M. 623, 875 P.2d 379 (1994), which considered the comparative fault of a bar owner, who failed to provide adequate security at the bar, with the fault of Pablo Ochoa, a patron who shot and killed another patron. The bar had a reputation for being very dangerous. *Id.* at 624, 380. An employee of the bar did not attempt to stop a fight between the two patrons, could see that Mr. Ochoa was clearly intoxicated, and had reason to know that Mr. Ochoa carried a gun and may have killed someone in another state. *Id.* The Court held that comparative fault should be applied, regardless of the intentional conduct of Mr. Ochoa. *Id.* at 626, 382. The New Mexico Supreme Court suggested the following jury instruction:

> If you find that the [owner] [operator] of the [place of business] breached [his] [her] [its] duty to use ordinary care to keep the premises safe for use by the visitor, you may compare this breach of duty with the conduct of the third person(s) who actually caused the injury to the plaintiff(s) and apportion fault accordingly. In apportioning this fault, you should consider that the [owner's] [operator's] duty to protect visitors arises from the likelihood that a third party will injure a visitor and, as the risk of danger increases, the amount of care to be expected by the [owner] [operator] also increases. Therefore, the proportionate fault of the [owner] [operator] is not necessarily reduced by the increasingly wrongful conduct of the third party.

*Atler,* 117 N.M. at 626, 875 P.2d at 382.

The UTC argues that in this case, because the risk of harm to the UTC from the continued PDA procedure was so high, the amount of care QHR was required to exercise also increased. Consequently, the UTC argues that the Court should not necessarily reduce QHR's proportionate

-42-

fault by the degree of the wrongful conduct of the physicians who were the direct cause of the harm. The *Atler* jury instruction enables the fact finder to consider the risk of danger and the foreseeability of the harm in apportioning fault, and reminds the fact finder that the actor most directly causing the harm need not be held solely or mostly responsible. Under *Atler*, the proportionate fault of the party neglecting to provide a safe environment to protect its customers from harm is not necessarily reduced by the increasingly wrongful conduct of the actor directly causing the harm, because an increased risk of danger also increases the amount of care to be expected by the party neglecting to protect its customers. *Atler* does not, however, prohibit the fact finder from apportioning a greater percentage of fault to the actor directly causing the harm.

Here, in apportioning fault, the Court recognizes that the Hospital relied upon QHR as the expert in hospital management, and that the risk to the UTC as the result of QHR's breach was foreseeable and was great. The Court is also mindful of the special role of the CEO under the circumstances to push the medical staff to act. The Court also must take other circumstances into account. Neither the CEO nor QHR could make any medical judgments or direct medical staff in the performance of their medical judgments or duties. The CEO did consult the medical staff when the issue arose. The physicians who developed and performed the PDA procedure on the UTC directly and necessarily caused the UTC harm. Dr. Schlicht submitted bogus credentials to the Credentials Committee. The MEC should have conducted a focused review even without the CEO requesting one. The Hospital failed to restrict Dr. Schlicht's privileges as part of the peer review process.

The physicians who performed the procedures on the UTC, particularly Dr. Schlicht, are primarily at fault for causing the harm. Dr. Schlicht developed the PDA procedure that caused the harm, and performed the PDA procedure on the UTC. Dr. Bryant, an orthopedic surgeon,

Chief of Staff, and Chair of the MEC, assisted in performing the experimental procedure. Dr. Schlicht and Dr. Bryant convinced members of the medial staff that the PDA procedure was safe, and convinced them and the CEO that Dr. Masel's report resulted from a business dispute between doctors and was not based in fact. Dr. Schlicht also presented bogus credentials to the Credentials Committee upon which it and Dr. Bryant relied. The Court has found that Dr. Schlicht and Dr. Bryant together are 67% at fault.[17]

For procedures that Dr. Schlicht performed, whether they were the PDA procedure, or other procedures outside his scope of training, his percentage of fault is attributable to the Hospital. *See Reynolds v. Swigert,* 102 N.M. 504, 507-8, 697 P.2d 504, 507-8 (Ct. App. 1984) (if a physician is employed by the hospital, "the hospital may be held liable for the tortious acts of the physician which are done in the scope of his employment.") (citations omitted). The Hospital's percentage of fault based on the actions of Dr. Schlicht and Dr. Bryant in performing the procedures is included in the 67% of fault the Court attributes to Dr. Schlicht and Dr. Bryant. For non-PDA procedures that Dr. Schlicht negligently performed after September 21, 2007, Dr. Schlicht is 67% at fault.

The Hospital's percentage of fault based on its own negligence is 16.5% based on its independent failure to conform to the standard of care in failing to adequately investigate Dr. Masel's negative review of Dr. Schlicht. Finally, QHR is 16.5% at fault based on its breach stemming from the CEO's failure to request a focused review of Dr. Schlicht. QHR owed a direct duty of care to the UTC, which included the duty to appropriately involve medical staff in evaluating medical issues. Amended Memorandum Opinion, 71. The Hospital and its Board relied on QHR for its expertise in hospital management. QHR failed in both respects.

---

[17] No percentage fault is attributed to Dr. Bryant for non-PDA procedures he performed.

D.    QHR's Request to Dismiss the Claims of Certain UTC Members

QHR requests the Court to dismiss the claims of the following UTC members because the (1) procedure was performed before a focused review could have been completed; (2) they underwent a non-PDA procedure; and/or (3) the evidence fails to establish which physician performed the procedure:  Kent Gwynne, Gayle Lunceford, James Silva, Barbara Olson, William Rogers, Kathy Swope, Shirley Huebert, Annabelle Lindley, Theresa Crawford, Tom Sullivan, Frank Guerrero, and James Durden.  Before ruling on that Request, the Court will give the parties an opportunity to submit written argument as to whether the request should be granted, consistent with the above findings and conclusions, as to individual members of the UTC.

CONCLUSION

Based on the foregoing, the Court concludes that the UTC has established that QHR was both the cause in fact and the proximate cause of the UTC's injuries resulting from (1) PDA procedures Dr. Schlicht or Dr. Bryant performed after September 21, 2007; and (2) non-PDA procedures Dr. Schlicht performed as lead physician after September 21, 2007 that breached the applicable standard of care.  QHR has established that other non-parties were primarily at fault. QHR's percentage of fault is 16.5%.

_____
ROBERT H. JACOBVITZ
United States Bankruptcy Judge

Date entered on docket: December 23, 2016

COPY TO:

All counsel of record in Adv. No. 13-00007

-45-