UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW MEXICO

In re: OTERO COUNTY HOSPITAL
ASSOCIATION, INC.,

    Debtor.

Case No. 11-11-13686 JL

UNITED TORT CLAIMANTS, as individuals,

    Plaintiffs,

v.

QUORUM HEALTH RESOURCES, LLC,

    Defendant.

Master Docket,
Misc. Proceeding No. 13-00007
Adversary Nos:

12-1204j through 12-1207j,
12-1209j, 12-1210, 12-1212
through 12-1215j, 12-1221j,
12-1235j, 12-1238j through
12-1241j, 12-1243j, 12-1244j,
12-1246j, 12-1248j, 12-1249j,
12-1251j through 12-1261j,
12-1271j, 12-1276j and 12-1278j.

## MEMORANDUM OPINION

The United Tort Claimants ("UTC") and Quorum Health Resources, LLC ("QHR") jointly asked the Court to determine whether QHR is entitled to an offset of the amounts QHR or its insurer(s) paid on behalf of QHR to UTC in partial settlement against any damages the Court may ultimately award to UTC on their negligence claims against QHR.[1] The Court heard oral argument on March 1, 2017 and took the matter under advisement. After considering the

---

[1] No written motion for offset has been filed of record. At a status conference held January 10, 2017, the parties raised several issues collectively referred to as "offset issues," and jointly asked the Court to rule on those issues. The Court issued an order setting a briefing schedule for the "offset issues." *See* Order Resulting from Status Conference Held January 10, 2017 – Docket No. 560. The Court will treat the joint request of the parties that the Court decide the "offset issues" as a joint oral motion.

parties' arguments in light of the relevant case law and the evidence currently before the Court, the Court concludes that under the settlement agreement at issue, QHR is entitled to a credit, but only for the amounts previously paid by or on behalf of QHR used to satisfy a self-insured retention that can only be satisfied by payments that compensate the injured party for the same damages as those arising from UTC's negligence claims against QHR.

BACKGROUND, FACTS, AND PROCEDURAL HISTORY

Otero County Hospital Association, Inc. ("Debtor") filed a voluntary petition under Chapter 11 of the Bankruptcy Code on August 16, 2011. *See* Case No. 11-13686-j11 – Docket No. 1. UTC commenced these adversary proceedings by removing to this Court between June 18, 2012 and September 12, 2012 forty-seven actions originally commenced in state court before the Debtor filed its Chapter 11 bankruptcy case. As part of the Debtor's bankruptcy case, UTC, QHR, one of its insurers, and other parties to the removed state court cases reached a partial settlement. Debtor, UTC, QHR, and Nautilus Insurance Company ("Nautilus"), as well as CHS/Community Health Systems, Inc., Community Health Systems Professional Services Corporation, Triad Health Corporation, Community Health Systems, Inc. and certain of their direct and indirect parents and subsidiaries and affiliates, attended one or more mediation sessions. The parties reached an agreement and executed a Term Sheet to memorialize the basic terms of the agreement. *See* Exhibit 2. The Term Sheet includes the following terms:

> [Debtor], Nautilus and QHR will pay $21 million to the UTC, $8.45 million of which will be paid by Nautilus, $7.5 million of which will be paid by [Debtor], and $5.05 million of which will be paid by QHR. [Debtor] may pay its contribution over three years. (Bankruptcy lawyers to agree on language re where the money is to be paid.) The term "Personal Injury Claims" shall mean, collectively, the UTC's bodily injury claims arising from surgeries performed by Frank Bryant and/or Christian Schlicht, claims of mismanagement however captioned, and any and all related or derivative claims.
>
> The UTC will agree that, should any of the UTC recover a judgment against QHR on any of the Personal Injury Claims, the UTC will enforce all such judgments against the

-2-

available insurance only, and not against the assets of QHR. The UTC will give QHR a release of all claims, however captioned, for liability on the Personal Injury Claims in excess of QHR's insurance.

Term Sheet, ¶¶ 1 and 8.

The parties also agreed in the Term Sheet to "enter into a more complete agreement documenting this settlement[.]" *Id.* at ¶ 12.

On August 7, 2012, Debtor confirmed its Third Amended Chapter 11 Plan of Reorganization dated June 20, 2012 for Otero County Hospital Association, Inc. *See* Order Confirming the Third Amended Chapter 11 Plan of Reorganization dated June 20, 2012 for Otero County Hospital Association, Inc. ("Confirmation Order"), Case No. 11-11-13686-JA – Docket No. 712. The Confirmation Order approved the Settlement Agreement that the parties to the Term Sheet entered into as contemplated by the Term Sheet. The Settlement Agreement confirms that the provisions in the Term Sheet are included as part of the parties' agreement. *See* Exhibit 1 – Settlement Agreement, ¶ H.9 ("This Settlement Agreement supersedes any and all prior or contemporaneous discussions, negotiations, correspondence and/or drafts, *except the Term Sheet and Waiver of Defense Conditions* attached hereto and the Plan Confirmation Order, *which are material hereto and which are incorporated herein for all purposes."*) (emphasis added).

The Settlement Agreement includes the following recitals:

WHEREAS, the United Tort Claimants have initiated the claims and lawsuits identified in Exhibit A hereto (which, along with any and all claims, demands, suits, obligations, costs, judgments, demands, rights, liabilities, actions and causes of action of any nature, known or unknown, discovered and undiscovered, suspected or unsuspected, fixed or contingent at law or in equity arising out of, related to, or in any way directly or indirectly involving them, including claims and lawsuits arising out of, related to, or in any way directly or indirectly involving their subject matter, are referred to collectively as the "Personal Injury Claims") against, in various combinations, the Debtor, QHR, CHS/, Triad, CHSPSC, Schlicht and Frank T. Bryant, MD;

-3-

WHEREAS, the UTC and QHR wish to resolve all claims the UTC has or could have alleged against QHR to the extent provided herein, whether discovered or undiscovered, known or unknown, on any theory, including fraud and intentional tort claims, mismanagement claims, tort claims and theories of action of any kind in any and all amounts, but only to the extent such claims are in excess of any and all available insurance policies, including but not limited to the combined applicable policy limits of Healthcare Professional Services Liability – Claims Made and Umbrella Liability – Claims Made Policy No. 6801409 issued by Lexington Insurance Company ("Lexington") to QHR and other insureds as enumerated or defined by the policy or otherwise deemed as such ("Lexington Policy"), and Follow Form Excess Policy No. IH-HP079A issued by Ironshore Insurance Company ("Ironshore") to QHR and other insureds as enumerated or defined by the policy or otherwise deemed as such ("Ironshore Policy") and any other insurance policies Lexington or Ironshore has issued to QHR (which, with the Lexington Policy and the Ironshore Policy, are collectively referred to as the "Lexington/Ironshore Policies");

WHEREAS, it is understood that the UTC will continue the Unreleased Claims Against QHR (as defined herein) and that the releases set forth herein apply only to QHR's liability on the Personal Injury Claims in excess of QHR's insurance;

Settlement Agreement, pp.1, 2, and 3.

The Settlement Agreement defines the "Unreleased Claims Against QHR" as follows:

that portion of any and all claims, demands, suits, obligations, damages, sums of money, debts, expenses, costs, judgments, settlements, demand rights, liabilities, actions and causes of action against QHR or its respective present or former employees, agents, representatives, general partners, limited partners, divisions, parents, subsidiaries, business units, related entities, principals, third party administrators, affiliates, receivers, heirs, executors, associates, directors, officers, attorneys, trustees, assigns, predecessors and successors **within QHR's insurance**

Settlement Agreement, p. 6, ¶ C.3. (emphasis added).

The Settlement Agreement provides for the following payments:

Nautilus shall pay the sum of 8.45 million ("Nautilus Payment") into a bank account established by the UTC's counsel for the benefit of all of the United Tort Claimants ("UTC Account"). QHR and the UTC agree that, of this sum, Nautilus shall pay $6 million toward settlement with the UTC solely on behalf of QHR, and QHR and UTC further agree that said amount is intended to satisfy any SIR or SIRs applicable to QHR's excess coverages.
. . . .
QHR shall pay the sum of $5.05 million ("QHR Payment") into the UTC Account.

Settlement Agreement, p. 4, ¶¶ A.1. and A.1.a.

-4-

In exchange, UTC released QHR from the following:

> that portion of any and all claims, demands, suits, obligations, damages, sums of money, debts, expenses, costs, judgments, settlements, demand rights, liabilities, actions and causes of action of any nature, known or unknown, discovered or undiscovered, suspected or unsuspected, fixed or contingent at law or in equity arising out of, related to, or in any way directly or indirectly involving the Personal Injury Claims or the subject matter of the Personal Injury Claims on any theory **in excess of QHR's insurance.**

Settlement Agreement, p. 6, ¶ C.3. (emphasis added).

The UTC agreed to enforce any judgment against QHR on any of the Unreleased Claims Against QHR "against the available insurance only, and not against the assets of QHR . . ." Settlement Agreement, p. 7, ¶ C.4.

QHR has three insurers that issued policies that cover or may cover claims asserted by UTC in these adversary proceedings and similar state court litigation not removed to this Court: Nautilus, Lexington Insurance Company ("Lexington"), and Ironshore Insurance Company ("Ironshore"). The insurance policies issued by Nautilus, Lexington and Ironshore are the first, second and third tiers of insurance coverage, respectively. Neither Lexington nor Ironshore participated in the mediation sessions. Ironshore later settled with UTC. Litigation concerning insurance coverage issues involving Lexington remains pending in state court in Tennessee (the "Coverage Litigation").

Following the partial settlement, UTC amended its complaints in these adversary proceedings to eliminate all defendants other than QHR, and to eliminate all claims other than its negligence claims.[2] This Court has tried UTC's remaining negligence claims against QHR in

---

[2] For a representative sample of the original complaint, *see* Adversary No. 12-1221, Complaint for Medical Malpractice and Damages naming Dr. Christian Schlicht, the Debtor, QHR, Community Health Systems, and White Sands Health Care Systems, and asserting claims for negligence and fraud against all defendants, claims for willful, reckless and/or negligent hiring, training, supervision and credentialing, respondeat superior, violation of the New Mexico Unfair Trade Practices Act, battery against Drs. Schlicht and Bryant, and seeking both compensatory and punitive damages. For a representative

phases, creating a master docket number for use in all of the removed adversary proceedings for phase 1, phase 2, and pre-trial matters in the damages phase of the trials. *See* Order Regarding Continued Use of Master Docket – Docket No. 559.

In phase 1, the Court determined that QHR owed a duty to UTC, and breached its duty in two respects.[3] In phase 2, the Court determined that one of QHR's two breaches of duty caused UTC harm, and that QHR's percentage of fault stemming from its breach is 16.5%.[4] Four selected adversary proceedings are scheduled for damages trials, beginning July 21, 2017. *See* Amended Pre-Trial Order for Damage Trial – Docket No. 593. Following the conclusion of the damages trials, UTC and QHR will go to mediation again in an effort to resolve all remaining cases. Ruling on the offset issue before the parties' continued mediation sessions will aid the parties in their settlement efforts.

DISCUSSION

QHR asserts that it is entitled to an offset or credit of the amounts QHR or Nautilus paid on behalf of QHR under the Settlement Agreement against any damages amount the Court may

---

amended complaint filed after the Settlement Agreement, *see* Adversary Proceeding No. 12-1271, First Amended Complaint for Failure to Properly Operate Hospital, naming QHR as the only defendant, asserting only claims for negligence, and requesting compensatory damages, costs, and pre- and post-judgment interest.

[3] The Court found that QHR breached its duty to UTC 1) in connection with the granting of temporary privileges to Dr. Christian Schlicht; and 2) by failing to make a formal request that the hospital's medical executive committee initiate an investigation of Dr. Schlicht (*i.e.,* a focused review under the medical staff bylaws) after learning that Dr. Schlicht's proctor asserted Dr. Schlicht was performing experimental surgery on patients of the hospital and failing to apprise the hospital's board of the proctor's assertion. *See* Amended Memorandum Opinion (Docket No. 286). The Court also determined that comparative fault, rather than joint and several liability, applies to UTC's claims. *Id.* at p. 92.

[4] The Court concluded that 1) QHR's breach of duty in failing to request a focused review of Dr. Schlicht caused UTC harm; and 2) QHR is liable for 16.5% of any damages awarded for injuries suffered by members of UTC who either a) underwent a procedure referred to in these proceedings as the PDA procedure after September 21, 2007, or b) had a procedure other than the PDA procedure performed by Dr. Christian Schlicht as lead physician after September 21, 2007, with respect to which Dr. Schlicht committed medical negligence. *See* Memorandum Opinion (Docket No. 545) and Order Resulting from Hearing on Causation and Comparative Fault (Docket No. 546).

-6-

ultimately award UTC on their negligence claims.  QHR relies on New Mexico's rule against double recovery of damages for a plaintiff's injuries.  *See Hood v. Fulkerson,* 102 N.M. 677, 680, 699 P.2d 608, 611 (1985) ("Duplication of damages or double recovery for injuries received is not permissible.") (citations omitted).  *See also, Hale v. Basin Motor Co.,* 110 N.M. 314, 320, 795 P.2d 1006, 1012 (1990) (stating that "New Mexico does not allow duplication of damages or double recovery for injuries received.") (citations omitted).  Under this rule, plaintiffs generally "may not collect more than the damages awarded to them, or, put another way, they may not receive compensation twice for the same injury."  *Sunnyland Farms, Inc. v. Central New Mexico Electric Cooperative, Inc.,* 2013-NMSC-017, ¶ 47, 301 P.3d. 387, 400 (2013) (citing *Hale,* 795 P.2d at 1012).   This rule applies even when there are multiple theories of recovery for a single injury, provided the relief requested is the same.   As explained in *Fulkerson,* "[w]here there are different theories of recovery and liability is found on each, but the relief requested was the same, namely compensatory damages, the injured party is entitled to only one compensatory damage award."  *Fulkerson,* 102 N.M. at 680, 600 P.2d at 611 (citing *Clappier v. Flynn,* 605 F.2d 519 (10th Cir. 1979)).  *Cf. Sanchez v. Clayton,* 117 N.M. 761, 765, 877 P.2d 567, 571 (1994) ("To the extent a judgment for damages is paid by one or more of the judgment debtors, we agree that a claim for the *same damages* against any other person is extinguished regardless of the theories upon which the respective claims for relief are based.") (emphasis in original).[5]

---

[5] An exception to the prohibition against double recovery is the collateral source rule.  *See Sunnyland Farms,* 301 P.3d at 400 (recognizing that "the collateral source rule is an exception to the rule against double recovery.") (citations omitted).  Under the collateral source rule, a plaintiff may "recover his full losses from the responsible defendant, even though he may have recovered part of his losses from a collateral source." *McConal Aviation, Inc. v. Commercial Aviation Ins. Co.,* 110 N.M. 697, 700, 799 P.2d 133, 136 (1990). *See also, Friedland v. TIC-The Indus., Co.,* 566 F.3d 1203, 1205-06 (10th Cir. 2009) (explaining that "the collateral source rules posits that '[p]ayments made to or benefits conferred on the injured party from other sources are not credited against the tortfeasor's liability, although they cover all or a part of the harm for which the tortfeasor is liable.'") (quoting Restatement (Second) of Torts § 920A(2) & cmt. d (1979)); *Sunnyland Farms,* 301 P.3d at 401 (explaining that, under the collateral source

Because UTC's claims seek damages in compensation for their injuries, QHR reasons that it must receive a credit for all amounts QHR (or Nautilus on QHR's behalf) already paid in partial settlement of UTC's claims; otherwise, UTC would receive double recovery for their injuries. UTC counter that the terms of the Settlement Agreement and the Term Sheet foreclose QHR from receiving a credit for the payments made by QHR or on its behalf as part of the partial settlement. To determine whether QHR is entitled to a credit, the Court must examine the terms of the Settlement Agreement and the Term Sheet.[6]

Because a settlement agreement is a form of contract, the Court applies general principles of contract interpretation under state law to determine the meaning of a settlement agreement.[7] *Walters v. Wall-Mart Stores, Inc.,* 703 F.3d 1167, 1172 (10th Cir. 2013) ("Because settlement agreements are contracts, '[i]ssues involving the formation and construction of a purported settlement agreement are resolved by applying state contract law.'") (quoting *Shoels v. Klebold,*

---

rule, "if a plaintiff is compensated for his or her injuries by any source unaffiliated with the defendant, the defendant must *still* pay damages, even if this means that the plaintiff recovers twice.") (emphasis in original). "The collateral source rule is designed to preclude an alleged tort-feasor from setting up in mitigation or reduction of damages that the plaintiff has been compensated by insurance in whole or in part, where such insurance was not procured by the alleged wrongdoer." *Yardman v. San Juan Downs, Inc.,* 120 N.M. 751, 762, 906 P.2d 742, 753 (Ct. App. 1995) (citations omitted). The collateral source rule is inapplicable here. "It is the well-reasoned and majority rule that where the benefits derive from the defendant himself, or a source identified with him, he is entitled to a credit for it, since there is no collateral source but only funds provided by the defendant." *Aragon v. Brown,* 93 N.M. 646, 648, 603 P.2d 1103, 1105 (Ct. App. 1979), *overruled on other grounds by Smith v. Village of Ruidoso,* 128 N.M. 470, 994 P.2d 50 (Ct. App. 1999) (citations omitted). The payments at issue here were made directly by QHR or by one of its insurers, solely on its behalf.

[6] The Term Sheet is part of the Settlement Agreement. *See* Settlement Agreement, ¶ H.9 (providing that the Term Sheet is material to the Settlement Agreement and incorporated into the Settlement for all purposes).

[7] The Settlement Agreement includes the following choice of law provision:
> The validity, interpretation, and legal effect of this Settlement Agreement shall be governed by the laws of the State of New Mexico except to the extent that it involves bankruptcy matters in which case bankruptcy law shall govern notwithstanding any conflicts of law principles. Any action to enforce any provisions of this Settlement Agreement shall be brought in the Bankruptcy Court of the District of New Mexico.

Settlement Agreement, ¶ H.6.

375 F.3d 1054, 1060 (10th Cir. 2004)).  *See also, Flying J Inc. v. Comdata Network, Inc.,* 405 F.3d 821, 831 (10th Cir. 2005) (observing that "[t]he general rules of contract interpretation under state law apply to settlement agreements.") (citation omitted); *Builders Contract Interiors, Inc. v. Hi-Lo Indus., Inc.,* 139 N.M. 508, 511, 134 P.3d 795, 798 (Ct. App. 2006) (recognizing that "a settlement agreement is a species of contract").  Under New Mexico law, "the role of the court is to give effect to the intention of the contracting parties." *Bogle Farms, Inc. v. Baca,* 122 N.M. 422, 428, 925 P.2d 1184, 1190 (1996).  In doing so, the Court should avoid reliance on form over substance, and instead "'ascertain . . . the intent of the parties as shown by the contents of the instrument.'" *Id.* (quoting *Shaeffer v. Kelton,* 95 N.M. 182, 185, 619 P.2d 1226, 1229 (1980)).  However, because it is difficult to "ascrib[e] meaning and content to terms and expressions in the absence of contextual understanding," the court is not "restricted to the bare words of the agreement in interpreting the intent of the parties to a contract, but may also consider the context in which the agreement was made to determine whether the party's words are ambiguous." *Mark V, Inc. v. Mellekas,* 114 N.M. 778, 781, 845 P.2d 1232, 1235 (1993) (internal quotation marks and citation omitted).  In addition, to determine whether a claim has been released the Court may look "'outside the simple terms of a settlement agreement to determine the nature of the transaction and scope of the intent of the parties.'" *Branch v. Chamisa Dev. Corp., Ltd.,* 147 N.M. 397, 405, 223, Pl.3d 942, 950 (Ct. App. 2009) (quoting *Gutierrez v. Sundancer Indian Jewelry, Inc.,* 117 N.M. 42, 44, 868 P.2d 1266, 1269 (Ct. App. 1993)).

     The terms of the Settlement Agreement and the Term Sheet at issue here concern payments of the settlement amounts, releases, and unreleased claims.  Under the Term Sheet and the Settlement Agreement, QHR was required to make a direct payment of $5.05 million to UTC.  *See* Term Sheet, ¶ 1; Settlement Agreement, ¶ 1.a.  In addition, Nautilus was required to

pay $8.45 million, of which $6 million was to be paid solely on behalf of QHR. Settlement Agreement, ¶¶ A.1 and A.1.a. In exchange for QHR's payment of the settlement amount, the Term Sheet provides that UTC will agree to enforce any judgment ultimately obtained against QHR "against the available insurance only, and not against the assets of QHR." Term Sheet, ¶ 8. *See also,* Settlement Agreement, ¶ C.4 ("should any of the UTC recover a judgment or judgments against QHR on any of the Unreleased Claims Against QHR, the UTC will enforce any and all such judgments against the available insurance only, and not against the assets of QHR . . .").

UTC agreed to release "all claims, however captioned, for liability on the Personal Injury Claims in excess of QHR's insurance." Term Sheet, ¶ 8. Similarly, the released claims under the Settlement Agreement are defined as the "Personal Injury Claims on any theory in excess of QHR's insurance." Settlement Agreement, ¶ C.3. *See also,* Settlement Agreement, pp. 2 - 3 (reciting QHR's and UTC's intent "to resolve all claims the UTC has or could have alleged against QHR . . . but only to the extent any such claims are in excess of any and all available insurance policies . . . "). The claims retained by UTC under the Settlement Agreement, defined as "Unreleased Claims Against QHR," are claims and damages[8] "within QHR's insurance." Settlement Agreement, ¶ C.3.

Given the context in which the settlement was reached, it is clear that the parties intended to maximize the possible recovery for UTC under all available insurance policies while at the same time extinguishing any other liability of QHR to UTC. Thus, the intended meaning of the language used in the Settlement Agreement and the Term Sheet regarding released claims (*i.e.,*

---

[8] Paragraph C.3 of the Settlement Agreement defines the "Unreleased Claims Against QHR" as "that portion of any and all **claims**, demands, suits, obligations, **damages**, sums of money, debts, expenses, costs judgments, settlements, demand rights, liabilities, actions and causes of action against QHR . . ." Settlement Agreement, ¶ C.3 (emphasis added).

-10-

claims "in excess" of available insurance) versus unreleased claims (*i.e.,* claims and damages "within" available insurance) is clear: claims are released if *not covered* by and to the extent damages are not payable under any available insurance; unreleased claims are claims that *are covered* by available insurance to the extent the type of damages that may be awarded on the claims are the type of damages payable under insurance.

UTC direct the Court's attention to *Rummel v. Lexington Ins. Co.,* 123 N.M. 752, 945 P.2d 970 (1997). In *Rummel,* plaintiff obtained an $11,000,000 judgment against Circle K, which included both compensatory and punitive damages, for personal injuries Rummel sustained on the job as a clerk at a Circle K convenience store. The insured had several personal injury insurance policies, which were "stacked" so that each layer of insurance provided coverage after the lower layers were expended. *Rummel,* 945 P.2d at 973. One of the policies covered both compensatory and punitive damages, while another insurance policy higher in the stacked layers of coverage expressly excluded punitive damages from its coverage. *Id.* Before any insurance coverage could be triggered, Circle K was required to satisfy a Self-Insured Retention ("SIR"). After judgment was entered, plaintiff reached a settlement with some, but not all, of the insurance companies. Rummel's strategy was to allocate settlement moneys to compensatory and punitive damages in order to maximize the recovery under each of the insurance policies. *Id.* at 975. The *Rummel* court reviewed the language of the insurance policy at issue, and concluded that nothing in the policy prevented "allocation of damages so as to provide maximum protection for the insured." *Id.* at 982.

A large part of *Rummel* involved the court's interpretation of the insurance policies. Interpreting the insurance policy, the *Rummel* court determined that nothing in the insurance policy precluded the parties from allocating settlement monies to damages not covered by the

-11-

Case 13-00007-j    Doc 620    Filed 05/15/17    Entered 05/15/17 16:00:52 Page 11 of 17

policy. *Rummel,* 945 P.2d at 982. That allocation resulted in a greater amount recoverable against the Lexington policy. This Court does not have the insurance policies before it, nor is it appropriate for the Court to resolve insurance coverage issues. Insurance coverage issues are part of the Coverage Litigation. In addition, *Rummel* discussed potential bad faith claims against an insurer who allegedly refused to participate in the settlement negotiations. *See Rummel,* 945 P.2d at 983-985. UTC contend in their brief that, similar to *Rummel,* Lexington has acted in bad faith by failing to participate in the mediation sessions that resulted in the Settlement Agreement. And, because UTC have agreed under the Settlement Agreement to enforce any judgment only against the available insurance, UTC cast Lexington— the entity that will ultimately be called upon to pay any judgment UTC may obtain against QHR— as the "real party in interest." The Court need not address these arguments. Lexington is not a party to these adversary proceedings. The Court can, however, apply the principles of *Rummel* and *Fulkerson* to conclude that the parties may allocate the settlement payments in such a way as to maximize the potential recovery from the insurance policies, provided the allocation is consistent with the terms of the insurance policies, and provided, further, that such payments do not compensate UTC more than once for the same damages resulting from the injuries that form the basis of UTC's remaining negligence claims against QHR.

> *Whether the Settlement Payments in Exchange for UTC's Release of Claims "in excess of QHR's insurance" Must be Credited Against any Judgment the UTC Ultimately May Obtain Against QHR*

There are two payment components set forth in the Settlement Agreement that may require a credit against any judgment UTC may obtain against QHR: 1) QHR's $5.05 direct

payment to UTC; and 2) Nautilus's $6 million payment made "solely on behalf of QHR."[9]
Settlement Agreement, ¶¶ A.1 and A.1.a. The Court will address each in turn.

The Settlement Agreement obligates QHR itself to pay $5.05 million to UTC. *See* Settlement Agreement, ¶ A.1.a. Because the Settlement Agreement releases QHR from claims "in excess" of its insurance policies, QHR's payment of $5.05 million necessarily settles the claims to the extent not covered by or payable under QHR's available insurance policies. And because under the clear terms of the Settlement Agreement UTC retain as "Unreleased Claims Against QHR" all claims and damages within QHR's available insurance policies (*i.e.,* claims covered by insurance to the extent the damages awarded are the type of damages payable under the policies), QHR's payment of $5.05 million is allocated to damages not otherwise payable under the insurance policies to the extent it will maximize UTC's recovery from available insurance. By the agreement, QHR and UTC agreed to allocate QHR's payment to claims not covered by the policies or for which damages are not covered under the policies, unless it is necessary to make a different allocation to use the payment to satisfy a SIR. QHR is not entitled to an offset for its $5.05 million payment because the parties agreed to apply such payment to damages other than the damages payable under the policies, *except* to the extent, if at all, that

(i) the $5.05 million payment is applied to satisfy a SIR to trigger coverage, **and**

(ii) the SIR can only be satisfied under the insurance polic(ies) by payments that compensate the injured party for the same damages (regardless of the theory of recovery) as those arising from negligence claims at issue in these adversary proceedings.

Otherwise, QHR's $5.05 million payment does not represent an impermissible double recovery or duplication of damages. In exchange for its payment, QHR received the UTC's agreement not

---

[9] Per the Settlement Agreement, Nautilus paid a total of $8.45 million for the benefit of UTC. *See* Settlement Agreement, ¶ A.1.

-13-

to enforce any judgment it ultimately may obtain against QHR's assets. *See* Settlement Agreement, ¶ C.4. ("UTC will enforce any and all such judgments against the available insurance only, and not against the assets of QHR . . .").

The Settlement Agreement here is unlike the agreement in *Summit Properties v. Public Service Co. of New Mexico,* 138 N.M. 208, 118 P.3d 716, 731 (Ct. App. 2005). In *Summit,* the parties attempted to allocate a settlement payment to attorney's fees otherwise not recoverable as a matter of law. *See, Summit,* 118 P.3d at 731 (stating that "[t]he agreement . . . provided compensation to Summit that it was not otherwise entitled to receive."). The *Summit* court concluded that the parties' attempt to "characterize the settlement as payment for attorney fees, where there was no legal right to those fees, appear[ed] to be an effort to circumvent this rule" requiring the credit "against the obligation of other joint obligors." *Id.* The *Summit* court observed further that "allowing Summit to avoid crediting a joint obligor for the amount of the settlement by characterizing the settlement as attorney fees Summit was not entitled to recover in the lawsuit for breach of contract would violate the rule against double recovery of damages and the principles underlying the theory of joint obligations." *Id.* (citing *Fulkerson,* 699 P.2d at 611). Here QHR's payment under the Settlement Agreement settled claims not covered by its insurance, but there is no indication that those additional claims are the types of claims for which the UTC are not entitled to recover as a matter of law. The released claims included claims for fraud and claims for willful or reckless hiring, training, supervision and credentialing. QHR's settlement payment does not, therefore, constitute an impermissible duplication of damages.

*Whether the Settlement Payments used to Satisfy SIR(s) Must be Credited Against any Judgment the UTC Ultimately May Obtain Against QHR*

The Settlement Agreement provides that "Nautilus shall pay $6 million toward settlement with the UTC solely on behalf of QHR" and that such payment "is intended to satisfy any SIR or

-14-

SIRs applicable to QHR's excess coverages." Settlement Agreement, ¶ A.1.  It is clear from the unambiguous language of the Settlement Agreement that both the UTC and QHR intended for the payments to satisfy any SIR required to trigger the Lexington insurance polic(ies).  A SIR is generally understood in the insurance industry to be "[t]he amount of an otherwise-covered loss that is not covered by an insurance policy and that usu[ally] must be paid before the insurer will pay benefits."  Black's Law Dictionary, 1365 (7th ed. 1999).  Ordinarily "[o]nly payments that are covered by the policy should be applied to satisfy the deductible/self-insured retention."  3 Allan D. Windt, Insurance Claims & Disputes § 11:31 (6th ed.).  In other words, insurance policies generally provide that satisfaction of a SIR requires that the payment be applied to a claim or loss covered by the policy.  For this reason, it is quite possible that to satisfy applicable SIRs to trigger coverage under the Lexington policies, all or part of Nautilus' $6 million payment must be applied to compensate UTC for the same damages this Court awards to UTC.  To the extent the SIRs can only be satisfied by so applying Nautilus' payment, QHR is entitled to a credit or offset for the amount paid by Nautilus to satisfy a SIR.

Such payments would duplicate the compensatory damages the UTC may ultimately be awarded on its remaining negligence claims against QHR.   This conclusion depends, however, on the language of the insurance policies – if the policies do not expressly limit the types of payments necessary to satisfy the SIR, QHR may not be entitled to a credit.  *Cf. Rummel v. Lexington Ins. Co.,* 123 N.M. 752, 945 P.2d 970 (1997) (SIR satisfied by unsecured bankruptcy claim against underlying insurer's bankruptcy estate).

The holding of *Sunnyland,* 2013-NMSC-017, 301 P.3d 387 (2013) is inapplicable here.  In *Sunnyland,* the defendant settled with the plaintiff's insurer and acquired the insurer's subrogation rights as part of the settlement.  *Sunnyland,* 301 P.3d at 391.  Defendant then sought

-15-

Case 13-00007-j    Doc 620    Filed 05/15/17    Entered 05/15/17 16:00:52 Page 15 of 17

an offset of $3.2 million for the subrogation rights it obtained in the settlement. *Id.* at 400. The New Mexico Supreme Court held that the defendant was not entitled to an offset, notwithstanding the settlement, because offset would violate the collateral source rule and public policy. *Id.* The *Sunnyland* court reasoned that subrogation is not "truly a right" but, rather, an "equitable remedy," and that equitable principles do not permit a defendant to "assert a right of subrogation that it acquires from the plaintiff's insurer." *Id.* at 402. Nautilus is QHR's insurer. Nautilus's payment "solely on behalf of QHR" is not a payment from a collateral source. Nor is QHR seeking to exercise a subrogation right it acquired from the UTC's insurer through a settlement.

*Whether Ironshore's Payments Must be Credited Against Any Judgment the UTC Ultimately May Obtain Against QHR*

Ironshore settled with UTC on the eve of the first phase of the trial. The terms of the settlement among UTC, QHR and Ironshore are not before the Court. As a result, the Court makes no determination at this time regarding whether or to what extent QHR is entitled to a credit for amounts Ironshore paid in settlement.

CONCLUSION

The law favors settlements. *See Navajo Tribe of Indians v. Hanosh Chevrolet-Buick, Inc.,* 106 N.M. 705, 707, 749 P.2d 90, 92 (1988) (stating that "[i]t is the policy of the law and of the State of New Mexico to favor settlement agreements") (citations omitted). *See also, Sunnyland,* 301 P.3d at 401 (recognizing New Mexico's general "policy of encouraging settlements.") (citation omitted). The plain language of the Settlement Agreement reserving claims "within QHR's insurance," and releasing claims "in excess of QHR's insurance," means that settlement payments should be applied to maximize the UTC's recovery from available insurance. The Court has construed the Settlement Agreement, which included the Term Sheet,

to determine whether and to what extent QHR is entitled to a credit or offset against any judgments this Court enters in these adversary proceedings for amounts QHR and Nautilus paid in settlement. Quantifying the amount of any offset or credit requires interpretation of the Lexington insurance polic(ies). Interpretation of the Lexington policy or policies is not an issue before the Court.

                                                          */s/ Robert H. Jacobvitz*
                                                          ROBERT H. JACOBVITZ
                                                          United States Bankruptcy Judge

Date entered on docket: May 15, 2017

COPY via CM/ECF to all counsel of record.