UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW MEXICO

In re: OTERO COUNTY HOSPITAL ASSOCIATION, INC.,

Debtor.

Case No. 11-11-13686 JL

UNITED TORT CLAIMANTS, as individuals,

Plaintiffs,

v.

QUORUM HEALTH RESOURCES, LLC,

Defendant.

Master Docket,
Misc. Proceeding No. 13-00007
Adversary Nos:

12-1204j through 12-1207j,
12-1209j, 12-1210j, 12-1212 through
12-1215j, 12-1221j; 12-1235j, 12-
1238j through 12-1241j, 12-1243j;
12-1244j, 12-1246j; 12-1248j,
12-1249j,12-1251j through 12-1261j,
12-1271j, 12-1276j and 12-1278j

## MEMORANDUM OPINION

Before the Court are the following motions: 1) Defendant Quorum Health Resources, LLC's Motion to Preclude the Testimony of Plaintiffs' Economist, M. Brian McDonald, Ph.D., on the Issue of Hedonic Damages or in the Alternative, to Limit his Opinions to a General Description of Hedonic Damages, Excluding Opinions as to Specific Values or Ranges of Values ("Motion to Preclude or Limit Expert Testimony on Hedonic Damages") (Docket No. 641); 2) Defendant Quorum Health Resources, LLC's Motion to Preclude the Speculative Opinions of Plaintiffs' Life Care Planner, Angelo Romagosa, M.D. ("Motion to Preclude Testimony of Dr. Romagosa") (Docket No. 642); and 3) Defendant Quorum Health Resources, LLC's *Daubert* Motion to Preclude Speculative Opinions Concerning Alleged Injuries from PMMA ("Motion to Preclude Testimony of Dr. Harvie and Dr. Rashbaum") (Docket No. 643) (together, the

"*Daubert* Motions"). Quorum Health Resources ("QHR") contends that certain expert testimony United Tort Claimants ("UTC") intend to offer in the upcoming damages trials fails to meet the admissibility standard for scientific evidence under Federal Rule of Evidence 702 established by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). UTC oppose the *Daubert* Motions.[1] The Court held a final hearing on the *Daubert* Motions on July 19, 2017 and took the matter under advisement.

After considering counsel's arguments and the relevant case law, the Court will exercise its sound discretion to allow the expert testimony of Dr. Romagosa regarding future medical needs and costs, and the expert testimony of Dr. Harvie and Dr. Rashbaum regarding alleged injuries from the injection of polymethylmethacralate ("PMMA") during the surgical procedures (the "PDA procedures") at issue in these adversary proceedings. The Court will also allow Dr. McDonald to provide limited testimony regarding the concept and meaning of hedonic damages. Accordingly, the Court will deny the Motion to Preclude Testimony of Dr. Romagosa, deny the Motion to Preclude Testimony of Dr. Harvie and Dr. Rashbaum, and grant, in part, the Motion to Preclude or Limit Expert Testimony on Hedonic Damages.

DISCUSSION

I.  Standards for Admission of Expert Scientific Testimony

Federal Rule of Evidence 702, made applicable adversary proceedings in bankruptcy cases by Fed. R. Bankr. P. 9017, governs expert testimony. It provides:

---

[1] *See* Plaintiff United Tort Claimants' Response in Opposition to Defendant Quorum Health Resources, LLC's Motion to Preclude the Testimony of Plaintiffs' Economist, M. Brian McDonald, Ph.D., on the Issue of Hedonic Damages (Docket No. 653); Plaintiff United Tort Claimants' Response in Opposition to Defendant Quorum Health Resources, LLC's Motion to Preclude the Opinions of Plaintiffs' Life Care Planner, Angelo Romagosa, M.D. ( Docket No. 654); and Plaintiff UTC's Response to Defendant Quorum Health Resources, LLC's *Daubert* Motion to Preclude Speculative Opinions Concerning Alleged Injuries from PMMA (Docket No. 655).

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702

The first requirement for the Court to consider under Rule 702 is the proposed expert's qualifications. Assuming the expert is qualified to give expert testimony, "Rule 702 imposes a gatekeeping function on district courts to ensure expert testimony is admitted only if it is relevant and reliable." *Etherton v. Owners Ins. Co.,* 829 F.3d 1209, 1217 (10th Cir. 2016) (citing *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) and *Daubert,* 509 U.S. at 589).[2] The party seeking to introduce expert testimony must demonstrate that the proffered testimony satisfies the requirements of Rule 702. *United States v. Nacchio,* 555 F.3d 1234, 1241 (10th Cir. 2009) ("The proponent of expert testimony bears the burden of showing that its proffered expert's testimony is admissible.") (citing *Ralston v. Smith & Nephew Richards, Inc.,* 275 F.3d 965, 970 n.4 (10th Cir. 2001)). The Court has broad discretion in determining the admissibility of proffered expert testimony. *Taylor v. Cooper Tire & Rubber Co.,* 130 F.3d 1395, 1397 (10th Cir. 1997) (citation omitted).

Expert testimony is "relevant" if it will help the factfinder to understand the evidence or determine a fact issue. *See Daubert,* 509 U.S. at 591 (explaining that Rule 702's condition that

---

[2]*See also,* Advisory Committee Notes to the 2000 Amendments to Rule 702 (stating that "[t]he amendment affirms the trial court's role as gatekeeper and provides some general standards that the trial court must use to assess the reliability and helpfulness of proffered expert testimony."); *Hart v. Corrections Corp. of America,* 2014 WL 12670796, *2 (D.N.M. May 6, 2014) ("Rule 702 imposes a special gatekeeping obligation on the Court to ensure that expert testimony is not admitted at trial unless it is both relevant and reliable.") (citing *Kumho Tire,* 526 U.S. at 141 and *Daubert,* 509 U.S. at 592-93); *Hollander v. Sandoz Pharmaceuticals Corp.,* 289 F.3d 1193, 1204 (10th Cir. 2002) ("The *Daubert* standard ensures that the proffered evidence is both 'reliable' and 'relevant.'") (citation omitted).

the evidence or testimony "'assist the trier of fact to understand the evidence or to determine a fact in issue'. . . . goes primarily to relevance.") (quoting Rule 702); *Etherton,* 829 F.3d at 1217 ("The 'help the trier of fact' language of Rule 702 is a relevance test for expert testimony . . . . the expert testimony must 'fit'— it must relate to a disputed issue in the case.") (citing *Daubert,* 509 U.S. at 591-92).[3]

Expert testimony is "reliable" under Rule 702 if it is "based on sufficient facts or data," "is the product of reliable principles and methods," and is the result of the expert witness's reliable application of "the principles and methods to the facts of the case." Fed. R. Evid. 702(b), (c), and (d). In testing reliability, courts also apply, to the extent applicable, the four nonexclusive factors identified in *Daubert*: "(1) whether the opinion at issue is susceptible to testing and has been subjected to such testing; (2) whether the opinion has been subjected to peer review; (3) whether there is a known or potential rate of error associated with the methodology used and whether there are standards controlling the technique's operation; and (4) whether the theory has been accepted in the scientific community." *Dodge v. Cotter Corp.,* 328 F.3d 1212, 1222 (10th Cir. 2003) (citing *Daubert,* 509 U.S. at 593-94).[4]

---

[3] *See also Bitler v. A.O. Smith Corp.,* 400 F.3d 1227, 1234 (10th Cir. 2005) (tying relevance under Rule 702 to Rule 401's definition of relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.") (quoting Rule 401)

[4] Other factors used to test reliability identified in the Advisory Committee Notes to Rule 702 are:
    (1) whether the expert is proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying;
    (2) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion;
    (3) whether the expert has adequately accounted for obvious alternative explanations;
    (4) whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting; and
    (5) whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.
    Advisory Committee Notes to Rule 702 (2000 Amendments).

The applicability of any of these factors largely depends upon the particular facts and circumstances of the case. *Kumho Tire,* 526 U.S. at 150 (concluding "that we can neither rule out, nor rule in, for all cases and for all time the applicability of the factors mentioned in *Daubert* . . . . Too much depends upon the particular circumstances of the particular case at issue."). Ultimately, the Court's inquiry under Rule 702 is "a flexible one." *Daubert,* 509 U.S. at 594. The Court has "broad discretion . . . in deciding how to assess an expert's reliability, including what procedures to utilize in making that assessment, as well as in making the ultimate determination of reliability." *Dodge,* 328 F.3d at 1223 (citing *Kumho Tire,* 526 U.S. at 152) (remaining citation omitted)). *See also, Kumho Tire,* 526 U.S. at 152 ("the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable").

When the Court is the fact finder, it has greater leeway to admit expert testimony and later discount its persuasive value as it deems appropriate. *See Attorney Gen. of Okla. v. Tyson Foods, Inc.,* 565 F.3d 769, 780 (10th Cir. 2009) (stating that "a judge conducting a bench trial maintains greater leeway in admitting questionable evidence, weighing its persuasive value upon presentation."). The *Daubert* standards must still be satisfied, but "the usual concerns regarding unreliable expert testimony reaching a jury obviously do not arise when a district court is conducting a bench trial." *Id.* at 779 (citing *Seaboard Lumber Co. v. United States,* 308 F.3d 1283, 1302 (Fed. Cir. 2002)).

With these standards in mind, the Court will consider each of QHR's *Daubert* Motions to determine whether the proffered expert witness testimony should be admitted at the damages trials.

## II. Expert Testimony of Life Care Planner Regarding Future Medical Needs and Costs

QHR seeks to preclude the expert testimony of Angelo Romagosa, M.D. regarding UTC's future medical needs and associated costs resulting from the surgical procedures at issue in these proceedings. For each UTC Plaintiff in these adversary proceedings, Dr. Romagosa prepared a life care plan and life care plan update. A life care plan provides an estimate of the anticipated medical costs necessitated by the injury.[5] A life care planner may rely on the opinions of other medical experts in formulating a life care plan. *See Abraham v. Graebel Van Lines, Inc.,* 2016 WL 1304853, *3 (D. Wyo. Feb. 3, 2016) ("[I]t is permissible for an expert, particularly in the area of life care planning, to rely on the reports or information of other experts.") (citing *North v. Ford Motor Co.,* 505 F.Supp.2d 1113, 1119 (D. Utah 2007)); *Rivera v. Volvo Cars of North America, LLC,* 2015 WL 11120666, *3 (D.N.M. June 22, 2015) ("'A life care planner does not formulate medical opinions, but rather relies upon the opinions and findings of medical specialist[s].'") (quoting *Feliciano v. Cate St. Capital, Inc.,* 2014 WL 7642091, *2 (D. Wyo Sept. 17, 2014)). Even though the entirety of a life care planner's testimony may not constitute strictly scientific testimony, the Court's gatekeeping obligation under *Daubert* to ensure relevance and reliability "applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical'' and 'other specialized' knowledge." *Kumho Tire,* 526 U.S. at 141. The *Daubert* standards apply to proffered expert testimony of life care planners. *See, Abraham,* 2016 WL 1304853 (applying Rule 702 and *Daubert* to evaluate the admissibility of testimony of life care planner).

---

[5] *See* International Academy of Life Care Planners Standards of Practice, International Association of Rehabilitation Professionals (2009) (defining "Life Care Plan" as "a dynamic document based upon published standards of practice, comprehensive assessment, data analysis and research, which provides an organized, concise plan for current and future needs with associated cost for individuals who have experienced catastrophic injury or have chronic health needs."),

-6-

QHR does not contest Dr. Romagosa's qualifications. As a board certified medical doctor who has served as a life care planner for more than ten years, he is qualified to complete both the assessment of plaintiffs' future medical needs and the life care plans estimating those associated anticipated costs. QHR asserts that Dr. Romagosa's proffered testimony fails to meet the reliability requirement of Rule 702 and *Daubert.* "Under *Daubert,* 'any step that renders the analysis unreliable . . . renders the expert testimony inadmissible. This is true whether the step completely changes a reliable methodology or merely misapplies that methodology.'" *Dodge,* 328 F.3d at 1222 (quoting *Mitchell v. Gencorp Inc.,* 165 F.3d 778, 782 (10th Cir. 1999) (remaining citation omitted)). Further, the Court may exclude expert testimony as unreliable if the "analytical gap" between the underlying data and the expert opinion is too great. *See Norris v. Baxter Healthcare Corp.,* 397 F.3d 878, 886 (10th Cir. 2005) ("'A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.'") (quoting *General Elec. Co. v. Joiner,* 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997)).

QHR contends that Dr. Romagosa's testimony is unreliable because it is speculative by failing to separate the costs associated with any pre-existing conditions from those arising from the PDA procedure. In his deposition, Dr. Romagosa testified as follows: "I don't know of a pathologist, and I don't know of a spine surgeon that can actually tease that apart to say PMMA caused this, and a pre-existing condition caused this." Deposition Transcript of Dr. Romagosa, 48:18-25. Plaintiffs each had some back problem or condition for which they sought treatment before they received the PDA procedure. QHR argues that plaintiffs must prove damages that compensate for the aggravation or worsening of the pre-existing condition caused by the PDA

-7-

procedure.[6] QHR argues further that plaintiffs may not recover to the extent the post-operative condition was already being suffered before the medical procedure took place or that are attributable to the natural progression or degeneration of the pre-existing medical condition that would have occurred had the PDA procedure not been performed, or due to old age. Because Dr. Romagosa admitted in deposition testimony that he cannot divide injuries caused by the PDA procedures from the pre-existing conditions, QHR concludes that Dr. Romagosa's proffered testimony regarding plaintiffs' life care plans is inadmissible because it is speculative and unreliable.

UTC argues that these adversary proceedings are not "aggravation of injuries" cases, and that the Court needs to hear the testimony of other witnesses to put Dr. Romagosa's testimony in context and to assess its import. UTC's argues further that QHR's objections really go to the weight of the testimony and not to admissibility. This Court agrees with this latter argument.

"[R]ejection of expert testimony is the exception rather than the rule." Advisory Committee Notes to Rule 702 (2000 Amendments). QHR will have an opportunity to attack UTC's expert testimony through cross-examination and through presentation of its own expert testimony. *See Daubert,* 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.") (citation omitted). The Court will qualify Dr. Angelo Romagosa as an expert to give life care planning testimony. After hearing the testimony of Dr. Romagosa and all other witnesses at the damages trials, the Court will determine whether or to what extent this is an aggravation of pre-exiting injuries case and what weight, if any, to give to Dr. Angelo Romagosa's expert testimony.

---

[6] *See,* New Mexico UJI 13-1802 (regarding the measure of damages with preexisting conditions); New Mexico UJI 13-1808 (regarding the measure of damages for aggravation of preexisting condition).

-8-

### III. Expert Testimony Regarding Injuries from PMMA

QHR also seeks to exclude the testimony of Dr. Keith Harvie and Dr. Ralph Rashbaum. Again, QHR does not contest their qualifications as experts. Similar to its arguments regarding the admissibility of Dr. Romagosa's testimony, QHR complains that the proffered testimony of Dr. Harvie and Dr. Rashbaum regarding injuries from PMMA fails to account for damage suffered as the result of pre-existing conditions. QHR asserts that Drs. Harvie and Rashbaum have not considered alternative explanations for the harms plaintiffs have suffered, give opinions not supported by the literature, and fail to adequately explain the basis for their opinions or to take into account the actual effects of PMMA on UTC members on an individualized basis.[7] QHR asserts that the expert testimony of Drs. Harvie and Rashbaum is speculative and, therefore, unreliable. UTC disagrees, and argues that the Court should assess the testimony of Drs. Harvie and Rashbaum in conjunction with the testimony of other witnesses, including Dr. Gregory Misenhimer, who has treated many patients after they underwent the PDA procedure.

The Court will qualify Drs. Harvie and Rashbaum as experts to give testimony concerning injuries caused by PMMA. Such testimony satisfies the relevance and reliability requirements of Rule 702 and is admissible. Testimony regarding the effects of PMMA is relevant because it relates to the procedures at issue in these adversary proceedings and will assist the Court in understanding the nature of the alleged injuries. The proffered testimony is reliable because it is based on these witnesses' experience, expertise, and training, as applied to

---

[7] QHR also argues that Dr. Rashbaum relied on information contained in a green binder but UTC failed to produce the binder to QHR, which has hindered QHR's ability to effectively cross-examine him. The issue regarding the green binder is an issue that more properly should have been presented as a discovery issue under Rule 37 of the Federal Rules of Civil Procedure as made applicable in these adversary proceedings. The Court will not exclude or limit the testimony of Dr. Rashbaum based on a failure to produce the green binder.

-9-

their review of each of the plaintiffs' medical information. Dr. Harvie spoke to each of the plaintiffs by phone before issuing his report. Dr. Rashbaum reviewed updated medical information for each of the plaintiffs since they underwent the PDA procedure. QHR complains that the testimony of Drs. Harvie and Rashbaum fail to account for other possible explanations for the plaintiffs' current medical conditions, and that testimony about what potential injuries can result from the use of PMMA in the procedures performed on the plaintiffs cannot be relied upon to determine what actually happened to any particular plaintiff. But these potential shortcomings affect the persuasiveness of the testimony rather than its admissibility.

The weight given such testimony is a separate issue. *See McCoy v. Whirlpool Corp.,* 287 Fed.Appx. 669, 679 (10th Cir. 2008) (unpublished) (observing that "[w]hether expert evidence is admissible under Rule 702 is a distinct and separate question form whether it and plaintiff's other evidence is sufficient to prove causation or another element of the plaintiff's claim under the governing substantive law.") (citation omitted). QHR will have an opportunity at trial to cross-examine these witnesses. The Court will consider the expert testimony conjunction with the testimony of other witnesses. After hearing all of the evidence, the Court will decide what weight to give to the testimony of Drs. Harvie and Rashbaum, and whether to disregard it entirely.

    IV.    <u>Expert Testimony Regarding Hedonic Damages</u>

UTC seek to offer the expert testimony of Dr. Brian McDonald, an economist with a Ph.D. in economics from the University of Pennsylvania, and a Bachelor of Arts in economics from Georgetown University, on the issue of hedonic damages. Hedonic damages, which provide compensation for the loss of enjoyment of life, are recoverable under New Mexico law. *See Smith v. Ingersoll-Rand Co.,* 214 F.3d 1235, 1246 (10th Cir. 2000) (recognizing that "New

Mexico state law permits . . . the recovery of hedonic damages") (citation omitted); *Sena v. New Mexico State Police,* 119 N.M. 471, 477, 892 P.2d 604, 610 (Ct.App. 1995) (stating that "the economic value of damages for the loss of enjoinment of life . . . [is] sometimes referred to as hedonic damages," and that "damages are recoverable for the value of the loss of enjoyment of life itself"). An economist may offer expert testimony regarding loss of enjoyment of life. *Couch v. Astec Indus., Inc.,* 132 N.M. 631, 636, 53 P.3d 398, 403 (Ct.App. 2002) ("In New Mexico, 'it is not improper for the trial court to permit an economist to testify regarding his or her opinion concerning the economic value of a plaintiff's loss of enjoyment of life.'") (quoting *Sena,* 119 N.M. at 478).

In *Smith v. Ingersoll-Rand Co.,* 214 F.3d 1235 (10th Cir. 2000), the Tenth Circuit explained that expert testimony of an economist regarding hedonic damages may be admitted to "explain . . . the meaning of hedonic damages" and to identify "broad areas of human experience" to consider when determining damages for loss of enjoyment of life. *Ingersoll-Rand,* 214 F.3d at 1246. Expert testimony explaining what hedonic damages are, and distinguishing such damages from other types of damages, such as damages for pain and suffering, meets the relevancy requirement because such testimony helps the fact finder "'place a value on a loss that is difficult to quantify.'" *Id.* at 1244 (quoting the trial court's decision). However, expert testimony attempting to quantify or value hedonic damages fails to satisfy both the relevancy and reliability requirements of Rule 702 and is, therefore, inadmissible.[8] *See BNSF Railway Co. v. LaFarge Southwest, Inc.,* 2009 WL 4279849, *2 (D.N.M. Feb. 9, 2009)

---

[8] In *Ingersoll-Rand,* the Tenth Circuit did not expressly rule on the admissibility of expert testimony attempting to quantify or value hedonic damages, but nevertheless observed that, because "[a]ttempts to quantify the value of human life have met considerable criticism in the literature of economics as well as in the federal court system . . . . federal courts which have considered expert testimony on hedonic damages in the wake of *Daubert* have unanimously held quantifications of such damages inadmissible." *Ingersoll-Rand,* 214 F.3d at 1245 (citations omitted).

-11-

("The majority rule in federal courts . . . is that expert testimony which places a *dollar figure* before the jury in an attempt to *quantify* the value of a human life is inadmissible and does not meet the relevance and reliability factors set forth in *Daubert* and its progeny.") (citations omitted). "[A]ny opinion testimony which places . . . a dollar figure or numeric formula as a so-called 'benchmark figure,' 'guideline,' or 'range of values' to be used in calculating damages . . . . is just a 'trojan horse' aimed at getting the same type of inadmissible information before the jury under a different label." *Id.*

QHR does not contest Dr. McDonald's qualifications. At oral argument, QHR and UTC agreed further that, to the extent Dr. McDonald is allowed to testify, he may only provide testimony regarding hedonic damages consistent with *Ingersoll-Rand.*

QHR's remaining argument is relevance. QHR contends that Dr. McDonald's testimony is unnecessary because the Court is already aware of what hedonic damages are. If the testimony is unnecessary, it fails to meet the relevance requirement because it will not aid the Court. This Court disagrees. The bankruptcy court is a specialized court. Unlike state courts, federal bankruptcy courts only occasionally conduct personal injury damages trials. Expert testimony regarding the nature of hedonic damages as a component of the damages that may be awarded to compensate UTC for their injuries will assist the Court in its role as trier of fact.

Consistent with *Ingersoll-Rand,* and the parties' agreement, the Court will allow Dr. McDonald to give expert testimony regarding the concept of hedonic damages, how they differ from other types of damages, and the kinds of human experiences that the Court should consider when fixing damages for the loss of enjoyment of life. The Court will exclude any testimony regarding the amount or computation of hedonic damages. Permitted conceptual testimony regarding hedonic damages may include the following:

a) Testimony that an award for loss of enjoyment of life damages is premised on the assumption that the value of an individual's life exceeds the sum of that person's economic productivity, and that loss of enjoyment of life damages considers the effect of the injury on the plaintiff's non-work activities such as leisure, hobbies, recreational activities, the ability to pursue a chosen occupation, community activities, and internal well-being;

b) Testimony about how hedonic damages can take into account decisions that involve tradeoffs between the risk of a shorter life expectancy or the prospect of a long life, on the one hand, and occupational choices or decisions on how to spend money, on the other; and how the tradeoffs relate conceptually to any hedonic damages suffered by the plaintiffs;

c) Testimony about broad areas of human experience which should be considered by the trier of fact in determining hedonic damages for a particular plaintiff, such as how the plaintiff spent leisure time and participated in recreational activities, hobbies, and community activities; and

d) Testimony regarding how hedonic damages differ from damages to compensate for pain and suffering.

Dr. McDonald is precluded from giving any testimony regarding economic research on the value of a statistical life, the value of a statistical life, or any other testimony that places a dollar figure on hedonic damages, whether in the abstract or with respect to a particular plaintiff, or that describes a numeric range or formula, benchmark figure, or guidelines for calculating hedonic damages.

CONCLUSION

Based on the foregoing, the Court will deny the Motion to Preclude Testimony of Dr. Romagosa and deny the Motion to Preclude Testimony of Dr. Harvie and Dr. Rashbaum. Drs. Romagosa, Harvie and Rashbaum are qualified experts and the subject matter of their expert testimony meets the relevancy and reliability requirements of Rule 702. The Court will grant the Motion to Preclude or Limit Expert Testimony on Hedonic Damages, in part, to limit Dr. McDonald's expert testimony to the nature of hedonic damages and the general areas of human experience that should be considered when awarding damages for the loss of enjoyment of life.

After considering the expert testimony, the Court will give it whatever weight it deems appropriate, including disregarding some or all of the proffered testimony in its entirety. The Court will enter separate orders consistent with this Memorandum Opinion.

_____
ROBERT H. JACOBVITZ
United States Bankruptcy Judge

Date entered on docket: August 9, 2017

COPY via CM/ECF to all counsel of record.