UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW MEXICO

In re: OTERO COUNTY HOSPITAL
ASSOCIATION, INC.,

Case No. 11-11-13686 JL

Debtor.

UNITED TORT CLAIMANTS, as
individuals,

    Plaintiffs,

v.

QUORUM HEALTH RESOURCES, LLC,

    Defendant.

Master Docket,
Misc. Proceeding No. 13-00007
Adversary Nos:

12-1204j through 12-1207j,
12-1209j, 12-1210j, 12-1212 through
12-1215j, 12-1221j; 12-1235j, 12-1238j
through 12-1241j, 12-1243j;
12-1244j, 12-1246j; 12-1248j,
12-1249j, 12-1251j through 12-1261j,
12-1271j, 12-1276j and 12-1278j

## **MEMORANDUM OPINION (Judgment Language Issue)**

The Court tried these related adversary proceedings in phases. The first two phases tried issues common to all of the related adversary proceedings. In Phase I, the Court determined the duty and breach elements of the United Tort Claimants' negligence claims against Quorum Health Resources, LLC ("QHR"). In Phase II, the Court determined causation and allocation of fault. In Phase III, the Court will adjudicate damages for the individual members of the United Tort Claimants ("UTC").

QHR requests the Court to require any judgment against QHR awarding damages to a member of the UTC to include language that expressly limits enforcement against available insurance only.  The UTC oppose this request, asserting that QHR fraudulently induced the UTC to agree to limit enforcement of any judgment against available insurance by making materially false representations to the UTC regarding the nature and extent of available insurance coverage. More specifically, the UTC assert that QHR made a misrepresentation relating to the erosion of policy limits.  The parties have fully briefed the issue, which the Court has termed the "Judgment Language Issue."[1]  The Court took the Judgment Language Issue under advisement following a final, evidentiary hearing on the Judgment Language Issue, held June 19, 2017.

After considering the evidence admitted at the final hearing on the Judgment Language Issue, the Court finds that the UTC have failed to sustain their burden of proving that QHR made any materially false representations to the UTC regarding the extent of the available insurance coverage.  Consequently, in accordance with the parties' settlement agreement and the Third Amended Plan of Reorganization confirmed in Otero County Hospital Association, Inc.'s Chapter 11 bankruptcy case, the UTC may enforce any judgment awarded against QHR in these related adversary proceedings solely against available insurance, and not against QHR's assets. Any judgment entered in favor of a member of the UTC and against QHR will contain language expressly limiting enforcement against available insurance only, and not against QHR's assets.

---

[1] *See* Memorandum Brief Regarding Judgment Language Issue (Docket No. 608); United Tort Claimants' Memorandum Brief Regarding Judgment Language (Docket No. 619); Reply to United Tort Claimants' Memorandum Brief Regarding Judgment Language (Docket No. 621); Quorum Health Resources' Supplemental Brief re: Judgment Language Issue (Docket No. 659).  *See also,* Declaration of John L. Corbett with attachments (Docket No. 609) filed in support of QHR's brief.

FINDINGS OF FACT

Otero County Hospital Association, Inc. (the "Hospital") filed a voluntary petition under Chapter 11 of the Bankruptcy Code on August 16, 2011 commencing Case No. 11-11-13686 JL (the "Bankruptcy Case"). The Hospital sought bankruptcy relief due in part to the filing of numerous state court lawsuits against the Hospital, one of its employed physicians, other individuals, and other entities, including QHR. The UTC removed many of the state court lawsuits to this Court, commencing the related adversary proceedings. The Court created a master docket, Docket No. 13-00007, for use in filing documents common to all or many of the related adversary proceedings. *See* Docket No. 1.

In April of 2012, the UTC and QHR attended an informal settlement negotiation at the offices of Loeb & Loeb in Los Angeles, California (the "April 2012 Negotiation"). Counsel for the UTC, including Lisa Curtis and Bernard R. Given, attended the settlement negotiation. David Wood attended the settlement negotiation on behalf of QHR, as "insurance coverage counsel." *See* Affidavit of David E. Wood – Docket No. 619-4. Others present at the April 2012 Negotiation included counsel for QHR, including Tamara Safarik; Robert Vento, QHR's Senior Vice President of Operations at the time; and counsel for the Hospital. The negotiations began in the morning of April 10 and lasted until nearly 2:30 a.m. the following day, but were unsuccessful.

Mr. Vento recalls that Mr. Wood was the principal target regarding insurance coverage issues at the April 2012 Negotiation, that counsel for the UTC were insisting that there would be some guarantee from QHR about the amount of available insurance, and that Mr. Wood was "passionately and emphatically defending that he couldn't guarantee that the insurance would be available." Exhibit 5 - Deposition of Robert Vento dated June 8, 2017 ("Vento Deposition"), p.

11, lines 15 – 17.  Mr. Vento also recalled that Mr. Wood said he could "not guarantee that there are no other claims."  Vento Deposition, p. 11, lines 23 – 24.

In August of 2015, Mr. Vento signed an Affidavit that included the following statement regarding the April 2012 Negotiation:

> At one point, UTC lawyer Lisa Curtis came into the GCRMC/QHR room and demanded that QHR promise that it would preserve the Lexington and Ironshore Insurance Company excess insurance policies for the UTC's sole use and benefit in the event that they recovered from QHR. QHR insurance coverage lawyer Mr. Wood told her, in front of the group, that QHR could not agree to this because there was another claim under the Lexington/Ironshore policies.
>
> Affidavit of Robert Vento dated August 24, 2015 ("Vento Affidavit"), ¶8, attached as Exhibit G to the Vento Deposition.

Mr. Vento does not now have a distinct recollection whether Mr. Wood told counsel for the UTC about the existence of another claim.

An issue emerged during the April 2012 Negotiation that Mr. Wood described as a "deal breaker."  It was the reason the UTC and QHR were unable to reach a settlement at that time. The UTC asked QHR to represent and warrant that the entire insurance policy limits would be available to pay the UTC's claims in the event the UTC obtained judgments against QHR.  The parties went back and forth on that issue, and Mr. Wood said at the time that QHR could not agree to that.

Mr. Wood testified at the final hearing on the Judgment Language Issue that he told counsel for the UTC at the April 2012 Negotiation that QHR could not warrant that the entire insurance policy limits would be available to pay the UTC's claims in the event the UTC obtained judgments against QHR because there was another claim.[2]  Mr. Wood testified that he told Lisa Curtis, counsel for the UTC, that other unrelated claims had been made against the

---

[2] A finding summarizing a witness's testimony is not a finding that the testimony is true or untrue.  It merely summarizes the testimony.

-4-

Lexington policy. Mr. Wood testified that he did not specifically identify the other claim, or the name of the claimant as part of the April 2012 Negotiation.

Lisa Curtis testified at the final hearing on the Judgment Language Issue that Mr. Wood never said to her at the April 2012 Negotiation that there was another claim that would impede any amount of the insurance available to pay the UTC's claims. Ms. Curtis understood the representation in the Term Sheet that the limits of the Lexington policy had not been eroded by any other claim to mean that there were no other claims, and no money reserved from the Lexington policy to cover those claims. Had the UTC known that there were claims other than the UTC's claims asserted against the Lexington policy, the UTC would not have settled on the terms contained in the Term Sheet. Ms. Curtis has no recollection of Mr. Wood telling her at the April 2012 Negotiation about another claim that had eroded the policy.

In May of 2012, the Hospital, the UTC, QHR, and Nautilus Insurance Company ("Nautilus") attended a formal mediation before the Honorable Alan C. Torgerson, United States Magistrate Judge for the District of New Mexico.[3] That mediation resulted in a settlement of the UTC's claims against the Hospital. As part of the settlement, the UTC, QHR, the Hospital, other related entities, and Nautilus executed a Term Sheet on May 16, 2012. *See* Exhibit A. The Term Sheet contains the following provisions:

> To the best of QHR's knowledge, the limits of the Policies have not been eroded by any other claim as of this date.
>
> Term Sheet, ¶ 3.b.
>
> Once Nautilus pays its policy limits under this settlement, Nautilus policy limits will be deemed exhausted, its duty to defend shall end, and QHR will tender its defense of the Personal Injury Claims to Lexington and Ironshore. QHR's defense costs will erode the limits of the Policies.
>
> Term Sheet, ¶ 7.

---
[3] The parties attended an all-day mediation session on May 16, 2012 and again on May 30, 2012.

>The UTC will agree that, should any of the UTC recover a judgment against QHR on any of the Personal Injury Claims, the UTC will enforce all such judgments against the available insurance only, and not against the assets of QHR. The UTC will give QHR a release of all claims, however captioned, for liability on the Personal Injury Claims in excess of QHR's insurance.
>
>Term Sheet, ¶ 8.

The Hospital, the UTC, QHR, and others also entered into a Settlement Agreement in September 2012.[4] *See* Exhibit C. The Settlement Agreement contains the following provision regarding insurance coverage:

>The Parties acknowledge and agree that QHR and its present or former employees, agents, representatives, general partners, . . . and related entities have not made, do not make and may not be construed as having made or making any representation about the Lexington/Ironshore Policies or whether, to what extent, or under what circumstances coverage may exist under the Lexington/Ironshore Policies with the exception of the representations expressly enumerated in paragraph 3 of the Tem Sheet.
>
>Settlement Agreement, ¶ B.2.

The Settlement Agreement contains the following provision regarding recovery of any judgment awarded to the UTC and against QHR:

>The UTC and their respective present or former employees, agents, representatives, general partners, limited partners, . . . agree that should any of the UTC recover a judgment or judgments against QHR on any of the Unreleased Claims Against QHR, the UTC will enforce any and all such judgments against the available insurance only, and not against the assets of QHR or its respective present or former employees, agents, representatives, general partners, limited partners . . .
>
>Settlement Agreement, ¶ C.4.

---

[4] All members of the UTC and their counsel signed the Settlement Agreement. *See* Exhibit C. The last signature on the Settlement Agreement is dated October 11, 2012. *Id.* at p. 143.

The Settlement Agreement contains the following representation and warranty by the UTC regarding their non-reliance on any statement of fact or assurance by QHR other than factual statements made in paragraph 3 of the Term Sheet:

> The UTC represent and warrant that they are not relying upon any statement of fact or assurance by QHR in entering into this Settlement Agreement, save only the factual statements made in paragraph 3 of the Term Sheet.

Settlement Agreement, ¶ E.2.

The Hospital confirmed its Third Amended Chapter 11 Plan of Reorganization for Otero County Hospital Association, Inc. on August 7, 2012. *See* Order Confirming the Third Amended Chapter 11 Plan of Reorganization Dated June 20, 2012 for Otero County Hospital Association, Inc. ("Confirmation Order"), Case No. 11-13686-j11 – Docket No. 712. The Confirmation Order incorporated the terms of the Settlement Agreement.

Lexington Insurance Company ("Lexington") and Ironshore Insurance Company ("Ironshore") issued the insurance policies that are subject to the UTC's claims. The UTC have since reached a separate settlement with Ironshore. The Lexington policy[5] is a claims made policy. QHR's defense costs, including its attorneys' fees incurred defending the UTC's claims will erode the limits of the Lexington policy.

As of the April 2012 Negotiation, claimants against Natchez Regional Medical Center ("NRMC") had made claims against the Lexington policy (the "Natchez Claims"). QHR settled the Natchez Claims in late 2012. In January of 2013, a total of $13,000,000 was paid in settlement of the Natchez Claims. Of that amount, Lexington paid $8,000,000 to NRMC under the Lexington policy. Liability coverage for the Natchez Claims under the Lexington policy was subject to a $5,000,000 self-insured retention. None of the defense costs incurred in defending

---

[5] Lexington issued two policies to QHR for different terms. Both policies may cover the UTC's claims. For purposes of this Memorandum Opinion, the Court will refer to the two policies together as the "Lexington policy."

and settling the Natchez Claims were paid from the Lexington policy as of the time the UTC and QHR signed the Term Sheet.

The negotiations that ultimately settled the Natchez Claims began in late November 2012. Mr. Wood believes he first became aware of the Natchez Claims sometime in 2011. The UTC did not learn of the payment in settlement of the Natchez Claims until 2015 when QHR responded to interrogatories propounded by the UTC.

## DISCUSSION

A. *The Parties' Positions*

QHR requests that any judgment entered in favor of a UTC member and against QHR include the following language:

> This judgment against QHR will be enforced against the available insurance only, and not against the assets of QHR or its respective present or former employees, agents, representatives, general partners, limited partners, divisions, parents, subsidiaries, business units, related entities, principals, third party administrators, affiliates, receivers, heirs, executors, associates, directors, officers, attorneys, trustees, assigns, predecessors and successors.

Such language is premised on the language contained in the Term Sheet and the Settlement Agreement, which were made part the terms of the Hospital's confirmed Chapter 11 plan.

The UTC assert that QHR fraudulently induced the UTC to enter into a settlement agreement that limits enforcement of any judgment solely against available insurance, and made materially false representations[6] to the UTC, to the Court, and to the settlement mediator, Judge Torgerson, regarding the amount of available insurance. Based on such alleged fraud, the UTC ask the Court, in the event the UTC obtain a judgment against QHR, to hold QHR individually liable up to the amount paid to settle the Natchez Claims. The UTC contend that they are not

---

[6] The UTC assert that QHR made materially false representations and misrepresentations. The Court sees no difference between a false representation and a misrepresentation and uses "false representation" or misrepresentation" to refer to both.

-8-

requesting the Court to "undo" the terms of the Hospital's confirmed Chapter 11 plan. For the reasons below, the Court concludes that the UTC have failed to demonstrate that QHR fraudulently induced the UTC to settle or made a materially false representation regarding the amount of the available insurance. The Court need not, therefore, consider whether UTC's request would affect the terms of the Hospital's confirmed Chapter 11 plan.

    C. *Fraudulent Inducement, Fraud, and Misrepresentation – Applicable Standard of Proof of Proof*

The UTC bear the burden of proving that QHR falsely induced the UTC to settle and/or made a materially false representation or fraudulent representation. *See United States v. 1,557.28 Acres of Land in Osage Cnty, Kan.,* 486 F.2d 445, 447 (10th Cir. 1973) ("The burden of proving fraud is of course on the party alleging it.") (citing *Koscove v. Comm'r of Internal Revenue,* 225 F.2d 85 (10th Cir. 1955)). *See also Walker v. Smith,* 39 N.M. 148, 149, 42 P.2d 768, 769 (1935) (party asserting fraud in the inducement based on false and fraudulent representations bears the burden of proving "fraud and reliance thereon"). QHR and the UTC disagree about the appropriate standard of proof the UTC must sustain. New Mexico law applies a clear and convincing standard of proof to claims for fraudulent misrepresentation and fraudulent inducement. *See Applied Capital, Inc. v. Gibson,* 558 F.Supp.2d 1189, 1200 (D.N.M. 2007) ("The party asserting fraudulent misrepresentation must prove each of those elements by clear and convincing evidence.") (citing *Cyprus Amax Minerals Co. v. Duran Sand & Gravel, Inc.,* 2006 WL 4079084, *10 (D.N.M., May 31, 2006) (citing UJI 13-1633 NMRA)); *Eckhardt v. Charter Hosp. of Albuquerque, Inc.,* 124 N.M. 549, 562, 953 P.2d 722, 735 (Ct. App.1997) ("common law fraud must be proven by clear and convincing evidence.") (citations omitted); *Walker,* 39 N.M. at 149, 42 P.2d at 769 (clear and convincing standard applied to defense claiming that execution of note was induced by fraud and fraudulent representations).

Bankruptcy law applicable to non-dischargeability claims for false representation, false pretenses, and actual fraud applies a preponderance of the evidence standard. *See Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) (establishing a preponderance of the evidence standard for non-dischargeability fraud claims under 11 U.S.C. § 523(a)(2)(A)). Regardless of which standard applies the evidence falls short.

Fraud in the inducement under New Mexico law requires proof of the following elements: "(1) a misrepresentation of fact or failure to disclose a material fact; where (2) the falsity was known to the maker or where the representation or concealment was reckless; (3) the maker acted with the intent to deceive and to induce the other party to act in reliance; and (4) the other party actually relied on the representation or concealment." *Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.,* 170 F.3d 985, 994 (10th Cir. 1989) (citing *Lotspeich v. Golden Oil Co.,* 125 N.M. 365, 961 P.2d 790, 792 (Ct. App. 1998) (remaining citation omitted)). Similarly, fraud and fraudulent misrepresentation require the plaintiff to establish "(1) a misrepresentation of fact, (2) either knowledge of the falsity of the representation or recklessness on the part of the party making the misrepresentation, (3) intent to deceive and to induce reliance on the misrepresentation, and (4) detrimental reliance on the misrepresentation." *Williams v. Stewart,* 137 N.M. 420, 429, 112 P.3d 281, 290 (Ct. Ap. 2005) (citing UJI 13-1633) (remaining citation omitted). UTC have failed to demonstrate that QHR made a knowing or reckless misrepresentation or concealment of fact concerning the amount of available insurance or the existence of other claims.

The UTC's assertion that QHR made materially false representations comes down to the following representation in the Term Sheet:

> To the best of QHR's knowledge, the limits of the Policies have not been eroded by any other claim as of this date.

-10-

The UTC contend that this representation means that there were no other existing *claims* made against the insurance policy or policies from which payments could be made, which, if paid, would reduce the amount of insurance available to pay the UTC's claims.[7] The UTC therefore believe that QHR made a false representation and fraudulently induced them to enter into a settlement whereby the UTC would limit its recovery of any judgment against QHR to available insurance only. This Court disagrees.

The term "eroding" when used in relation to a type of insurance liability policy refers to what is known as an eroding policy. The Lexington policy is an eroding policy. Under an eroding policy the insurer's payment of defense costs reduces the policy limits available to pay claims. *See North Am. Specialty Ins. Co. v. Royal Surplus Lines Ins. Co.,* 541 F.3d 552, 559 (5th Cir. 2008) ("In an eroding policy . . . the insurer's payments to defense counsel to defend the liability suit count against the policy limits.") (citation omitted). *See also Amerisure Mut. Ins. Co. v. Arch Specialty Ins. Co.*, 784 F.3d 270, 274 (5th Cir. 2015) (same) (quoting *North American Specialty Ins.,* 541 F.3d at 559)); *DPC Indus., Inc. v. American Int'l Specialty Lines Ins. Co,* 615 F.3d 609, 615 n.3 (5th Cir. 2010) (explaining that under an eroding policy, "defense costs 'count' against and 'erode' the policy limits.") (citation omitted).

Sometimes, "erode," "erosion," or "eroding" is used more generically in reference to a liability insurance policy to refer to any payment that reduces the policy limits available to pay claims under the policy. *See, e.g., Columbia Cas. Co. v. SMI Liquidating, Inc.,* 909 F.Supp.2d 1303, 1320 n. 6 (D. Utah 2012) (explaining that under "eroding" insurance policies, "indemnity *payments* and defense costs *paid* by the carrier apply toward exhausting the limits of the liability policies.") (emphasis added); *Appleton Papers Inc. v. George A. Whiting Paper Co*., 2012 WL

---

[7] Lisa Curtis testified that this language in the Term Sheet meant that there were no other claims eroding the policy.

-11-

2704920, *19 (E.D. Wis. July 3, 2012) (explaining that indemnity payments erode policy limits); *Schnitzer Steel Indus., Inc. v. Continental Cas. Co.*, 2011 WL 13177696, *3 (D. Or. Aug.3, 2011) (discussing insurance policies under which "[o]nly the payment of settlements or judgments erodes the general liability limits of the Policies."); *John Crane, Inc. v. Admiral Ins. Co.*, 991 N.E.2d 474, 478 (Ill. Ct. App. 2013) (referring to a policy under which policy limits are eroded by payment of both indemnity payments and defense costs). *Cf. IMO Indus. Inc., v. Transamerica Corp.*, 101 A.3d 1085, 1111 (N.J.Super.Ct.App.Div. 2014) (recognizing that "an insured's deductible erodes the policy limits" when the amount of the deductible is deducted from the insured's coverage) (citations omitted).

The language in the Term Sheet, "the limits of the Policies have not been eroded by any other claim," is imprecise in its use of the term "claim" because claims do not erode policy limits. *Payments* erode policy limits. A claim asserted against a policy may never be settled or result in a judgment that requires payment from the policy limits. Thus, until there has been a payment on a claim, the policy limits have not been eroded by a claim. The representation is best construed to mean that, as of the date of the Term Sheet, to the best of QHR's knowledge, Lexington had not *paid any claims* under the Lexington policy that had eroded the policy limits.

QHR's representation is not false. The language, "as of this date," refers to the date of the Term Sheet – May 16, 2012 – and clearly limits the representation to that point in time. In fact, no payments had been made on any claims asserted against the Lexington policy as of the date of the Term Sheet. Nor had any payments been made from the Lexington policy as of the date of the Settlement Agreement. The representation in the Term Sheet is not false because no *payments* had been made from the Lexington policy at the time specified in the representation. *Claims* had been made against the Lexington policy. However, because settlement of the

Natchez Claims did not occur until December 2012 and payment on the Natchez Claims did not occur until January 2013, the Lexington policy *had not been eroded* as of the date of the Term Sheet.

Nor is QHR's representation that the limits of the Lexington policy had not been eroded by any other claim as of the date of the Term Sheet misleading. There is no evidence before the Court that the UTC asked QHR to make a representation regarding whether any claims had been made against the Lexington policy. QHR made no representation whether a negotiation was in prospect that may or may not result in a settlement under which Lexington would pay a claim that would erode policy limits. QHR's only representation in the Term Sheet or Settlement Agreement regarding either the erosion of the Lexington policy or other claims against QHR was that, as of May 16, 2012, Lexington had not paid a claim that eroded policy limits. And QHR represented and warranted in the Settlement Agreement that it was not relying on any statement of fact or assurance by QHR in entering into the Settlement Agreement other than those set forth in the Term Sheet. Even though Lexington's payment of the Natchez Claims occurred about six months after the date of the Term Sheet, the negotiations that resulted in the settlement of the Natchez Claims had not begun as of the date of the Term Sheet or the date of Settlement Agreement. It was unknown at those times whether a settlement of the Natchez Claims would be reached.

The testimony of Mr. Wood and Mr. Vento also undercut the UTC's position regarding the meaning of QHR's representation in the Term Sheet. Both Mr. Wood and Mr. Vento recalled that QHR was adamant during the April 2012 Negotiation that QHR could not guaranty that the limits of the Lexington policy would be available to satisfy the UTC's claims. Mr. Wood believes he informed Ms. Curtis of the existence of another claim against the Lexington

-13-

policy. Ms. Curtis contends that the UTC were not made aware of the existence of another claim. Mr. Vento does not now recall whether Mr. Wood specifically told Ms. Curtis at the April 2012 Negotiation that another claim had been made against the Lexington policy. But he clearly remembers that QHR's refusal to guaranty that the limits of the Lexington policy would be available to satisfy the UTC's claims became the sticking point that prevented the parties from reaching an agreement at the April 2012 Negotiation.

On close inspection, Ms. Curtis' testimony is consistent with the representation QHR ultimately made in the Term Sheet. Ms. Curtis testified that she has no recollection of Mr. Wood telling her at the April 2012 Negotiation about another claim *that had eroded the policy* (emphasis added). No erosion had occurred at the time of the April 2012 Negotiation, nor as of the time the parties signed the Term Sheet, nor as of the date of the Settlement Agreement. Based on the evidence, the Court finds that QHR through its counsel made no materially false representations to the UTC about the existence of any other claims against the Lexington policy.

The UTC could have required UTC to represent in the Term Sheet that there were no other claims asserted against the Lexington policy. They did not. Instead, the UTC agreed to the settlement on the terms contained in the Term Sheet. The UTC benefitted from the settlement as confirmed by the Hospital's chapter 11 plan.

## CONCLUSION

Based on the foregoing, the Court concludes that QHR is entitled to have language in any judgment entered in favor of the UTC that limits the UTC's enforcement to the available insurance and not from QHR's own assets. This requirement is consistent with the parties' settlement. The UTC failed to prove that QHR fraudulently induced them to enter into the settlement on such terms, or otherwise made a materially false representation about the amount

-14-

of available insurance or the absence of any other claims that could erode the Lexington policy in the future. The Court will enter a separate order consistent with this Memorandum Opinion.

*[signature]*
ROBERT H. JACOBVITZ
United States Bankruptcy Judge

Date entered on docket: November 17, 2017

COPY via CM/ECF to all counsel of record