In re: OTERO COUNTY HOSPITAL        Case No. 11-11-13686 JL
ASSOCIATION, INC.,

       Debtor.

---

UNITED TORT CLAIMANTS, as
individuals,

       Plaintiffs,

                                  Master Docket,
                                    Misc. Proceeding No. 13-00007
                                    Adversary Nos:

       v.                             12-1204j through 12-1207j,
                                    12-1209j, 12-1210j, 12-1212 through
                                    12-1215j, 12-1221j; 12-1235j, 12-1238j
                                    through 12-1241j, 12-1243j;
                                    12-1244j, 12-1246j; 12-1248j,
                                    12-1249j, 12-1251j through 12-1261j,
                                    12-1271j, 12-1276j and 12-1278j

QUORUM HEALTH RESOURCES, LLC,

       Defendant.

## **MEMORANDUM OPINION**

THIS MATTER is before the Court on four motions for reconsideration and/or to reopen the evidence (sometimes, the "Four Motions") brought by the United Tort Claimants[1] (the "UTC") or Quorum Health Resources, LLC ("QHR"). *See* Docket Nos. 629, 720, 742, and 783. The Four Motions concern three distinct issues: (1) dismissal of certain of the plaintiffs' claims

---

[1] The UTC consists of all of the plaintiffs named in the adversary proceedings identified by number in the above caption.

for lack of causation; (2) new evidence from Robert Zuniga, M.D. and others; and (3) alleged misconduct during the litigation by opposing counsel.

<u>BACKGROUND AND SUMMARY OF PRIOR RULINGS</u>

In 2011, the UTC commenced individual actions against Dr. Schlicht, Dr. Bryant, Otero County Hospital Association, Inc., d/b/a Gerald Champion Regional Medical Center ("GCRMC" or the "Hospital"), QHR, and other defendants in state court alleging medical malpractice and other acts of negligence relating to an alleged experimental lower back procedure (the "PDA procedure") performed on the plaintiffs. *See, e.g.*, Docket No. 1 in Adversary Proceeding No. 12-01276. As a result of these state court actions, GCRMC filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code in this Court. *See* Docket No. 1 in Case No. 11-13686-j11. The UTC removed forty-seven pending state court actions to this Court during GCRMC's bankruptcy case thereby commencing the adversary proceedings referenced in the above caption (the "Adversary Proceedings"). *See, e.g.*, Notice of Removal of State Civil Action under 28 U.S.C. §§ 1367(A) and 1452(A) and Rule 9027(A) of the Federal Rules of Bankruptcy Procedure at Docket No. 573 in Case No. 11-13686. Prior to confirmation of a chapter 11 plan in the bankruptcy case, GCRMC, the physicians, and others settled with the UTC, leaving QHR as the remaining defendant in the Adversary Proceedings. *See In re Otero Cty. Hosp. Ass'n, Inc.*, 527 B.R. 719, 726 (Bankr. D.N.M. 2015)("[T]he sole remaining defendant is the hospital management company that provided non-medical administrative services to the hospital."). The Court created a master docket for the individual Adversary Proceedings. *See* Docket Nos. 1, 297 and 559 in Miscellaneous Case No. 13-00007.

The Court has completed two phases of trial in the Adversary Proceedings and a third phase in four of the Adversary Proceedings. In phase one, the Court held an 11-day trial on the duty and breach of duty elements of the UTC's negligence claims against QHR ("Phase I"). *See*

-2-

*In re Otero* 527 B.R. at 726 (hereinafter, "*In re Otero Phase I*"). The Court determined QHR owed the members of the UTC a duty of care that included: "(1) the duty to appropriately involve medical staff in evaluating medical issues; and (2) the duty to inform the board and the medical staff about issues relating to patient safety known or that should be known by the hospital management company." *In re Otero Phase I*, 527 B.R. at 767.

The Court concluded that QHR's breach of the duty of care arose out of GCRMC's interim Chief Executive Officer's actions in response to a letter he received from Dr. Schlicht sent to Hospital Administration "responding to a letter in which Dr. Masel asserted that Dr. Schlicht was not a Spine Specialist and was improperly performing 'experimental surgery' on patients of the Hospital" (the "Masel Letter"). *Id.* at 771.[2] In light of: the Masel Letter; the fact that Dr. Masel was Dr. Schlicht's proctor charged with reviewing his performance; the fact that no disinterested member of the Hospital medical staff had the expertise to evaluate the PDA procedure; and the fact that the Hospital medical staff were not conducting a formal investigation into Dr. Masel's assertions, the Court concluded:

> Under the circumstances, QHR through its interim CEO should have informed the Board or its Executive Committee of Dr. Masel's assertion, made a written request of the MEC to conduct a focused review of the matter pursuant to Section 6.2 of the Medical Staff Bylaws, and then informed the Board or its Executive Committee that such request had been made . . . The CEO had the authority and responsibility to request a focused review of Dr. Schlicht's conduct.

*Id.* at 773-774.

In addition, during Phase I, the Court determined that comparative fault, and not joint and

---

[2] The Court found a second breach of the duty of care; however, no procedures were performed on the members of UTC as a result of that breach. *See In re Otero Phase I* at 770-771("By failing to obtain the Credentials Committee's approval before granting temporary privileges to Dr. Schlicht, QHR breached a duty to the UTC to ensure that the temporary privileging procedures in place to protect patient safety were followed before the CEO granted the privileges. However, Dr. Schlicht did not perform any procedures on any members of the UTC under the temporary privileges.").

several liability, would apply to QHR because the UTC had failed to prove any of the statutory exceptions to comparative fault.[3] *Id.* at 777. The Court did not believe the assertion of "experimental surgery" was "sufficient for the interim CEO to invoke the summary suspension provision under the Medical Bylaws" to halt the PDA procedure. *Id.* at 773. After taking into account, among other things, that no patients were complaining about the PDA procedure and the CEO was a highly experienced, competent CEO who consulted medical staff at the Hospital and was satisfied the Masel Letter was written because of a business dispute between Dr. Masel and Dr. Schlicht and not because of an immediate dangers to Hospital patients, the Court concluded:

> QHR did not have the ability to stop Dr. Schlicht or Dr. Bryant from performing the PDA procedure. A summary suspension of Dr. Schlicht's or Dr. Bryant's privileges to perform the PDA procedure on patients based on the nature of the procedure would require the exercise of professional medical judgment. QHR was not capable of making those judgments and had no responsibility to do so. That was the responsibility of the Hospital's medical staff and Board.

*Id.* at 779. The Court, having determined that the public policy exception to applying comparative fault did not apply, held that comparative fault and not joint and several liability would apply if damages were awarded. *See id.* at 778-779.

In Phase II, after a 4-day trial on the merits, the Court determined causation and allocated QHR's comparative fault. *In re Otero Cty. Hosp. Ass'n, Inc.*, No. 11-11-13686 JL, 2016 WL 7985365, at *1 (Bankr. D.N.M. Dec. 23, 2016)(hereinafter "*In re Otero Phase II*"). The Court

---

[3] By default courts in New Mexico apply comparative fault when apportioning damages in a tort action. *See Saiz v. Belen Sch. Dist.,* 1992-NMSC-018, ¶ 34, 113 N.M. 387, 400, 827 P.2d 102, 115; *see also* N.M.S.A. § 41-3A-1. Courts can apply joint and several liability in limited exceptions. *See Saiz v. Belen Sch. Dist.,* 1992-NMSC-018, ¶ 34, 113 N.M. 387, 400, 827 P.2d 102, 115. New Mexico has developed a public policy exception to comparative fault for an inherently dangerous activity, which holds:
> If a party has the authority to control the manner in which an inherently dangerous activity is conducted, that party has a corresponding nondelegable duty to take the precautions necessary to protect others from any peculiar risk of physical harm arising from such activity.

*Gulf Ins. Co. v. Cottone*, 2006-NMCA-150, ¶ 23, 140 N.M. 728, 735, 148 P.3d 814, 821.

-4-

allocated QHR's fault at 16.5%. *Id.*

In determining causation, the Court found that had the QHR CEO requested the GCRMC Medical Executive Committee ("MEC" or "GCRMC MEC") and the Board to conduct a focused review after receiving the Masel Letter: (1) the MEC would have acted on the CEO's formal request; (2) the MEC would have sought a physician outside of the Hospital to perform the review; (3) the reviewer would have told the MEC that the PDA procedure was dangerous; and (4) the MEC would have acted on that information and stopped the PDA procedure. *See In re Otero Phase II*, at *7-8. As such, the Court found that the CEO's failure to request the focused review caused the UTC to suffer harm by (1) having the experimental PDA procedure; or (2) undergoing a procedure where Dr. Schlicht as the lead physician committed medical negligence by performing procedures beyond the scope of his credentials. *Id.* at *9. The Court limited causation to "the UTC's injuries resulting from (1) PDA procedures Dr. Schlicht or Dr. Bryant performed after September 21, 2007; and (2) non–PDA procedures Dr. Schlicht performed as lead physician after September 21, 2007 that breached the applicable standard of care." *In re Otero Phase II* at *22. The Court reasoned and inferred based on the evidence presented in Phase II that an outside focused review of the PDA procedure "would have taken two months." *Id.* at *8.

Phase III of the trials will determine damages for individual members of the UTC ("Phase III"). The parties agreed to try damages issues in four of the Adversary Proceedings first with the intent to use the damages as test cases for mediation. *See* Amended Pretrial Order for Damage Trial at Docket No. 593. The parties selected four of the Adversary Proceedings and the Court held a 9-day trial on the issue of damages. *See* Docket Nos. 668, 669, 670, 671, 674, 675, 676, 677, & 682. The Court took the matter under advisement.

## THE PENDING MOTIONS TO RECONSIDER AND/OR
## REOPEN EVIDENCE AND THE COURT'S RULINGS

The Four Motions consist of:  (1) Motion for Reconsideration and/or Relief from Judgment and Motion to Reopen Evidence ("UTC Motion to Reconsider and Reopen Evidence") at Docket No. 629; (2) Motion to Amend and/or for Reconsideration of Order and Memorandum Opinion Regarding Comparative Fault and Causation ("UTC Zuniga Evidence Motion") at Docket No. 720; (3) Quorum Health Resources, LLC's Cross-Motion to Amend and/or for Reconsideration of Memorandum Opinion Regarding Comparative Fault and Causation (the "QHR Zuniga Evidence Motion") at Docket No. 743;[4] (4) Supplemental Motion to Amend and/or for Reconsideration of Order and Memorandum Opinion Reg[a]rding Comparative Fault and Causation (the "UTC Defense Counsel Misconduct Motion") at Docket No. 783.

### *(1) The UTC Motion to Reconsider and to Reopen Evidence*

In the UTC Motion to Reconsider and Reopen Evidence, the UTC ask the Court to admit new evidence with respect to three members of the UTC who underwent surgeries not involving PDA to show that Dr. Schlicht was the lead physician performing surgery and to reopen the evidence to show that a fourth UTC member underwent the PDA procedure. The UTC also ask the Court to reconsider its ruling affecting eight members of the UTC that the PDA procedure would not have been stopped until September 21, 2007. Those eight members of the UTC underwent procedures prior to September 21, 2007. QHR opposes the UTC Motion to Reconsider and Reopen Evidence. *See* Quorum Health Resources, LLC's Response to UTC Motion for Reconsideration and/or Relief from Judgment and Motion to Reopen Evidence at Docket No. 637. The Court heard oral argument on the UTC Motion to Reconsider and Reopen

---

[4] The UTC Zuniga Evidence Motion and QHR Zuniga Evidence Motion are together the "Zuniga Evidence Cross-Motions."

Evidence on June 19, 2017 and took the matter under advisement. For reasons explained below, the Court will grant the UTC Motion to Reconsider and Reopen Evidence only with respect to Thomas T. Sullivan and his spouse and otherwise deny motion.

*(2) The Zuniga Evidence Cross-Motions for Reconsideration*

After the UTC filed the UTC Motion to Reconsider and Reopen Evidence, the parties filed cross-motions for reconsideration based on newly discovered evidence from Dr. Zuniga. *See* Scheduling Order at Docket No. 733. In its cross-motion the UTC ask the Court to reconsider three issues in light of this newly discovered evidence. *See* UTC Zuniga Evidence Motion at Docket No. 720. First, the UTC ask the Court to change the date by which the Schlicht surgeries would have stopped following the CEO's receipt of the Masel Letter. Second, the UTC ask the Court to apply joint and several liability instead of comparative fault. Third, the UTC ask the Court to increase the apportionment of fault attributed to QHR. QHR opposes the UTC Zuniga Evidence Motion. *See* Quorum Health Resources, LLC's Opposition to the UTC's Motion to Amend and/or for Reconsideration of Order and Memorandum Opinion Regarding Comparative Fault and Causation at Docket No. 742.

The QHR Zuniga Evidence Motion also asks the Court to reconsider its rulings on causation and apportionment of fault. *See* at Docket No. 743. QHR asks the Court to apply a subjective standard in determining causation and to dismiss the claims against QHR for a lack of causation. In the alternative, QHR asks the Court to reduce the apportionment of fault to QHR.

The Court held an evidentiary hearing on the Zuniga Evidence Cross-Motions on December 6, 2017 and took the matter under advisement. The evidence admitted at that hearing is admitted for all purposes in the Adversary Proceedings. For reasons explained below, the Court will grant in part the UTC Zuniga Evidence Motion with respect to admitting new evidence and with respect to the time by which Dr. Schlicht's procedures would have been

-7-

stopped and otherwise will deny the UTC Zuniga Evidence Motion. The Court will deny the

QHR Zuniga Evidence Motion, except for admitting new evidence.

### (3) The UTC Defense Counsel Misconduct Motion

Last, the Court will consider the UTC Defense Counsel Misconduct Motion. *See* Docket

No. 783. The UTC ask the Court to reconsider applying joint and several liability or to increase

QHR's apportionment of fault based on their allegation of misconduct on the part of QHR's

defense counsel. QHR opposes the UTC Defense Counsel Misconduct Motion. *See* Quorum

Health Resources, LLC's Brief in Response to the UTC's Motion to Reopen Evidence Regarding

Apportionment of Liability and the Application of Joint and Several Liability, Based on QHR's

Alleged Collusion and Joint Defense with GCRMC at Docket No. 797. The Court held an

evidentiary hearing on the UTC Defense Counsel Misconduct Motion on January 5, 2018 and

took the matter under advisement. For reasons explained below, the Court will deny the UTC

Defense Counsel Misconduct Motion.

DISCUSSION

The Court will first discuss the legal standard it will apply in considering the Four

Motions and then separately consider each motion.

A. The legal standard for considering motions to reopen the evidence and motions to reconsider prior to entry of a final judgment or order.

### (1) Rule 54(b) instead of Rules 59 and 60 applies to the Court revising its non-final orders at issue in the Four Motions.

Rule 54(b) applies to the Court revising non-final judgments and orders.[5]  *See Raytheon*

*Constructors, Inc. v. Asarco, Inc.*, 368 F.3d 1214, 1217 (10th Cir. 2003) (explaining Rule 60(b)

---

[5] For the purposes of this opinion, "Rule(s)" refers to the Federal Rules of Civil Procedure. "Bankruptcy Rule(s)" refer to the Federal Rules of Bankruptcy Procedure. Bankruptcy Rules 7054, 9023 and 9024 make Rule 54, 59 and 60 applicable in adversary proceedings, with exceptions not applicable here.

applies only to final orders; whereas Rule 54(b) applies to non-final orders); *In re Akbari-Shahmirzadi*, 2013 WL 1099794 at *3 (Bankr. D.N.M. 2013) (J. Thuma). Rule 54(b) states:

> *. . . any order or other decision*, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and *may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.*

Fed. R. Civ. P. 54(b)(emphasis added).

The Court's rulings in Phase I or Phase II of the trial are not final orders because they did not adjudicate the damages element of the UTC's negligence claims. *See Servants of Paraclete v. Does*, 204 F.3d 1005, 1011 (10th Cir. 2000) (acknowledging "the well-settled and established rule that 'an order that determines liability but leaves damages to be calculated is not final.'") (quoting *Albright v. UNUM Life Ins. Co. of America*, 59 F.3d 1089, 1092 (10th Cir. 1995) (quoting 16 Charles A. Wright, Arthur R. Miller, Edward H. Cooper & Eugene Gressman, *Federal Practice and Procedure* § 4009, at 576 (1977) (additional internal quotation marks omitted)). "District courts generally remain free to reconsider their earlier interlocutory orders." *Been v. O.K. Indus.*, 495 F.3d 1217, 1225 (10th Cir. 2007). Because the Court's decisions following Phase I and Phase II were not final judgments or orders, Rule 54(b) applies to the Four Motions.

> *(2) The legal standard for motions to reopen the evidence prior to entry of a final judgment or order.*

When determining whether to reopen the evidence under Rule 54(b), "A district court has broad discretion to reopen a case to accept additional evidence and that decision will not be overturned on appeal absent an abuse of that discretion." *Smith v. Rogers Galvanizing Co.*, 148 F.3d 1196, 1197-98 (10th Cir. 1998) (citing *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 331 (1971) (remaining citation omitted)); *see also Moses H. Cone Mem'l Hosp. v.*

-9-

*Mercury Constr. Corp.*, 460 U.S. 1, 12, (1983) ("[E]very order short of a final decree is subject to reopening at the discretion of the district judge."). The same standard applies to trials before the bankruptcy court.

Courts often consider the following factors in reviewing a request to reopen the evidence: (1) the timing of the request; (2) the nature and character of the additional evidence; and (3) the potential prejudice to the opposing party. *Rogers Galvanizing Co.,* 148 F.3d at 1198; *see also Skier's Edge Co. v. Lapada De & Tool, Inc.*, 99 Fed. Appx. 848 (10th Cir. 2004) ("In making its decision to reopen, the court should consider the following factors:  (1) the timing of the motion, (2) the nature of the additional evidence, and (3) the potential for prejudice to the nonmoving party.")(citing *Smith*, 148 F.3d at 1198). "[F]airness is the key criterion" to the Court's decision. *Smith,* 148 F.3d at 1198 (quoting *Blinzler v. Marriott Int'l, Inc.*, 81 F.3d 1148, 1160 (1st Cir. 1996)). Fairness includes consideration of whether the new evidence was reasonably discoverable despite diligence prior to conclusion of the trial.

*(3) The legal standard for motions to reconsider prior to entry of a final judgment or order.*

The Court now turns to the legal standard for reconsideration under Rule 54(b) apart from the issue of reopening the evidence.

Rule 54(b) does not curtail or provide the Court with any standards by which to exercise its broad discretion to reconsider its non-final judgments or orders. *Rimbert v. Eli Lilly & Co.*, 647 F.3d 1247, 1251 (10th Cir. 2011). Courts have applied different standards to motions for reconsideration under Rule 54(b). *See In re Winkle*, 2016 WL 920393, at *1 (Bankr. D.N.M. 2016) (observing that, courts "tend to disagree on what standard to apply in reconsidering such [non-final] orders.").

The Tenth Circuit suggests that when considering a Rule 54(b) motion for reconsideration, a "court may look to the standard used to review a motion made pursuant to

Federal Rule of Civil Procedure 59(e)." *Ankeney v. Zavaras*, 524 F. App'x 454, 458 (10th Cir. 2013)(unpublished). Under the Rule 59(e) standard, a court can grant a motion to reconsider when there is "(1) an intervening change in the controlling law, (2) new evidence previously unavailable, and (3) the need to correct clear error or prevent manifest injustice." *Id.*; *see also CalMat Co. v. Oldcastle Precast, Inc.*, 2017 WL 6016465, at *2 (D.N.M. Dec. 4, 2017)(stating, "The Tenth Circuit has analyzed motions to reconsider interlocutory orders under Rule 54(b) and looked to Fed. R. Civ. P. 59(e) for guidance in addressing those motions to reconsider.").

In addition to the Rule 59(e) standard, some courts use other factors to guide the analysis of a Rule 54(b) motion for reconsideration. These additional factors "restrict the review" the Court undertakes by "reducing (i) the depth of the Court's analysis the second time around—thus conserving judicial resources" and by considering, "(ii) the impositions that relitigation of the prior ruling will impose on the party opposing the motion for reconsideration." *Anderson Living Tr. v. WPX Energy Prod., LLC*, 308 F.R.D. 410, 435 (D.N.M. 2015). Courts consider "how thoroughly the earlier ruling addressed the specific findings or conclusions that the motion to reconsider challenges." *Id.* at 434. To determine thoroughness, the Court looks to the development of the evidence, the "time and energy" of the Court and the parties and whether the Court previously "addressed the exact point or points that the motion to reconsider challenges." *Id.*

Courts also look to the development of the case in terms of its "progress and posture." *Id.* As such, it is necessary to consider stability or "the degree of reasonable reliance the opposing party has placed in the Court's prior ruling." *Id.* (citing, 18B Charles Alan Wright, Arthur R. Miller, Edward H. Cooper, Vikram David Amar, Richard D. Freer, Helen Hershkoff, Joan E. Steinman & Catherine T. Struve, *Federal Practice & Procedure* § 4478.1 (2d ed.)).

-11-

Other courts rely on the court's plenary power "to revisit and amend interlocutory orders when justice so requires." *Adetomiwa v. Redstone College*, 2015 WL 9259964, *1 (D. Colo. 2015); *see also Friedman v. Dollar Thrifty Automotive Group, Inc.*, 2015 WL 8479746, *2 (D. Colo. 2015) ("In deciding a motion to reconsider an interlocutory order, the court is not bound by the stricter standards for considering a Rule 59(e) or 60(b) motion . . . . Instead, a court has plenary power to revisit and amend interlocutory orders as justice requires.").

Generally, a motion for reconsideration under Rule 54(b) does not allow the movant to "get a second bite of the apple using the same arguments that were raised or could have been raised in prior briefing." *Thomas v. Kaven*, No. CV 12-381-JCH-LAM, 2017 WL 3098266, at *1 (D.N.M. June 14, 2017); *see Fortier v. New Mexico Human Servs. Dep't*, No. CV 16-482 SCY/WPL, 2017 WL 3017168, at *1 (D.N.M. July 13, 2017)("[A] motion to reconsider should do more than simply restate the position that was unsuccessfully advanced by the party in the initial motion, and should not present new arguments that could have been raised in the initial motion."); *Anderson Living*, 308 F.R.D. at 434 ("A movant for reconsideration thus faces an easier task when he or she files a targeted, narrow-in-scope motion asking the Court to reconsider a small, discrete portion of its prior ruling than when he or she files a broad motion to reconsider that rehashes the same arguments from the first motion, and essentially asks the Court to grant the movant a mulligan on its earlier failure to present persuasive argument and evidence."); and *Bergerson v. New York State Office of Mental Health, Central New York Psychiatric Center*, 652 F.3d 277, 288 (2d Cir 2011)("[W]here litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again.").[6]

---

[6] Courts within the Tenth Circuit have quoted this language with approval when applying Fed.R.Civ.P. 54(b), *see Libretti v. Courtney*, 2015 WL 12938931, *2 (D. Wyo. 2015) and *Carvana V. MFG Financial,*

Ultimately, whether to grant a motion to reconsider an interlocutory order under Rule 54(b) falls within the Court's sound discretion. *Trujillo v. Bd of Educ. of Albuquerque Public Schools*, 212 Fed. Appx. 760, 765 (10th Cir. 2007) (unpublished) ("A district court has discretion to revise interlocutory orders prior to entry of final judgment.") (citing *Price v. Philpot*, 420 F.3d 1158, 1167 n.9 (10th Cir. 2005)); *see also* Fed. R. Civ. P. 60(b), Advisory Committee Notes accompanying the 1945 Amendment ("[i]nterlocutory judgments ... are left subject to the complete power of the court rendering them to afford such relief from them as justice requires.").

In lengthy, complex litigation such as the Adversary Proceedings before this Court involving trial of the issues common to numerous lawsuits in multiple phases, and application of rulings in one phase of the ligation in subsequent phases, the movant faces a high bar to convince the Court to reconsider it prior rulings. In *Anderson Living*, the Court described that high bar as follows:

> Movants for reconsideration . . . carry the full burden of production: they must persuade the Court, using only the evidence and argument they put before it, that it should change its prior ruling; they must do all of the legwork, and not rely on the Court to do any supplemental fact-finding or legal research; and they must convincingly refute both the counterarguments and evidence that the opposing party used to win the prior ruling and any new arguments and evidence that the opposing party produces while opposing the motion to reconsider. Unlike the motion that produced the prior ruling, a motion to reconsider is not—and is not supposed to be—a fair fight procedurally. The deck is stacked against a movant for reconsideration, and if such a movant hopes to prevail, he or she must have not only a winning legal position, but the work ethic and tenacity to single-handedly lead the Court to his or her way of thinking.

308 F.R.D. at 435.

---

*Inc.*, 2008 WL 2468539, *1 (D. Utah 2008); as have many other courts. *See, e.g.*, *Dillon v. BMO Harris Bank, N.A.*, 2017 WL 564501, n. 7 (M.D.N.C. 2017); *Lexington Insurance Company v. ACE American Insurance Company*, 192 F.Supp. 712, 714 (S.D. Tex. 2016); *In re Roussel*, 2015 WL 4779247, *3 (E.D. Ark. 2015); *BMW of North America, LLC v. Kuveyka*, 2014 WL 33450903, *3 (M.D. Ala 2014); *Static Control Components, Inc. v. Lexmark Intern., Inc.*, 615 F.Supp.2d 575, 578 (E.D. Kty 2009); *Vaxiion Therapeutics, Inc. v. Foley & Lardner LLP*, 2009 WL 10671997, *1 (S.D. Cal. 2009).

-13-

This Court will consider the Four Motions with the above standards in mind.

B. <u>UTC Motion to Reconsider and Reopen Evidence,</u>

The UTC Motion to Reconsider and Reopen Evidence came about in a somewhat unusual way. QHR's in its proposed findings of fact and conclusions of law following the Phase II trial asked the Court to dismiss the claims of the following members of the UTC for either (1) the lack of evidence that the UTC member had the PDA procedure or had a procedure by Dr. Schlicht or (2) the date of the procedure was before September 21, 2007. The UTC members whose cases QHR sought to dismiss are summarized in the tables below.[7]

**Table 1: Claims of the UTC Members QHR Sought to Dismiss based on no proof of a PDA procedure or no proof Dr. Schlicht was the lead physician performing surgery.**

| Name | QHR's Reason for Dismissal |
|---|---|
| Frank Guerrero | No PDA procedure |
| Lavine Durden | No PDA procedure; lead physician unclear |
| Thomas L. Sullivan and Pat Sullivan | No PDA procedure; no proof of lead physician |
| Theresa Crawford and Clarence Crawford | No proof of lead physician |
| Kent Gwynne and Elizabeth Gwynne [8] | No PDA procedure; no proof of lead physician |
| Estate of James Silva | No PDA procedure |

**Table 2: Claims of the UTC Members QHR sought to dismiss because the procedure occurred before September 21, 2007.**

| Name | Date of Procedure |
|---|---|
| Annabelle Lindley and Jearl Lindley, M.D. | 09/12/2007 |
| Gayle Lunceford and Cecil Lunceford | 08/01/2007 |
| Shirley Hubert | 08/29/2007 |
| Kent Gwynne and Elizabeth Gwynne | 07/23/2007 |
| Kathy J. Swope and Jimmy L. Swope | 08/13/2007 |
| Estate of James Silva | 08/02/2007 |
| William Rogers | 08/09/2007 |
| Barbara Olson | 08/08/2007 |

[7] James Silva and Kent Gwynne are listed in both Tables. In subsequent briefing, QHR and the UTC addressed the claims of Mr. Silva and Mr. Gwynne only with respect to the surgery date; UTC did not offer additional evidence of the type of procedure or the lead physician. *See* UTC Response to QHR's Requests to Dismiss Certain Claims (Docket No 567).

[8] The Court was notified on 10/04/2016 that Kent Gwynne is deceased. *See* Docket No. 60 in Adversary Proceeding No. 12-1221. A motion to substitute Elizabeth Gwynne for Kent Gwynne is outstanding in the individual adversary proceeding. *See* Docket No. 61 in Adversary Proceeding No. 12-1221.

-14-

The UTC attached to its response to QHR's proposed findings of fact and conclusions of law additional exhibits not proffered at trial and in the response asked the Court to revisit its prior rulings. *See* Docket Nos. 567 and 587. QHR then filed a reply. The Court heard oral argument on March 1, 2017. At oral argument and in its reply brief, QHR agreed that Thomas Sullivan had a PDA procedure within the timeframe the Court found QHR to have been at fault. *See* Docket No. 580 at p. 7.[9] At the oral argument, the Court determined that if the UTC wanted the Court to revisit its prior rulings and consider additional evidence, the UTC should file a motion to reconsider and a motion to reopen the evidence to place their arguments before the Court in the correct procedural posture. The Court entered an order following the oral argument that, among other things, denied QHR's request to dismiss the claims of Thomas Sullivan and his spouse, and authorized the UTC to file a motion to reconsider and a motion to reopen the evidence. *See* Order Resulting from Oral Argument Held March 1, 2017 at Docket No. 596.

The UTC thereafter filed the UTC Motion to Reconsider and Reopen Evidence on May 30, 2017. *See* Docket No. 629. The motion included both a request for reconsideration and a request to reopen the evidence. QHR filed its response on June 9, 2017. *See* Docket No. 637. The Court heard oral argument on June 19, 2017 and took the matter under advisement. Damages trials in the four individual UTC members' adversary proceedings began on July 24, 2017.

---

[9] In QHR's response to the UTC Motion to Reconsider and Reopen Evidence, QHR states, "QHR agrees that the operative reports identify the surgery as involving PMMA injection into the disc space and therefore falls within the time frame and within the procedure for which QHR has been found to have a share of the fault." *See* Docket No. 637 at p. 5. Later, during argument QHR asserted that UTC did not meet their burden at trial in regards to Mr. Sullivan and the evidence would need to be reopened. *See* Docket No. 651. The Court entered an order denying QHR's request to dismiss Mr. Sullivan prior to the UTC filing the UTC Motion to Reconsider and Reopen Evidence. *See* Order Resulting from Oral Argument Held March 1, 2017 at Docket No. 596.

*(1) Evidence from Dr. Harvie relating to whether the UTC members in question had a PDA procedure or other procedure in which Dr. Schlicht was the lead surgeon*

In Phase II of the trial, the UTC had the burden to demonstrate that QHR's breach of duty caused the individual members of the UTC harm by undergoing a PDA procedure or other procedure in which Dr. Schlicht was the lead physician practicing outside his scope of training. The only evidence presented during Phase II specific to individual UTC members is the report of Dr. Keith W. Harvie, one of the UTC's expert witnesses. *See* Causation and Comparative Fault Trial Rule 26 Report and Addendum of Dr. K.W. Harvie at Ex. 179. Dr. Harvie's report examines the procedures performed on members of the UTC on a patient-by-patient basis and identifies the treating physician(s).

Under the Court's ruling, the UTC members who underwent a non-PDA procedure after September 21, 2007 can recover only if Dr. Schlicht acted as lead physician and committed medical negligence by practicing outside of the scope of his credentials. Dr. Harvie's report does not specify whether Mr. Sullivan had a PDA procedure. *See* Ex. 179, p. 82.[10] In addition, Dr. Harvie's report does not indicate that Frank Guerrero, Lavine Durden, and Theresa Crawford underwent a PDA procedure. *See* Ex. 179 at pp. 29-31 (Theresa Crawford) at pp. 35-36 (Lavine Durden) at pp. 40-41. Dr. Harvie's report includes inconclusive and inconsistent information and fails to establish whether Dr. Schlicht acted as lead physician for the procedure that forms the basis of Frank Guerrero, Lavine Durden, and Theresa Crawford's claims.

For example, for Ms. Crawford, Dr. Harvie reports:

---

[10] Dr. Harvie's report states the following with respect to Mr. Sullivan:
> When [Mr. Sullivan] initially went to see Dr. Schlicht, Mr. Sullivan was told . . . that there was a new procedure, being done in Europe that used plastic and elastic. . . . In February 2008, Mr. Sullivan had surgery. . . . Only Dr. Bryant's name appears on the operating report.

Exhibit 179, p. 82.

-16-

On the operating permit signed on June 6, 2008, *Dr. Schlicht was noted to be the operating surgeon.* The operating room note did not indicate that Dr. Bryant did anything in the operating room. And the operating room note listed that Dr. Schlicht did an anterior cervical fusion. It was noted [on the operating permit] that Dr. Bryant verified the operative site and under surgical procedures. *Dr. Bryant was listed as the primary surgeon.*

Ex. 179, p. 30 (emphasis added). For Mr. Durden, Dr. Harvie's report states:

In June 28, 2008, Mr. Durden had a lumbar laminectomy and discectomy at L5-S1, primarily on the left side. Dr. Schlicht admitted him. *Dr. Bryant was listed as the attending and admitting surgeon.* Mr. Durden had his second surgery at that time. It should be noted that there is a discrepancy on the notes for the second surgery; Dr. Schlicht was listed as the admitting doctor, however *on the operative report Dr. Schlicht was listed as the surgeon who performed the surgery.*

Ex. 179, p. 36 (emphasis added). Finally, for Mr. Guerrero, Dr. Harvie's report states:

September 19, 2008, [Mr. Guerrero] had a surgical procedure done and it was noted in preoperational report that Dr. Schlicht would be his surgeon. In the actual operative report it was recorded that the operative surgeon was Dr. Frank Bryant and that Dr. Schlicht was assisting. On the other hand, the anesthesia note recorded that Dr. Schlicht was the surgeon.

Ex. 179, p. 40.

The UTC seek to reopen the evidence with respect to Mr. Sullivan[11] to establish that he had a PDA procedure. With respect to Ms. Crawford,[12] Mr. Durden, and Mr. Guerrero, the UTC seek to reopen the evidence to offer several exhibits purporting to establish that Dr. Schlicht served as lead physician performing surgery.

---

[11] Mr. Sullivan's wife, Pat Sullivan, is also a named Plaintiff in Adversary No. 12-1261. The Court will refer only to Mr. Sullivan in this part of the Discussion because he is the UTC member who underwent the procedure.

[12] Ms. Crawford's husband, Clarence Crawford, is also a named Plaintiff in Adversary No. 12-1278. The Court will refer only to Ms. Crawford in this part of the Discussion because she is the UTC member who underwent the procedure.

## (2) Whether Dr. Rashbaum's Testimony Is Sufficient to Establish Causation with respect to Mr. Guerrero, Ms. Crawford, and Mr. Durden

Alternatively, the UTC assert that Dr. Ralph Rashbaum's Phase I trial testimony is sufficient to establish causation with respect to all members of the UTC, including Mr. Sullivan, Ms. Crawford, Mr. Durden, and Mr. Guerrero. The UTC directed the Court to the following portions of Dr. Rashbaum's testimony:

> Q. In your review of the surgeries that were done by Dr. Schlicht, do you have an opinion whether those surgeries were appropriate and accepted or experimental?
> A. I have an opinion.
> Q. And what is your opinion?
> A. They were experimental.
> Q. Do you have any doubt in that opinion?
> A. Without a doubt. Excuse me. May I modify that?
> Q. Yes.
> A. There are cases in which Dr. Schlicht did a vertebroplasty or kyphoplasty which wasn't experimental --
> Q. Understood.
> A.-- okay? So those worked. I mean, those were part of the I remember -- if I remember correctly. So what I'm relating to you is, any issue in which Dr. Schlicht was acting as a surgeon and not a pain therapist.

Phase I, Testimony of Dr. Rashbaum, p. 22, lines 8 – 23

> Q. Let's get some of these things out. Do you consider Dr. Schlicht to be a highly qualified surgeon?
> A. No.
> Q. Does Dr. Schlicht -- are you familiar with the training that he had in his pain management fellowship?
> A. Yes.
> Q. And the training in his pain management fellowship, would that allow him to ever act in the position as an orthopedic surgeon?
> A. No. Or a neurosurgeon.

Phase I, Testimony of Dr. Rashbaum, p. 40, lines 1 – 10.

> Q. Did you review, also in the client operative reports that Dr. Schlicht was acting outside the scope of his qualification and was, in fact, acting as a surgeon?
> A. I did, and he was.
> Q. For Dr. Schlicht to be doing surgery, orthopedic spine surgery, would that be an additional way of experimenting on patients?
> A. Yes.

-18-

Phase I, Testimony of Dr. Rashbaum, p. 43, line 20 thru p. 44, line 2.

> Court: Dr. Rashbaum, I think you testified that as a pain management specialist, Dr. Schlicht was not qualified to perform surgery. Would you explain the difference between surgery and what a pain management specialist would do?
>
> Dr. Rashbaum: As a pain management -- given Dr. Schlicht's training at Emery and I'm familiar with the people that he trained under. The exemplary program, really top notch, pain management is basically the diagnosis and treatment of pain states. And the diagnosis and treatment of pain states takes the form of A, imaging, okay -- history, imaging, and diagnostic injections, therapeutic injections, and then pain interventions. Okay? That scope has been expanded from the standpoint of simply putting in spinal stimulators and pumps to doing percutaneous intervention called kyphoplasty or vertebroplasty in the treatment of vertebral compression fractures. So I, myself, representative of a company, Medtronic, and another company, I forgot the name of which at this time taught anesthesiologists how to put tubes through the percutaneous, through the back into the vertebral body -- the robust portion of the spine to basically expand, if you will, okay that fracture which creates a wedge. And the -- Your Honor, can appreciate what that is. You've seen commercials for osteoporosis where the women, through age, they go like this, and those are wedge compression fractures. There's a large controversy as to whether you need balloon arthroplasty or just inside tubes, but the poignant fact is they're capable of doing that. I draw the line, very simply between the surgery made necessary, because anytime you do an intervention that you cut the skin, which is pain intervention in some form or fashion, putting in an implant like a stimulator or a pump, you're cutting the skin, but you're nowhere near the spine. You're nowhere near the nerve roots. You're not doing any of those things. That's the purview of specialty training, which in my case was six years. And other people's cases of six or seven years. So that's really the difference from that standpoint. I hope that give you the information.

Phase I, Testimony of Dr. Rashbaum, p. 59, line 16 through page 61, line 3.

Dr. Rashbaum's testimony supports a finding that Dr. Schlicht performed procedures on members of the UTC that he was not qualified to do, and that the PDA procedure he performed was not appropriate. From this the UTC would have the Court conclude that any time Dr. Schlicht participated in a surgical procedure for which he was not qualified, the UTC have established causation. And because Dr. Harvie's report indicates that Dr. Schlicht participated in the non-PDA procedures performed on Mr. Durden, Ms. Crawford, and Mr. Guerrero, the UTC assert that they have established causation for those UTC members. The Court is not persuaded that it should change its ruling based on this testimony.

-19-

The UTC had the burden to prove that QHR's breach of duty in failing to request a focused review of Dr. Schlicht caused each member of the UTC harm. Dr. Rashbaum's testimony is insufficient evidence to establish causation with respect to individual members of the UTC who had a non-PDA procedure. Dr. Bryant was a trained surgeon. Dr. Rashbaum did not testify that Dr. Schlicht performed surgery outside the scope of his qualification in any of the non-PDA procedures in which Dr. Bryant was lead surgeon and Dr. Schlicht assisted Dr. Bryant. Instead, Dr. Rashbaum gave generalized testimony regarding Dr. Schlicht's qualifications and the inappropriateness of his performing any type of surgery. As explained below, the evidence the UTC have offered to demonstrate that Dr. Schlicht acted as the lead physician for the non-PDA procedures performed on Ms. Crawford, Mr. Durden, and Mr. Guerrero is inconclusive. Thus, the UTC's alternative argument that seeks to establish causation as to Ms. Crawford, Mr. Durden, and Mr. Guerrero based on Dr. Rushbaum's testimony fails.

*(3) Whether the Court Should Reopen the Evidence to Admit Additional Exhibits*

The UTC ask the Court to reopen the evidence to offer the following additional exhibits in support of the claim of Mr. Sullivan that he underwent a procedure involving PDA and the claims of Mr. Guerrero, Mr. Durden, and Ms. Crawford that Dr. Schlicht was the lead surgeon for the procedures they underwent:

**Table 3: The UTC's proffered evidence for the UTC Members QHR sought to dismiss for lack of evidence**

| Name | The UTC's Proffered Evidence |
|---|---|
| Thomas Sullivan | - Operative/Procedure Report – January 23, 2008 listing procedure as "percutaneous disk height restoration arthroplasty" (Docket No. 629 at Ex. A) |
| Frank Guerrero | - Patient consent form dated 9/16/08, authorizing Dr. Schlicht to perform a "bilateral cervical three/four facet fusion" (Docket No. 629 at Ex. B)<br>- Surgical Services report dated 9/16/08 reflecting Dr. Schlicht DO as "Primary Surgeon" (Docket No. 629 at Ex. C) |

-20-

| | |
|---|---|
| | - Patient Ledger for services performed 9/16/08 (Docket No. 629 at Ex. D)<br>- Operative Procedure Report dated 9/16/08 for "posterior instrumentation C3-4 with lateral mass, screws and rod, i.e. posterior fusion C3-4 reflecting Dr. Bryant as "surgeon" and Dr. Schlicht as "assistant" (Docket No. 629 at Ex. E) |
| Lavine Durden | - Operative/Procedure Report dated 6/26/08 showing Dr. Schlicht as "Surgeon" and "None" for assistant (Docket No. 629 at Ex. F)<br>- Surgical Services report reflecting Dr. Schlicht as "primary surgeon" and Dr. Bryant as "Surgeon – Other") for surgery on 6/26/08 (Docket No. 629 at Ex. G)<br>- Patient Ledger for services performed on 6/26/08 (Docket No. 629 at Ex. H) |
| Theresa Crawford | - Patient consent form darted 6/6/08, authorizing Dr. Schlicht to perform a cervical four/five, cervical five/six anterior cervical discectomy and fusion (Docket No. 629 at Ex. I)<br>- Billing statement dated 8/26/08 from Spine Pain Institute/Christian R. Schlicht, D.O (Docket No. 629 at Ex. J)<br>- Patient Ledger for services performed on 6/19/08 (Docket No. 629 at Ex. K) |

The Court finds that the evidence should be reopened with respect to Mr. Sullivan to admit the January 23, 2008 Operative/Procedure Report attached to Docket No. 629 at Exhibit A. The timing of the request to reopen, made shortly after the completion of Phase II but before the entry of a final order, is reasonable and weighs in favor of reopening the evidence. The additional evidence the UTC seek to offer with respect to Mr. Sullivan conclusively establishes that he underwent a PDA procedure that the Court determined in Phase II caused harm. Allowing the UTC to reopen the evidence for this limited purpose will not unduly prejudice QHR. Indeed QHR concedes that this additional evidence demonstrates that Mr. Sullivan had a PDA procedure. In fairness, the Court will allow the UTC to reopen the evidence to offer a single exhibit to establish that Mr. Sullivan underwent a PDA procedure.

However, the evidence should be not reopened with respect to the claims of Mr. Guerrero, Mr. Durden, and Ms. Crawford to admit the newly proffered documentary evidence

that purports to show that Dr. Schlicht was the lead physician for the procedures they underwent. Although the documentary evidence UTC proffers suggests that Dr. Schlicht was the lead physician, QHR points to other documentary evidence that suggests Dr. Schlicht was *not* the lead physician. If the Court reopened the evidence to admit UTC's proffered documentary evidence, the Court would also reopen the evidence to admit the documentary evidence QHR proffered in response to UTC's motion. The Court would then find the evidence to be inconclusive regarding whether Dr. Schlicht or Dr. Bryant was the lead physician performing surgery and conclude that the UTC had not satisfied its burden of proof with respect to the claims of Mr. Guerrero, Ms. Crawford and Mr. Durden.

QHR points to several documents that contradict the UTC's proffered evidence of who acted as lead physician in performing a non-PDA procedure on Mr. Guerrero, Ms. Crawford, and Mr. Durden. For example, QHR attached a copy of the Operative/Procedure Report dated September 16, 2008 for a procedure performed on Frank Guerrero reflecting Dr. Bryant as "surgeon" and Dr. Schlicht as "assistant." *See* Docket No. 637 at Ex. C. As to Ms. Crawford, QHR attached a copy of the Operative/Procedure Report dated June 19, 2008 reflecting Dr. Bryant as "surgeon" and Dr. Schlicht as "assistant." *See* Docket No. 637 at Ex. G.

Mr. Durden is the most problematic. The UTC proffer an Operative/Procedure Report that identifies Dr. Schlicht as the primary surgeon with no assistant. *See* Docket No. 629 at Ex. G. The UTC also proffer a Surgical Services Report that identifies Dr. Bryant as "Surgeon – Other." *Id.* The surgical procedure identified in the Operative/Procedures Report is "Left L5-S1 hemilaminectomy, discectomy." *See* Docket No. 629 at Ex. F. The Surgical Services Report similarly identifies the "actual procedure" as "Lumbar Discectomy L5/S1 Lt. Side." Docket No. 629 at Ex. G. QHR offers contradictory evidence in the form of a patient consent form dated

6/26/08 authorizing Dr. Bryant to perform a "lumbar discectomy lumbar five –sacral one left side" and a discharge summary for the procedure performed on 6/26/08 showing only Dr. Bryant as the treating physician. *See* Docket No. 637 at Ex. D.

From the conflicting evidence, it is possible to infer that Dr. Bryant performed the procedure even though the Operative Report identifies Dr. Schlicht as the primary surgeon, because the consent form authorized Dr. Bryant to perform the procedure described in the Surgical Services Report as the "actual procedure." QHR also direct the Court's attention to testimony from Dr. Bryant which suggests that he was present and participated in the procedure. *See* Docket No. 637 at Ex. G.

Because the newly proffered documentary evidence is inconclusive regarding whether Dr. Schlicht or Dr. Bryant was the lead physician who performed surgery on Mr. Guerrero, Ms. Crawford and Mr. Durden, and UTC bears the burden of proof on that issue, admitting the new evidence would not change the Court's decision with respect to the claims of these UTC members. The Court will therefore deny the UTC Motion to Reconsider and Reopen Evidence insofar as it asks the Court to reopen the evidence with respect to the claims of Mr. Guerrero, Ms. Crawford, and Mr. Durden.

(4) *Whether the Court Should Reconsider the September 21, 2007 cutoff date based on testimony of Dr. Pollard and Mr. Heckert*

The UTC ask the Court to reconsider the finding that a focused review would have been completed by September 21, 2007 based on testimony from Dr. Pollard and Mr. Heckert admitted during the Phase II trial. The UTC argue that this testimony shows the PDA procedure would have been suspended on July 21, 2007 pending the outcome of the focused review.

The UTC point to no new evidence on this issue as their basis for the Court to reconsider its finding. Instead, the UTC rely on the testimony from Dr. Pollard and Mr. Jim Heckert about

what happened after patients experienced complications from the PDA procedure in 2008 to argue there was sufficient evidence before the Court that had the CEO timely requested the MEC to conduct a focused review of Dr. Schlicht on receipt of the Masel Letter, the PDA procedure would have immediately been stopped on July 21, 2007.

Dr. Pollard and Mr. Heckart testified regarding the need for immediate suspension of the PDA procedure after patients were complaining of complications in 2008. Dr. Pollard recalled stating, "Hey, you guys need to put a hold on this until we figure out what is going on." William Pollard, M.D. Dep. 13:4-5, Jan. 22, 2015 ("Pollard Dep."). Dr. Pollard also determined along with Mr. Heckert, the GCRMC CEO in 2008, that "this has to stop until we get an outside evaluation of what the hell is going on." Pollard Dep. 13:23-25. As CEO, Mr. Heckert immediately suspended the PDA procedure in 2008.[13]

In July 2007, no patients were complaining and the complications from the PDA procedure had not yet surfaced. The Court is not persuaded by evidence of what Dr. Pollard and Mr. Heckert believed and did once complications from the PDA became known to establish what would have occurred in July 2007.

The UTC also argue that because the Hospital's medical staff bylaws allow a non-physician CEO to immediately suspend privileges and because Dr. Masel's assertions against Dr. Schlicht were so serious, an immediate suspension pending the outcome of a focused review would have occurred. The UTC again point to Dr. Pollard's and Mr. Heckert's testimony to establish that it was more likely than not that the Hospital would have put an immediate stop to the PDA procedure pending completion of the focused review. The Court disagrees.

Article VI, Section 6.6.A of the Medical Staff Bylaws of Gerald Champion Regional

---

[13] Mr. Heckert became the CEO of the Hospital in March of 2008. *See In re Otero Phase I*, at 755.

Medical Center ("Medical Staff Bylaws") effective as of July 2007 provides:

> The Chief of Staff, the Vice Chief of staff when acting for the Chief of Staff, the MEC, the Chief of Department of which the affected medical Staff member is a member, or the President and CEO is empowered to restrict or suspend summarily without benefit of a hearing or personal appearance any or all privileges of a member of the Medical staff *if there is cause to believe that the Medical Staff member's conduct requires that immediate action be taken to protect the life of any patient or to reduce the likelihood of imminent danger to the health or safety of any individual.* (emphasis added).

The Court already weighed the evidence presented in Phase II and expressly found that there was insufficient evidence from which the Court would infer that the MEC would have suspended Dr. Schlicht's or Dr. Bryant's privileges to perform the PDA procedure or any other procedure pending the outcome of a focused review. *See In re Otero Phase II* at *17. The UTC did not call a single member of the MEC to testify about what it would have done had Mr. Richardson requested a focused review. The Court found further that "[t]he CEO could not summarily suspend Dr. Schlicht's privileges pending the outcome of the focused review" because "doing so would require a medical judgment the CEO could not make." *Id.*

The UTC urge that immediate suspension does not require medical judgment because the Medical Staff Bylaws only require that the CEO have "cause to believe that the Medical Staff member's conduct requires that immediate action be taken to protect the life of any patient or to reduce the likelihood of imminent danger to the health or safety of any individual." However, the Court found that in the circumstances existing at the time suspending Dr. Schlicht's privileges to perform the PDA procedure pending the outcome of the focused review would have required medical judgment regarding the propriety of the PDA procedure itself. *See In re Otero Phase I*, 527 B.R. at 734 and 751.

During Phase II, the Court heard how the then CEO of the hospital, Mr. Richardson, met with senior medical staff at the Hospital other than Dr. Bryant and Dr. Schlicht following his

-25-

review of Dr. Schlicht's letter to discuss the matter contained in the letter. Mr. Richardson met with Dr. Jones, Chair of the Credentials Committee and Dr. Austin, Vice-President of Medical Affairs. Mr. Richardson spoke with Dr. Bryant, who was the Chief of Staff and performing the PDA procedure alongside Dr. Schlicht. Mr. Richardson also reviewed Dr. Schlicht's privileging and credentials file. Mr. Richardson was convinced that the matters addressed in the letter reflected a business dispute between doctors and did not pose a threat to patients. At that time, there were no patient complaints about the PDA procedure or Dr. Schlicht, and patients undergoing the procedure were generally pleased. Mr. Richardson was a highly experienced, competent hospital CEO. Under the circumstances existing on July 21, 2007 only a qualified physician could make a judgment that Dr. Schlicht's "conduct require[d] that immediate action be taken to protect the life of any patient or to reduce the likelihood of imminent danger to the health or safety of any individual" as required by the Medical Bylaw to summarily suspend the PDA procedure at the Hospital.

In sum, in the UTC Motion to Reconsider and Reopen Evidence, the UTC have presented no new evidence in support of their request that the Court reconsider the September 21, 2007 cutoff date. The Court has already considered the evidence the UTC assert establishes that the PDA procedure would have (or should have) stopped pending the outcome of the focused review. The Court found to the contrary. Evidence of what Dr. Pollard and what Dr. Heckert did after serious complications from the PDA procedure became known fails to establish what a MEC, CEO, or hospital board, or even GCRMC's MEC or board without knowledge of any complications from the PDA procedure, would have done pending the outcome of a focused review.

When the Court has thoroughly analyzed the very points a party requests the Court to

revisit, the Court need not engage in revising its earlier decision. *Cf. Anderson Living,* 308 F.R.D. at 433-434 (observing that a court can refuse to entertain a motion to reconsider, and suggesting that the court "should restrict its review of a motion to reconsider a prior ruling in proportion to how thoroughly the earlier ruling addressed the specific findings or conclusions that the motion to reconsider challenges."). In this motion the UTC ask the Court for a second bite at the apple, which the Court will not allow.

Phase II of this litigation determining causation and comparative fault addressed the timing of the two breaches of duty the Court found following Phase I of the trial. The UTCs' arguments in the UTC Motion to Reconsider and Reopen Evidence are the essentially same arguments the Court previously considered and rejected in determining that the PDA procedure would not have been suspended on July 21, 2007 pending the outcome of the focused review. Therefore the Court denies the request for reconsideration in the UTC Motion to Reconsider and Reopen Evidence.

C. The UTC and QHR cross-motions for reconsideration based on newly discovered evidence from Robert Zuniga, M.D.

The Court will now consider the cross-motions for reconsideration based on the new evidence from Dr. Zuniga and other related new evidence. At the evidentiary hearing on the cross-motions, the Court admitted Dr. Robert Zuniga's, Monica Arrowsmith's, and Pamela Kushmaul's testimony.

At the oral argument held June 19, 2017, the UTC stated that Dr. Zuniga, a treating physician for one or more of the UTC members in the damages trials, recently gave deposition testimony that could affect the Court's earlier decisions. Believing that Dr. Zuniga's testimony might be privileged under the Review Organization Immunity Act ("ROIA"), the parties suspended questioning Dr. Zuniga about those matters to give GCRMC the opportunity to assert

-27-

the ROIA privilege. GCRMC asserted the privilege pending its investigation into the applicability of the privilege.[14] *See* Docket No. 660. GCRMC ultimately dropped its claim the ROIA privilege due to a lack of supporting evidence. *See* Order Determining that the Review Organization Immunity Act Privilege is Inapplicable at Docket No. 731.

After further discovery the UTC and QHR filed the Zuniga Evidence Cross-Motions for reconsideration. The newly discovered evidence includes Dr. Zuniga's testimony regarding his review of patient records and his conversations with a female administrator at GCRMC in 2007 concerning Dr. Schlicht and the propriety of the PDA procedure. *See* Docket No. 720, & Docket No. 743. The newly discovered evidence also includes testimony by Senior Vice President, Quality, Legal and Regulatory Compliance, Monica Arrowsmith and by Pamela Kushmaul, counsel for GCRMC. The Court held an evidentiary hearing on the Zuniga Evidence Cross-Motions on December 6, 2017, admitted the testimony of Dr. Zuniga, Ms. Arrowsmith and Ms. Kushmaul, and took the matter under advisement.

In the UTC Zuniga Evidence Motion, the UTC ask the Court to reconsider the following: (1) the date by which the Schlicht procedures would or should have been stopped; (2) applying joint and several liability instead of comparative fault; and (3) the apportionment of fault attributed to QHR. The QHR Zuniga Evidence Motion asks the Court to apply a subjective standard in determining causation and dismiss the claims against QHR for a lack of causation. In the alternative, QHR asks the Court to reduce its apportionment of fault. As discussed below, the Court will not change its ruling based on the Zuniga Evidence Cross-Motions on the application

---

[14] N.M. Stat. Ann. § 41-9-5 provides with limited exceptions that "all data and information acquired by a review organization in the exercise of its duties and functions shall be held in confidence and shall not be disclosed to anyone except to the extent necessary to carry out one or more of the purposes of the review organization."

of joint and several liability, the apportionment of fault, or causation, except with respect to the length of time needed to conduct a focused review.

(1) *The evidence is too inconclusive for the Court to make any finding regarding whether Dr. Zuniga spoke with Sue Johnson-Phillippe or a female administrator on the Hospital medical staff*

The UTC ask the Court to find that Dr. Zuniga spoke with Sue Johnson-Phillippe, the QHR-employed CEO at the Hospital, when he told a female administrator at the Hospital that the PDA procedure was dangerous and should be immediately stopped. QHR counters that Dr. Zuniga did not speak to Sue Johnson-Phillippe, and asks the Court to find that Dr. Zuniga had this conversation with a female administrator on medical side of the Hospital. If Dr. Zuniga spoke with Sue Johnson-Phillippe in July 2007 it could result in the Court changing its ruling that joint and several liability does not apply. If Dr. Zuniga spoke with a female administrator on the Hospital medical staff, it could result in the Court apportioning more fault to the Hospital. The Court finds the evidence too inconclusive to make either inference. It is simply unclear whom Dr. Zuniga spoke to at the Hospital.

Dr. Zuniga was deposed as a treating physician for one of the UTC members in preparation for the Phase III damages trials. *See* Zuniga Dep. 5:16-8:12, Jun. 8, 2017 ("First Zuniga Dep.").[15] The First Zuniga Dep. testimony was admitted in evidence. During his deposition, Dr. Zuniga revealed he had knowledge about PDA procedures performed at the Hospital that were not the result of his treating UTC members after complications from PDA emerged. First Zuniga Dep. 12:4-5.

**Dr. Zuniga:** I think it's prudent for me to mention that I reviewed a lot of these cases for the hospital at one point. Did you – were you aware of that?
**Mr. Klecan:** No, no.

---

[15] The parties compiled the depositions and trial testimony entered into evidence for the evidentiary hearings on the Zuniga Evidence Cross-Motions and the UTC Defense Counsel Misconduct Motion in a separate notebook labeled, "Designated Depositions & Trial Testimony Re: 12/06/17 Hearing."

> **Dr. Zuniga:** Okay. You should be aware of that because you need to read my explanation. And, in fact, after I read three or four of these cases, I was sent – this was many years ago, but I picked up the phone, and I called the administrator and I said, you need to stop this. So am I surprising both of you at this?
> **Mr. Klecan:** It's news to me. I don't know if it's news to Greig.
> **Mr. Coates:** It is news to me as well. And with what you've just said pretty clearly indicates there is no way in Hades we're getting through your deposition in half an hour.
> **Dr. Zuniga:** well, that's why – that's – I think it's prudent for me to mention that. It's probably going to come out at some point anyway. But – and it goes beyond that. I have a –
> **Mr. Klecan:** Can I say something? It may not. Because if this was a peer review type thing, then there may – there are peer review privileges that are involved.

First Zuniga Dep. 12:7-13:7.

After this Court determined that the ROIA (peer review) privilege did not apply to Dr. Zuniga's testimony, Dr. Zuniga executed an affidavit and was deposed again. *See* Order Determining that the Review Organization Immunity Act Privilege is Inapplicable at Docket No. 731. The affidavit and second deposition testimony were also admitted in evidence. In his affidavit Dr. Zuniga states "I was contacted by an administrator at Gerald Champion Regional Medical Center in 2007." *See* Zuniga Affidavit at ¶ 2. Dr. Zuniga testified that this conversation occurred in "2007 because I remember that was just before I moved to my new house. So it was probably mid to late 2007." *See* Zuniga Dep. 5:24-6:1, Aug. 21, 2017 ("Second Zuniga Dep.").

When pressed to further narrow the timeframe, Dr. Zuniga was inconclusive.

> **Mr. Klecan:** Can you be any more precise about when in 2007 you had that conversation other than to say mid to late 2007?
> **Dr. Zuniga:** I want to say late – I want to say late 2007.
> **Mr. Klecan:** November, December?
> **Dr. Zuniga:** I couldn't tell you.
> **Mr. Klecan:** what do you mean by late?
> **Dr. Zuniga:** Yeah, somewhere in there.

*See* Second Zuniga Dep. 33:9-17.

Likewise Dr. Zuniga was not able to name the female administrator he spoke to.

> **Mr. Coates:** What is it that let you know that this person was an administrator?

-30-

**Dr. Zuniga:** Well it was a female administrator. And I think she might have stated that. And she was from the hospital in Alamogordo.

**Mr. Coates:** Okay. What is it that – I mean if somebody suggests to you, well, how do you know it wasn't a secretary or somebody like that , what is it that leads you to believe that it wasn't a secretary?

**Dr. Zuniga:** Well we had a pretty long conversation on the phone and she behaved as an administrator. I mean, she was pretty detailed on her questioning the information she wanted to know and about Dr. Schlicht, whether I knew Dr. Schlicht. And she didn't strike me as a secretary just passing something on for her boss or something like that. She wanted to know in detail. She had some pretty administrative-type questions.

*See* Second Zuniga Dep. 6:3-21.

Dr. Zuniga was then asked to describe the conversation he had with the female

administrator.

**Mr. Coates:** Was it your sense that this was informal or was it formal, or how would you describe what your perception was of the task you were asked to complete?

**Dr. Zuniga:** Yeah, it was – it was – I mean, it wasn't an extremely formal conversation. It was more of a – it was kind of an interesting conversation because it was almost like asking me whether Dr. Schlicht was trained or capable of doing this procedure. Almost as a kind of a concern, trying to find out whether other people in the community were doing this, is this something that you get trained on. I was training people to do this at the university level. So my take was that she was trying to gather whether this is something that we were training people to do basically.

**Mr. Coates:** And what did you tell her?

**Dr. Zuniga:** I said, no, absolutely not, this is – this is not something that we train people to do. And in fact, this is a dangerous thing to be doing.

*See* Second Zuniga Dep. 8:10-9:5. Dr. Zuniga had been sent 12-15 charts to review and was

asked to report "whether this was an accepted procedure within the medical community and

whether it was being done anywhere else." *See* Zuniga Affidavit at ¶3.

**Mr. Coates:** And can you tell the Court what it is – at what point in that review of how many charts it was that you knew enough to pick up the phone and say what you said?

**Dr. Zuniga:** Yeah. It wasn't very many, three or four charts. And I was very concerned about this. And I thought they should know that, and putting patients at risk. And we had a long conversation about this not being a smart thing to be doing.

*See* Second Zuniga Dep. 9:23-10:5. In further questioning Dr. Zuniga outlined,

-31-

What I remember is reviewing enough and talking to her that I thought this was so outrageous that I thought it needed to stop. And I don't remember reviewing the whole thing. I put a stop to it pretty early on because I thought this was just beyond the scope of what Dr. Schlicht should be doing.

See Second Zuniga Dep. 53:1-7.

Dr. Zuniga did not submit a formal report to the female administrator based on his chart review.

**Mr. Coates:** Do you recall at any point filling out any type of paperwork or form of any document at all related to your review of these charts.
**Dr. Zuniga:** You know, I don't think I did. No, I don't think I did. Because it was a telephone – what happened was I felt that this was such a risk to patients, that instead of doing a report, I think I called her up.
**Mr. Coates:** Okay.
**Dr. Zuniga:** And I don't think I even finished doing a full review. It was just so crazy to me that this was being done, that for patients' safety, I just picked up the phone and said, this is not right.
**Mr. Coates:** What did she say, as best you can remember, after you told her that this should not be done at all?
**Dr. Zuniga:** Not much. I mean, the conversation almost ended very quickly after that. It was almost like I was disappointing her, in a way. So there was not much to say. Once I expressed my dislike of what was being done, it was pretty abrupt. Not much else to talk about really.

See Second Zuniga Dep. 14:19-15:15. Dr. Zuniga later clarified,

**Mr. Klecan:** It sounds like you're suggesting that the administrator that you talked to was disappointed that the procedure was not something that had been approved. Am I overstating that? Am I getting the wrong impression?
**Dr. Zuniga:** Well, she never stated that. It was just my – how I felt. It was – she seemed to be very excited to tell me about all this stuff. And the when I said that this is a crazy thing to be doing, her demeanor kind of changed.
**Mr. Klecan:** Okay.
**Dr. Zuniga:** it's like she wasn't really interested in anything I had to say anymore. It's like almost like she wasn't expecting me to – she was almost expecting me to validate this, and I went the opposite way.

See Second Zuniga Dep. 27:23-28:13.

Based on this testimony, it is unclear whether Dr. Zuniga spoke with Ms. Johnson-Phillippe or with a female administrator on the Hospital medical staff. Dr. Zuniga could not remember whether he spoke with the Hospital CEO or someone else, and his memory was vague

-32-

regarding the time in 2007 when the conversations occurred. The conversation occurred nearly ten years before Dr. Zuniga was asked about it in the deposition. Dr. Zuniga did not keep any notes or other records of the conversation, any of the charts he reviewed, or any other records to refresh his recollection about with whom he spoke or when. Further discovery by the parties did not fill in these gaps.

The Court has evidence that the female administrators who then worked o on the Hospital medical staff, namely Monica Arrowsmith, Jodi Duprez, Diana Green Mary Harding, Monica Contreras, Sharon McCoy, Dianna Melendrez, and Ellen Skrak do not recall an informal review of the PDA procedure or sending any records to Dr. Zuniga. *See* Kushmaul Dep. 11:16-19:6, Nov. 9, 2017 ("First Kushmaul Dep.").

Ms. Johnson-Phillippe left the Hospital in mid-July 2007. Dr. Zuniga initially testified in late 2017 that his conversation with the female administrator "was probably mid to late 2007," Second Zuniga Dep. 6:1, and when pressed later testified "I want to say late – I want to say late 2007." Second Zuniga Dep. 33:12-13. When asked "November, December?" he responded "I couldn't tell you," and then when asked again he said "Yeah, somewhere in there." Second Zuniga Dep. 33:14-17.

Neither party deposed Ms. Johnson-Phillippe or called her as a witness regarding the event about which Dr. Zuniga's testified. QHR sought to admit into evidence as Exhibit J the Affidavit of Sue Johnson-Phillippe dated November 4, 2017 ("SJP Affidavit").[16] QHR filed the SJP Affidavit in this miscellaneous proceeding on November 21, 2017, the last day of the

---

[16] QHR labeled their exhibits for this evidentiary hearing separately from the exhibit numbering system used throughout the phases of trial. Their exhibit notebook for the Zuniga Evidence Cross Motions evidentiary hearing is labeled "Zuniga Issue 2017: QHR Exhibits A-M." The UTC continued the exhibit numbering from the phases of trial.

-33-

discovery period.[17] *See* Docket No. 775. Ms. Johnson-Phillippe did not appear to testify in person at the hearing on the Zuniga Evidence Cross-Motions. The UTC objected to the admission of the SJP Affidavit, complaining, in part, that because QHR did not file the SJP Affidavit until just before the close of discovery, the UTC were prevented from fairly meeting this evidence at the hearing. The Court agrees that the SJP Affidavit is inadmissible.

"In general, an affidavit is not a form of evidence that is admissible at trial[.]" *Mitchell v. Zia Park, LLC,* 842 F.Supp.2d 1316, 1320 (D.N.M. 2012) (citing *Johnson v. Weld Cnty., Colo.,* 594 F.3d 1202, 1210 (10th Cir. 2010)). The SJP Affidavit is hearsay: it is an out of court statement by Ms. Johnson-Phillippe offered by QHR to prove the truth of Ms. Johnson-Phillippe's statement that she never spoke to Dr. Zuniga and has no knowledge of a request by a "female administrator" for Dr. Zuniga to review some of Dr. Schlicht's operative reports. *See* SJP Affidavit, ¶ 5. Under the residual exception to the hearsay rule, a hearsay statement may nevertheless be admitted if:

> (1) the statement has equivalent circumstantial guarantees of trustworthiness;
> (2) it is offered as evidence of a material fact;
> (3) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and
> (4) admitting it will best serve the purposes of these rules and the interests of justice.

Federal Rule of Evidence 807(a). Even if the requirements set forth in subsection (a) are met,

> The statement is admissible only if, before the trial or hearing, the proponent gives an adverse party reasonable notice of the intent to offer the statement and its particulars, including the declarant's name and address, so that the party has a fair opportunity to meet it.

Federal Rules of Evidence 807(b).

The SJP Affidavit, filed on the last day of the discovery period, fails to meet the

---

[17] The Scheduling Order fixed a discovery completion deadline of November 21, 2017. *See* Docket No. 733.

-34-

requirements of FRE 807(b). Even though the UTC could have taken Ms. Johnson-Phillippe's deposition during discovery on their own behalf, the UTC did not receive adequate notice of QHR's intent to offer the SJP Affidavit at the hearing to have a fair opportunity to meet it. And because Ms. Johnson-Phillippe did not appear to testify at the hearing in person, the UTC were not able to cross-examine her regarding the statements contained in the SJP Affidavit. The Court will, therefore, exclude the SJP Affidavit from evidence.

Other avenues to identify the female administrator were fruitless despite diligent efforts by counsel for GCRMC to track down any physical evidence. The Hospital's records from the audit system for copying or printing patient charts were damaged and cannot be accessed to identify who copied the records to send to Dr. Zuniga. *See* Jason Clay Judah Dep. 9:7-21:14, Nov. 21, 2017. The Hospital does not keep phone records that stretch back to 2007, nor does its vendor AT&T. *See* Ana Leticia Castro Dep. 6:14-7:9, Nov. 21, 2017; Ex. H at pp. 17-53. The Hospital does not keep shipping records that stretch back to 2007, nor do its vendors Federal Express or United Parcel Services. *See* John Hudson Dep. 5:5-11:6, Nov. 9, 2017; Paul Edward Martin Dep. 4:20-12:14, Nov. 9, 2017; & Ex. H at pp. 11-12.

The UTC argue the new evidence shows the QHR employed CEO, Sue Johnson-Phillippe was the only individual at the Hospital that had access to the medical records, an incentive to inquire about the procedure, and the means to bury any evidence of Dr. Zuniga's informal chart review. *See* Docket No. 720. They urge the Court to infer that Dr. Zuniga spoke with Sue Johnson-Phillippe before she was terminated on July 13, 2007 and ask the Court to hold that the PDA procedures should have been stopped by July 13, 2007. The evidence does not support these requested findings.

Because the new evidence fails to establish that Dr. Zuniga ever spoke with Sue Johnson-

Phillippe, the Court declines to apply joint and several liability or increase the apportionment of fault to QHR. Likewise, because the new evidence fails to establish that Dr. Zuniga spoke with a female administrator on the Hospital medical staff, the Court will not grant QHR's request to reapportion a greater percentage of fault to the Hospital.

   *(2) The new evidence provides further support for the Court's finding that the MEC would have conducted a focused review and stopped the PDA procedure if Mr. Richardson had a focused review.*

   QHR argues that the new evidence from Dr. Zuniga shows the GCRMC MEC would not have acted to suspend the PDA procedure even if the interim CEO, Mr. Richardson, had requested a focused review. QHR reasons that because the PDA procedures were not stopped in 2007 when Dr. Zuniga told a female administrator at the Hospital that the PDA procedure was dangerous and should be stopped, such evidence of what in fact happened is the best evidence of what the MEC would have done had Mr. Richardson asked it to perform a focused review. The Court disagrees. The Court has declined to make a finding that Dr. Zuniga spoke with a female administrator on the Hospital medical staff because the new evidence is too inconclusive to make that inference. The Court further declines to find that the MEC was aware of Dr. Zuniga's conversations with a female administrator.

   The testimony of Ms. Arrowsmith and Dr. Zuniga, admitted in evidence at the hearing on the Zuniga Evidence Cross-Motions, provides further support for the Court's findings that had Mr. Richardson made a formal request of the MEC to conduct a focused review of Dr. Schlicht performing the PDA procedure, the MEC would have done so, would have engaged an independent outside reviewer, and would have stopped the PDA procedure after learning of the reviewer's conclusions.

   Monica Arrowsmith, R.N., M.S.N., J.D. was employed by the Hospital during the relevant time period as the Hospital's Senior Vice President, Quality, Legal and Regulatory

-36-

Compliance.[18] In addition to her nursing credentials, Ms. Arrowsmith also has a juris doctor degree. She was an administrator on the Hospital medical staff. She testified:

> So a typical process and I don't remember this specifically for Gerald Champion, but a typical process is . . . if the Medical Executive Committee feels like we need outside peer review for one or two reasons, one if there's no other specialist available who would have the qualifications to review it, because sometimes there's a single specialty or no one else has that same set of privileges. Or if they feel like sometimes they just need outside expertise for a variety of reasons, political, dynamics, whatever, sometimes you just want to go get a third opinion . . . then there are organizations and agencies that actually have medical review panels available for outside review. And so typically, you would send those through an existing agency because they sort of vetted their people, they have the qualifications, they have the insurance protection, et cetera . . . what happens is they then issue a formal report, that then the Medical Executive Committee or if it's been delegated to a peer review committee reviews and then determines what steps they need to take after that, if any . . . If I were doing it, I would just go to one of my go-to agencies.

Arrowsmith Dep. 17:11-19:8, Nov. 15, 2017.

The Hospital had no specialist in-house with the qualifications to review the PDA procedure, other than Dr. Bryant and Dr. Schlicht who were performing the procedure. The nature of the assertion by Dr. Schlicht's outside proctor, charged with reviewing his performance, that Dr. Schlicht was performing experimental surgery certainly would have prompted the MEC to seek an outside opinion had the CEO of the Hospital made a formal written request of the MEC to conduct a focused review.

Robert Zuniga, M.D. specializes in anesthesiology and pain management. In 2007 he was an assistant professor and served as the Director of Pain Management Services at the University of New Mexico Hospital. *See* Ex. 358 at ¶2. In this capacity he was responsible for training the anesthesiology residents and the pain management fellows. *See* Second Zuniga Dep. 7:4-10. In his role, he received calls from attorneys, administrators, and companies regarding pain

---

[18] Ms. Arrowsmith left GCRMC after Mr. Richardson was appointed as the interim CEO. *See* Arrowsmith Dep. 37:21-22.

management. Second Zuniga Dep. 46:19-47:1. When Dr. Zuniga reviewed the PDA procedure taking place at GCRMC, Dr. Zuniga concluded after reviewing only a few of the 12 to 15 patient charts he was given that the procedure was dangerous and should be stopped immediately.[19] It is almost inconceivable that the MEC would not have suspended the procedure immediately if presented with such a conclusion by an outside expert such as Dr. Zuniga as part of a focused review.

QHR argues in its cross-motion that the Court should have applied a subjective standard to evaluate whether the GCRMC MEC would have conducted a focused review upon the request of the CEO, and if it had done so, to determine whether the MEC would have stopped the PDA procedure. QHR argues that the best evidence of what the MEC would have done is what it actually did after Dr. Zuniga completed his review, which was to allow the PDA procedure to continue.

Regardless of whether the Court were to apply an objective or subjective standard, the Court's decision on this issue would be the same. The fact that GCRMC MEC did not act following the completion of Dr. Zuniga's review does not show what the MEC would have done had it been aware of Dr. Zuniga's conclusions. The Court has found the evidence too inconclusive to determine whether Dr. Zuniga reported his conclusions to Sue Johnson-Phillippe or to a female administrator on the Hospital medical staff. The evidence does not show that the MEC was aware of Dr. Zuniga's conclusions.

---

[19] Dr. Zuniga testified that although he was sent 12 or 15 charts, he did not "even [finish] doing a full review. It was just so crazy to me that this was being done, that for patients' safety, I just picked up the phone and said, this is not right." Second Zuniga Dep. 15:3-6. Dr. Zuniga testified further,
> What I remember is reviewing enough and talking to her that I thought this was so outrageous that I thought it needed to stop. And I don't remember reviewing the whole thing. I put a stop to it pretty early on because I thought this was just beyond the scope of what Dr. Schlicht should be doing.

Second Zuniga Dep. 53:1-7.

In addition, based on the testimony at trial and the additional testimony from Monica Arrowsmith and Dr. Zuniga described above, the Court finds (a) that the GCRMC MEC, as well as any medical executive committee acting responsibly, would have conducted a focused review had the CEO of the Hospital made a formal written request that it conduct the review based on the information contained in Dr. Schlicht's response to the Masel Letter;[20] (b) after receiving the CEO's formal written request for it to conduct a focused review of the PDA procedure being performed at the Hospital, the MEC would have conducted a focused review and as part of the review would have sought an outside opinion regarding the PDA procedure Dr. Schlicht was performing at the Hospital; and (c) the MEC would have stopped the PDA procedure upon the outside reviewer reporting his or her conclusions to the MEC.

> (3) *Based on the new evidence, the Court will revise its ruling regarding how long it would have taken the MEC to suspend the PDA procedure had Mr. Richardson asked the MEC to conduct a focused review.*

Based on the new evidence from Dr. Zuniga and Ms. Arrowsmith, the Court will revise its previous ruling that the PDA procedure would have stopped by September 21, 2007 had Mr. Richardson requested the MEC to conduct a focused review and reported the matter to the Hospital board or the executive committee of the board.

In the Phase II trial, Mr. Michael Peterson testified that a medical executive committee's focused review process, where outside expertise is required, can be done in a matter of days, or it can take months particularly if more than one outside reviewer is engaged and literature searches are needed. Mr. Peterson's best estimate of how long it would have taken the GCRMC MEC to

---

[20] The Court found in *Phase II* that given the nature of Dr. Masel's assertion that Dr. Schlicht was inappropriately performing experimental surgery on patients of the Hospital, the fact that Dr. Masel was Dr. Schlicht's outside proctor with the expertise and responsibility to evaluate the PDA procedure Dr. Schlicht was performing, the fact that no disinterested member of the Hospital medical staff had the expertise to evaluate the procedure, and given the potential liability to the Hospital if it did not conduct a focused review in the face of a written request from the Hospital's Chief Executive Officer, the Court found it is more likely than not that the GCRMC MEC would have conducted the focused review had Mr. Richardson requested it. *See In re Otero Phase II*, at *7-8.

conduct a focused review of the PDA procedure was two months. The Court previously found that if the MEC had conducted a focused review of the PDA procedure at Mr. Richardson's request it would have taken 60 days.

Based on Dr. Zuniga's and Monica' Arrowsmith's testimony summarized above, the Court now finds that an outside reviewer engaged by the MEC would have come to the same conclusions as Dr. Zuniga after reviewing only a few patient charts and without conducting a literature search and would have promptly communicated those conclusions to the MEC. The Court also finds that upon receiving the report from the outside reviewer that the PDA procedure was dangerous and should be stopped immediately, the GCRMC MEC would have immediately put a stop to the PDA procedure pending the outcome of a further investigation. The Court finds that the MEC would have suspended the PDA no later than two weeks (fourteen days) after the request was made of the MEC to conduct a focused review: *i.e.* by August 4, 2007. The Court is making what it regards as a conservative estimate in the absence of more specific evidence on the timing.

D.    The UTC Defense Counsel Misconduct Motion

During discovery relating to the new evidence from Dr. Zuniga, the parties deposed counsel for GCRMC, Pamela Kushmaul. *See* First Kushmaul Dep. After her deposition and upon reviewing the e-mails her firm produced, the UTC filed the UTC Defense Counsel Misconduct Motion. The Court held an evidentiary hearing on the motion on January 5, 2018 and took the matter under advisement.

The UTC assert that defense counsel engaged in serious misconduct in this litigation that tainted the evidence presented to the Court. The UTC argue that the misconduct and tainted evidence warrants the imposition of joint and several liability on QHR because the UTC was and

is prejudiced in proving joint and several liability.

More specifically, the UTC allege that counsel for QHR and GCRMC secretly colluded in: (a) foisting fault onto the Hospital (who had settled) by allowing QHR to point the finger at the Hospital medical staff; (b) conducting a coordinated collective trial strategy and undisclosed joint defense strategy; (c) manipulating witnesses; (d) acting together to fail to produce documents and evidence to the UTC while sharing that information between themselves; (e) acting together to give QHR greater access to witnesses than to the UTC; and (f) engaging in other misconduct. *See* Supplemental Motion to Amend and/or for Reconsideration, Docket No. 783 at pp. 2-3 and UTC's corrected Brief in support of the Misconduct Motion, filed December 1, 2017 and December 4, 2017, Docket No. 784 (hereinafter the "Brief in Support."). The UTC assert further that as part of a cover up counsel for QHR knowingly kept silent while counsel for the Hospital lied in a deposition on November 9, 2017 about the meetings she had with Mr. Klecan and the number of number of e-mails she exchanged with counsel for QHR. The UTC allege that QHR's collusion with GCRMC was willful and deliberate and done with full knowledge that it was improper. *See* Docket Nos. 783 & 784.

QHR counters that: (1) all communications between counsel for GCRMC and counsel for QHR were ethically sound; (2) QHR's litigation strategy to limit its liability by blaming the Hospital was apparent from the start of litigation; (3) the UTC had the same access to witnesses but did not take advantage of informal discovery opportunities; (4) all but two documents in question were produced by GCRMC to UTC and the documents the UTC did not receive were cumulative; (5) and to QHR's counsel's knowledge, Ms. Kushmaul testified truthfully at the deposition about the number of e-mails.

*(1) The Court will look to Rule 60(b)(3) for guidance in deciding the UTC Defense Counsel Misconduct Motion*

The UTC Defense Counsel Misconduct Motion is analytically distinct from the other motions to reconsider. The UTC complain of unfair litigation tactics and unethical conduct by defense counsel. The UTC ask the Court to consider new evidence relating to this alleged attorney misconduct and apply joint and several liability on the ground that because of the misconduct the UTC was unable to fully and fairly present their case and the evidence was tainted. The relief the UTC seek is akin to a motion seeking relief from a judgment under Rule 60(b)(3). Therefore, the Court will look to Rule 60(b)(3) to decide the motion.

Rule 60(b)(3) states:

> On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons . . . (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party.

Rule 60(b)(3) offers a party the opportunity to challenge "judgments which were unfairly obtained, not . . . those which are factually incorrect." *Zurich N. Am. v. Matrix Serv., Inc.*, 426 F.3d 1281, 1290 (10th Cir. 2005). In the Tenth Circuit, the party asserting misconduct under Rule 60(b)(3) first "must show clear and convincing proof of fraud, misrepresentation, or misconduct. [Second], the challenged behavior must *substantially* have interfered with the aggrieved party's ability fully and fairly to prepare for and proceed at trial." *Zurich*, 426 F.3d at 1290 (internal quotations and citations omitted). As such, the party must show "evidence of intent or a deliberate plan or scheme to interfere with" its case. *Id.* at 1292. Although "a failure to disclose requested information during discovery may constitute misconduct under Rule 60(b)(3) . . . this usually requires the violation of a specific discovery request or order." *Id.*

The Court will look to Rule 60(b)(3) for guidance and will apply the Tenth Circuit's two-part test. The Court will examine first, whether the UTC has shown that QHR engaged in

-42-

misconduct; and second, if misconduct is proven, whether the UTC has shown that the misconduct interfered with the UTC's ability to fully and fairly present their case at trial.

For reasons discussed below the Court finds the UTC failed to meet its burden to show that counsel for QHR engaged in the misconduct the UTC allege. As the UTC did not prove misconduct, the Court will deny the UTC Defense Counsel Misconduct Motion without reaching the question of whether any actions by counsel for QHR interfered with the UTCs' ability to fully and fairly present their case.

### (2) The evidence does not show that counsel for QHR engaged in misconduct during the litigation

The UTC's principal arguments in support of their Defense Counsel Misconduct Motion consist of: (a) QHR allegedly aiding and abetting false deposition testimony from Pamela Kushmaul; (b) GCRMC allegedly giving QHR greater access to fact witnesses; (c) QHR and GCRMC allegedly attempting to get Dr. Austin to falsify his testimony; (d) QHR and UTC allegedly conspiring to conceal important documentary evidence from the UTC; and (e) QHR and UTC allegedly colluding through an improper joint defense strategy after the Hospital had settled with the UTC. The Court will address each of these arguments.

### (a) Alleged false deposition testimony from Pamela Kushmaul

After Dr. Zuniga testified on June 8, 2017 that he spoke with a female administrator at the Hospital sometime in 2007, Ms. Kushmaul, as counsel for GCRMC, worked extensively to determine whether the ROIA privilege applied and then to respond to discovery requests. She was subsequently deposed about to her efforts to investigate the applicability of the ROIA privilege to Dr. Zuniga's testimony. *See* First Kushmaul Dep.

The UTC contend that at the deposition Ms. Kushmaul intentionally—for the purpose of concealing the collusion between QHR and GCRMC—gave false testimony. The UTC contend

-43-

Ms. Kushmaul lied when she testified: (1) that there were less than ten e-mails between counsel for QHR and counsel for the UTC, although, in fact, there were at least 547 e-mails; and (2) that she had no meetings with Mr. Klecan (counsel for QHR), whereas, in fact, there were many. The UTC contend further that Mr. Klecan's knowing failure to correct the false testimony is further evidence of the QHR and GCRMC's collusion. In their Brief in Support, the UTC characterize the import of this deposition testimony and Mr. Klecan's silence as follows:

> The strongest proof that QHR and GCRMC knew their collusion was improper is found in Ms. Kushmaul's testimony from her first deposition. As shown above, Ms. Kushmaul testified she had never had any meetings with Mr. Klecan. . . . The same motive explains why Ms. Kushmaul also chose not tell the truth about the fact that there were at least 547 e-mails—not 10—that were sent between her and counsel for QHR. . . . This same concealment motive also unfortunately explains Mr. Klecan's behavior.

*See* Docket No. 786 at pp. 4-5.

During the deposition at issue, Ms. Kushmaul was asked about whether she conducted an investigation into whether Dr. Zuniga's communications with Hospital personnel were protected by the ROIA privilege:

> **Mr. Coates:** Okay, Did you conduct an investigation when you became – when you became aware of Dr. Zuniga's testimony as to what – whether their ROIA privilege applied to Dr. Zuniga?
> **Ms. Kushmaul:** I did.

*See* First Kushmaul Dep. 9:8-12.

Ms. Kushmaul then testifies at length about that investigation. The investigation included (a) a review of the Hospital's records and systems to ascertain who pulled the patient charts sent to Dr. Zuniga; and (b) an effort to ascertain the identity of the female administrators working at GCRMC at the time and whether any of them sent patient charts to Dr. Zuniga or spoke with him about Dr. Schlicht or the PDA procedures. *See* First Kushmaul Dep. 9:12-30:15.

Later in the deposition, during questioning by counsel for the UTC, Ms. Kushmaul was

-44-

asked about her meetings with Mr. Klecan and others:

> **Mr. Coates**: And how many total hours you think you've spent with him [John
> Wheeler] in preparation for either the investigation of ROIA that you did or for
> your deposition here today all told?
> **Ms. Kushmaul**: I have no idea.
> **Mr. Coates**: Dozens of hours?
> **Ms. Kushmaul**: I – I wouldn't think so, no, not dozens.
> **Mr. Coates**: Ten?
> **Mr. Klecan**: Object to the form. Are you asking 10 hours spent with Mr. Wheeler?
> **Mr. Coates:** Yes.
> **Ms. Kushmaul:** Less than 10.
> **Mr. Coates**: Okay. How many? What's your best estimate, ma'am?
> **Ms. Kushmaul**: You know, I don't like to guess. Less than six. Less than five.
> **Mr. Coates**: Okay. How many meetings have you taken with Mr. Klecan either in
> person or by phone?
> **Ms. Kushmaul**: Nothing.
> **Mr. Coates:** Okay. How about Ms. Ferrick (phonetic), his partner?
> **Mr. Klecan** She's not quite my partner. She's co-counsel.
> **Mr. Coates:** Fair enough.
> **Mr. Coates**: How many other attorneys besides Mr. Wheeler have you met with on
> the issues that bring us here today?
> **Ms. Kushmaul**: No one. No other meetings, no other attorney, no other time.

*See* First Kushmaul Dep. 39:2-40:6. Ms. Kushmaul was also asked about her e-mail

communications with counsel for QHR.

> **Mr. Coates**: have you been electronically communicating – that is via e-mail – with
> any of the Quorum lawyers?
> **Ms. Kushmaul**: From time to time in terms of – of the investigation, you know,
> just early on before the hearing, I let them know that, you know, I found nothing.
> **Mr. Coates**: Okay. How many e-mails do you estimate that you have exchanged
> between yourself and anybody who represents Quorum?
> **Ms. Kushmaul**: I don't have any idea but few.
> **Mr. Coates**: More than just the one you spoke about. Right?
> **Mr. Klecan**: Form. I don't know which one you're referring to.
> **Ms. Kushmaul**: More than one, certainly.
> **Mr. Coates**: More than ten, ma'am?
> **Ms. Kushmaul**: I wouldn't think so.

*See* First Kushmaul Dep. 44:20-44:11. After this deposition, John D. Wheeler & Associates, P.C.

produced at least 547 e-mails covering the entire span of this litigation. *See* Exhibit 337.

Reading Ms. Kushmaul's deposition testimony about meetings she had with Mr. Klecan

and the number of e-mails she exchanged with anyone representing QHR, in context, it is obvious that Ms. Kushmaul and Mr. Klecan understood that Ms. Kushmaul was being asked about meetings and e-mails that relate to the investigation she conducted after Dr. Zuniga's first deposition taken June 8, 2017 and possibly also in preparation for her deposition.

Both lines of questioning of Ms. Kushmaul occurred following her lengthy testimony about the Hospital's investigation. Ms. Kushmaul's answer to the question posed to her about the number of meetings she had with Mr. Klecan was asked right after a question posed to her about the number of hours she spent with John Wheeler[21] about the investigation GCRMC conducted following Dr. Zuniga's testimony at his first deposition. The line of questioning ended with the question, "[h]ow many other attorney besides Mr. Wheeler have you met with *on the issues that bring us here today*?" First Kushmaul Dep. 40:2-4 (emphasis added). Similarly, Ms. Kushmaul's answer to the question posed to her about the number of e-mails she exchanged with anyone representing QHR specifically references "the investigation" the Hospital conducted following Dr. Zuniga's first deposition and about which she had just testified at length.

The Court finds Ms. Kushmaul's deposition testimony, and Mr. Klecan not correcting that testimony, does not show any attorney misconduct.

*(b) Alleged efforts by GCRMC to give QHR greater access to fact witnesses*

The UTC complain that the e-mails show QHR was given greater access to fact witnesses for informal interviews and preparation for trial. *See* Docket No. 784. The bulk of the e-mails in evidence relate to scheduling informal interviews, depositions, or trial preparation for fact witnesses who are associated with the Hospital. The evidence suggests that counsel for GCRMC made the fact witnesses available to the UTC as well as to QHR. The following e-mail exchange

---

[21] John D. Wheeler and Pamela Kushmaul are both employed by John D. Wheeler & Associates, P. C.

-46-

between Mr. Klecan and Ms. Kushmaul addresses the UTC's and QHR's access to Hospital

employed witnesses to conduct informal interviews:

> **Mr. Klecan:** Here is their witness list for the next phase. Pam, have they talked to you about any of these?
> **Ms. Kushmaul:** They have not talked to me, but they did ask to meet with John [Wheeler] last Thursday and asked him for assistance getting to the MEC members. He told them that to the degree we assist in making witnesses available to QHR we would make them available to the UTC. Grieg [Coates] said, "Well, you didn't last time" to which John said, "we made them available for one interview but when you began asking for 2 and 3 we did not." Vic [Poulous] was trying to be the peacemaker and agreed with John on that point.

Ex. 337 at p. 611. Neither party presented testimony from the Hospital's counsel, John Wheeler.

There is no evidence that QHR directed or encouraged counsel for the Hospital to limit the

UTC's informal discovery or impede its access to fact witnesses. There is also no evidence that

the UTC ever took advantage of the Hospital's offer to make MEC members available for one

interview each.

The Court finds the evidence relating to access to witnesses does not show any attorney

misconduct.

### (c) Alleged efforts by QHR to get Dr. Austin to falsify his testimony

The UTC strenuously argues that QHR's entreaty to Ms. Kushmaul to refresh Dr.

Austin's recollection regarding his testimony about the Masel Letter is evidence of attorney

misconduct. *See* Exhibit 337 at pp. 673-684. The UTC contend that "refresh" was code for

"manipulate." QHR asserts that it is not misconduct for it to go through GCRMC's counsel when

trying to refresh a Hospital employed witness's recollection and that refreshing the recollection

of a fact witness in preparation for trial is specifically contemplated in the Rules of Professional

Responsibility. Because the Court does *not* find that counsel for QHR or counsel for GCRMC

did anything to assist or encourage Dr. Austin to testify falsely, the Court finds and concludes

that the evidence relating to refreshing Dr. Austin's recollection does not show any attorney

misconduct.

The Third Restatement of the Law Governing Lawyers § 116 states:

> In preparing a witness to testify, a lawyer may invite the witness to provide truthful testimony favorable to the lawyer's client. Preparation consistent with the rule of this Section may include the following: discussing the role of the witness and effective courtroom demeanor; discussing the witness's recollection and probable testimony; revealing to the witness other testimony or evidence that will be presented and asking the witness to reconsider the witness's recollection or recounting of events in that light; discussing the applicability of law to the events in issue; reviewing the factual context into which the witness's observations or opinions will fit; reviewing documents or other physical evidence that may be introduced; and discussing probable lines of hostile cross-examination that the witness should be prepared to meet. Witness preparation may include rehearsal of testimony. A lawyer may suggest choice of words that might be employed to make the witness's meaning clear. However, a lawyer may not assist the witness to testify falsely as to a material fact.

Restatement (Third) of the Law Governing Lawyers §116 (2000).

The e-mails relating to refreshing Dr. Austin's recollection were sent because Dr. Austin had testified at the Phase I trial that he did not recall learning that Dr. Schlicht was performing experimental surgery, and QHR was hoping to refresh his recollection to the contrary. *See In re Otero Phase I,* at 750 ("Dr. Austin was aware that Dr. Masel had raised some concerns about Dr. Schlicht's medical judgment, but he was not aware that Dr. Masel had accused Dr. Schlicht of performing experimental surgery. No one at the hospital ever told Dr. Austin that Dr. Schlicht was performing experimental surgery."). QHR's counsel sought to refresh Dr. Austin's recollection by asking GCRMC's counsel to show him a credentialing file unavailable to QHR because of a ROIA privilege, making Dr. Austin aware of certain trial testimony, and finding out what Dianna Melenedrez recalled and perhaps asking her to talk to Dr. Austin. *See* Ex. 337 at pp. 673-684.

An attorney refreshing a witness's recollection in an effort to have a witness recall events more favorably to the attorney's client is not misconduct so long as counsel does not assist the

-48-

witness to testify falsely as to a material fact. *See* Restatement (Third) of the Law Governing Lawyers §116 (2000). The evidence does not establish that counsel for QHR or counsel for GCRMC by attempting to refresh Dr. Austin's recollection were attempting to assist or encourage him to testify falsely. Nor did QHR's counsel do anything wrong by asking Ms. Kushmaul, the Hospital's lawyer, to refresh the recollection of a Hospital employee rather than doing so himself in an informal interview or deposition. The efforts by counsel for QHR and counsel for GCRMC to attempt to refresh Dr. Austin's recollection did not constitute attorney misconduct

*(d) Alleged concealment of important documents*

In regards to the documents produced, the UTC allege and argue at length in their Brief in Support that because of misconduct by QHR's counsel the UTC did not receive twenty-six important documents that GCRMC secretly provided to QHR, and that the concealment of the documents is further evidence of collusion between QHR and GCRMC. *See* Docket No. 786 at pp. 9-14. In its Response, QHR attaches e-mails showing that QHR sent eighteen of the twenty-six documents to counsel for the UTC on March 3, 2014, well before the Phase I trial. *See* Docket No. 797 at Ex. A. The UTC identified another document that it claimed it never received as UTC's Trial Exhibit 101. In their Reply filed December 20, 2017, the UTC never acknowledge their error in asserting that UTC did not receive twenty-six important documents, even though the UTC, in fact, received nineteen of those documents. *See* Docket No. 798.

QHR has represented in open court that it did not receive four of the other seven documents and that another of the documents, contained in a locked file, had nothing to do with matters at issue in the Adversary Proceedings.

That leaves two of the twenty six documents not yet accounted for. The UTC did not receive the GCRMC Pain Management 3-year Plan from 2006 or the GCRMC Pain Management

-49-

3-year Plan REVISED from 2006 (together, the "Three Year Plans"). *See* Docket No. 784; and Exhibit No. 337 at pp. 270-273(referencing those documents). Although, a failure to provide documents in response to discovery requests can constitute misconduct under Rule 60(b)(3), Courts are reluctant to apply Rule 60(b)(3) when there is no specific discovery request or order compelling production of the document. *See Zurich*, 426 F.3d at 1290. The UTC had served GCRMC (but not QHR) with a request for production that was broad enough to cover the Three Year Plans. GCRMC produced the final version of the Three Year Plans, entitled "Pain Management Physician Economic Model 3 Year Plan" to the UTC but did not produce the underlying documents used in its creation. *See* Ex. 359. QHR did not send the Three Year Plans to the UTC.

There is no evidence that counsel for QHR encouraged the Hospital to withhold the documents or was aware that the UTC had not received the documents from GCRMC. Given the thousands of pages of exhibits before the Court, it is conceivable that GCRMC inadvertently failed to produce the Three Year Plans to the UTC. Certainly, QHR's failure to send these underlying documents to the UTC does not rise to the level of a deliberate plan or scheme to withhold evidence in this case, and the Court does not believe it was the result of attorney misconduct.

*(e) Alleged improper collusive litigation strategy*

The UTC urge that QHR's misconduct also lay in a collusive effort between QHR and GCRMC to cast blame on the Hospital by manipulating witness testimony, concealing important documents from the UTC, and giving the QHR better access to interview Hospital employed witnesses informally. The Court does not believe QHR committed misconduct by advancing its litigation strategy to attribute liability to the Hospital or in connection with the cooperation GCRMC gave to QHR in QHR's preparation of its defense. As previously discussed, the Court

-50-

has found no improper witness manipulation, concealment of documents, or unequal access to witnesses.

In a case in which a court is applying the doctrine of comparative fault, defendants tend to cast blame on others, particularly other defendants who have settled. QHR's litigation strategy to place liability and blame on the Hospital and Drs. Bryant and Schlicht has been apparent since the beginning of this litigation.[22]

The UTC allege that the number of e-mails, the tone of the e-mails, and the access to witness and documents counsel for GCRMC gave to counsel for QHR, demonstrate misconduct in the form of a cooperative collusive conspiracy. The e-mails between counsel for GCRMC and counsel for QHR cover a variety of topics including: (1) scheduling witnesses who were associated with GCRMC for informal interviews, depositions, and witness preparation; (2) responses to formal and informal discovery requests; and (3) updates on the progress of the case. *See* Exhibit No. 337. The e-mails also show Ms. Kushmaul responded to formal discovery requests by e-mailing documents to QHR. *Id.* The e-mails show that a friendly professional rapport existed between counsel for QHR and counsel for GCRMC. At times, counsel for GCRMC congratulates QHR's counsel on the Court's rulings and is enthusiastic about QHR's prospects in the case. *See, e.g.*, Ex. 337 at p. 545. The e-mails show that counsel for GCRMC

---

[22] Prior to Phase I of the trial the Court had ruled on cross motions for Summary Judgment by UTC and QHR. QHR's argument at summary judgment was that they owed no duty to the UTC because its management agreement with the Hospital placed all liability on the Hospital. *See In re Otero Phase I*, 514 B.R. at 326. QHR's theory of the case – that liability rested with the Hospital and not QHR as the Hospital management company remained consistent through the phases of trial. *See In re Otero Phase I*, at 763–64 (reciting, "QHR counters that it had no duty to patients with respect to those activities – and therefore has no liability in this case – because its function was strictly limited to managing administrative, nonmedical matters at the Hospital."); and *In re Otero Phase II*, at *14 (reciting, "QHR reasons further that because the Credentials Committee and the MEC had the information from Dr. Masel that this Court determined should have triggered the CEO to request a focused review, yet did nothing to restrict Dr. Schlicht's privileges or stop the procedure, QHR cannot be held responsible.").

was rooting for QHR's success in the context of the litigation and cooperated with QHR in connection with its preparation of its defense; however, that alone is not evidence of misconduct on the part QHR's counsel. The Court finds the evidence before the Court relating to litigation strategy and GCRMC's cooperation with QHR does not show any attorney misconduct.

Overall, the UTC failed to meet its burden of showing that counsel for QHR engaged in any misconduct during the litigation. As the UTC did not prove misconduct, the Court will not reach the question of whether QHR's actions interfered with the UTC's ability to fully and fairly present their case.

<u>CONCLUSION</u>

The Court grants in part and denies in part the UTC Motion to Reconsider and Reopen Evidence. The Court will allow the UTC to reopen the evidence to offer one document that shows Mr. Sullivan had a PDA procedure and now finds that Mr. Sullivan underwent a PDA procedure. The Court will not allow the UTC to reopen the evidence in regards to the other plaintiffs whose claims are at issue in that motion. The Court will not revise its ruling to hold that the interim CEO should have summarily suspended the PDA procedure on July 21, 2007. The Court will enter a separate order consistent with this ruling.

The Court grants in part and denies in part the UTC Zuniga Evidence Motion. The Court reopens the evidence to admit the testimony of Dr. Zuniga, Monica Arrowsmith, and Pamela Kushmaul, and the other evidence admitted in evidence at the hearing. The Court does not admit the affidavit of Sue Johnson-Phillippe offered in evidence at the hearing. Based on Dr. Zuniga's testimony, the Court will revise the September 21, 2007 date by which the GCRMC would have stopped PDA procedure at the Hospital had Mr. Richardson asked the MEC to conduct a focused review of Dr. Schlicht performing the PDA procedure. The Court now holds the PDA procedure would have been stopped by August 4, 2007. As a result of this ruling the claims following

-52-

plaintiffs at issue will not be denied based on the date the PDA procedure would have stopped: Annabelle Lindley and Jearl Lindley, M.D. (Adversary Proceeding No. 12-1205), Shirley Hubert (Adversary Proceeding No. 12-1210), Kathy J. Swope and Jimmy L. Swope (Adversary Proceeding No. 12-1243), William Rogers (Adversary Proceeding No. 12-1251), and Barbara Olson (Adversary Proceeding No. 12-1278). The Court will not revise its rulings regarding the application of comparative fault or the apportionment of fault to QHR. The Court will enter a separate order consistent with these rulings.

With respect to the QHR Zuniga Evidence Motion, the Court has admitted the new testimony from Dr. Zuniga, Monica Arrowsmith, and Pamela Kushmaul, and the other evidence admitted in evidence at the hearing. The Court does not admit the affidavit of Sue Johnson-Phillippe offered in evidence at the hearing. The Court has supplemented its findings and conclusions regarding what the GCRMC MEC would have done had Mr. Richardson requested a focused review. The Court will not otherwise revise its finding of causation and the Court will not revise its apportionment of fault to QHR. The Court will enter a separate order consistent with this ruling.

The Court denies the UTC Defense Counsel Misconduct Motion and will not revise its ruling regarding the applicability of the doctrine of comparative fault based on that motion. The Court will enter a separate order consistent with this ruling.

_____
ROBERT H. JACOBVITZ
United States Bankruptcy Judge

Date entered on docket: January 29, 2018

COPY via CM/ECF to all counsel of record

-53-