UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW MEXICO

In re: OTERO COUNTY HOSPITAL         Case No. 11-11-13686 JL
       ASSOCIATION, INC.,

      Debtor.
_____

UNITED TORT CLAIMANTS, as
individuals,

      Plaintiffs,

                               Master Docket,
                               Misc. Proceeding No. 13-00007
                               Adversary Nos:

      v.                            12-1204j through 12-1207j,
                               12-1209j, 12-1210j, 12-1212 through
                               12-1215j, 12-1221j; 12-1235j, 12-1238j
                               through 12-1241j, 12-1243j;
                               12-1244j, 12-1246j; 12-1248j,
                               12-1249j, 12-1251j through 12-1261j,
                               12-1271j, 12-1276j and 12-1278j

QUORUM HEALTH RESOURCES, LLC,

      Defendant.


## MEMORANDUM OPINION

The Court tried these related adversary proceedings in phases. In the first two phases, the

Court tried issues common to all of the related adversary proceedings. In Phase I, the Court

determined the duty and breach elements of the United Tort Claimants' negligence claims

against Quorum Health Resources, LLC ("QHR"). In Phase II, the Court determined causation

and allocation of fault. In Phase III, the Court will adjudicate damages for the individual

members of the United Tort Claimants ("UTC"). The Court held damages trials in the following

four individual adversary proceedings and took the matters under advisement: 1) Patricia E. Rue

and Gary T. Rue v. QHR – Adversary Proceeding No. 12-1257 J; 2) Ivan S. Jackson v. QHR – Adversary Proceeding No. 12-1240 J; 3) Desiree A. Smith and Henry Smith v. QHR – Adversary No. 12-1255 J; and 4) Kelly Robbins and Herbert Robbins v. QHR – Adversary No. 12-1278 J (together, the "Four Adversary Proceedings").[1] These individuals who were the patients are sometimes referred to below as the "Four UTC Members." Based on the evidence presented at trial, the Court finds and concludes that the Four UTC Members are entitled to damages resulting from QHR's breach of duty in the amounts determined below.

FACTS

The Court makes the following findings of fact:

### I.  <u>Facts Common to All Four Plaintiffs</u>

*The "PDA" Procedure*

The medical procedure at issue in the Four Adversary Proceedings is sometimes called percutaneous disc arthroplasty ("PDA").[2] The PDA procedure involves the percutaneous injection of polymethlmethacrylate ("PMMA") into the intervertebral disc space of the patient's lumbar spine. Desiree Smith, Patricia Rue, Kelly Robbins, and Ivan Jackson all underwent a PDA procedure performed by Christian R. Schlicht, D.O. and/or Frank T. Bryant, M.D., at the Gerald Champion Regional Medical Center ("GCRMC" or the "Hospital"). The PDA procedure as performed at the Hospital is an experimental, inappropriate procedure that should never have been performed on any patient, except possibly under the auspices of an institutional review

---

[1] Adversary Proceeding No. 12-1278 J has other named plaintiffs whose damages trials have not yet been heard.
[2] The PDA procedure is also sometimes referred to as interpositional disc arthroplasty, disc arthroplasty, or disc height restoration arthroplasty.

-2-

board.[3] Nevertheless, some patients other than the UTC who underwent the PDA procedure were happy with the results.

*PMMA and its Potential Effects*

PMMA is a common substance physicians use in the body due to its bio-compatibility as an inert substance. It is typically used within or to resurface the bone, such as with kyphoplasty or arthroplasty. With kyphoplasty, PMMA is used in a "doughy" state to achieve greater control of the placement of PMMA in the bone. PMMA has other authorized uses in the human body. However, the use of PMMA in the lumbar spine to perform the PDA procedure at the Hospital was inappropriate.

Dr. Schlicht has described the PDA procedure as removing 1mm of disc material and replacing it with up to 9mm of PMMA to expand the disc space. Once cured, PMMA is stiffer than the intervertebral disc, which normally acts like a jelly shock absorber. Using PMMA in the disc space in the manner Dr. Schlicht and Dr. Bryant used PMMA in the PDA procedure will change the stress loading of the patient's spine, which could cause bony reactive changes.

The risks of injecting PMMA percutaneously into the intervertebral body of the disc space include: 1) extrusion, which occurs when PMMA moves after injection, and after it has hardened; 2) extravasation, which occurs at the time of injection when the PMMA spreads or leaks beyond its intended location; 3) inflammation from the sandpaper like effect of PMMA, which is left in little shards and granules; and 4) nerve burn or nerve response to the presence of PMMA. Because PMMA in its liquid state is very hot, it can cause nerve root burn.

---

[3] The Court previously found that an institutional review board could not be empaneled for the PDA procedures at the Hospital because the physicians were not performing the PDA procedure for the purposes of conducting systematic research to advance the science of medicine. *See* Amended Memorandum Opinion, pp. 36 – 37 (Docket No. 286).

Case 13-00007-j    Doc 827    Filed 01/30/18    Entered 01/30/18 15:26:10 Page 3 of 55

Biomechanical complications may arise from the injection of PMMA into the soft tissue inside the disc as the body attempts to stop the motion surrounding the inflamed area.[4]

Gregory R. Misenhimer, M.D. has treated 15-20 patients that underwent a PDA procedure, more than any other physician. Dr. Misenhimer reported that the PMMA injected into the disc space during the PDA procedure often leaked out of the intervertebral disc space into the spinal canal neural foramen, where the nerves come out of the spinal cord. In his opinion, all patients he treated who underwent the PDA procedure had some complications from the procedure, though they varied in severity. Dr. Misenhimer operated on about two-thirds of the patients he treated who underwent the PDA procedure that Dr. Schlicht and/or Dr. Bryant performed in an attempt to remove the PMMA fragments around the nerve roots or the spinal canal. In his experience, the PMMA material he encounters in patients who underwent a PDA procedure "is never in one big chunk; it is granular . . . [with] lots of little pieces."

However, if the patient's reported pain symptoms do not correlate with PMMA in the area, Dr. Misenhimer does not remove the PMMA. Instead, he performs a fusion without removing the PMMA. In his view, if the patient who underwent a PDA procedure complains of both back and leg pain, he would recommend removing the PMMA fragments at the same time as a fusion procedure.

The interior of the intervertebral disc space, consisting of the annulus fibrosis and the nucleus pulposus, has a high water content and has a gel-like consistency. When PMMA is injected into the disc space in a hot, liquid state, it does not stay in one piece. Shards or pebbles of PMMA material form. PMMA in its fluid liquid state is hot; it reaches 200 degrees

---

[4] Conflicting expert testimony was presented regarding whether some of these risks associated with PMMA and the PDA procedure are, in fact, risks. The Court's risk findings reflect the Court's assessment of the expert testimony.

Fahrenheit, which is too hot to touch. It is exothermic, generating heat as it sets. PMMA generally cures in 12 to 15 minutes and then comes to rest at body temperature. If PMMA is injected into the disc space in a liquid, hot form, it can burn the surrounding nerves, causing injury. However, PMMA does not burn nerve roots unless it extravasates. Even so, PMMA can irritate nerves without extravasation. PMMA can also burn the tissue inside the disc space. Injection of PMMA into the disc space can never effectuate a fusion because a fusion requires bone-to-bone contact.

Particles of PMMA inside the lumbar disc space can act like sandpaper, irritating the soft tissue, causing inflammation and pain. Injection of PMMA into the lumbar disc space can also affect the adjunctive levels of the lumbar spine as the body tries to stop the motion surrounding the inflammation. *See* Exhibit 263.

Ralph F. Rashbaum, M.D., a board certified orthopedic surgeon, reviewed the reports Keith W. Harvie, D.O., prepared for each of the Four UTC Members, the updated medical records of the Four UTC Members, and the original life care plans Angelo Romagosa, M.D., prepared. In Dr. Rashbaum's opinion, PMMA injected into the disc space is a pain generator that causes the stimulation of nociceptive fibers in the endplate and vessels. The nerves respond to the presence of PMMA, causing pain. Dr. Rashbaum connects the PDA procedure to worsening physical conditions at a much faster rate than would occur through the normal aging process. *See* Exhibit 263. Dr. Rashbaum explained that PMMA in the disc space causes degenerative painful effects beyond the level where the PMMA was originally injected. *Id.* All experts who testified at trial agreed that the PDA procedure could not effectuate a fusion of vertebrae. Because the PDA procedure cannot effectuate a fusion, Dr. Rashbaum concludes, and the Court finds, that motion between vertebrae that have PMMA in the intervening disc space is inevitable, and

generated pain in the Four UTC Members. *See* Exhibit 263. Dr. Rashbaum opined, within

reasonable degree of medical probability, that the PDA procedure caused the Four UTC

Members severe problems that they would not otherwise have experienced but for the PDA

procedure, including the following:

> intractable and severe pain to their legs and back; loss of motor function in their
> lower extremities and/or debility requiring wheelchairs, walkers, or other assistive
> ambulatory devices; sensory function loss and debility in their lower extremities;
> numerous falls due to pain, debility, and deconditioning, with increased risks of
> same as they age; bladder incontinence; bowel incontinence . . . depression . . .

*See* Exhibit 263.

An article published in 2014 by Dr. Varga, many years after Drs. Schlicht and Bryant

stopped performing the PDA procedure, describes a procedure similar to the PDA procedure

performed at the Hospital. *See* Exhibit 265 and Exhibit EEEEE. Dr. Varga conducted his study

"with the approval of the responsible ethics committee and in accordance with the national law

and the Helsinki Declaration of 1975 (in its current revised form)." Exhibit 3333, p. 7. He also

obtained informed consent from all patients included in the study. *Id.*

Dr. Varga's study describes injection of PMMA in "dough" form to address degeneration

of the lumbar disc in elderly patients. Two of the potential problems Dr. Varga identified are: 1)

extravasation while injecting the material; and 2) extrusion. Other potential complications that

Dr. Varga identified include "bleeding at the puncture site, bone infection or fracture, damage to

the nerve roots or cord . . . and passage of material into the venous system with embolization to

the pulmonary vasculature or compression of neural tissue." Exhibit EEEEE, p. 2. According to

Dr. Varga's report, when the procedure is properly performed, the PMMA material is injected

into the disc space in a doughy state at a particular trajectory, using a trocar of a certain diameter,

and does not contact the nerves. Further, "[p]rior to withdrawal of the needles, the material

should be allowed to fully cure to avoid dragging of cement into the soft tissues." *Id.* Dr. Varga

-6-

reports that "[t]he avoidance of cement leaks posteriorly into the spinal canal and laterally into the extraforaminal space is essential." Exhibit EEEEE, p. 2. When used in this manner, PMMA does not cause nerve burn. Dr. Varga recommends the procedure for "elderly patients . . . particularly if they represent high-risk patients for open surgery." Exhibit 265. There is no evidence that Drs. Schlicht and Bryant performed the PDA procedure in the manner Dr. Varga specified, and Drs. Schlicht and Bryant did not limit the procedure to use on elderly patients who were not candidates for traditional lumbar surgery.

All people experience degeneration of their spines as they age, but for the majority, the degeneration that occurs during the natural aging process does not cause chronic pain. It is difficult, if not impossible, in many instances, to specifically identify the cause of back pain. Many things can cause back pain. For example, arthritis, a degenerative disc, narrowing of the disc space, malalignment of the spine, such as scoliosis, and spinal stenosis can cause back pain. Psychological problems can also cause back pain. Nerve impingement also causes back pain. Irritation of the nerve root in the lumbar spine can case leg pain. Herniation of the disc, spinal stenosis, narrowing of the foramen, can impinge the nerves in the spine and cause pain. Most leg pain is related to a nerve compression from part of the spine that forms the sciatic nerve. Radicular pain, nerve pain radiating down a leg, often correlates to a disc problem. Chronic pain can cause a person to develop depression. The S1 nerve controls bowel and bladder function.

The expected success rate for an initial spinal fusion is quite good, though a moderately high percentage of all back surgeries fail. For multiple surgeries in the same level of the spine, the chance of success drops significantly with each successive surgery. In addition, surgeries performed on the lumbar spine generally lead to at least some secondary issues. It is rare for a patient to experience no residual symptoms after lumbar spine surgery.

*Spinal Cord Stimulators*

A spinal cord stimulator interrupts the transmission of pain experienced in the body to the brain. A spinal cord stimulator has a lead with an electrode on the end. The stimulator is attached to the outside of the dura between the tissues and the spinal canal, but not in the dura. The technology used in spinal cord stimulators has greatly improved since first developed in the 1970s, resulting in much greater efficacy. The newest form of spinal cord stimulators use a high frequency. Instead of a single contact electrode, today's spinal cord stimulators have sixteen contact electrodes, which can cover different areas of the spinal cord. In Dr. Rashbaum's opinion, Ms. Robbins, Ms. Rue, Ms. Smith, and Mr. Jackson would all benefit from a spinal cord stimulator, and their need for a spinal cord stimulator was necessitated by the PDA procedure. Sometimes a spinal cord stimulator provides enough pain relief that a patient can take less pain medication.

*Pain Pumps as an Alternative to Long-Term Narcotic Use to Alleviate Pain*

Long-term opioid use, as Michel Sucher, M.D., an addiction medicine specialist opined, is not effective, is risky, and is likely to produce substance abuse problems. In his opinion, opioids should only be used in acute cases, or post-surgery, in limited doses over short time periods. Lifetime use of tramadol, a narcotic pain reliever, can be risky because of increased risk of addiction and seizures.

Pain pumps can also be used to alleviate pain, though a pain pump cannot reduce a patient's pain level from 10 to 0 to eliminate all pain. Pain pumps use the same medication as oral narcotics but provide the medication through a different delivery system in smaller doses. A pain pump delivers micro-doses of a narcotic to an area outside the dura. A doctor programs the pump, so that patients cannot dose themselves beyond what the treating physician has programmed. A physician can adjust both the interval and amount of the doses. It is much more

-8-

unlikely for a patient to become dependent on the narcotics delivered by a pain pump because of the micro-dose amounts. Dr. Rashbaum reported an average pain reduction of 60% following the implementation of a pain pump. Eligibility for a permanent pain pump depends on a reported 50% reduction in pain. In Dr. Rashbaum's experience, 80% of the patient population who receive a trial pain pump meet the minimum 50% pain relief threshold to receive a permanent pain pump. Dr. Rashbaum has not encountered narcotic addiction attributable to patients' use of pain pumps. Use of a pain pump to deliver pain relief medication reduces the need for oral narcotic medication to relieve pain. In the opinion of both Dr. Rashbaum and Dr. Harvie, Ms. Robbins, Ms. Rue, Ms. Smith, and Mr. Jackson would benefit from a micro-dosing pain pump. In the opinion of Robert Zuniga, M.D., the pain pump is a patient's last option to deal with pain management. Dr. Sucher agrees. He opined that a pain pump should not be used unless it is absolutely necessary, and should be reserved for use in only the most extreme cases. Dr. Sucher does not believe any of the four plaintiffs need a pain pump.

*Life Care Plans*

A life care plan is a dynamic document, based on extensive data analysis and research. A life care plan provides information regarding a patient's current and future needs and associated costs relating to a person's injury. To create a life care plan, a life care planner takes a comprehensive review of the patient's medical records and interviews the patient. A physical exam of the patient is also performed. Based on this review, the life care planner creates a life care plan that assesses the patient's current and long-term needs, including physician follow up exams, diagnostic tests, pain intervention needs, medications, medical devices, home assistance needs, and any anticipated home modifications. Dr. Romagosa prepared life care plans for each of the Four UTC Members, and supplemented those plans to remove or adjust certain costs, or to add new procedures.

-9-

Dr. Romagosa did not use the Medicare cost of certain procedures; rather, he used the retail price. A life care plan designed to address care necessitated by negligent surgery should not include future care attributable to pre-existing conditions, but if a pre-existing condition is aggravated by an injury caused by the surgery, a life care plan may include costs attributable to the aggravation. In Dr. Romagosa's opinion, for the Four UTC Members, it is extremely difficult to differentiate the future care attributable to pre-existing conditions from the care attributable to the PDA procedure, or to place a percentage attributable to pre-existing conditions. If a symptom is no worse after the injury than it was before the injury, the life care plan should not include the cost of care for that symptom. In each of the life care plans for the Four UTC Members, Dr. Romagosa did not attempt to separate the costs attributable to the PDA procedure from those that would have happened in any event. He did not differentiate care necessitated by pre-existing conditions or normal aging from care necessitated as a result of the PDA procedure because he considered the PDA procedure a life-changing event and because of the difficulty in making the allocation.

Dr. Romagosa relied on data from El Paso for the cost estimates used in his life care plans. He did not compare costs by calling various providers where each plaintiff lives. For medications, Dr. Romagosa looked up costs at drugstore.com or Walgreens. Physicians are not paid the same amount for the same procedure from all patients. Dr. Romagosa gathered information regarding what physicians typically charge for a particular procedure, but did not ask what a physician actually accepts in payment for the service. In El Paso, the typical retail fee structure is 125% of Medicare costs. Not all of the medication costs included in Dr. Romagosa's life care plans use the cost of the generic brand, even if the generic medication is available.

-10-

In awarding damages for past and future medical expenses, for each of the Four UTC members the Court made downward adjustments to the amounts claimed. For example, the Court made adjustments for medical expenses not necessitated as a result of the PDA procedure. The Court excluded medical expenses already incurred from projected future medical expenses appearing on Dr. Romagosa's updated life care plans. In awarding damages for medical expenses, pain and suffering and loss of enjoyment of life resulting from the PDA procedures, the Court took into account that pain and suffering resulting from pre-existing conditions, comorbidities and aging is not compensable. The Four UTC members each claimed damages for mental anguish separately from damages for pain and suffering and loss of enjoyment of life. The Court included damages for mental anguish in its award of damages for pain and suffering.

The Court also adjusted future medical expenses and associated costs to present value. M. Brian McDonald, Ph.D., calculated the present value of the Four UTC Members' future medical costs and associated expenses based on Dr. Romagosa's life care plans. The Court finds Dr. McDonald's methodology, which is the only evidence before the Court regarding present value calculations, appropriate.

## II. Individual Plaintiffs

The following chart identifies the Four UTC Members and summarizes the history of their back surgeries and the PDA procedure at issue in the Four Adversary Proceedings:

|  | Date and levels of PDA Procedure | Birth Year | Previous Surgeries | Subsequent Surgeries | Total Surgeries |
|---|---|---|---|---|---|
| **Patricia Rue** | 02/25/08 L5 – S1 | 1953 | -Lumbar Discectomy, L5 - S1 (2001) -Fusion, L5 – S1 (2005) -Revision L5 – S1(2007) | None | 4 |
| **Ivan Jackson** | 11/2007 L2 – L3 | 1938 | -Fusion L3 – S1 (2005) -spinal leak (2005) | None | 3 |

-11-

| | | | | | |
|---|---|---|---|---|---|
| **Kelly Robbins** | 12/19/07 L3 – L4 & L5 – S1 | 1949 | None | -PMMA removal by Dr. Ray (2013) | 2 |
| **Desiree Smith** | 10/29/07 L5 – S1 | 1962 | None | -Surgery by Dr. Bryant to correct complications from 10/29/07 procedure (November 2007) -Removal of PMMA pieces and fusion by Dr. Bryant (2008) -laminectomy/removal of lumbar facets by Dr. Masel (2010) -decompression surgery by Dr. Misenhimer (2013) | 5 |

### A. *Patricia Rue and Gary Rue*

Ms. Rue lives in Glencoe, New Mexico, about eight miles outside of Ruidoso. She and her husband, Gary Rue, have been married for forty-five years and have two grown children. She is currently 64 years old. Ms. Rue worked for Ruidoso State Bank for eight years. She also worked part time at the Ruidoso Downs racetrack. Ms. Rue's father operated a fruit stand. Ms. Rue and her husband helped her father open another location. Later, when that location closed, Mr. and Mrs. Rue opened their own fruit stand in Glencoe. They have an orchard and raise their own fruit. They make homemade jellies and sell fruit, chile ristras, and other homemade crafts at the fruit stand. Working at the fruit stand included lifting items and bending over to stock fruit. Ms. Rue enjoyed doing arts and crafts and interacting with customers at the shop. For a time, the Rues' son and his children lived with them.

Ms. Rue's PDA procedure was not her first back surgery. She started experiencing back issues in 2000. Her leg also hurt. She saw a chiropractor, but that did not provide any relief. In 2001 she underwent a lumbar discectomy at L5 – S1 performed by Dr. Bryant. A discectomy involves removal of disc material. After the discectomy, Ms. Rue felt better for some time. Then,

-12-

in 2005, after her left leg started to hurt, she returned to Dr. Bryant. He recommended she undergo a spinal fusion. A spinal fusion involves fusing two vertebral bodies together. She had a fusion at L5 – S1 in 2005 with screws, but it was unsuccessful. The fusion did not heal properly. In January 2007, Ms. Rue had a revision fusion surgery at L5 – S1 due to the non-union. After the 2007 surgery, she was able to work at the fruit stand. However, over time, Ms. Rue's left leg progressively became weaker. She tried epidural injections, water therapy and a TENS unit. Ultimately, she returned to Dr. Bryant for a fourth back surgery.

In February of 2008, Dr. Bryant, assisted by Dr. Schlicht, performed Ms. Rue's PDA procedure.[5] The Operative/Procedure Report identifies the following procedures performed during the February 2008 surgery: 1) removal of non-segmental spinal instrumentation unilateral, left side L5 – S1; 2) endoscopic percutaneous discectomy unilateral, left side; 3) percutaneous facet fusion L5 – S1, right side; and 4) transforaminal epidural steroid injection, L5 root, left side. Exhibit 207-022. Ms. Rue had PMMA injected at L5 – S1. When she woke up from the PDA procedure, she was in excruciating pain. Within a few hours, she had no feeling in her legs and could not stand. She thought she was paralyzed.

After each lumbar spine surgery, scar tissue forms. Each surgery contributes to subsequent problems, including epidural fibrosis. Epidural fibrosis is the formation of scar tissue near the nerve root. Ms. Rue's magnetic resonance imaging ("MRI") from October of 2009 shows epidural fibrosis, scaring around nerves in the epidural space, including the area encasing the S1 nerve root. *See* Exhibit 201, p. 4. Because of her multiple surgeries, it is not possible to determine which surgery caused which part of the epidural fibrosis shown on her MRI. Ms. Rue also suffers from a problem in her thoracic spine (middle back). In 2014, she started receiving

---

[5] The Operative/Procedure Report identifies the PDA procedure as "Percutaneous interpositional disk arthroplasty L5-S1." Exhibit 207-022.

injections for her thoracic pain. *See* Exhibit 201, p. 227. Her records also reflect trouble with her cervical spine (neck). She received trigger point injections in her cervical spine in 2017. Problems with the thoracic spine can relate to problems in the cervical spine but typically do not relate to problems with the lumbar spine. Cervical spine problems are unrelated to lumbar spine problems.

Since the 2008 PDA procedure, Ms. Rue cannot do all of the work she used to be able to do at the fruit stand before the PDA procedure. It is now too difficult for her to carry out the product and stock the shelves at the fruit stand; those tasks require lifting and bending that she can no longer do. She uses a walker on and off. Before the PDA procedure, she was involved in her church and served as a confirmation teacher. After her PDA procedure, she could no longer serve as a lector at her church, serve communion, or kneel down. She suffers from intermittent bladder incontinence that started shortly after the PDA procedure.

Before the PDA procedure, Ms. Rue was able to enjoy intimacy with her husband, but now, it is too painful. She used to vacuum every day; however, since the PDA procedure her husband has to do that chore. She is able to drive, but only for short distances. She did not suffer from depression before the PDA procedure, but now she takes medication for depression. She uses a walker, which she did not need before the PDA procedure. Four years ago she bought an adjustable bed, which has helped. But she usually retires to her bedroom by six o'clock each day. She and her husband do not share a bedroom because she is too uncomfortable. She uses pillows on her back, knees, and side in an effort to alleviate the pain. Sometimes she wakes up in pain and has to take more pain medication. Since the PDA procedure in 2008, Ms. Rue's left leg pain is worse than ever, and she has uncontrolled spasms that occur without warning.

-14-

In 2013, Dr. Zuniga implanted a spinal cord stimulator in Ms. Rue. Her trial results showed an 80% improvement in pain. The spinal cord stimulator continues to provide her with pain relief, but she still experiences pain. The spinal cord stimulator has enabled Ms. Rue to reduce her intake of other pain medication. She would consider a pain pump if Dr. Zuniga felt it would help. Anti-depressants have also been effective. She has received trigger point injections to help with the pain. Michael Palacio, a nurse practitioner, also treated Ms. Rue. Neither Dr. Zuniga nor Michael Palacio felt that Ms. Rue exaggerated or magnified her reported symptoms.

Recently, Ms. Rue made some modifications to her bathroom. Mr. and Mrs. Rue also rebuilt the building where the fruit stand is located, so that there is a "living" quarters off the customer area. The Rues made this addition so Ms. Rue would not feel so isolated alone in the house. She can still interact with customers, but she can no longer make chile ristras or other crafts that she used to enjoy making before the PDA procedure. She has started quilting instead. She uses a walker to get from the house to the fruit stand.

Ms. Rue's husband, Gary, now runs the fruit stand. Ms. Rue misses her day-to-day work at the fruit stand and her former level of interaction with the customers, some of whom she has known for thirty-five years. Mr. Rue reports that Ms. Rue does not enjoy life except when her grandchildren are around her. He has suffered the loss of Ms. Rue's companionship and guidance. He cares for her all of the time. They do not share a bedroom any longer, but he checks on her during the night. They used to like to go to the casino and the horse races, but stopped going about five or six years ago.

Ms. Rue's multiple back surgeries at the same level indicate that she suffers from "failed back syndrome." Failed back syndrome occurs when one or more lumbar spine procedures fail to effectively resolve the pain. Revision surgeries generally have a lower success rate. Any one of

-15-

Ms. Rue's four surgeries could have left her with chronic pain and spasms. Ms. Rue has undergone physical therapy, trigger injections, and epidural injections in an effort to alleviate her pain, without much relief. Ms. Rue has epidural fibrosis, or scar tissue around the root nerve, which could have resulted from a prior surgery. However, no notation of epidural fibrosis was made in Ms. Rue's medical records until after the PDA procedure.

In Dr. Harvie's opinion, Ms. Rue's PDA procedure "resulted in permanent nerve injury, secondary to the use of PMMA" and that the "heat from the PMMA curing process burned the nerves." *See* Exhibit 239. Dr. Harvie also believes that the nerves "may have been burned while the cement was setting, or the nerves were stretched when they were putting in the cement, or the objects that appear in the spinal canal." Exhibit 233. Dr. Harvie concluded further, to a degree of medical probability, that "Ms. Rue's loss of bladder control, secondary to permanent nerve damages and problems with ambulation . . . are causally related to the insertion of PMMA." Exhibit 239. Had Ms. Rue received an anterior interbody fusion, instead of the PDA procedure, Dr. Harvie believes, to a degree of medical certainty, that Ms. Rule "would not need interventions for the treatment of chronic pain and urinary incontinence, secondary to the damaged done to her nerve root." *Id.* The Court finds that Ms. Rue's PDA procedure aggravated her pre-existing condition at L5 – S1, and caused her harm.

*Ms. Rue's Past Medical Expenses*

Ms. Rue claims past medical expenses in the total amount of $237,774.41. *See* Exhibit 215. In Dr. Harvie's opinion, all of these expenses are attributable to the PDA procedure and Ms. Rue's need for subsequent care. Ms. Rue had the PDA procedure on February 25, 2008. Based on the timing of the claimed expenses, the following expenses were incurred in connection with the PDA procedure itself: $19,177.32 charged by Gerald Champion Regional Medical Center; $13,021.00 charged by Presbyterian Healthcare for imaging; $8,169.00 charged by Southwest

-16-

Orthopaedics. *Id.* Additional medical expenses incurred in October of 2008 total $9,546.00. *Id.* Ms. Rue incurred physical therapy medical expenses from October 2008 through February 2017 in the amount of $6,178.00. *Id.* Other claimed expenses in the amount of $181,683.09, including care provided by Dr. Zuniga and Michael Palacio, N.P., were incurred in 2009 or later. *Id.* Based on the evidence, the Court finds that $150,000.00 of Ms. Rue's past medical expenses are attributable to the PDA procedure.

*Ms. Rue's Anticipated Future Medical Expenses*

Ms. Rue claims anticipated future medical and related expenses in the amount of $419,618.00 adjusted to 2017 present value. *See* Exhibit 278.[6] Based on Ms. Rue's current age, her life expectancy is twenty-three years. *Id.* Dr. Romagosa's life care plan estimated future medical care and related expenses for Ms. Rue for the following items: 1) doctor's appointments with a primary care provider, orthopedic spine surgeon, physiatrist, psychiatrist and urologist; 2) medications, including pain medication, anti-depressant medication, anti-anxiety medication, and epidural steroid injections; 3) tests, including MRI, urodynamic study, and ultrasound; 4) home modifications, including bathroom modification with a handicap height toilet, walk-in in shower, and hand held showerhead; 5) ambulation assistance, including a walker, powered scooter, lift for the scooter and scooter maintenance; 6) physical therapy sessions; and 7) professional maid/caregiver service three times per week. *See* Exhibit 244. In addition, Dr. Romagosa included estimated costs of $93,818 for a dorsal column stimulator, also known as a spinal cord stimulator, and $85,436 for a pain pump. *See* Exhibit 249.

Based on the expert testimony of Dr. McDonald and Dr. Romagosa, and taking into account the surrounding facts and circumstances, the Court finds that Ms. Rue's future medical

---

[6] Economic consultant, M. Brian McDonald, who holds a Ph.D. in economics from the University of Pennsylvania, calculated the present value of the plaintiffs' future medical expenses. *See* Exhibit 270

expenses and other associated costs attributable to the PDA procedure is $190,000.00, adjusted to present value.

*Ms. Rue's pain and suffering and loss of enjoyment of life*

Ms. Rue is currently 64 years old. She endured significant pain and suffering, and loss of enjoyment of engaging in activities and enjoying life as a result of the PDA procedure. She and her husband no longer share a bedroom; she is no longer able to have intimacy with her husband. She can no longer participate in the business at the fruit stand in the manner she previously enjoyed. The Court finds that Ms. Rue suffered damages of $1,000,000.00 for pain and suffering and $1,000,000.00 for loss of enjoyment of life.

*Mr. Rue's loss of consortium*

Because of Ms. Rue's condition following the PDA procedure, Mr. Rue has lost the level of companionship and ability to have intimate relations with Ms. Rue that he previously enjoyed. Mr. Rue suffered damages of $125,000.00 for loss of consortium.

*B. Ivan Jackson*

Ivan Jackson is now 80 years old. He is a 6'5" former high school basketball player inducted into the sports hall of fame in his hometown, Springfield, Illinois. Mr. Jackson spent twenty years in active duty military service. After he retired from the military, he worked as the night manager for the Non-Commissioned Officers' Club at Holloman Air Force Base. He later returned to Springfield, Illinois where he worked for the recreation department, ran a community center for the Department of Urban Development, and worked for Lincoln's challenge, recruiting kids to join the Air Force, earn their G.E.D. and go to junior college. Eventually, he returned to New Mexico and became a substitute teacher in Alamogordo. He also worked for the Boys and Girls Club, coordinating field trips and camping trips to the mountains. He helped the coaches at basketball camps, and coached junior high and high school basketball players.

-18-

In 2004, while working as a substitute teacher in Alamogordo, New Mexico, Mr. Jackson started experiencing lower back pain. He also had sciatic pain. He saw Dr. Frank Bryant. Cortisone shots did not work. On March 24, 2005, Dr. Bryant performed a fusion surgery spanning three levels on Mr. Jackson, L3 – S1. During the surgery, Dr. Bryant nicked the dura, which required an additional procedure two weeks later to drain the fluids due to a cerebrospinal fluid leak and hemorrhage. The pressure resulting from the leak and hemorrhage was significant. After the surgery, Mr. Jackson could not walk very far. He experienced both bowel and bladder incontinence following the March 2005 surgery, but by August of 2005, he regained control of both. He was able to return to the gym to coach the kids. After recovering from the 2005 surgeries, he had minimal back pain.

However, by 2007, Mr. Jackson's back pain returned, and was worse than before. He was unable to walk more than two blocks without pain. Dr. Bryant determined that Mr. Jackson had "developed adjacent segment disease in the form of the severe central canal stenosis at L2 –L3 with accompanying severe facet arthropathy and degenerative disk disease at that level." Exhibit EEEEE, p. 104. He saw Dr. Schlicht, who told Mr. Jackson that he could put some spacers in to fix Mr. Jackson's back. Mr. Jackson agreed to the procedure. Dr. Bryant, assisted by Dr. Schlicht, performed the PDA procedure[7] at L2 – L3 on Mr. Jackson on November 28, 2007. *Id.* As part of the November 2007 surgery, Dr. Bryant also removed segmental hardware L3 through S1, and performed L2 - L3 laminectomy decompression and L2 - L3 bilateral facet fusion. *See* Exhibit EEEEE, p. 104. Because of his previous experience with Dr. Bryant, Mr. Jackson was very displeased to learn that Dr. Bryant was one of the doctors who performed the November 2007 surgery.

---

[7] Described in the Operative/Procedure Report as "Disk Arthroplasty Fusion L2,3." Exhibit EEEEE, p. 106.

In November of 2013, Mr. Jackson had a heart attack. He was taken to a hospital in El Paso by air. He spent two days in the hospital. He currently has signs of chronic obstructive pulmonary disease ("COPD"), but he is not on oxygen.

Dr. Sandra Grummert was Mr. Jackson's primary care physician in Alamogordo from 2009 to 2013. In 2010, Dr. Grummert diagnosed Mr. Jackson as having COPD and back pain with radiculopathy, gout, and "gouty arthritis." At that time, Mr. Jackson could not stand very long or very straight. In successive visits, Mr. Jackson continued to complain of back pain and knee trouble. His back condition affected his ability to be active. In Dr. Grummert's opinion, Mr. Jackson suffers from "failed back syndrome." By 2013, Dr. Grummert diagnosed Mr. Jackson with congestive heart failure.

As of the trial, Mr. Jackson lived in a Veterans' Administration home in Yountville, California. He anticipates moving to another Veterans' Administration home in Illinois in the near future to live closer to one of his daughters. It is difficult for him to travel. If he stands for more than two minutes, his back starts to ache. He uses a walker.[8] The dining hall where he currently resides is four blocks away. It is too far for him to walk to, though one time he walked to the dining hall using his walker, stopping to rest along the way. He needs assistance to cook, because he cannot stand to cook. He needs assistance with laundry, and he needs someone to drive him because he cannot drive on his own. He does not take pain medication because he does not want to become a "pain addict." He has not sought treatment for his back pain since 2007. Nevertheless, he reports that his overall condition is progressively worse since 2005 and 2007. After the 2007 PDA procedure, Mr. Jackson could no longer play golf, could not coach the kids in basketball, and could not teach because he could not stand up in front of the class.

---

[8] Mr. Jackson gave conflicting testimony regarding whether he got the walker because of his heart attack, or due to his back pain.

Since the PDA procedure, Mr. Jackson has experienced worsening radicular back pain traveling to his legs. He experiences sharp pains from his thigh down to his calf; other times he experiences a sharp pain from his knee to his ankle. His toes are sometimes a little numb, or feel like they are curling under, but Mr. Jackson has not seen a podiatrist. He had some bladder and bowel trouble following his surgery in 2005, but since regained control. Currently, he experiences "urgency" of urination, and must rush to make it to the restroom, but does not suffer from bowel incontinence.

Mr. Jackson reports that he sometimes feels sorry for himself. He does not drink alcohol or use tobacco, though he used tobacco in the past. He is not currently obese. He is not in constant pain. In 2014 or 2015, Mr. Jackson had a cortisone shot that provided relief. He catches the bus at the VA home and is able to go to the gym to do some exercises.

Dr. Harvie performed a review of Mr. Jackson's medical records and interviewed Mr. Jackson by telephone. Mr. Jackson experienced some bladder issues before the PDA procedure. Dr. Harvie agrees that the more time that elapses between a surgical procedure and bladder incontinence, the less likely that bladder incontinence is attributable to the procedure. There is insufficient evidence to connect the PDA procedure to Mr. Jackson's current bladder issues.

Dr. Harvie believes that Mr. Jackson should not have had any surgery on the L2 – L3 level. In Dr. Harvie's opinion, Mr. Jackson's PDA procedure "resulted in permanent nerve injury, secondary to the use of PMMA" and that "the heat from the PMMA curing process burned the nerves." *See* Exhibit 237. Dr. Harvie concludes to a degree of medical probability that the back procedures Dr. Bryant and Dr. Schlicht performed "indicated poor medical judgment." In Dr. Harvie's opinion "Mr. Jackson's numbness and loss of sensation in his legs is causally

related to the insertion of PMMA." *Id.* The Court finds that Mr. Jackson's PDA procedure aggravated his pre-existing condition and caused him harm.

*Mr. Jackson's Past Medical Expenses*

Mr. Jackson claims past medical expenses in the total amount of $36,146.43. *See* Exhibit 219. Of this amount, $31,257.66 was billed for the PDA procedure itself. *Id.* Mr. Jackson also claims medical expenses for care that Dr. Bryant provided on November 29, 2007 in the amount of $45.54, and for physical therapy treatments following the PDA procedure totaling $1,108.29. *Id.* Finally, Mr. Jackson claims $3,734.94 for care provided by his primary care physician, Dr. Sandra Grummert, from September 14, 2009 through October 14, 2016. *Id.* Based on the evidence presented, the Court finds that past medical expenses in the amount of $32,500.00 are attributable to the PDA procedure.

*Mr. Jackson's Anticipated Future Medical Expenses*

Mr. Jackson claims anticipated future medical and related expenses in the amount of $218,112.00 adjusted to 2017 present value. *See* Exhibit 276. Based on Mr. Jackson's current age, his life expectancy is six years. Dr. Romagosa, a certified life care planner, budgeted the following anticipated future expenses for Mr. Jackson over the remainder of his expected lifetime: 1) doctor's appointments with a primary care provider, orthopedic spine surgeon, physiatrist, psychiatrist, and urologist; 2) medications, including pain medication and anti-depressant medication; 3) tests, including x-rays, MRI, and ultrasound; physical therapy sessions; 4) home modifications, including installation of non-slip grab bars in the bathroom and replacement of a bathtub with a walk-in shower and hand-held shower head; ambulation assistance, including a cane, walker, motorized scooter, lift for the scooter, and annual scooter maintenance; and 5) professional maid/caregiver service three times per week. *See* Exhibit Nos.

243 and 247. In addition, Dr. Romagosa budgeted anticipated expenses for Mr. Jackson for a dorsal column stimulator and a pain pump together totaling $91,627. Exhibit 247.

Based on the expert testimony of Dr. McDonald and Dr. Romagosa, and taking into account the surrounding facts and circumstances, the Court finds that Mr. Jackson's future medical expenses and other associated costs attributable to the PDA procedure is $65,000.00, adjusted to present value. Mr. Jackson does not want to take opiates for the pain. He does not currently take any pain medication. He uses a walker. He plans to move to the VA home in Illinois to be closer to his daughter. If he resides in the VA home, home modifications will not be necessary.

### Mr. Jackson's pain and suffering and loss of enjoyment of life

The PDA procedure caused Mr. Jackson pain and suffering and loss of enjoyment of life. He can no longer teach the children to play basketball. He has limited mobility and can only stand for a short period. The Court finds that Mr. Jackson suffered damages of $500,000.00 for pain and suffering and $750,000.00 for loss of enjoyment of life.

### C. Kelly Robbins and Herbert Robbins

Ms. Robbins has lived in Ruidoso, New Mexico since 2004. She was born in Roswell, New Mexico, and has been married to her husband, Herbert Robbins, for forty-four years. She has three children and eight grandchildren. Mr. Robbins is an Episcopal minister in Artesia, New Mexico.

Ms. Robbins received a bachelor's degree in social work from New Mexico State University ("NMSU"), and completed her master's degree in social work at NMSU in 2002. She became a licensed clinical social worker in 2004. Over the years, Ms. Robbins worked for the department of vocational rehabilitation and the department of corrections adult probation parole, where she was promoted to supervisor, and worked for the department of human services. Her

-23-

job as supervisor for adult probation parole required her to commute to Roswell and to Carlsbad from Ruidoso five days a week. For a short period of time, she moved to Santa Fe with her husband to run the Episcopal Church camp. She retired from her job with the State of New Mexico in 2009. She later took a job at Lincoln County Medical Center as an outpatient therapist and group therapy counselor. She later worked with a foster program in Ruidoso as a part-time clinician until 2013. Ms. Robbins enjoyed her work very much and got a lot of satisfaction from it.

Ms. Robbins first started experiencing lower back pain sometime around the year 2000. She pulled something in her back when she was doing laundry. She had chronic recurrent back pain due to osteoarthritis, a degenerative condition. During the time she commuted to work in 2005 – 2006, Ms. Robbins' back pain worsened. Her doctor, Dr. Moreno, prescribed a Transcutaneous Electrical Nerve Stimulation unit (also known as a TENS unit) to help with the pain, which she used frequently. Despite her chronic back pain, Ms. Robbins could perform household chores, shop for groceries, manage her home, participate in recreational activities, and exercise regularly.

Her brother, a physician who was Chief of Staff at Lincoln County Medical Center, suggested she see Dr. Schlicht about her back pain. He had heard about a presentation Dr. Schlicht had given and referred her to him. Dr. Schlicht talked to Ms. Robbins about an outpatient procedure that could help her with her back pain. A History and Physical Report dated December 19, 2007 reports that Ms. Robbins "was given the treatment option of a percutaneous restoration arthroplasty with percutaneous facet fusion," and that the use of PMMA in the disc space was given to her along with a handout explaining the technical aspects of the procedure. *See* Exhibit 220, p. 36.

Dr. Bryant, assisted by Dr. Schlicht, performed the PDA procedure[9] on Ms. Robbins on December 19, 2007. *See* Exhibit 297 – Operative/Procedure Report reflecting Dr. Bryant as the surgeon and Dr. Schlicht as the assistant. During the December 2007 surgery, Dr. Bryant and Dr. Schlicht also performed the following procedures: 1) L3 – 4 bilateral facet fusion; 2) L5 – S1 bilateral facet fusion; 3) L3 – 4 bilateral discectomy; 4) L5 – S1 bilateral discectomy. Ms. Robbins had PMMA injected at two levels of her lumbar spine, L3 – L4 and L5 – S1. *Id.* She had no other back surgery prior to the PDA procedure.

Immediately following the PDA procedure, Ms. Robbins experienced severe lower back pain. About a month later, the pain lessened but was still present and significant. At the time, both Ms. Robbins and Dr. Schlicht felt that the PDA procedure had been a success. Six months later, however, Ms. Robbins could hardly walk. Dr. Bryant examined her, took an x-ray, determined that nothing had moved, and sent her on her way.

From 2008 to 2012, Ms. Robbins lived with her back pain. She also had neck pain during that time. She saw Dr. Masel for cervical arthritis pain. She also went to Dr. Simmons for cervical degenerative disc disease. She tried exercising, doing water aerobics and yoga. She upgraded a TENS unit and used it frequently because she felt it helped alleviate her back pain. Nevertheless, Ms. Robbins continued to experience lumbar pain. She had limited endurance, struggled with household chores, and had less tolerance for activities and regular exercise.

Ms. Robbins' lower back pain gradually worsened. The pain radiated to her left foot, left knee, and right thigh. Because Ms. Robbins continued to experience lower back pain, her brother ordered an MRI in 2011. The MRI showed disk degeneration with a prominent protrusion at the L3-L4 level with some stenosis. A CT scan from September of 2011 showed multilevel disc

---

[9] The PDA procedure is described in the Operative/Procedure Report as "Disk arthroplasty fusion" and "Disc arthroplasty fusion L5 –S1." *See* Exhibit 297.

degeneration. Neither the CT scan nor the MRI showed an evidence of posterior extravasation of PMMA at L3 – L4, or L5 – S1 levels of Ms. Robbins' spine.

During the Christmas season in 2012, Ms. Robbins and her husband took a trip to Bella Vista, Arkansas to spend Christmas with Ms. Robbins' middle son and family. At the time, she was using walking sticks; she considered herself too vain to use a cane. When they arrived in Arkansas, Ms. Robbins could not get out of the car. Her legs kept giving out. She fell twice. Her pain level was 8 or 9 out of 10. It was the worst pain Ms. Robbins had experienced since immediately after the PDA procedure. After she returned to New Mexico, Ms. Robbins read an article in the paper about Dr. Schlicht, and learned that he was not a qualified neurosurgeon.

Ms. Robbins began seeing Dr. Ray in December of 2012. The images of Ms. Robbins' back taken at that time showed an intact "glob" of PMMA. The images did not show evidence of nerve impingement or extravasation from the PMMA. Nevertheless, Dr. Ray concluded that the PMMA in her spine likely contributed to Ms. Robbins' back pain. On January 31, 2013, Dr. Ray removed most, but not all, of the PMMA from Ms. Robbins' spine. He also performed an anterior interbody fusion with interbody cage placement at L3 – L4 and L2 – L3, and plate and screw instrumentation at L5-S1. The surgery took 8 hours.

Since the 2013 surgery, Ms. Robbins' lower back pain improved significantly. She experienced a 75% improvement after Dr. Ray's surgery. Even so, she continues to have pain, and takes oxycodone to alleviate the pain. She also has neck pain, which is unrelated to the PDA procedure. She is not currently exercising, but she has tried exercising using a recumbent bicycle, treadmill, and yoga. It is difficult for her to get in and out of a car. She continues to have lower back pain. She plans to explore the possibility of a pain pump or spinal cord stimulator.

In the early 2000s, Ms. Robbins was diagnosed with a chronic form of depression. She received counseling and medication to treat her condition. She has had counseling on and off over the years, but is not currently going to counseling because she would need to travel to Roswell or Alamogordo to receive treatment. Mr. Robbins characterizes her depression as a baseline feeling of misery.

Ms. Robbins has recently modified her home to include a low threshold shower, a shower bench, and hand held shower. She also added a bidet to the bathroom. She also has a housekeeper to assist with household cleaning. She has tried acupuncture and medical marijuana to help alleviate her back pain.

Ms. Robbins is currently 67 years old, with an actuarial life expectancy of 16 years. In retirement she hoped to sew, knit, and garden. She is presently unable to sew. In the past she played the organ and the piano and played the organ for the church. She continues to go to church and volunteer there. But she is no longer able to do all of the activities she used to do. She no longer hikes.

In Dr. Harvie's opinion, Ms. Robbins should have been treated with weight loss, an exercise program, and anti-inflammatory drugs when she first presented with lower back pain, and that, if she had been treated in that manner, she would not have needed any surgery in her lower back. *See* Exhibit 238. Dr. Harvie concluded that the PDA procedure "resulted in permanent nerve injury, secondary to the use of PMMA" and that "the heat from the PMMA curing process burned the L5 nerves." In his opinion, to a reasonable degree of medical certainty, Ms. Robbins' "sensory loss and incontinence is causally related to the insertion of PMMA." *Id.* The Court finds that Ms. Robbins's PDA procedure aggravated her pre-existing condition and caused her harm.

Herbert Robbins has been a minister for forty years. A large part of his ministry is counseling. Ms. Robbins cared for him while he had cancer. He feels his wife has a very high tolerance for pain, and appreciates that she cared for him during the midst of her own pain. Watching her suffer through this process is an ordeal for him.

### Ms. Robbins' Past Medical Expenses

Ms. Robbins claims past medical expenses in the total amount of $250,295.49. *See* Exhibit 230. Of this amount, $41,773.93 was incurred for the PDA procedure itself, plus immediate follow up. *Id.* Medical expenses for the surgery performed by Dr. Ray in 2013 to remove the PMMA material and perform procedures on several levels of her lumbar spine total $149,183.50. *Id.* Between December 11, 2012 and October 28, 2016, Ms. Robbins incurred an additional $26,793.00 for medical services provided by Dr. Ray. *Id.* The remainder of the claimed medical expenses in the amount of $32,545.06 were incurred after the PDA procedure, and include imaging and x-ray expenses, physical therapy expenses, and doctor visits. Based on the evidence, the Court finds that $246,000.00 of Ms. Robbins's past medical expenses are attributable to the PDA procedure.

### Ms. Robbins' Anticipated Future Medical Expenses

Ms. Robbins claims anticipated future medical and related expenses in the amount of $276,494.00 after adjustment to 2017 present value. *See* Exhibit 277. Ms. Robbins' current life expectancy is sixteen years. Dr. Romagosa budgeted the following anticipated future medical expenses and other associated costs for Ms. Robbins over the remainder of her expected lifetime: 1) doctor's appointments with a primary care provider, orthopedic spine surgeon, physiatrist, and psychiatrist; 2) medications, including pain medication, muscle relaxants, and anti-depressant medication; 3) tests, including x-rays and an MRI; 4) epidural steroid injections; 5) home modifications, including installation of non-slip grab bars, installation of a handicap-height toilet

-28-

and pedestal sink, hand-held shower head and shower chair; 6) ambulation assistance, consisting of a motorized scooter, scooter lift, scooter maintenance, a cane, a walker, and a wheelchair; 7) rehabilitation, including physical therapy sessions and a gym membership; and 8) professional maid/caregiver service three times per week. *See* Exhibits 246 and 248. In addition, Dr. Romagosa budgeted anticipated future expenses for a dorsal column stimulator with an associated cost of $93,809.00, including trial and installation, re-implantation of a new device in nine years, and follow up visits with a pain management specialist. *Id.*

Based on the expert testimony of Dr. McDonald and Dr. Romagosa, and taking into account the surrounding facts and circumstances, the Court finds that Ms. Robbins' future medical expenses and other associated costs attributable to the PDA procedure is $215,000.00, adjusted to present value. Ms. Robbins has a history of past depression, which would likely have persisted even without the PDA procedure.

### Ms. Robbins' pain and suffering and loss of enjoyment of life

The PDA Procedure caused Ms. Robbins pain and suffering. She was greatly distressed to learn by reading the paper that Dr. Schlicht, who performed her PDA procedure, was not a surgeon. The PDA procedure also contributed to Ms. Robbins' loss of enjoyment of life. The Court finds that Ms. Robbins suffered damages of $1,300,000.00 for pain and suffering and $1,000,000.00 for loss of enjoyment of life.

### D. Desiree Smith and Henry Smith

Ms. Smith is 55 years old and currently lives in Roswell, New Mexico. She is a partial paraplegic. For many years, Ms. Smith operated a travel center in Alamosa, with a restaurant, gas station, convenience store, and bar. She worked 16-18 hours a day, seven days a week. She began having back pain in 2006. Despite her back pain, Ms. Smith was not experiencing leg pain; did not have bowel or bladder incontinence; continued to work long hours; and could walk

-29-

normally, manage her home, drive her car, and take care of herself without assistance. She tolerated her back pain well enough to engage in her hobbies and have normal intimacy with her husband.

Eventually, though, Ms. Smith's primary care physician referred her to Dr. Bryant for her back pain. He diagnosed her with a herniated disc, and stated that the only way to fix it was through surgery. Ms. Smith had a PDA procedure[10] on October 29, 2007. She was 45 years old at the time. The Operative/Procedure identifies Dr. Schlicht as the surgeon. *See* Operative/Procedure Report, Exhibit 19-36.[11] During the October 29, 2007 procedure, Ms. Smith also had a left hemilaminectomy, left discectomy, facet fusion bilaterally L5 – S1, and repair of incidental durotomy. *Id.*

The PDA procedure was the first back surgery Ms. Smith underwent. She remembers that the doctors told her it was a new procedure that would cut down on recovery time, but gave conflicting testimony regarding whether she was told that PMMA would be injected into her back. When she woke from the surgery, she experienced horrible pain. She could not move her legs. She had swelling and was numb from the waist down. Before the PDA procedure she had not experienced any problems with her legs. After the PDA procedure, some feeling came back to her legs, but she had trouble with her left leg and would have to drag her pant leg to pull her leg into position. No feeling has ever returned to her calves.

During the PDA procedure, PMMA was injected into the L5 – S1 disc space. *See* Exhibit 190, p. 36. Ms. Smith's x-ray showed five separate pieces of PMMA. *See* Exhibit 323. The

---

[10] The Operative/Procedure report describes the PDA procedure as "Disk arthroplasty fusion." Exhibit 190, p. 38.
[11] Another copy of the Operative/Procedure Report from Ms. Smith's October 2007 procedure, printed on February 19, 2011, identifies Dr. Bryant as the surgeon, with Dr. Schlicht as the assistant. *See* Exhibit CCCCCC.

PMMA extravasated into the spinal canal.[12] The extravasation of PMMA, requiring extraction, traumatized the descending S1 nerve root. Exhibit 190, p. 129. Ms. Smith's images also show evidence of extrusion of PMMA.

Two weeks after the PDA procedure, Dr. Bryant informed Ms. Smith that she had a post-operative infection, complicated by a spinal fluid leak, and that further surgery was necessary. She agreed to undergo the second surgery in mid-November 2007. After the second surgery, her legs were still numb and she was in a lot of pain. She experienced persistent sciatica pain. It was difficult for Ms. Smith to walk because she could not bend her left leg. She also had bowel and bladder incontinence due to cauda equine syndrome caused by the PDA procedure.

By 2008 Ms. Smith remained in a lot of pain, which Dr. Bryant linked to extruded PMMA. She was experiencing persistent left-sided sciatica pain. Dr. Bryant attributed Ms. Smith's lower back pain to pieces of the PMMA that needed to be removed. Dr. Bryant performed a third surgery in 2008 to remove a protruding piece of PMMA and to put in a plate and screws. After the third surgery, Ms. Smith experienced no change; her left leg remained weak. She tried a cane and crutches. She continued to experience bladder and bowel incontinence. She tried steroid injections, but those were ineffective.

In 2009, Ms. Smith presented to Dr. Misenhimer with severe pain in her left lower extremity, weakness, and a foot drop. *See* Exhibit 324. Dr. Misenhimer believed this was likely caused by an injury to the L – 5 nerve. In 2010, Ms. Smith saw Dr. Masel, who noted that Ms. Smith was experiencing left lower extremity radiculopathy and numbness. A CT scan taken at this time shows that PMMA remained in the neural foramina on both sides of Ms. Smith's spine.

---

[12] The Operative/Procedure report states that "[t]here was no extravasation noted of the material either through the annulus or through the end plate . . ." Exhibit 190, p. 38. This assessment is incorrect. *See* Discharge Summary, dated October 31, 2007 - Exhibit 190, p. 29 (reporting extravasation of cement during surgery).

*See* Exhibit 191, p. 10. Dr. Masel performed an L5 – S1 laminectomy with removal of lumbar facets in 2010.

Prior to the PDA procedure, Ms. Smith did not have any leg issues, but did have some foot issues. After the PDA procedure, Ms. Smith has fallen several times. She fell outside Wendy's; she missed the curb. She fell in the backyard and broke her foot. She fell when trying to maneuver through sliding glass door. In addition, Ms. Smith was in a car accident in January 2013. She injured her hand in the wreck.

In March of 2013, Ms. Smith woke during the middle of the night and could not move her legs at all. This was a very dramatic change. Dr. Misenhimer performed a decompression laminectomy surgery in April of 2013. Dr. Misenhimer did not look for PMMA during the surgery. She remained in the hospital for three or four days. After 7 or 8 weeks of rehabilitation to try to get feeling back in her legs, she was unable to walk. She has been in a wheelchair since then.

Ms. Smith had four other back surgeries after the PDA procedure. Dr. Masel operated on Ms. Smith in 2010. She later developed a problem with the level above the site of the PDA procedure. Dr. Harvie attributes Ms. Smith's bowel and bladder problems to the PMMA. In his opinion, $494,000 in medical treatment, including physical therapy, home care, and rehabilitation, is necessary to address the problems arising from the PDA procedure. Dr. Harvie opined that all of Ms. Smith's subsequent back problems are related to the PMMA, which caused inflammation of the disc and the development of adjunctive level disc disease and stenosis. The PMMA was "a" factor in Ms. Smith's development of spinal stenosis, though PMMA is not the only factor.

-32-

Before her 2007 PDA procedure, Ms. Smith liked to bowl, camp, fish, hike and horseback ride. She can no longer do those things. She also testified that her condition following the PDA procedure put a big strain on everyone, including her husband. She was unable to be intimate with him.

Ms. Smith is now a partial paraplegic. She must use a wheel chair. Her paralysis is likely the result of her multiple lumbar surgeries. There is no indication that Ms. Smith has "doctor shopped" to obtain more pain medication than should be prescribed. Ms. Smith's husband of thirty-four years passed away in August of 2014. When he died, Ms. Smith moved to Roswell to be closer to her daughter and grandchildren. She is unable to live alone, and needs help all the time. Ms. Smith cannot drive. She receives daily assistance to help cook, bathe, dress, and go to doctor's appointments. Ms. Smith has a home health aide who provides 28 hours of care per week. Her daughter also provides assistance. She does not smoke or drink.

Since her back surgeries, Ms. Smith has had to use pain medication to control the pain, though she has tried to reduce the amount of pain medication she takes to manage her pain. She has attempted to try different modalities, such as muscle relaxers or anti-inflammatory medications instead of narcotics, which provide some relief, but she has never been able to completely stop taking narcotic pain medication. Her blood pressure increases due to the pain, so that when she runs out of narcotic pain medication, her blood pressure rises. She also suffers from gastric ulcers. Over the years. Ms. Smith has reported varied pain levels ranging from 0/10 to 7/10.

Dr. Harvie recommended a spinal cord stimulator for Ms. Smith. If the spinal cord stimulator relieved the pain, Dr. Harvie would not also add a pain pump. But if the spinal cord stimulator did not effectively address Ms. Smith's pain, he would recommend also adding a pain

-33-

pump. Right now Ms. Smith takes pain medication that manages 80% of her pain. Without the pain medication, her pain level is 9/10. Shortly before trial, Ms. Smith got a pain pump. With the pain pump, Ms. Smith has noticed a big difference and reports that it has reduced her back pain significantly.

Ms. Smith has not worked since the PDA procedure in 2007. Currently, she lives on her own in an apartment on the first floor. She cannot stand in the shower and must use a shower chair. The bathroom door has been made wider. She installed bars around the toilet and bathtub. She can no longer take baths. She has gained a lot of weight, has high blood pressure, and suffers from depression. She has also been diagnosed with congestive heart failure. She no longer gets out of the house very often, except to go to doctor appointments. Her grandchildren come to see her. She currently receives Medicare assistance.

Dr. Harvie believes Ms. Smith should never have had any surgery on her back. He would have prescribed weight loss, exercise, and anti-inflammatory drugs to alleviate her back pain. In his opinion, the PDA procedure caused Ms. Smith "permanent nerve injury, secondary to the use of PMMA; the heat from the PMMA curing process burned the nerves." *See* Exhibit 240. To a degree of medical probability, it is Dr. Harvie's opinion that "Ms. Smith's loss of bowel and bladder control is causally related to the insertion of PMMA." *Id.* Had she been treated conservatively, and, if ultimately necessary, received the appropriate surgical procedure, Dr. Harvie believes, to a degree of medical certainty, that Ms. Smith would not now be a partial paraplegic with lack of urine and bladder control. *Id.* The Court finds that Ms. Smith's PDA procedure aggravated her pre-existing condition and caused her harm.

*Ms. Smith's Past Medical Expenses*

Ms. Smith claims past medical expenses in the total amount of $494,674.09. *See* Exhibit 200. Of this amount, $90,723.11 was incurred for the PDA procedure on October 29, 2007 and

-34-

immediate follow up on October 31, November 13, and November 20, 2007. *Id.* X-Ray

Associates of New Mexico charged $381.00 for an x-ray taken on November 13, 2007. *Id.* at p.

33. Southwest Orthopaedics, LLC, Dr. Bryant's practice, billed $18,347.00 to Ms. Smith from

March 12, 2008 to September 8, 2008. *Id.* These expenses are attributable to Dr. Bryant's

removal of PMMA and fusion in 2008. Medical expenses for the surgery Dr. Masel performed in

2010 total $89,810.78. *Id.* Medical expenses for the surgery Dr. Misenhimer performed in 2013

total $97,280.76. *Id.* The remainder of the claimed medical expenses in the amount of

$198,131.44 were incurred for medical care received after November of 2007, including

ambulance charges, home healthcare, physical therapy, and other doctor, physician's assistant,

and nurse practitioner visits. *Id.* Based on the evidence, the Court finds that $470,000.00 of Ms.

Smith's past medical expenses are attributable to the PDA procedure.

>*Ms. Smith's Anticipated Future Medical Expenses*

Ms. Smith claims anticipated future medical expenses and related costs of $860,701.00

after adjustment to 2017 present value. *See* Exhibit 279. Ms. Smith's current life expectancy as

of 2017 is twenty-seven years. Dr. Romagosa budgeted the following anticipated future medical

expenses and related costs for Ms. Smith over the remainder of her expected lifetime: 1) doctor's

appointments with a primary care provider, orthopedic spine surgeon, physiatrist, psychiatrist

and urologist; 2) medications, including pain medication, medication for muscle spasms, and

anti-depressant medication; 3) epidural steroid injections; 4) tests, including x-rays, MRI, renal

ultrasound, urodynamic study, and Doppler studies; 5) home modifications, including

installation/removal of a new pedestal sink and handicap-height toilet, installation of non-slip

grab bars, replacement of bathtub with a walk-in shower, and hand-held shower head; 6)

ambulation assistance, including a motorized scooter, scooter lift, and scooter maintenance, a

straight cane, walker and wheelchair; 7) adult diapers and self-catheter kit; 8) physical therapy

sessions and gym membership; and 9) professional maid/care giver service three times per week. *See* Exhibit 245 and 250. Dr. Romagosa's anticipated future medical expenses include expenses for a pain pump and associated doctor visits over a twelve-year therapy period totaling $85,446.00, and a dorsal column stimulator, including trial, installation, and replacement after nine years, totaling $93,818.00. *See* Exhibit 250. Together, the budgeted expenses for a pain pump and dorsal column stimulator total $179,254.00. *Id.*

Based on the expert testimony of Dr. MacDonald and Dr. Romagosa, and taking into account the surrounding facts and circumstances, the Court finds that Ms. Smith's future medical expenses and associated costs attributable to the PDA procedure is $670,000.00, adjusted to present value.

### Ms. Smith's pain and suffering and loss of enjoyment of life

The PDA procedure has caused Ms. Smith much pain and suffering. She has also lost enjoyment of life. As a partial paraplegic, she can no longer engage in the activities such as horseback riding, camping, and bowling, that she used to enjoy. The Court finds that Ms. Smith suffered damages of $3,000,000.00 for pain and suffering and $2,000,000.00 for loss of enjoyment of life.

### Ms. Smith's lost future earning capacity

Before the PDA procedure, while running the convenience store, Ms. Smith earned an average of $4,000 per month. She has not been able to work since the 2007 PDA procedure. The Court finds that Ms. Smith's lost future earning capacity is $350,000.00.

DISCUSSION

The Court makes the following conclusions of law:[13]

---

[13] Any facts recited in this discussion section not also set forth in the facts section of this Memorandum Opinion are findings of fact made by the Court in accordance with Fed. R. Bankr. P. 7052 and

In this phased trial the UTC assert negligence claims against QHR. "A negligence claim requires that the plaintiff establish four elements: (1) defendant's duty to the plaintiff, (2) breach of that duty, typically based on a reasonable standard of care, (3) injury to the plaintiff, and (4) the breach of duty as cause of the injury." *Zamora v. St. Vincent Hosp.*, 2014-NMSC-035, ¶ 22, 335 P.3d 1243, 1249 (citing *Herrera v. Quality Pontiac*, 2003-NMSC-018, ¶6, 134 N.M. 43, 73 P.3d 181 (remaining citation omitted). If the defendant's negligent breach of duty injures the plaintiff, the defendant may be held liable for the resulting damages. *See Baer v. Regents of University of California*, 1999 NMCA-005, ¶7, 126 N.M. 508, 510, 972 P.2d 9, 11 (explaining that, "[u]nder established principles of tort theory, negligence must proximately cause an injury for the defendant to be liable for the resulting damages.")(citation omitted).

In Phase I of the trial, which addressed duty and breach of duty, the Court determined that QHR owed a duty to the UTC and breached that duty by failing to request the Medical Executive Committee at the hospital to conduct a focused review of Dr. Schlicht and the PDA procedures. *See* Amended Memorandum Opinion – Docket No. 286. The Court also concluded that comparative fault, rather than joint and several liability, applies. *Id.*

In Phase II, which addressed causation and comparative fault, the Court determined that QHR's breach of duty constituted both the cause in fact and the proximate cause of the UTC's injuries stemming from the following: (1) PDA procedures Dr. Schlicht or Dr. Bryant performed after September 21, 2007; and (2) non-PDA procedures Dr. Schlicht performed as lead physician after September 21, 2007 that breached the applicable standard of care. *See* Memorandum

---

supplement the facts section of this opinion. Similarly, to the extent the facts section of this Memorandum Opinion contains any conclusions of law not separately stated in the discussion section, the Court incorporates such conclusions of law by reference in this discussion.

-37-

Opinion – Docket No. 545.[14] The Court also determined that QHR's percentage of fault is 16.5%. *Id.*

Phase III involves adjudication of damages. Although causation was adjudicated in Phase II, adjudication of damages necessarily involves an element of causation that was reserved for Phase III. As discussed below, because the Four UTC Members each had lumbar back problems that preexisted their PDA procedures, the UTC must prove the extent that the PDA procedure aggravated a pre-existing condition within a reasonable degree of certainty and must also prove the amount of damages resulting from the injury.

For the damages phase of the trials, the parties selected four adversary proceedings to be tried first. In the first four adversary proceedings, the admitted evidence relevant to the damages trials in all *UTC v. QHR* adversary proceedings before the Court was deemed admitted for all future damages trials. The parties also presented testimony and other evidence individualized to each of the Four UTC Members and their spouses.

The Four UTC Members offered expert testimony from Dr. Harvie and Dr. Rashbaum linking the PDA procedure to the subsequent physical complications they suffered. QHR offered counter expert testimony from Dr. William Iannacone. The Court concludes that the expert testimony from Dr. Harvie and Dr. Rashbaum is sufficient to establish that the PDA procedure caused the Four UTC Members harm. Unlike *Lopez v. Martinez*, where the medical expert testified only that the subsequent injury was "consistent" with the type of injury that would likely occur as a result of the accident, the UTC's experts testified that the PDA procedure actually caused the subsequent harm to the Four UTC Members. *See Lopez v. Martinez*, 2014 WL

---

[14] On January 29, 2018, the Court ruled on four motions for reconsideration. The Court's rulings changed the September 21, 2007 cutoff date to August 4, 2007. The rulings did not change the Court's decision that the doctrine of comparative fault applies or the allocation of 16.5% of fault to QHR. *See* Memorandum Opinion – Docket No. 816.

7187065, *4 (N.M. Ct. App. Nov. 17, 2014)(unpublished). This Court is relying on comparative testimony in addition to expert testimony.

*Damages for Aggravation of a Pre-existing Condition*

All Four UTC Members had lower back pain before they underwent the PDA procedure; two of them, Ivan Jackson and Patricia Rue, had one or more back surgeries prior to the PDA procedure. The Four UTC Members seek damages based on the aggravation of a pre-existing condition.

New Mexico's Uniform Jury Instruction 13-1802 provides the following guidance to jurors in assessing damages based on an alleged aggravation of a pre-existing condition:

> If you find that, before any injury in this case, plaintiff was already impaired by a physical or emotional condition, plaintiff is entitled to compensation for the aggravation or worsening of the condition, but not for elements of damages to the extent they were already being suffered.

NMRA, Civ. UJI 13-1802.

The UTC bear the burden of proving the extent of the aggravation of a pre-existing condition within a reasonable degree of certainty. As the New Mexico Supreme Court has instructed,

> Where the injury is an aggravation of a pre-existing condition, plaintiff must prove the extent of the aggravation because the aggravation is the injury that has been inflicted. Further, the extent of the aggravation must be established with reasonable certainty.

*Morris v. Rogers*, 80 N.M. 389, 390-91, 456 P.2d 863, 864-65 (1969)(citations omitted).

"Although the injury (the aggravation) must be reasonably certain, 'Uncertainty as to the amount of damages one may be entitled to receive will not prevent a recovery'" *Id.* (quoting *Hebenstriet v. Atchison, Topeka & Santa Fe Ry. Co.*, 65 N.M. 301, 336 P.2d 1057 (1959)). However, "a judgment based on conjecture, surmise or speculation cannot be sustained." *Hebenstriet*, 65 N.M. at 306, 336 P.2d at 1061.

-39-

A plaintiff may prove the extent of the aggravation of a pre-existing condition by "testimony that the pre-existing condition has been aggravated by a stated percentage amount" or by "comparative testimony." *Morris*, 80 N.M. at 391, 456 P.2d at 865 (citations omitted). Comparative testimony includes evidence comparing functionality and pain before and after the medical procedure at issue. *See Morris*, 80 N.M. at 391, 456 P.2d at 865 (describing the comparative testimony before and after the injury). A plaintiff may also prove the extent of aggravation by other medical testimony based on a reasonable medical probability. *Avillar Hatfield*, 82 N.M. 565, 567, 484 P.2d 1275, 1277 (Ct. App. 1971)(also discussing proof of aggravation using comparative testimony); *see also Stetz v. Skaggs Drug Centers, Inc.*, 114 N.M. 465, 471, 840 P.2d 612, 618 (Ct. App. 1992)(discussing proof of the extent of aggravation by medical and comparative testimony).

### *The Use of Comparative Testimony to Establish the Extent of the Aggravation*

In *Morris*, the plaintiff brought a negligence claim against the defendant seeking damages for injuries sustained in an automobile accident. The plaintiff relied on comparative testimony to establish the extent the automobile accident aggravated pre-existing injuries to plaintiff's cervical spine. Before the accident, the plaintiff "had experienced five cervical injuries[,]" and four of plaintiff's "cervical vertebral interspaces had been fused . . ." *Morris*, 80 N.M. at 390, 456 P.2d at 864. The pre-accident fusion at one of the levels (C6 – C7) resulted in a non-union. *Id.* Before the automobile accident, the plaintiff, a welder, had acute pain that had disappeared but "continued to have radiating pain from the C6 – C7 non-union," severe headaches and other pain but could still do heavy lifting. *Morris*, 80 N.M. at 391, 456 P.2d at 865. Before the accident, the plaintiff moved 150-pound machines from time to time but otherwise performed light work. *Id.* After the accident, the plaintiff's pain progressively increased until he was unable to do work of any type, which necessitated another surgery. *Id.* That surgery involved a re-fusion

-40-

at C6 – C7 and a fusion at a level adjacent to a prior pre-accident fusion. *Id.* The New Mexico Supreme Court observed on appeal that the comparative testimony established the extent of the injury (the aggravation), which was "a decrease of flexion and extension of the cervical spine and an increase in the severity of neck pain which resulted in an inability to work and which necessitated surgery." *Id.*[15]

In *Skaggs Drug Centers,* the New Mexico Court of Appeals held that comparative testimony regarding the plaintiff's increased pain and discomfort, restrictions in the ability to engage in volunteer and household activities, new problems in the hip and pelvis areas, and greater knee pain and knee problems after a fall, corroborated by medical testimony, was sufficient to prove the extent of aggravation of a pre-existing condition. 114 N.M. at 470-71, 840 P.2d at 617-18.

Consistent with *Morris*, *Hatfield*, and *Skaggs Drug Centers* a plaintiff may rely on comparative testimony regarding a plaintiff's pre- and post-injury physical condition and pain to establish the extent of aggravation of a pre-existing condition. By offering such comparative testimony, a plaintiff may recover damages for the resulting harm caused by the injury even when the plaintiff suffers from a pre-existing injury. The Court relies in part on comparative testimony before and after the PDA procedure to establish the extent of the aggravation of the Four UTC Members' pre-existing conditions.

---

[15] The defendant in *Morris* did not challenge the trial court's findings that the plaintiff suffered pain and discomfort and an impaired earning ability as a result of the accident but did challenge the finding that the plaintiff suffered a permanent injury as a result of the accident. Ultimately, after examining the trial court's findings on appeal, the *Morris* court reversed the finding of permanent injury and remanded the case to the trial court for new findings excluding damages for permanent injury and a portion of two medical bills not incurred as a result of the accident.

*The Potential Effect of a Lapse of Time between Negligent Act and the Subsequent Harm*

In negligence cases, a resulting injury may not occur until well after the negligent act. A lapse in time between the negligent act and the subsequent harm presents a potential causation problem. The Restatement of Torts addresses the effect of the passage of time in determining whether an actor's conduct is a substantial factor (*i.e.* a cause) in bringing about harm to another:

> Experience has shown that where a great length of time has elapsed between the actor's negligence and harm to another, a great number of contributing factors may have operated, many of which may be difficult or impossible of actual proof. Where the time has been long, the effect of the actor's conduct may thus become so attenuated as to be insignificant and unsubstantial as compared to the aggregate of the other factors which have contributed. However, where it is evident that the influence of the actor's negligence is still a substantial factor, mere lapse of time, no matter how long, is not sufficient to prevent it from being the legal cause of the other's harm.

Restatement (Second) of Torts, § 433, cmt. f. (1965).

Thus the passage of time alone will not prevent recovery, provided the injury would not have occurred but for the defendant's negligent act or omission, and provided the negligent act or omission is "reasonably connected as a significant link to the injury." NMRA, Civ. UJI 13-305.[16]

*The Purpose of Damages and the Role of the Fact Finder*

Damages awarded to a plaintiff for injuries suffered as a result of another's negligence are meant to make the injured party whole. *See Lovelace Medical Center v. Mendez*, 111 N.M. 336, 349, 805 P.2d 603, 616 (1991)("In New Mexico, as elsewhere, the purpose of compensatory damages is to make an injured person whole.")(citing *Hood v. Fulkerson*, 102 N.M. 677, 680, 699 P.2d 608, 611 (1985)(remaining citations omitted)). The amount of damages ultimately

---

[16] *See also Chamberland v. Roswell Osteopathic Clinic, Inc.*, 2001-NMCA-045, ¶18, 130 N.M. 532, 536, 27 P.3d 1019, 1023 ("To establish liability, there must be a chain of causation initiated by some negligent act or omission of the defendant, which in legal terms is the cause in fact or the 'but for' cause of plaintiff's injury.")(citation omitted).

awarded "'necessarily rests with the good sense and deliberate judgment of the tribunal assigned by law to ascertain what is just compensation[;] . . . each case must be decided on its own facts and circumstances.'" *Sandoval v. Baker Hughes Oilfield Operations, Inc.*, 2009-NMCA-095, ¶18, 146 N.M. 853, 858, 215 P.3d 791, 796 (quoting *Sandoval v. Chrysler Corp.*, 1998-NMCA-085, ¶13, 125 N.M. 292, 296, 960 P.2d 834, 838). Surveying typical damages awards in similar cases is generally not useful to the determination of an appropriate damages award. *Id.* (observing that "[w]e are skeptical about the usefulness of comparing awards for pain and suffering in other cases.")(citations omitted). Ultimately, the damages a factfinder awards will be upheld unless "'it appears that the amount awarded is so grossly out of proportion to the injury received as to shock the conscience,'" *Lujan v. Reed*, 78 N.M. 556, 564, 434 P.2d 378, 386 (1967)(quoting *Mathis v. Atchison, Topeka and Santa Fe Ry. Co.*, 61 N.M. 330, 337, 300 P.2d 482, 487 (1956)), or there is "unmistakable" evidence that the factfinder "was influenced by prejudice, passion, or other improper considerations." *Baxter v. Gannaway*, 113 N.M. 45, 48, 822 P.2d 1128, 1131 (Ct. App. 1991)(citation omitted).[17]

*The Four UTC Members Have Established the Aggravation of a Pre-existing Condition*

The Four UTC Members have offered sufficient evidence of the extent of the aggravation as a result of the PDA procedure through both expert testimony and through comparative testimony of their conditions before and after their PDA procedure. The extent of aggravation of a pre-existing condition includes injury to the intervertebral disc spaces at the levels in which the

---

[17] *See also Chavez v. Atchison, Topeka & Santa Fe Ry. Co.,* 77 N.M. 346, 351, 423 P.2d 34, 37 (1967)("The question of excessiveness is determined by (1) whether the evidence, viewed in the light most favorable to plaintiff, substantially supports the award and (2) whether there is an indication of passion, prejudice, partiality, sympathy, undue influence, or a mistaken measure of damages on the part of the fact finder.")(citation omitted); *Terrel v. Lowdermilk*, 74 N.M. 135, 140, 391 P.2d 419, 423 (1964)("Only in extreme cases where the award results from passion, prejudice, partiality, sympathy, undue influence, or some corrupt cause or motive, will we disturb the [damages] award.")(citations omitted).

-43-

PDA procedures were performed and, in some cases, injury to the spinal canal or to nerve roots as a result of the PDA procedure. Uncertainty as to the amount of damages to which the Four UTC Members are entitled will not prevent a recovery so long as awarding the damages does not require conjecture, surmise, or speculation.[18]

*Past Medical Expenses*

Because of QHR's negligence, the Four UTC Members underwent a PDA procedure. Medical expenses incurred for the PDA procedure itself are therefore compensable as supported by the evidence. The Four UTC Members have provided sufficient evidence that certain of their claimed past medical expenses are attributable to the PDA procedure. Such expenses are recoverable as compensatory damages.

*Future Medical Expenses and Dr. Romagosa's Life Care Plans*

A plaintiff may recover damages for reasonable and necessary future medical expenses resulting from an injury. *See* NMRA, Civ. UJI 13-1804. As for future medical expenses, a plaintiff must offer sufficient evidence that such expenses "are reasonably certain to be incurred." NMRA, Civ. UJI 13-1804 (Directions for Use).

Dr. Romagosa's life care plans detail anticipated future medical expenses and other costs for the Four UTC Members. He included the anticipated cost of a spinal cord stimulator and a pain pump for all Four UTC Members even though some of them will not likely receive one or both of those devices or have already received one. Ivan Jackson, for example, is not a likely candidate for either device because of his age. Ms. Rue, for example, already received a spinal

---

[18]  The online version of Merriam-Webster Dictionary defines "conjecture" as an "inference formed without proof or sufficient evidence; a conclusion deduced by surmise or guesswork." *See Conjecture*, Merriam-Webster, https://www.merriam-webster.com/dictionary/conjecture. It defines "surmise: as "a thought or idea based on scanty evidence." *See Surmise*, Merriam-Webster, https://www.merriam-webster.com/dictionary/surmise. It defines "speculate" as "to take to be true on the basis of insufficient evidence." *See Speculate*, Merriam-Webster, https://www.merriam-webster.com/dictionary/speculate.

cord stimulator. In addition, Dr. Romagosa's life care plans did not attempt to separate the future medical and other related expenses directly attributable to the PDA procedure from those expenses the Four UTC Members would incur due to other co-morbidities, pre-existing conditions or aging. He reasoned that it was simply too difficult to "tease that apart." The prices for some of the expenses included in the life care plans do not adequately take into account the comparable price in the locality where the Four UTC Members currently live, nor do they take into account the fact that a particular UTC member may be eligible for Medicaid or Medicare.

Notwithstanding these shortcomings, the Court concludes that the life care plans provide evidence of anticipated future medical expenses and associated costs for the Four UTC Members attributable to the PDA procedure that is sufficient for the Court to award damages for anticipated future medical expenses. The Court will reduce the amount of damages for anticipated future medical expenses from that stated by Dr. Romagosa to account for uncertainties. In calculating the damages for anticipated future medical expenses, the Court will adjust the award to present value.

*Pain and Suffering Damages*

Under New Mexico law, plaintiffs may recover damages for mental pain and suffering resulting from an injury. *See Higgins v. Hermes*, 89 N.M. 379, 381, 552 P.2d 1227, 1229 (Ct. App. 1976)(recognizing under New Mexico law that "damages can be recovered for mental pain and suffering as a consequence of physical injuries.")(citing *Rutledge v. Johnson*, 81 N.M. 217, 465 P.2d 274 (1970)); *see also Hoskie v. United States*, 666 F.2d 1353, 1357 (10th Cir. 1981)(observing that "the New Mexico Supreme Court clearly recognized past and future mental pain and anguish, as well as past and future physical pain and suffering" as "legally compensable items of damage.")(citing *Rutledge*, 81 N.M. at 219-20, 465 P.2d at 276-77)); NMRA, Civ. UJI 13-1807 (damages are recoverable for "[t]he pain and suffering experienced [and reasonably

-45-

certain to be experienced in the future] as a result of the injury."). Further, "[w]here physical injuries are pled, it is generally agreed that mental anguish will result." *Higgins*, 89 N.M. at 381, 552 P.2d at 1229 (citation omitted). Damages for pain and suffering are part of compensatory damages. *Alber v. Nolle*, 98 N.M. 100, 106, 645 P.2d 456, 463 (Ct. App. 1982)(citations omitted).

There is no fixed standard for determining the amount of damages for pain and suffering. *See Strickland v. Roosevelt Cnty. Rural Electric Cooperative*, 99 N.M. 335, 340, 657 P.2d 1184, 1189 (1982)("There is no standard fixed by law for measuring the value of pain and suffering")(citation omitted); *see also* NMRA, Civ. UJI 13-1807 (explaining that "[n]o fixed standard exists for deciding the amount of these damages [for pain and suffering]. You must use your judgment to decide a reasonable amount to compensate the plaintiff for the pain and suffering."). The factfinder (here, the Court) must exercise its judgment to determine an appropriate damages award for pain and suffering. *Strickland*, 99 N.M. at 340-41, 657 P.2d at 1189-90 ("[T]he amount to be awarded [for pain and suffering] is left to the jury's judgment.")(citation omitted).

Except in limited circumstances not applicable here, a plaintiff cannot recover separate, additional damages for emotional distress. *See Castillo v. City of Las Vegas*, 2008-NMCA-141, ¶22, 145 N.M. 205, 210-11, 105 P.3d 870, 875-76 (stating that New Mexico has "limited the availability of damages for emotional distress" to "plaintiffs who prevail on a claim for negligent or intentional infliction of emotional distress" although "compensation for emotional distress is permitted when a plaintiff establishes loss of consortium, intentional misconduct, defamation, or a physical injury.")(citations omitted). Emotional distress is included within the damages that may be awarded for pain and suffering. *Cf. Higgins*, 89 N.M. at 381, 552 P.2d at 1229 (observing

-46-

that, "[u]nder the concept 'pain and suffering' recovery has been allowed for physical pain, nervousness, grief, anxiety, worry and shock.")(citation omitted).

In addition, in awarding compensatory damages, the fact finder considers the nature, extent, and duration of the injury. *See* NMRA, Civ. UJI 13-1806 and Committee Commentary (directing use of the instruction regarding "[t]he nature, extent and duration of the injury" as part of the damages instruction, and stating that "[t]here seems to be no question in the adjudicated cases that, in the proper circumstances, an instruction referring to the nature, extent and duration of the injury is a proper element for the jury to consider."); *Vaca v. Whitaker*, 86 N.M. 79, 85, 519 P.2d 315, 321 (Ct. App. 1974)(the damages elements the jury considered in negligence claim included the nature, extent and duration of the injury); *Martinez v. Ponderosa Products, Inc.*, 108 N.M. 385, 387, 772 P.2d 1308,1310 (Ct. App. 1988)("plaintiff would be entitled to consideration as to the nature, extent, and duration of the injury . . ."). Damages awarded for pain and suffering will be limited to pain and suffering resulting from the aggravation of pre-existing conditions caused by the PDA procedures.

### Loss of Enjoyment of Life Damages

Consistent with New Mexico law, Plaintiffs may recover damages to compensate for a loss of enjoyment of life, also known as hedonic damages. *See Smith v. Ingersoll-Rand Co.*, 214 F.3d 1235, 1246 (10th Cir. 2000) (recognizing that "New Mexico state law permits . . . the recovery of hedonic damages . . .")(citation omitted); *Sena v. New Mexico State Police*, 1995-NMCA-003, ¶¶26 and 27, 119 N.M. 471, 477, 892 P.2d 604, 610 (stating that "the economic value of damages for the loss of enjoinment of life [is] sometimes referred to as hedonic damages," and that "damages are recoverable for the value of the loss of enjoyment of life itself").

-47-

Loss of enjoyment of life damages attempts to measure the value of a human life. It encompasses the leisure activities a person used to enjoy, the pleasure from earning money at work, the enjoyment that accompanies spending those earnings, and the enjoyment from the work itself. Ultimately, the monetary value placed on the loss of enjoyment of life is quite difficult to measure. Nevertheless, that difficulty does not preclude the award of loss of enjoyment of life damages. The appropriate amount of hedonic damages is left to the fact finder. *See Ingersoll-Rand Co.*, 214 F.3d at 1246 (concluding that expert testimony regarding the interpretation and meaning of hedonic damages without applying the facts of the case to those criteria sufficiently left the jury "free to exercise its fact-finding function"); *Martinez v. Caterpillar, Inc.*, 2007 WL 5377515, *2 (D.N.M. Sept. 6, 2007)(observing that "the jurors themselves are fully capable of determining the value to be placed on the enjoyment of life.").

Damages awarded for loss of enjoyment of life will be limited to loss of enjoyment of life resulting from aggravation of pre-existing conditions caused by the PDA procedures.

*Loss of Consortium*

Under New Mexico law, a spouse may recover damages for loss of consortium to compensate for the loss of society, guidance, companionship and sexual relations resulting from injury to the other spouse caused by a defendant's negligence. *See* NMRA, Civ. UJI 13-1810A (defining loss of consortium as "[t]he emotional distress of _____(plaintiff) due to the loss [of the society], [guidance], [companionship] and [sexual relations] resulting from the injury to _____ (name of injured or deceased spouse or child of plaintiff)" and explaining in the Use Note that loss of consortium "is another element of damage to be included . . . when the spouse . . . of the plaintiff has been injured or killed."); *Archer v. Roadrunner Trucking, Inc.*, 1997-NMSC-003, ¶4, 122 N.M. 703, 705, 930 P.2d 1155, 1157 (acknowledging that New Mexico recognizes "a common-law action for spousal loss of consortium.")(citing *Romero v.*

-48-

*Byers*, 117 N.M. 422, 424, 872 P.2d 840, 842 (1994)). Loss of consortium encompasses "'not only material services but such intangibles as society, guidance, companionship, and sexual relations.'" *Romero*, 117 N.M. at 425, 822 P.2d at 843 (quoting *Black's Law Dictionary* 309 (6th ed. 1990)). At its core, loss consortium is "'the emotional distress suffered by one spouse who loses the normal company of his or her mate when the mate is physically injured due to the tortious conduct of another.'" *Thompson v. City of Albuquerque*, 2017-NMCA-002, ¶7, 386 P.3d 1016, 1017 (quoting *Brenneman v. Bd. of Regents of Univ. of N.M.*, 2004-NMCA-003, ¶7, 135 N.M. 68, 84 P.3d 685 (additional internal quotation marks and citation omitted)); *see also, Couch v. Astec Indus., Inc.*, 2002-NMCA-084, ¶62, 132 N.M. 631, 645, 53 P.3d 398, 412 (same)(citing *Romero v. Byers*, 117 N.M. 422, 425, 872 P.2d 840, 843 (1994)). A claim for loss of consortium is derivative of the injured spouse's underlying cause of action, such that the "a plaintiff claiming spousal loss-of-consortium damages may recover such damages only if the injured person has a cause of action for physical injuries." *Archer*, 1997-NMSC-003 at ¶13, 122 N.M. at 709, 930 P.2d at 1161.

"[S]parse and very general evidence" of the loss of consortium, with no evidence comparing the couple's marital relationship before and after the injury, will not sustain a claim for loss of consortium. *Couch v. Astec*, 2002-NMCA-084, ¶63, 132 N.M. at 645, 53 P.3d at 412. (concluding that wife's testimony that the accident changed her life "'in every way imaginable . . . the financial burden to the emotional stress, to our children, everything just is upside down. We haven't had a moment's peace since this occurred[ ]'" was insufficient evidence as a matter of law, and pointing out that by failing to introduce evidence comparing her marital relationship before and after the accident, wife presented no means for the jury to evaluate her loss of consortium claim).

-49-

The loss of consortium claim asserted by Rev. Robbins fails due to a lack of evidence from which the Court can infer a loss of consortium. Rev. Robbins complained about emotional pain, and that it was troubling for him to see his wife living with the fear of knowing that a foreign substance was put in her body by a non-surgeon. Rev. Robbins provided no comparative testimony of his relationship with Ms. Robbins before and after the PDA procedure.

Mr. Rue observed that Ms. Rue had worse pain after the PDA procedure, that she was unable to help him with the fruit stand, and had a difficult time doing housework and vacuuming. He also reported that they are no longer able to be intimate, and that he no longer sleeps in the same bedroom with Ms. Rue, though he regularly checks on her during the night. Ms. Rue likewise testified that Mr. Rue has had to step in to run the fruit stand whereas before, it was a team effort. Ms. Rule confirmed that she can no longer be intimate with her husband because it is too difficult, and that the numbness in her groin and buttocks did not exist before the PDA procedure. She observes that her condition has affected Mr. Rue emotionally and physically, and that he cries when he sees her in pain. This testimony describing Mr. Rue's current marital relationship with Ms. Rue is sufficient to infer that their relationship is not the same as it was before the PDA procedure. Based on this evidence, Mr. Rue is entitled to a claim for loss of consortium.

As for Mr. Smith, the UTC's requested findings of fact and conclusions of law do not include a request for damages for Ms. Smith's late husband. *See* Docket No. 708. His estate has not been substituted as a party to this proceeding. In any event, Ms. Smith's generalized testimony regarding her relationship with Mr. Smith after the PDA procedure is insufficient to sustain a claim for loss of consortium.

-50-

*Lost Earnings*

A plaintiff injured by a defendant's negligent conduct may recover damages for lost earnings, which may include the present value of lost future earning capacity. *See* NMRA, Civ. UJI 13-1803 (providing for recovery of "[t]he value of lost earnings [and the present cash value of earning capacity reasonably certain to be lost in the future]" and instructing that "when there is an issue supported by the evidence concerning lost earning capacity in the future, then the bracketed material is to be used" with further instruction to discount award to present cash value). As with all damages for negligence claims, the plaintiff bears the burden of proving the amount of damages for lost earnings resulting from the injury with "reasonable certainty." *Baker Hughes*, 2009-NMCA-095, ¶48, 146 N.M. at 865, 215 P.2d at 803 (citations omitted). "There is no exception to the . . . rule for future damages. The ultimate fact which the plaintiff has the burden of proving is future damages reasonably certain to occur as a result of the original injury." *Rael v. F & S Co., Inc.*, 94 N.M. 507, 511, 612 P.2d 1318, 1322 (Ct. App. 1979)(citations omitted).

Damages for lost future earnings can be difficult to measure precisely. *Baker Hughes*, 2009-NMCA-095, ¶48, 146 N.M. at 865, 215 P.3d at 803 (citation omitted). Even so, damages for lost future earnings "cannot be based on surmise, conjecture, or speculation and must be proved with reasonable certainty." *Id.; see also Hebenstreit*, 65 N.M. at 306, 336 P.2d at 1061 (damages based on conjecture, surmise, or speculation are improper). The standard for awarding damages for lost future earning capacity is as follows:

> [I]f it appears from the evidence that a person has a continuing disability resulting from the injury which has resulted in and will continue to result in loss of earnings, and there is proof of his age, occupation, rate of pay when working, and previous condition of health, there is sufficient [evidence] to go to the jury even without proof of his earnings of any given period.

-51-

*Baros v. Kazmierczwk*, 68 N.M. 421, 429, 362 P.2d 798, 804 (1961)(citations omitted).[19]

Ms. Smith, who was 45 years old when she had the PDA procedure, seeks recovery of $460,000 for lost earnings over a period of ten years. Ms. Smith testified that before her PDA procedure, she earned an average of $4,000 per month when she worked at the truck stop. After the PDA surgery, Ms. Smith never returned to work. Both Ms. Smith's testimony and her treating physician's testimony establish that her diminished condition continued following the PDA procedure. No evidence was presented regarding the historical profitability of the truck stop owned and operated by Ms. Smith and her husband or the average income of a proprietor of a truck stop in a small town in New Mexico.

The evidence Ms. Smith presented is sufficient to award damages for lost earnings, including lost future earning capacity, discounted to present value. The Court will also discount the requested amount to account for other uncertainties.

*Discounting Damages Based on Particular Facts and Circumstances*

In awarding damages to the Four UTC Members, the Court will discount the damages ultimately awarded based on the particular circumstances of each of the Four UTC Members. For example, in awarding damages for future medical expenses, the Court will take into account whether the requested expenses are the type of expense the UTC member would likely have incurred notwithstanding the PDA procedure, the deficiencies in Dr. Romagosa's life care plans regarding the prices for future care, and evidence regarding whether a particular UTC member

---

[19] *See also Selgado v. Commercial Warehouse Co.*, 86 N.M. 633, 636-37, 526 P.2d 430, 433-34 (Ct. App. 1974)(finding that plaintiff's testimony combined with medical testimony regarding the continuing nature of plaintiff's disability was sufficient to submit the issue of lost earning capacity to the jury); *Methola v. Eddy Cnty.*, 96 N.M. 274, 629 P.2d 350 (Ct. App. 1981)("[W]hether there is any evidence of past earnings or of any decrease in plaintiff's earning capacity, proof of a continuing disability or an irreparable physical injury is all that is needed to permit the fact-finder to 'award substantial damages' for loss of wage-earning capacity.")(*quoting Jackson v. Southwestern Publ. Serv. Co.*, 66 N.M. 458, 349 P.2d 1029 (1960)).

needs or wants a pain pump or spinal cord stimulator. Similarly, in awarding damages for pain and suffering and loss of enjoyment of life, the Court will take into account the plaintiff's age and life expectancy and will discount the damages awarded to the extent each plaintiff failed to prove that the pain and suffering and loss of enjoyment of life was attributable the PDA procedure instead of other unrelated conditions.

*Damages Awards for each of the Four UTC Members*

*Patricia Rue*

Based on the evidence the Court concludes that Ms. Rue is entitled to damages from QHR of 16.5% of the following amounts:

> 1. Past and future medical expenses: $340,000.00.
>
> 2. Pain and suffering: $1,000,000.00.
>
> 3. Loss of enjoyment of life: $1,000,000.00.
>
> TOTAL: $2,340,000.00

In awarding these damages amounts, the Court has taken into account Ms. Rue's particular facts and circumstances.

*Gary Rue*

Based on the evidence the Court concludes that Mr. Rue is entitled to damages from QHR of 16.5% of $125,000.00 for his loss of consortium.

*Ivan Jackson*

Based on the evidence the Court concludes that Mr. Jackson is entitled to damages from QHR at 16.5% of the following amounts:

> 1. Past and future medical expenses: $97,500.00.
>
> 2. Pain and suffering: $500,000.00.
>
> 3. Loss of enjoyment of life: $750,000.00.

-53-

TOTAL: $1,347,500.00

In awarding these damages amounts, the Court has taken into account Mr. Jackson's particular facts and circumstances.

*Kelly Robbins*

Based on the evidence the Court concludes that Ms. Robbins is entitled to damages from QHR at 16.5% of the following amounts:

1. Past and future medical expenses: $461,000.00.

2. Pain and suffering: $1,300,000.00.

3. Loss of enjoyment of life: $1,000,000.00.

TOTAL: $2,761,000.00

In awarding these damages amounts, the Court has taken into account Ms. Robbins' particular facts and circumstances.

*Desiree Smith*

Based on the evidence the Court concludes that Ms. Smith is entitled to damages from QHR at 16.5% of the following amounts:

1. Past and future medical expenses: $1,140,000.00.

2. Pain and suffering: $3,000,000.00.

3. Loss of enjoyment of life: $2,000,000.00.

4. Lost earnings and lost future earning capacity: $350,000.00.

TOTAL: $6,490,000.00

In awarding these damages amounts, the Court has taken into account Ms. Smith's particular facts and circumstances.

CONCLUSION

Based on the evidence, the Court concludes that the Four UTC Members are entitled to damages in the amounts set forth above. The damages reflect the extent of the aggravation of each of the Four UTC Members' preexisting conditions resulting from QHR's negligence.

On January 23, 2018, QHR filed a motion to reconsider (Docket No. 811) (the "Offset Issue Motion to Reconsider") the Court's ruling in a Memorandum Opinion filed May 15, 2017 (Docket No. 620). That opinion addresses whether QHR is entitled to an offset of the amounts QHR or its insurer(s) paid on its behalf in partial settlement against any damages the Court may ultimately award to the UTC on their negligence claims against QHR. In the Offset Issue Motion to Reconsider, QHR asks the Court (before it issues any final damages judgments) to find that QHR is entitled to an offset for the $11.05 million paid by Nautilus and QHR, and the $2.1 million paid on QHR's behalf by Ironshore and to apply the offset as a credit to each judgment as they are entered until the total offset amount is extinguished. Alternatively, QHR asks the Court to order a stay of enforcement of any final damages judgments pending conclusion of appeals from the judgments or a final resolution of coverage issues in the Tennessee court where insurance coverage issues are pending. The Court will enter separate, final judgments consistent with this Memorandum Opinion, but in light of the pending Offset Issue Motion to Reconsider has not yet decided when to enter the judgments.

_____
ROBERT H. JACOBVITZ
United States Bankruptcy Judge

Date entered on docket: January 30, 2018

COPY via CM/ECF to all counsel of record