UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW MEXICO

In re: OTERO COUNTY HOSPITAL ASSOCIATION, INC.,

Debtor.

Case No. 11-11-13686 JL

UNITED TORT CLAIMANTS, as individuals,

        Plaintiffs,

  v.

QUORUM HEALTH RESOURCES, LLC,

Consolidated Misc. Adv. No. 13-00007
Adversary Nos:
    12-1204j through 12-1207j,
    12-1209j, 12-1210, 12-1212
    through 12-1215j, 12-1221j,
    12-1235j, 12-1238j through
    12-1241j, 12-1243j, 12-1244j,
    12-1246j, 12-1248j, 12-1249j,
    12-1251j through 12-1261j,
    12-1271j, 12-1276j and 12-1278j.

## **MEMORANDUM OPINION**

Quorum Health Resources, LLC ("QHR")[1] requests the Court to certify its appeal of the Court's final judgments directly to the Tenth Circuit Court of Appeals. *See* Quorum Health Resources, LLC's Memorandum of Law in Support of Its Motion for Certification of Case for Direct Appeal ("Motion") – Docket No. 873. *See also,* Doc. 874 (Exhibits to Motion).[2] The

---

[1] QHR is a national, for-profit hospital management company, specializing in providing hospital administrative services to rural hospitals.

[2] The Exhibits to the Motion consist of the following:
    Final Judgments Entered in Adversary Proceeding Nos. 12-1240j; 12-1278j; 12-1257j; and 12-1255j
    Notices of Appeal and Statement of Election filed in Adversary Proceeding Nos. 12-1240j; 12-1278j; 12-1257j; and 12-1255j
    *In re Otero Cnty. Hosp. Ass'n, Inc.*, 527 B.R. 719 (Bankr. D.N.M. 2015), *on reconsideration in part*, No. 11-11-13686 JL, 2018 WL 882394 (Bankr. D.N.M. Jan. 29, 2018) ("*In re Otero Phase I*")
    Memorandum Opinion entered December 23, 2016 (Docket No. 545)
    Memorandum Opinion entered January 30, 2018 (Docket No. 827)
    Memorandum Opinion Entered May 15, 2017 (Docket No. 620)

United Tort Claimants ("UTC")[3] oppose the Motion.[4] QHR also filed a reply.[5] As explained below, the Court will certify the final judgments for direct appeal to the Tenth Circuit consistent with 28 U.S.C. § 158(d)(2). Whether a hospital management company such as QHR owes a duty of care to patients of the hospital and if so the scope of the duty is a question of law, and is a matter of first impression involving a matter of public importance. On that basis, certification for direct appeal is required.

## BACKGROUND AND PROCEDURAL HISTORY

During the first half of 2011, the UTC commenced individual actions against Dr. Christian Schlicht, Dr. Frank Bryant, Otero County Hospital Association, Inc., d/b/a Gerald Champion Regional Medical Center (the "Hospital"), QHR, and other defendants in state court alleging medical malpractice and other acts of negligence relating to an alleged experimental surgical procedure (the "PDA procedure")[6] members of the UTC underwent at the Hospital. Due in large part to the filing of the state court actions, the Hospital filed a voluntary petition under Chapter 11 of the Bankruptcy Code on August 16, 2011. *See* Case No. 11-13686-j11 ("Bankruptcy Case") – Docket No. 1. The UTC commenced the related adversary proceedings referenced in the above caption (together the "Adversary Proceedings") by removing forty-seven state court actions to this Court.[7]

---

[3] The UTC is a term used to refer collectively to all of the plaintiffs in the above-captioned adversary proceedings.
[4] *See* Opposition of United Tort Claimants to Quorum Health Resources, LLC's Motion for Certification of Case for Direct Appeal ("Opposition") – Docket No. 888.
[5] *See* Quorum Health Resources, LLC's Memorandum of Law in Reply to the UTC's Opposition to its Motion for Certification of Case for Direct Appeal ("Reply") – Docket No. 891.
[6] The PDA procedure involved injection of polymethylmethacrylate into the patient's lumber intervertebral disc space (the lower back).
[7] *See, e.g.,* Notice of Removal of State Civil Action under 28 U.S.C. §§ 1367(A) and 1452(A), and Rule 9027(A) of the Federal Rules of Bankruptcy Procedure – Bankruptcy Case – Docket No. 573.

-2-

As part of the Hospital's bankruptcy case, the Hospital, UTC, QHR, one of its insurers, and other parties reached a partial settlement. The settling parties entered into a term sheet and a later settlement agreement, which were incorporated into the Hospital's confirmed Chapter 11 plan of reorganization. *See* Bankruptcy Case – Docket No. 712. Following the partial settlement, QHR remained the sole remaining defendant in the related Adversary Proceedings.

The Court created a master docket (Miscellaneous Case No. 13-00007) for the Adversary Proceedings and tried the Adversary Proceedings in phases.[8] In the first two phases, the Court tried issues common to all of the Adversary Proceedings. In Phase I, the Court tried the duty and breach elements of the UTC's negligence claims against QHR. The Court determined that QHR owed a direct duty to the UTC that included "(1) the duty to appropriately involve medical staff in evaluating medical issues; and (2) the duty to inform the board and the medical staff about issues relating to patient safety known or that should be known by the hospital management company." *In re Otero Phase I*, 527 B.R. at 767.

The Court concluded that QHR breached that duty in two respects: (1) in connection with the granting of temporary privileges to Dr. Christian Schlicht; and (2) by failing to make a formal request that the Hospital's medical executive committee initiate an investigation of Dr. Schlicht (*i.e.,* a focused review under the medical staff bylaws) after learning that Dr. Schlicht's outside proctor[9] asserted Dr. Schlicht was performing experimental surgery on patients of the hospital, and failing to apprise the Hospital's board of the proctor's assertion. *In re Otero Phase I,* 527 B.R. at 780.[10]

---

[8] *See* Docket Nos. 1, 297, and 559.

[9] A proctor is a physician assigned by the Hospital's credentials committee to observe the performance and/or conduct patient chart reviews for newly privileged Hospital-employed physicians. The credentials committee at the Hospital generally assigned an outside physician to serve as proctor when the requesting physician had a specialized area of practice less familiar to the staff at the Hospital. *In re Otero Phase I,* 527 B.R. at 745.

[10] The Court also determined as part of Phase I that comparative fault, rather than joint and several liability, applies to the UTC's claims.

-3-

In Phase II, the Court determined causation and allocated QHR's comparative fault. *See In re Otero Cnty. Hosp. Ass'n, Inc.,* No. 11-11-13686 JL, 2016 WL 7985365 (Bankr. D.N.M. Dec. 23, 2016) ("*In re Otero Phase II*") – Docket No. 545.[11] In determining causation, the Court found that had the Chief Executive Officer employed by QHR (the "QHR CEO") requested the Hospital's medical executive committee ("MEC") to conduct a focused review, (1) the MEC would have acted on the QHR CEO's formal request; (2) the MEC would have sought a physician outside of the Hospital to perform the review; (3) the reviewer would have told the MEC that the experimental surgical procedure was dangerous; and (4) the MEC would have acted on that information and stopped the PDA procedure. *See In re Otero Phase II,* at *7-8. Based on these findings, the Court concluded that the QHR CEO's failure to request a focused review caused the UTC to suffer harm by (1) having the PDA procedure; or (2) undergoing a procedure where Dr. Schlicht as the lead physician committed malpractice by performing procedures beyond the scope of his credentials. *Id.* at *9 and *22.

In considering cross-motions for reconsideration of its prior rulings, the Court determined that the additional testimony and documentary evidence relating to Dr. Robert Zuniga and the previous testimony of Monica Arrowsmith, R.N., M.S.N., J.D. provided further support for the Court's findings that had the QHR CEO made a formal request of the MEC to conduct a focused review of Dr. Schlicht performing the PDA procedure, the MEC would have done so, would have engaged an outside reviewer, and would have stopped the PDA procedure upon learning the reviewer's conclusions. *See* Memorandum Opinion ("Reconsideration Memorandum Opinion"), p. 36 – Docket No. 816. As part of its Reconsideration Memorandum Opinion, the Court

---

[11] The causation element of a negligence claim has two components: (1) cause in fact and (2) proximate cause. *Herrera v. Quality Pontiac*, 134 N.M. 43, 48, 73 P.3d 181, 186 (2003) (the breach of duty must be "a proximate cause and cause in fact of the plaintiff's damages.").

concluded that regardless of whether it applied an objective or subjective standard to determine causation, its decision would be the same. *Id.* at p. 38.

In Phase III, the Court determined damages.[12] *See* Memorandum Opinion ("Memorandum Opinion – Phase III") – Docket No. 827. So far, the Court has issued final judgments in four of the Adversary Proceedings. *See* Adversary Proceeding No. 12-1257 J (Patricia E. Rue and Gary T. Rue) – Docket No. 60; Adversary Proceeding No. 12-1240J (Ivan S. Jackson) – Docket No. 60; Adversary Proceeding No. 12-1255J (Desiree Smith and Henry Smith) – Docket No. 60; and Adversary Proceeding No. 12-1278J (Kelly Robbins and Herbert Robbins) – Docket No. 84. QHR has appealed each of these four judgments. *See* Exhibits A and B to Motion – Docket No. 874.

On joint request by QHR and the UTC, the Court also decided the issue of whether QHR is entitled to an offset for the amounts it or its insurers have already paid to the UTC (the "Offset Issue"). *See* Memorandum Opinion ("Offset Memorandum") – Docket No. 620. In considering the Offset Issue, the Court first construed the provisions of the term sheet and settlement agreement, which provided that the UTC agreed to enforce any judgment ultimately awarded against QHR in the Adversary Proceedings solely against the available insurance. *See* Offset Memorandum – p. 10.[13] Lexington Insurance Company ("Lexington") issued the only remaining insurance policies available to pay any judgment the UTC may obtain against QHR in these Adversary Proceedings. *Id.* at p. 5. Lexington is not a party to the Adversary Proceedings. *Id.* at p. 12. UTC and QHR are involved in ongoing litigation with Lexington in a Tennessee state court regarding insurance coverage (the "Insurance Coverage Litigation"). *Id.* at p. 5.

---

[12] The Phase III trials on damages included an aspect of causation. *See* Memorandum Opinion – Phase III, p. 38.
[13] On QHR's request, the Court by separate Memorandum Opinion and Order determined that QHR is entitled to have language limiting the enforcement of any award in favor of the UTC against available insurance only, and not against the assets of QHR. *See* Memorandum Opinion and Order – Docket Nos. 769 and 770.

-5-

Although the Court determined that QHR may be entitled to an offset or credit against any judgment the UTC may ultimately obtain against QHR, the Court concluded that it could not quantify the amount of any offset or credit because such a determination would require the Court to interpret the Lexington insurance policies, an issue not before the Court. *Id.*

Following the entry of an order in the Insurance Coverage Litigation determining that QHR's payment and a payment by Nautilus Insurance Company, taken together, satisfied the self-insured retentions applicable to the two Lexington insurance policies at issue, QHR asked the Court to reconsider its Offset Memorandum.[14]

During a status conference on QHR's Motion for Reconsideration of Offset Issue, held February 2, 2018, counsel for QHR made the following representation to the Court:

> Our view is . . . that the policies are really before the Tennessee court and that the mechanics of actually applying these various judgments and offsets with respect to the various UTC claimants is best handled by the Tennessee Court.[15]

---

[14] *See* Quorum Health Resources, LLC's Motion to Reconsider the Court's May 15, 2017 Memorandum Opinion Concerning Offsets, to Quantify and Apply the Amount of the Offsets Against the Judgments, and to Stay Enforcement of the Judgments ("QHR's Motion for Reconsideration of Offset Issue") – Docket No. 811.

[15] Counsel for QHR raised the collateral source rule during the status conference in the following exchange:

> **QHR COUNSEL:** What QHR originally argued in its offset motion is that you don't even need to get into issues of coverage, QHR is the defendant, QHR paid or its insurance companies paid on its behalf a sum certain and that sum certain should be taken off because under the collateral source rule if a defendant pays for a benefit then the defendant gets the right to that offset. So without getting into any issues of insurance, we believed you could simply just apply the offset that way."
>
> **COURT:** But since the amount of the SIRs—as I understand the court in Tennessee ruled that the payment of the 11.05 million satisfied the SIRS but didn't rule on how much of that was necessary to satisfy the SIRs—so even if this Court found there was an offset, we still wouldn't know how much based on the Tennessee's ruling. Isn't that right?
>
> **QHR COUNSEL:** Back then or now?
>
> **COURT:** Now.
>
> **QHR COUNSEL:** I'll let, this is not my area so I don't want to get into that.
>
> **QHR COUNSEL:** Your honor, as I mentioned before, the Court simply didn't resolve it because really the issue at that point was, have the SIRs been satisfied, were Lexington's obligations to defend QHR triggered. So the question of whether or not the SIRs were basically, or whether or not those payments were SIR plus

-6-

Based in part on this representation, the Court concluded that the Offset Issue necessarily involved interpretation of the Lexington insurance policies, and that enforcement of any judgment entered following the damages trials in Phase III was an issue to be decided in the Insurance Coverage Litigation where the amount of any offsets will be determined. Both QHR and the UTC agreed that the Court should issue final judgments. The Court reconsidered its Offset Memorandum to the extent necessary to enter final judgments following the damages trials in Phases III, but denied QHR's request to apply a credit or offset. *See* Memorandum Opinion ("Offset Reconsideration Memorandum") – Docket No. 846.

QHR filed its notice of appeal of the four judgments entered following the damages trials on March 21, 2018. *See* Docket No. 861. On March 23, 2018, QHR filed the Motion requesting certification of the judgments for direct appeal. *See* Docket No. 873. On April 4, 2018, QHR filed its Statement of Issues to be Presented on appeal. *See* Docket No. 885. QHR has identified fourteen separate issues, including whether QHR owed a duty to the UTC.[16]

---

something else, just simply wasn't in front of the Court and if that is an issue we believe that is something that Judge Woodruff would be best positioned to resolve that.

**COURT:** But this Court couldn't simply apply that money to the judgments as Mr. Montes suggested because we don't know how much to apply.

**QHR COUNSEL:** And the question of which policy period, and you know so its, the fact that there are two policies and two SIRs, the policies have different limits based and exhaustions and Lexington has indicated that its applying defense costs some defense costs to one policy and some to another. I mean it's kind of a minefield of coverage issues and that, um, that Judge Woodruff, I think is, we think , I mean he's been teed up to address something like this and address those particularly in connection with Lexington's obligations under its policies.

[16] The fourteen issues are:
 1. The Bankruptcy Court erred when it held that QHR owed a duty to members of the UTC.
 2. The Bankruptcy Court erred in its factual findings at the conclusion of the trial on the issue of duty.
 3. The Bankruptcy Court erred when it held that the "loaned servant" doctrine did not apply to the facts of this case.
 4. The Bankruptcy Court erred by applying the incorrect legal standard when determining proximate cause.
 5. The Bankruptcy Court erred in its apportionment of fault.
 6. The Bankruptcy Court erred in its factual findings at the conclusion of the trial on the issue of causation and apportionment.

DISCUSSION

Section 158(d) of Title 28 authorizes a bankruptcy court[17] to certify a judgment for direct appeal to the circuit court if:

> (i) the judgment, order, or decree involves a question of law as to which there is no controlling decision of the court of appeals for the circuit or of the Supreme Court of the United States, or involves a matter of public importance;
>
> (ii) the judgment, order, or decree involves a question of law requiring resolution of conflicting decisions; or
>
> (iii) an immediate appeal from the judgment, order, or decree may materially advance the progress of the case or proceeding in which the appeal is taken[.]

28 U.S.C. § 158(d)(2)(A).

If the Court determines that the circumstances described in any one of the three

---

7. The Bankruptcy Court erred in finding that any act or omission of QHR was a proximate cause of the injuries to the members of the UTC.
8. The Bankruptcy Court erred in the admission of the UTC's expert's opinions and further erred in relying on those inadmissible opinions in determining if the UTC's injuries were caused by the surgical procedures at issue in this case.
9. The Bankruptcy Court erred in finding that members of the UTC met their prima facie burden in establishing whether they suffered aggravation of preexisting conditions.
10. The Bankruptcy Court Erred in finding, from a legal and factual perspective, that the surgeries at issue were a cause of the UTC members' injuries.
11. The Bankruptcy Court erred in its calculation of damages.
12. The Bankruptcy Court erred in its findings of fact at the conclusion of the trial on the issue of damages.
13. The Bankruptcy Court erred in refusing to reduce the awards to the members of the UTC by the amount of money previously paid to the UTC by QHR or its insurers.
14. The Bankruptcy Court erred in entering judgments to the individual members of the UTC without any offset instead of entering one judgment for all members of the UTC with offsets.
Statement of Issues to be Presented on Appeal – Docket No. 885.

[17] The timing of the decision on a party's request for certification of direct appeal to the circuit court determines whether the bankruptcy court, district court, or bankruptcy appellate panel makes the decision. *See* Fed. R. Bankr. P. 8006(b) and (d). If the decision is made within 30 days after the effective date of the notice of appeal, the bankruptcy court decides. *See* Fed. R. Bankr. P. 8006(b) (explaining that a matter remains pending in the bankruptcy court for 30 days after the effective date of the notice of appeal; thereafter, the matter is pending in the district court or the Bankruptcy Appellate Panel); Fed. R. Bankr. P. 8006(d) ("Only the court where the matter is pending . . . may certify a direct review on request of parties . . ."). QHR filed its notice of appeal on March 21, 2018. The Court will enter this Memorandum Opinion within the 30-day period set forth in Bankruptcy Rule 8006.

It makes sense for the bankruptcy court to determine whether to make the certification under 28 U.S.C. § 158(d)(2) because of its familiarity with the issues implicated by its own judgment. *See Marshall v. Blake*, 885 F.3d 1065, 1072 (7th Cir. 2018) ("[U]nder § 158(d)(2)(A), the bankruptcy court gets to determine which legal questions are implicated by its own orders and whether those legal questions warrant certification. Given the bankruptcy court's familiarity with its own orders, it is in the best position to make this determination.").

provisions outlined in 28 U.S.C. § 158(d)(1)(A) exist, direct certification of the appeal to the circuit court of appeals is mandatory. *See* 28 U.S.C. § 158(d)(2)(B) ("If the bankruptcy court . . . determines that a circumstance specified in clause (i), (ii), or (iii) of subsection (A) exists . . . then the bankruptcy court . . . *shall* make the certification described in subparagraph (A).") (emphasis added).[18] Certification to the circuit court bypasses intermediate appellate review by the district court or the bankruptcy appellate panel. *See In re Woolsey,* 696 F.3d 1266, 1268 (10th Cir. 2012) ("§ 158(d)(2)(A) gives us [the circuit court] the authority to hear appeals straight from the bankruptcy court, leapfrogging over the district court or bankruptcy appellate panel in order to speed up the resolution of dispositive legal questions.") (citation omitted). However, upon certification, the circuit court still must determine whether it will accept the appeal. *See* 28 U.S.C. § 158(d)(2)(A) (granting jurisdiction to the circuit court); *Weber v. United States Trustee,* 484 F.3d 154, 157 (2d Cir. 2007) (the circuit court "may in its discretion exercise, or decline to exercise, that jurisdiction.") (citing 28 U.S.C. §158(d)(2)(A)); *In re Revel AC, Inc.*, No. 15-299(JBS), 2015 WL 333341, at *3 (D.N.J. Jan. 23, 2015) ("Such direct appeal is subject to authorization of the court of appeals.") (citation omitted).

Bankruptcy Rule 8006 governs the procedural requirements for a request for certification of direct appeal. A party seeking certification of direct appeal must file a request that includes the following:

> (A) the facts necessary to understand the question presented;
> (B) the question itself;
> (C) the relief sought;
> (D) the reasons why the direct appeal should be allowed, including which circumstance specified in 28 U.S.C. § 158(d)(2)(A)(i) – (iii) applies; and

---

[18] *See also, In re Tribune Co.*, 477 B.R. 465, 470 (Bankr. D. Del. 2012) ("[C]ertification to the court of appeals is *mandatory* if the bankruptcy court determines that circumstances specified in (i), (ii), or (iii) of subparagraphs (A) exists.") (emphasis in original) (citing 28 U.S.C. § 158(d)(2)(B)); 1 Collier on Bankruptcy ¶ 5.06[1] (Richard Levin & Henry J. Sommer eds., 16th ed. 2017) ("[I]f the bankruptcy court . . . determines that at least one of the conditions specified in section 158(d)(2)(A)(i), (ii), or (iii) exists, the court 'shall' make the requested certification.").

> (E) a copy of the judgment, order or decree and any related opinion or memorandum.

Fed. R. Bankr. P. 8006(f)(2).

The Motion fails to strictly comply with the technical requirements of Bankruptcy Rule 8006(f)(2). First, QHR identifies the "question itself" per Bankruptcy Rule 8006(f)(2)(B), as "whether the judgments of this Court entered March 18, 2018 were correctly decided." Motion, p. 2 (citing Fed. R. Bankr. P. 8006(f)(2)(B). Phrasing the question for certification in such a generic manner fails to provide any substantive basis for the Court to determine whether certification for direct appeal is appropriate. Second, QHR's recitation of the relevant facts necessary to understand the question presented is phrased in terms of the issues themselves and the errors QHR believes the Court made in issuing its decisions. Such an approach arguably conflates the separate requirements of Bankruptcy Rule 8006(f)(2).

Notwithstanding the Motion's technical deficiencies, it is clear that QHR requests certification for direct appeal of the following issues:

1. Whether QHR owed a duty to the UTC and if so the scope of the duty.

2. Whether the Court applied the appropriate standard in determining that QHR's breach of duty proximately caused the UTC harm.

3. Whether the Court was required to apply an offset of the amounts paid by or on behalf of QHR to the final judgments.

The Court will consider each of these issues in turn to determine whether the requirements for certification to the Tenth Circuit exist.

*Duty*

Under applicable New Mexico law, whether a duty of care exists is a question of law. *See In re Otero Phase I*, 527 B.R. at 760 ("The issue of whether a plaintiff owes a duty to a defendant is to be decided as a matter of law based on established legal policy.") (citations

omitted); *Solon v. WEK Drilling Co., Inc.,* 113 N.M. 566, 571, 829 P.2d 645, 650 (1992) ("It is thoroughly settled in New Mexico . . . that whether the defendant owes a duty to the plaintiff is a question of law.") (citations omitted). Questions of law, rather than questions of fact, or mixed questions of law or fact, are best suited for certification of direct appeal. *See Weber*, 484 F.3d at 158 (observing that direct appeal is most appropriate for cases involving questions of law "not heavily dependent on the particular facts of a case."); *Tribune,* 477 B.R. at 472 (concluding that a matter that was not a pure legal issue was not appropriate for direct appeal); *In re Abengoa Bioenergy Biomass of Kan.*, *LLC*, No. 16-10446, 2016 WL 3180587, at *1 (Bankr. D. Kan. May 26, 2016) ("[D]irect appeals should be reserved for questions of law rather than questions that are factual or mixed."). Here, the ultimate determination of whether QHR owed a duty to the UTC is a question of law, though the Court's assessment of duty, including its scope, necessarily involves certain industry wide factual considerations because the issue cannot be decided in a vacuum. *See In re Otero Phase I*, 527 B.R. at 765 (citing *Johnstone v. City of Albuquerque,* 140 N.M. 596, 600, 145 P.3d 76, 80 (Ct. App. 2006)). However, these factual considerations are not so prevalent as to preclude certification for direct appeal. Ultimately, "the determination of whether a duty exists must be based on policy considerations." *In re Otero Phase I*, 527 B.R. at 764 (citing *Rodriguez v. Del Sol Shopping Center Assocs., L.P.*, 326 P.3d 465, 474 (N.M. 2014) (concluding that "courts must articulate specific policy reasons, unrelated to foreseeability considerations, when deciding whether a defendant does or does not have a duty or that an existing duty should be limited.")).

The Court finds that the question of whether QHR owes a duty of care to the UTC satisfies 28 U.S.C. § 158(d)(2)(A)(i). Under that subsection, a question meets the requirements for certification if *either* 1) "the judgment . . . involves a question of law as to which there is no

-11-

controlling decision of the court of appeals for the circuit or of the Supreme Court of the United States; *or* 2) the question "involves a matter of public importance."  28 U.S.C. § 158(d)(2)(A)(i). *See also, Abengoa Bioenergy,* 2016 WL 3180587 at *6 ("Section 158(d)(2)(A)(i) also provides for allowing a direct appeal when the court concludes that the issue involves 'a matter of public importance.'").

     A question meets the first, alternative requirement, if the question at issue is a question of law with no controlling precedent. 28 U.S.C. § 158(d)(2)(A)(i). The question of whether QHR owes a duty to the UTC and if so the scope of the duty is a question of New Mexico state law for which there is no controlling precedent. *See In re Otero Phase I,* 527 B.R. at 760 (observing that whether a hospital management company owes a direct duty to patients of the hospital "is an issue of first impression in New Mexico, and no other court appears to have directly addressed it in a reported decision."). The UTC assert that state law questions are not subject to direct certification, relying on *Tribune*, 477 B.R. at 472 and *In re 15375 Mem'l Corp.,* No. 08-313-SLR, 2008 WL 2698678, at *1 (D. Del. July 3, 2008). Neither of those cases provides any reasoning for the conclusion that a state law question is not appropriate for direct certification. Other courts have certified state law issues for direct appeal.  *See, e.g., Hundley v. Marsh (In re Hundley)*, 603 F.3d 95, 96 (1st Cir. 2010) (certifying for direct appeal an issue involving debtor's property interest in tax refunds as determined under Massachusetts state law). Perhaps the conclusion that state law issues are not subject to certification for direct appeal is based on the statute itself, which appears to contemplate questions of federal law inasmuch as it sets a standard of "no controlling decision of the court of appeals for the circuit or the Supreme Court of the United States," both federal courts. 28 U.S.C. § 158(d)(2)(A)(i). Regardless of whether the question of duty satisfies the first, alternative circumstance for certification for direct appeal, the

-12-

Court finds that resolution of the question of duty satisfies the second circumstance requiring certification for direct appeal.

A question involves a matter of public importance if it "transcend[s] the litigants" and "will advance the cause of jurisprudence." 1 Collier on Bankruptcy ¶ 5.06[4][b] (Richard Levin & Henry J. Sommer eds., 16th ed. 2017). A question may also involve a matter of public importance if it will affect vital interests in the community. *Id.* Whether a hospital management company like QHR owes a duty of care to the patients of the hospital it helps manage is a matter of public importance. Many rural hospitals across New Mexico and across the United States employ hospital management companies to assist with hospital administration. Such management companies provide rural hospitals with expertise such hospitals may not otherwise be able to afford. Other courts have cited this Court's opinion in addressing similar questions of duty. *See, e.g., Faure v. Cmty. Health Systems Prof'l Services, Corp.*, No. 14CV599, 2017 WL 3575485, at *3 (D.N.M. Aug. 17, 2017) (distinguishing *In re Otero I*); *Harvey v. Gorospe*, No. CIV-14-219-RAW, 2015 WL 12567259, at *3 n.3 (E.D. Okla. 2015) (distinguishing *In re Otero I*). A Tenth Circuit decision on the question of whether a hospital management company owes a duty in tort to the patients of the hospital it manages, regardless of whether the Tenth Circuit determines that there is no duty, affirms this Court's decision, or finds a duty but redefines the scope of that duty, would affect the way hospital management companies conduct business. Because the question of duty satisfies the requirements of 28 U.S.C. § 158(d)(2)(A)(i), this Court must certify the question for direct appeal to the Tenth Circuit.

QHR also asserts that certification satisfies the third basis for certification of direct appeal: material advancement of "the progress of the case or proceeding in which the appeal is taken." 28 U.S.C. § 158(d)(2)(A)(iii). QHR points out that many remaining Adversary

-13-

Proceedings require damages trials. A Tenth Circuit decision regarding duty may very well obviate the need for further damages trials. However, material advancement of the other related Adversary Proceedings as a whole is insufficient grounds for certification. *See Ritchie Capital Mgmt., L.L.C. v. Stoebner*, No. 12-3038 (SRN), 2013 WL 2455981, at *3 – 4 (D. Minn. June 6, 2013) (pointing out that the language of 28 U.S.C. § 158(d)(20(A)(iii) "refers to the specific case or proceeding at issue—not to other cases or proceedings."). The Court need not certify the question of duty on this alternative ground.

### *Proximate Cause*

QHR frames the question of proximate cause for certification as whether this Court applied the correct legal standard to conclude that QHR's breach caused the UTC harm. However, the Court clarified in its Reconsideration Memorandum Opinion, that it would have found proximate cause regardless of whether it applied a subjective or objective standard. *See* Reconsideration Memorandum Opinion, p. 38. Under New Mexico law, proximate cause is a question of fact. *Herrera,* 134 N.M. at 48, 73 P.3d at 186 ("[P]roximate cause is generally a question of fact for the jury.") (citation omitted); *Calkins v. Cox Estates,* 110 N.M. 59, 61, 792 P.2d 36, 38 (1990) ("[P]roximate cause is a question of fact."). Issues primarily involving questions of fact are not appropriate for direct appeal. *15375 Mem'l*, 2008 WL 2698678, at *1 (concluding that "factual issues preclude a direct appeal" under 28 U.S.C. § 158(d)(2)); *Tribune,* 477 B.R. at 472 (mixed questions of fact and law are not purely legal questions appropriate for direct appeal); *Abengoa Bioenergy,* 2016 WL 3180587 at *6 (direct appeal is not appropriate "for questions of fact or mixed questions of fact or law.").

### *Offset*

Finally, QHR requests certification of the question of whether this Court was required to

apply an offset or credit of the amounts previously paid by or on behalf of QHR to reduce the damages amounts quantified in the judgments. QHR asserts that certifying this question for direct appeal satisfies 28 U.S.C. § 158(d)(2)(A)(iii) because it would materially advance the litigation.

Under a settlement agreement between UTC and QHR any judgments on UTC's negligence claims entered against QHR in the Adversary Proceedings are collectible only from monies payable by Lexington under two insurance policies it issued to its insured, QHR. This Court found that under the settlement agreement QHR (and insurance companies other than Lexington on its behalf) paid monies to settle both claims covered and claims not covered by the Lexington policies. Construing the settlement agreement, the Court determined that QHR's settlement payments are to be allocated to covered claims or uncovered claims in the manner that will maximize UTC's recovery from the Lexington policies. Further construing the settlement agreement, this Court concluded that QHR is entitled to an offset against judgments this Court enters on UTC's negligence claims only to the extent QHR's settlement payments to UTC are applied toward satisfaction of a self-insured retention under a Lexington policy, and the self-insured retention can only be satisfied by allocating the payment to claims covered by the policy.

Under the Court's ruling, to determine whether or in what amount QHR is entitled to an offset requires interpretation of the two Lexington insurance policies. Although QHR has asked this Court to certify the Offset Issue for direct appeal to the Tenth Circuit, QHR's counsel— without waiving any right to appeal this Court's decisions—agreed in open Court that applying offsets to the judgments is best handled in the Insurance Coverage Litigation, where Lexington is a party. Under these circumstances, none of the alternative grounds exists for certification of the Offset Issue for direct appeal.

## CONCLUSION

The question of whether QHR owes a duty to the UTC and if so the scope of the duty is a legal question involving a matter of public importance requiring certification for direct appeal to the Tenth Circuit. The Court is aware that the appeal raises many other issues, including issues that do not form the basis for QHR's requested certification for direct appeal, and many issues for which factual questions predominate. However, the question of duty is a threshold legal question, resolution of which could have a broader effect on hospital management practices in New Mexico and throughout the country.

The Court will enter a separate order consistent with this Memorandum Opinion.

_____
ROBERT H. JACOBVITZ
United States Bankruptcy Judge

Date entered on docket: April 19, 2018

COPY via CM/ECF to all counsel of record and to the United States Trustee